UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

KAREEM BELLAMY,                                             Docket No. 12cv1025 (WFK) (VVP)

                Plaintiff,

   -against-

THE CITY OF NEW YORK, JOHN J. GILLEN,
MICHAEL SOLOMENO, JOHN DOE 1 AND
JOHN DOE 2, SUPERVISING OFFICERS AT
THE NYPD 101ST PRECINCT,

                Defendants.

-----------------------------------------------------------x


PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S
MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(b)(6)
OF THE FEDERAL RULES OF CIVIL PROCEDURE


                        Thomas Hoffman, Esq.
                        Law Offices of Thomas Hoffman, P.C.
                        250 W. 57 St. Suite 1020
                        New York, New York 10107
                        212 581 1180
                        Thoff93452@aol.com

                        Attorney for Plaintiff

Of Counsel

Marvin A. Artis

# TABLE OF CONTENTS

Table of Authorities..............................................................................................iv

Preliminary Statement......................................................................................... 1

Standard of Review of 12(b)(6) Motions............................................................ 3

Statement of the Case

    A.  The Murder of James Abbott and the Arrest of Mr. Bellamy...........................4

    B.  The Termination of the Criminal Case.................................................. 8

        B1.  Judge Blumenfeld's First 440 Decision Granting Mr. Bellamy
              a New Trial (People v. Bellamy, 2008 NY Slip Op. 51694U..............8

        B2.  Second Decision that Adhered to first decision granting
              Mr. Bellamy a new trial (People v. Bellamy, 26 Misc. 3rd 1210A
              (Sup. Queens 2010)

            B2A.  The Findings as to the Reliability of the initial statement
                    Despite the Fraudulent Tape........................................10

            B2B.  Judge Blumenfeld Rejects Mr. Green's recantation..............13

            B2C.  Melvin's denial of involvement is discredited.........................14

    C.  The Appellate Division Unanimously Affirms.......................................15

POINT I

HECK DOES NOT BAR MR. BELLAMY'S CLAIM (CLAIMS I AND II)

    A. Heck does not apply as a state court authorized to invalidate the conviction,
        did so under circumstances indicative of innocence................................................16

    B.  Payne and its progeny completed the exoneration of Mr. Bellamy.........................19

    C.  Even if Mr. Bellamy's conviction is deemed not to have been invalidated,
        Heck does not apply as Mr. Bellamy is not eligible for Habeas Corpus.................20

POINT II

THE DISMISSAL OF MR. BELLAMY'S INDICTMENT IS A FAVORABLE
TERMINATION FOR PURPOSE OF A MALICIOUS PROSECUTION CLAIM,
AS THE DISMISSAL IS "NOT INCONSISTENT WITH INNOCENCE."
(CLAIMS II AND IX)

A. The allegation that the case was dismissed favorably is plausible and hence
   sufficient to withstand a 12(b)(6) dismissal...........................................22

B. The dismissal of the indictment was "not inconsistent with innocence" and
   is favorable under State law........................................................23

C. A prosecutor's statement regarding his/her belief as to whether there has
   been an exoneration has no relevancy to the "favorability" inquiry..................25

D. Cases relied upon by the City are readily distinguishable............................27

POINT III

A CLAIM FOR SUPERVISORY FAILURE TO INTERCEDE HAS BEEN
PLAUSIBLY STATED (CLAIMS IV AND V)

A. Supervisory Liability.................................................................29

B. Failure to Intercede.................................................................32

POINT IV

THE COMPLAINT PLAUSIBLY ALLEGES THREE DISTINCT MUNICIPAL
POLICIES THAT VIOLATED MR. BELLAMY'S RIGHT TO BE TRIED FAIRLY,
AND THOSE POLICIES WERE SEPARATELY AND CUMULATIVELY
THE "MOVING FORCE" THAT CAUSED MR. BELLAMY'S WRONGFUL
CONVICTION. (CLAIMS VI, VII, AND VIII)..................................................32

A. Monell Policy 1

The Policy to Shield Trial Prosecutors from Information Regarding
the Benefits Promised to, or Received by, Prosecution Witnesses..............32

People v. Steadman provided notice to the City that the Chinese Wall
policy was unconstitutional........................................................37

Monell Policy 2

    The City's systemic custom that fails to correct, reprove, discipline or sanction trial prosecutors for summation misconduct shows a deliberate indifference to defendants' 5th and 14th Amendment rights to a fair trial............................................................................................38

    Evidence of post-trial instances of the policy that misconduct is not corrected is evidence of the existence of the practice at the time of the trial............................................................................................42

Monell Policy 3

    A policy, practice and custom of training and directing trial prosecutors to not take notes when interviewing prosecution witnesses evince deliberate indifference to the deprivation of defendants constitutional right to receive exculpatory evidence............................................................42

B. The acts of the QDAO that fail to discipline for misconduct or walls off benefits that are conferred to witnesses are administrative in nature and do not fall within the judicial phase of the prosecution.......................44

C. Even if this court finds that the underlying Monell conduct committed by prosecutors is entitled to absolute immunity, such conduct does not extend to claims against the Municipality........................................45

POINT V

FRAMING A PERSON FOR A CRIME HE DID NOT COMMIT IS OUTRAGEOUS AND WELL OUTSIDE THE BOUNDS OF DECENCY ACCEPTABLE IN A CIVILIZED SOCIETY, GIVING RISE TO A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (CLAIM X)

Count XI for negligent infliction of emotional harm is hereby withdrawn

A. The one year statute of Limitations begins when the harm caused by the officers' conduct has ceased........................................48

B. The outrageous conduct of Gillen and Solomeno would give rise to an IIED claim............................................................49

C. Whether IIED is duplicative of other claims must await completion of discovery and Summary Judgment or trial...............................49

CONCLUSION........................................................................50

# TABLE OF AUTHORITIES

<u>Cases:</u>

<u>Ahern v. City of Syracuse</u>, 411 F. Supp. 2d 132, 146 (N.D.N.Y. 2006)....................................41

<u>Armatas v. Maroulleti</u>, 2010 U.S. Dist. LEXIS 112921, 40-42 (E.D.N.Y.)...............................24

<u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 126................................................35, 43

<u>Amore v. Novarro</u>, 624 F.3d 522, 535-536 (2d Cir. 2010).....................................................47

<u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2d Cir. 1994).........................................................32

<u>Anderson v. United States</u>, 417 U.S. 211, 219 (1974)............................................................7

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 683 (2009)..............................................................22, 33

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (U.S. 2009)....................................................30, 31, 39

<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 556 (U.S. 2007)...................................................33

<u>Bellamy v. Portuondo</u>, 99CV1832 (E.D.N.Y.)..................................................................22

<u>Bender v. City of New York</u>, 78 F.3d 787, 793 (2d Cir. 1996)................................................51

<u>Bertuglia v. City of New York</u>, 2012 U.S. Dist. LEXIS 36927, 75-82
    (S.D.N.Y. Mar. 19, 2012)..............................................................................41, 42

<u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 273 (1993).........................................................45

<u>Cantolino v. Danner</u>, 96 N.Y.2d 391, 395,395, (2001)....................................................23, 25

<u>Castilla v. City of NY</u>, 2011 L4345934 (S.D.N.Y.)...........................................................43

<u>Chepilko v. City of N.Y.</u>, 2012 U.S. Dist. LEXIS 15110 *46 (E.D.N.Y.)...................................42

<u>City of Canton</u>, 489 U.S. at 389-90, 109 S. Ct. 1197).......................................................43

<u>Colon v. Coughlin</u>, 58 F3d 865(2nd Cir. 1995)...............................................................31

<u>Connick v Thompson</u>, 131 S. Ct. 1350 (2011)................................................................44

<u>Dana v. Oak Park Marina, Inc.</u>, 230 A.D.2d 204, 208-10 (4th Dept. 1997)...............................50

<u>Darry v. People</u>, 10 N.Y. 120 (1854).........................................................................19

D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010),
    aff'd, 462 F. App'x 79 (2d Cir. 2012)..................................................................31

Doe v. N.Y. City Dep't of Social Servs., 649 F.2d 134, 141 (2d Cir. 1981)..............................32

Donahue v. Gavin, 280 F.3d 371 (3d Cir. 2002)...........................................................29

Drury v. Tucker, 210 A.D.2d 891, 892, 621 N.Y.S.2d 822 (4th Dept. 1994)..............................49

Dunlop v. Munroe, 11 U.S. 242, 269 (1812)................................................................30

Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir.1986)...........................................41

Fiacco v. City of Rensselaer, 783 F.2d 319, 331 (2d Cir. 1986)..........................................40

Fischer v. Maloney, 43 N.Y.2d 553, 557 (1978)............................................................50

Gabriel v. County of Herkimer, 2012 U.S. Dist. LEXIS 126709, 66-67 (N.D.N.Y).......................31

Gates v. United Health Group, 2012 U.S. Dist. LEXIS 100831, 45-46
    (S.D.N.Y. July 16, 2012)...............................................................................7

Gentile v. County of Suffolk, 926 F.2d 142, 152-53 (2d Cir. 1991).....................................40, 42

Global Network Comme'ns, Inc. v. City of N.Y., 458 F.3d 150, 156 (2d Cir. 2006)...................7,23

Green v. Montgomery, 219 F.3d 52, 61 (2d Cir. 2000)....................................................21

Hewitt v. City, 2011 US Dist. LEXIS 11479 (E.D.N.Y.)...................................................48

Huang v. Johnson   251 F.3d 65, 74-75(2nd Cir. 2001)....................................................21

Interpharm, Inc. v. Wells Fargo Bank, 2010 U.S. Dist. LEXIS 28802 *16 (S.D.N.Y.)...................16

Jones v. Town of E. Haven, 2012 U.S. App. LEXIS 15928 *31.............................................42

Jovanovic v. City of New York, 2010 U.S. Dist. LEXIS 144388, 51-52 (S.D.N.Y. 2010)...............48

Jovanovic v. City of New York, 2010 U.S. Dist. LEXIS 144388 at 17-18 (S.D.N.Y.)..........25, 26, 27

Johnson v. Louisiana, 2010 U.S. Dist. LEXIS 24396 *46 (W. Dist La 2010)............................47

Kogut v. County of Nassau, 2009 U.S. Dist. LEXIS 116354 *18 (E.D.N.Y.)........................18, 24

Kogut v. County of Nassau, 2012 U.S. Dist. LEXIS 121458 (E.D.N.Y)..................................42

v

Landon v. County of Orange, 2009 U.S. Dist. LEXIS 64927 *26 (S.D.N.Y.)...........................26

Lazaratos v. Ruiz, 2003 U.S. Dist. LEXIS 17511, 11-12 (2003).......................................22, 28

Leather v. Ten Eyck, 180 F.3d 420 424 (2nd Cir. 1999)..................................................21

Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,
    507 U.S. 163, 168 (1993).........................................................................................33

Llerando-Phipps v. City of N.Y., 390 F. Supp. 2d 372, 384 (S.D.N.Y. 2005)..........................49

Martinez v. Schenectady, 97 N.Y.2d 78, 84-85 (N.Y. 2001)............................................28

Mattter of Suarez v. Byrne, 10 N.Y.3d 523 (2008)......................................................19

McCray v. City of New York, 2007 U.S. Dist. LEXIS 90875, 76-77...........................18, 26, 27

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)...........................................7

Mejia v. City of New York, 119 F. Supp. 2d 232, 286 (E.D.N.Y. 2000)...............................50

Mendoza v. City of Rome, 872 F. Supp. 1110, 1118 (N.D.N.Y.1994)..................................41

Meridian Horizon Fund, LP v. Tremont Group Holdings Inc., 747 F. Supp. 2d 406, 410
    (S.D.N.Y. 2010).....................................................................................................38

Mitchell v. City of Albany, 2010 U.S. Dist. LEXIS 31426 (N.D.N.Y)...........................28, 29

Monell v. Department of Social Services, 436 U.S. 658, 690-691 (1978)............33, 44, 45, 46, 47

Morgan v. Nassau County, 2009 U.S. Dist. LEXIS 79180 (E.D.N.Y)..................................24

Murphy v. Lynn, 118 F.3d 938, 948 (2d Cir. 1997)......................................................18

Naim v. City of New York, 2012 U.S. Dist. LEXIS 100009 (E.D.N.Y)................................24

Neitzke v. Williams, 490 U.S. 319, 327 (1989)...........................................................33

Norton v. Town of Islip, 2009 U.S. Dist. LEXIS 27565, 2009
    WL 804702, at *18-19, *25-27 (E.D.N.Y. 2009)........................................................24, 48

Nuefeld v. Nuefeld, 910 F.Supp. 977, 983 (S.D.N.Y. 1996)............................................49

O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988)................................................32

Owen v. City of Independence, Mo., 445 at 653, n. 37....................................................47

Owen v. City of Independence, Mo., 445 U.S. 622 (1980)...............................................47

P.C. v. McLaughlin, 913 F.2d 1033, 1044......................................................................31

Page v. Vt. Dep't of Corr., 2012 U.S. Dist. LEXIS 81732............................................21

Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (U.S. 1986).......................................34

Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986).........................................33

People v. Bellamy, 2008 NY Slip op.51694U...................................................................8

People v Bellamy, 26 Misc. 3rd 1210A (Sup. Queens 2010)...........................................10

People v Bellamy, 45 A.D.3d 836 (2nd Dept. 2007).......................................................36

People v. Bellamy, 84 A.D.3d 1260, 1261-1262 (2d Dep't 2011).....................................15

People v. Crimmins, 38 N.Y.2d 407 (1975).....................................................................23

People v. Gallagher, 69 N.Y.2d 525, 529 (N.Y.)...........................................................19

People v. Payne, 3 N.Y.3d 266 (2004).............................................................15, 19, 29

People v. Shilitano, 218 N.Y. 161,170 (1916).................................................................13

People v. Steadman, 82 N.Y.2d 1, 7 (N.Y. 1993)..........................................34, 35, 37, 38

People v. Suarez, 6 N.Y.3d 202, 218 (N.Y. 2005)...........................................................18

People v. Wall, 29 N.Y.2d 863, 864(1971).......................................................................19

Platt v. Inc. Vill. of Southampton, 391 Fed. Appx. 62, 65 (2d Cir. 2010)............................31

Policiano v. Herbert 7 N.Y. 3d 588(2006)......................................................................19

Riccio v. City of NY, 2012 US Dist Lexis 70024............................................................18

Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 123 (2d Cir. 1991)..............................41

Rivas v. Suffok County, 2008 U.S. App. LEXIS 72 (2d Cir. 2008)....................................24

Rothstein v. Carriere, 373 F.3d 275, 286 (2d Cir. 2004)..................................................23

Rounseville v. Zahl, 13 F.3d 625, 629..........................................................................27

Samtani v. Cherukuri, 2012 U.S. Dist. LEXIS 70010 (E.D.N.Y).....................................49

Sash v. United States, 674 F. Supp. 2d 531, 543-544 (S.D.N.Y. 2009)...............................31

Smith v. Duquesnay, 2012 U.S. Dist. LEXIS 47064 *5 (E.D.N.Y)......................................21

Smith-Hunter v. Harvey, 95 N.Y.2d 191(2000)....................................................23, 26

Spencer v. Kemna, 523 U.S. 1 (U.S. 1998)...........................................................20, 21

Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 424-25 (2d Cir. 2008)......................38

Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999)...................................................50

Sylvester v. City of New York, 2006 U.S. Dist. LEXIS 81716(S.D.N.Y)..............................51

Tankleff v. County of Suffolk, 2010 U.S. Dist. LEXIS 135020 *25-26 (E.D.N.Y. 2010)...........18

United States v. City of Yonkers, 96 F.3d 600, 613 (2d Cir. 1996).....................................32

Van de Kamp v. Goldstein, 555 U.S. 335, 342-43 (2009)........................................45, 46, 47

Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir.1995)...........................................41

Wahhab v. City of New York, 386 F. Supp. 2d 277, 292-93 (S.D.N.Y. 2005).......................50

Walker v. City of New York, 974 F.2d 293, 301 (2d Cir. 1992)...............................40, 45, 46

Wheaton v.Gillen, E.D.N.Y. 99cv4712.............................................................7, 30

Statutes:

Civil Rights Act of 1871...........................................................................passim

Rule 8(a)..................................................................................................32

Section §170.30(1)(f)...........................................................................passim

Section 1983............................................................................................. passim

12(b)(6)................................................................................................ passim

CPL 160.60..............................................................................................22

CPL 440...........................................................................................passim

CPL 440.10(1)(g)...................................................................................15, 17

<u>Miscellaneous</u>

http://www.newyorklawjournal.com/PubArticleNY.jsp?id=1202564723093................................43

This memo is submitted in response to the defendant's motion to dismiss.

## Preliminary Statement

On December 23, 1995, when the jury was polled and each juror responded "guilty" Mr. Bellamy shouted, "I didn't do it," twelve times.   As he was removed by court officers, pancake style, from the court room, he turned to Mr. Abbott's mother and said, "I didn't kill your son, lady."   (See Exh.'s "A" & "B")  1&2   Although, a bleak future awaited him, what was paramount to Mr. Bellamy at this horrific moment was that the Abbott family would know the truth.   Mr. Bellamy has remained steadfast in his innocence—so steadfast that on April 12, 2007 although he was facing the rest of his life in prison, he refused an Alford plea that would have given him his immediate freedom.   Following his refusal of the Alford plea, Mr. Bellamy served another 14 months in jail.   He was finally released on August 14, 2008 after Hon. Joel L. Blumenfeld, Acting Supreme Court Justice, vacated the judgment of conviction based on newly discovered evidence that pointed towards the culpability of third parties and supported the innocence of Mr. Bellamy.

Section 1983 was specifically enacted to protect vulnerable members of American society whose lack of basic tools and resources to defend themselves makes them particularly susceptible to false accusations, wrongful convictions and unfair trials.   Indeed, Mr. Bellamy and others like him fit squarely within that class of American citizens for whom Section 1983 was designed to facilitate, not rigidly deny, access to our courts.   The early dismissal of Mr. Bellamy's case being sought by the Defendants would be grossly inconsistent with the intent and history of this great law, a law that was enacted not only to open the doors of American courts wider for citizens in Mr. Bellamy's predicament,

---

1 Defendants make references to the record in the State proceedings, as implicitly incorporated in the complaint. We refer to the transcripts to show that the claims are plausible and that the dismissal was consistent with Mr. Bellamy's innocence. We are not consenting to having this 12(b)(6) motion converted to a motion for Summary Judgment.

2 The trial was covered by Court TV.   The tape was part of the 440 and Appellate Division proceedings.

1

but also to ensure that they receive a fair process once inside. These are the kinds of rights and privileges that distinguish America's legal system from others around the world.

The catastrophic loss of Mr. Bellamy's freedom was not due to a mistake or lapse in judgment. On the contrary, Mr. Bellamy was victimized by two detectives who, through coercion and intimidation, manipulated each of the prosecutions three fact witnesses and key pieces of evidence. Evidence pointing away from Mr. Bellamy was suppressed. Leads to the two suspects identified at the beginning of the case as Mr. Abbott's murderers were neither investigated at that time nor 14 years later when the identities of these two suspects resurfaced. Mr. Bellamy's tragedy was also caused by municipal policies and practices that not only looked away from prosecutorial misconduct, but also shielded exculpatory information from the defense. As a result, Mr. Bellamy was deprived of his constitutional right to a fair trial. He now seeks to have the wrong redressed under Section 1983, the successor provision to the sweeping Civil Rights Act of 1871. The City moves to slam shut the doors of the court on Mr. Bellamy and to abort the normal legal process, claiming that the complaint does not plausibly "state a claim upon which relief can be granted."

The City's arguments go against well-settled law and, as the City readily concedes, have little precedent. Five arguments are advanced: 1. That Mr. Bellamy's 1983 claim for violation of his constitutional rights is barred by Heck; 2. That the dismissal of Mr. Bellamy's conviction was not a favorable termination; 3. That the Complaint fails to state a claim for supervisory or failure to intercede liability; 4. That the Complaint fails to state a claim for municipal liability; and 5. That the Complaint fails to state a claim for intentional or negligent infliction of emotional distress. Count XI (Negligent Infliction of Emotional Injury) is withdrawn.

After we set forth the 12(b)(6) standard and the circumstances of dismissal, we will respond to each argument in turn.

2

## Standard of Review of 12(b)(6) Motions

The City seems to have forgotten hornbook law that pleading standards are not the same as standards of proof. While bandying about the word "plausible", the City does not specifically point to factual allegations in the complaint that are not "plausible." Instead, before any discovery is undertaken, the City unilaterally converts this 12(b)(6) motion into a Summary Judgment motion. The proof of the pudding is that each of the cases cited as controlling was decided by way of Summary Judgment. While Iqbal raised the bar, it only did so to prevent implausible claims. The City seems to think that a pleading can be dismissed as implausible if the factual allegations can be refuted. Under this mistaken legal premise, the City going well outside the pleading, then asks the court to resolve critical facts prematurely.

Thus, the factual allegation that there is a Chinese Wall concealing exculpatory information is refuted by reference to Mr. Mansfield's 440 testimony. (Def. Exh. "I") Refuting the allegation that the termination was favorable, the City refers to the prosecutor's statement that "this was not an exoneration." (Def. Exh. "A") Undeterred that 12(b)(6) motions must be examined within the four corners of the pleading, the City proffers three affidavits to show that the termination was not indicative of innocence: First is the affidavit of Mr. Melvin, who initially pled the fifth, swearing that he did not kill Mr. Abbott. Not mentioned by the City is the fact that Mr. Melvin's' denial of his involvement in the murder was rejected by Judge Blumenfeld as not credible. Second is Mr. Green's affidavit that reopened the 440. Not mentioned by the City is the fact that Mr. Green disavowed his sworn statement at the reopened 440. Third, they offer Mr. Tatum's affidavit, the Melvin imposter, even though the veracity of the tape was not a determinative issue in either of the court's two decisions. Sidestepping the doctrine of collateral estoppel, these affidavits are submitted to circumvent the specific findings of Judge Blumenfeld and the Appellate Division and to allege that the dismissal was a result of a fraud

3

perpetrated on Judge Blumenfeld and the Appellate Division and thus was not favorable.  As the City does not explain why these affidavits should be given weight or consideration at this pre-pleading juncture, it is evident that the sole purpose of these submissions is either to distract or prejudice this court.

The 85 page complaint with its 33 page addendum is not confined to legal conclusions. Applying the second part of the two prong Iqbal inquiry, the complaint provides sufficient factual support to give the legal conclusions plausibility.

### Statement of the Case

### A.  The Murder of James Abbott and the Arrest of Mr. Bellamy

On the morning of April 9, 1994, Mr. Abbott went to C-Town, a supermarket located one block away from the scene of the murder on Beach Channel Drive, between Beach 49th Street and Beach 50th Street, to purchase some groceries.  Shortly after he left C-Town, Mr. Abbott was murdered.  The murder took place in broad day light on a busy thoroughfare, three blocks from Mr. Bellamy's home and one block from C-Town, where Mr. Bellamy shopped almost daily and continued to shop between the time of the murder and his arrest one month later.  (Compl 29-32)  There was no connection or link between Mr. Bellamy and Mr. Abbott, and no motive was proffered or shown.  Without any connection or link, Mr. Bellamy's killing Mr. Abbott made no sense.    On the day of Mr. Bellamy's arrest the investigation was closed.  By all accounts, however, two people killed Mr. Abbott.  Id. 242-245  Upon placing Mr. Bellamy in a cell, the arresting officer, Defendant Gillen, ominously said:  "Once I close the door, it closes for good".  Id. 242

It didn't take long for the two detectives to learn that Mr. Bellamy was likely innocent.  The only eyewitness, Andrew Carter, could not identify Mr. Bellamy at the lineup.  After the lineup, Mr. Carter was taken to another room at the precinct where Gillen privately suggested that Mr. Bellamy had

4

changed his hair style.  Id. 154-174  The second trial witness, Linda Sanchez, was a C-Town cashier on the day of the murder.  When Gillen entered C-Town shortly after Mr. Abbott was killed, Ms. Sanchez told him she "hadn't seen anything."  Id. 57-61  Ten days later, she called the detectives and told them that she had seen Mr. Bellamy and another man follow Mr. Abbott out of C-Town.  Ms. Sanchez's statement to the detectives that she saw Mr. Bellamy on a Sunday, a day he could not buy beer, was a critical piece of evidence that was withheld from the defense because the murder took place on a preceding Saturday.  Id. 62-70  Furthermore, Ms. Sanchez identified a photo of Mr. Bellamy's friend Terrell Lee as the person Mr. Bellamy was with.  Mr. Lee who was then interviewed by Gillen the same day gave an alibi for the morning of the murder.  This alibi was independently confirmed by Mr. Lee's wife, Monique Lee.  Id. 118-135  With Lee's alibi, Mr. Bellamy was also exonerated as Ms. Sanchez had told the police that she saw Lee and Bellamy together.  The detectives made no further investigation and closed the file probably because further inquiry would only complicate the investigation and only lead away from Mr. Bellamy's culpability.  This was not the first time Mr. Gillen framed an innocent person, as we will see later.

Each of the three trial fact witnesses exculpated Mr. Bellamy:  (i) Andrew Carter, the only eyewitness; (ii) Linda Sanchez, the C-Town cashier, who allegedly saw Mr. Bellamy following Mr. Abbott shortly before the murder; and (iii) Veronica Walker, who saw Mr. Abbott fighting on the corner where the murder occurred. Id. 178-213  Most of the exculpatory evidence was withheld from the prosecutor, and naturally, from the defense.

Gillen and Solomeno quickly learned the names of the actual killers. Ten days after the Abbott murder, Gillen received a detailed telephone report from an Anna Simmons, reporting that she had overheard a LeVon "Ish" Melvin and a Rodney "Turk" Harris, two members of a dangerous Far Rockaway gang named the Regulators, confess to the murder of James Abbott.  The gang members'

5

description of how the murder occurred was consistent with how the murder actually happened. Incredibly, this lead was not followed up by Gillen or Solomeno. Neither Melvin nor Harris was questioned as to his whereabouts at the time of the murder. Id. 226

Since there was no probable cause to arrest Mr. Bellamy, Detective Gillen decided to manufacture a statement which he falsely attributed to having been made by Mr. Bellamy ("This must be a case of mistaken identity, somebody probably accused me of murdering someone,") Id. 214-222 A second statement that was actually made by Mr. Bellamy-"I went to school with Mr. Abbott. I was with my friend Terrell Lee that morning...." was introduced at the trial as an extemporaneous statement and evidence of consciousness of guilt. The statement was, in actuality, responsive to Gillen's questioning of Bellamy about the murder. Id. 38-39

Instead of trying to find out who committed the murder, these police officers dishonored their badges by withholding evidence, including:

- Evidence that Sanchez identified a photograph of Terrell Lee as the second person she allegedly saw with Mr. Bellamy on the morning of the murder. Id. 118-125

- Evidence that Lee's alibi ruled him out as the second perpetrator. This was critical exculpatory information as Sanchez told the police that she saw Lee and Bellamy together. Id. 126-135

- Evidence that on the day of the murder Sanchez, upon being shown a photo of Abbott, told Gillen that she hadn't seen him in contradiction to her trial testimony that she saw Mr. Bellamy and another person standing behind Mr. Abbott shortly before the murder. Id. 57-61

- Evidence that Sanchez told Gillen and Solomeno that she saw Bellamy on a Sunday -- a day that he was trying to buy beer but could not. The murder occurred on a preceding Saturday. Id. 62-70

- Evidence that Veronica Walker told defendants Gillen and Solomeno that she knew Mr. Bellamy and that it was not Mr. Bellamy who she saw struggling with Mr. Abbott on the morning of the murder. Id. 178-213

- Evidence that two separate witnesses observed that the perpetrators wore hoods, which was inconsistent with Sanchez' description of Mr. Bellamy as wearing a hat, and consistent with the Simmons report that the perpetrators wore hoods. Id. 257-283

- Evidence that Gillen tampered with the Sanchez lineup sheet by changing the word Sunday to

6

Saturday.  Id. 67-70

- Evidence that Gillen suggested to Carter after his failed lineup identification that Mr. Bellamy had changed his hairstyle.  Id. 160-174

- Evidence of a statement from Mr. Abbott's sister that a former jealous boyfriend may have murdered her brother.

Lest the court surmises that these allegations of egregious wrongdoing are inconceivable or implausible, the Court's attention is directed to Wheaton v. Gillen, E.D.N.Y. 99cv4712 a §1983 action. The allegations in Wheaton are eerily similar to what occurred to Mr. Bellamy. Gillen withheld from Wheaton, who had been charged with robbery, a statement that cast serious doubt on the complainant's truthfulness.  Also suppressed was a separate statement from a second witness that the complainant had admitted that Wheaton had nothing to do with the robbery.  As in Bellamy, the investigation was stopped and the case closed upon Wheaton's arrest, even though there was a second culprit at large, as well as evidence that Mr. Wheaton was innocent.  Id. DKT 1 pars 13-59  The officer's egregious misconduct occurred in 1996 contemporaneously with the events here.  The City paid $120,000 in settlement.  Id. dkt #12  Whether there is more evidence of Gillen's propensity to violate the constitutional rights of defendants must await discovery.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) (Subsequent conduct may prove discriminatory motive in a prior employment decision) See Anderson v. United States, 417 U.S. 211, 219 (1974) (subsequent acts may tend to prove the nature of a prior conspiracy).

On a 12(b)(6) motion to dismiss, the Court may take judicial notice of court filings "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." See Gates v. United Health Group, 2012 U.S. Dist. LEXIS 100831, 45-46 (S.D.N.Y.); Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) The City ignores and worse, misrepresents the holding of the two decisions that granted Mr. Bellamy a

7

new trial. The City adopts the prosecutor's incredulous and disparaging statement that Mr. Bellamy was granted a new trial because the State Judge had "embraced fraud." (Def. Brf., p. 2)

## B. The Termination of the Criminal Case

On September 16, 2011, seventeen years after Mr. Bellamy's arrest, the People moved to dismiss the indictment.   The motion was granted by the Hon Joel Blumenfeld, acting Justice of the Supreme Court.   The indictment was dismissed and sealed pursuant to CPL 160.60, which provides that upon sealing "the arrest and prosecution shall be deemed a nullity and the accused shall be restored, in contemplation of law, to the status he occupied before the arrest and prosecution."   The certificate of disposition states that "the conviction was terminated in favor of Mr. Bellamy."   (See Exh. "C")
Set forth below are Judge Blumenfeld's findings made after three separate 440 hearings and testimony of more than 30 witnesses and over 100 exhibits.   We do so to explicitly refute the scurrilous allegation that Mr. Bellamy received a new trial because Judge Blumenfeld and the Appellate Division embraced fraud.

### B1.  Judge Blumenfeld's First 440 Decision Granting Mr. Bellamy a New Trial (People v. Bellamy, 2008 NY Slip Op. 51694U)

In February, 2007, Mr. Bellamy was granted a 440 Hearing based on his allegations that there existed newly discovered evidence, ineffective assistance of trial counsel and Brady/Giglio violations that occurred at the trial.   After the first 440 hearing was concluded but before a decision was rendered, in January 2008, the hearing was reopened.   A critical witness had come forward, stating that LeVon Melvin, the man who was reported to have confessed to the murder only days after the crime occurred, had confessed again 13 years later in the fall of 2007.   While driving together to work, Mr. Melvin told Michael Green, a friend for 40 years and the godfather of Melvin's children, that he and Rodney "Turk" Harris had killed Mr. Abbott.   Unbeknownst to Mr. Melvin, Mr. Green was a regular informant for the 101 pct.

8

Mr. Abbott was killed, Melvin said, because he had been "messing" with Melvin's girlfriend,

Yolanda "Yoyo" Dove.    Mr. Harris was the same accomplice identified 13 years earlier in the Simmons

report. (Compl 226)   Jealousy, as a motive, was consistent with a police report of an interview Mr.

Abbott's sister gave to Detective Gillen suggesting that a former boyfriend of her brother's girlfriend

may have committed the murder.    This report which Detective Gillen suppressed pointed directly to Mr.

Melvin's culpability. Judge Blumenfeld found that withholding this report was a Brady violation. Mr.

Melvin's confession corroborated a report from an Anna Simmons received shortly after the 1994

murder that LeVon "Ishmael" Melvin and Rodney "Turk" Harris, known gang members, had bragged

about committing the murder. Id. 226

Judge Blumenfeld made specific findings as to how Mr. Melvin's most recent confession was

discovered by the defense team.

> "In the beginning of January, 2008, after the CPL 440 hearing had gone on
> for over nine months, the defense retained the services of Joseph O'Brien,
> a retired Federal Bureau of Investigation Special Agent, to visit the area of
> the crime, to conduct an independent investigation and to try to locate Anna
> Simmons at the work and residence addresses the defense had eventually
> obtained once ADA Guy learned that the police couldn't find her. O'Brien's
> strategy was to visit the neighborhood and create some "chatter" about the
> Abbott case and the possibility that an innocent man might be in jail.  Having
> no connection to the area, he had no success and decided he needed local
> assistance. He found Edward Hensen, a retired detective from the 101[st]
> precinct who had worked that area for many years. Without mentioning the
> names provided by Anna Simmons, the two embarked on an independent
> investigation to try and locate Anna Simmons and to see if these names
> would surface.   They found two Laundromats around Beach 54th Street and
> a person named Anna Simmons, but not the person whom they believe called
> the police in this case. While they were talking to people in the project –
> some of whom Henson had arrested earlier in his career as a member of the
> police force, John Doe/CI, whom Henson had known from his years on the
> force, rode up to him on a bicycle and said that they had to talk. The
> investigators ascertained that he still lived at the address that Henson knew,
> agreed to meet him at his home. When they met, he told the investigators that
> "Ishmael Melvin killed that kid." He explained that he knows Melvin for over
> 40 years and has worked for him and is godfather to both of Melvin's children."
> Id. *13

9

Judge Blumenfeld then made findings as to how the "chatter strategy" produced the intended result.

> "Apparently the chatter strategy worked because Ishmael (Levon Melvin) had been hearing that Rodney Harris (Turk) had been talking to the detectives and was upset that Turk never told him. According to John Doe/CI, Ishmael was worried that Turk might be giving Ishmael up. Ishmael told him that he stabbed the guy about seven times because he wouldn't stop messing with his woman."
>
> Id. *13-14

After receiving Mr. Green's report, the defense team took Mr. Green to the QDAO where he was interviewed outside the presence of any member of the defense team. After the QDAO refused to arrange for Mr. Green to wear a wire, the defense provided him with a tape recorder. Shortly after, Mr. Green produced a recording wherein Mr. Melvin purportedly confessed to killing Mr. Abbott assisted by his friend Turk. The tape was immediately turned over to the police, the DA's office and eventually to the Judge. It was unknown at the time that Mr. Green had fabricated the tape.

With the newly discovered evidence, consisting of the first oral report which was later corroborated by the tape, Mr. Bellamy was granted a new trial. The 440 court initially denied Mr. Bellamy's claims of ineffective assistance of trial counsel and Brady violations, but Brady violations were found to exist after the reopened hearing.

### B2. Second Decision that adhered to first decision granting Mr. Bellamy a new trial (People v. Bellamy, 26 Misc. 3rd 1210A (Sup. Queens 2010))

#### B2A. The Findings as to the Reliability of the initial statement Despite the Fraudulent Tape

Shortly after Judge Blumenfeld's first decision became public, a string of events followed that established that Mr. Green had fabricated the tape. The case was reopened to ascertain if, in light of this serious fraud, the initial report from Mr. Green could still be credited. Testimony was taken from, inter alia, Mr. Green who was given absolute immunity from the egregious perjury he committed, Mr. Melvin who now agreed to testify (he had taken the 5th when subpoenaed by the defense at the first 440 hearing)

10

and Detective Henson. (See Exh. "D", p. 346)

The City misrepresents the circumstances under which Mr. Melvin went to the QDAO. He did

not, as the City contends, run to the DA as soon as he learned that his confession had allegedly been

recorded. Mr. Melvin first retained counsel to listen to the tape, he was not sure if his initial confession

was the one that had been recorded. Only after his attorney heard the tape at the prosecutor's office and

determined that it was not a tape of Mr. Melvin's initial confession, did Mr. Melvin agree to talk to the

QDAO. (See Exh. "D", p. 329 - 331)

In deciding whether the oral report of Melvin's confession remained reliable in light of the

fraudulent tape, the court carefully compared the details of the Simmons DD5 (Compl 226 ) with the

details of the confession given to Mr. Green. The maxim falsus in uno, falsus in omnibus, Judge

Blumenfeld noted, is "permissive only -- not mandatory –and it is for this court to determine how much

-- if anything -- to believe from a witness" Id. *7  The court considered whether it was plausible that Mr.

Melvin would confide in Mr. Green. These were Judge Blumenfeld's carefully-made findings regarding

the first statement:

> "To begin with Mr. Green was Mr. Melvin's longtime friend and also the
> godfather of his children. Mr. Green was a confidential informant for the
> 101 pct, and had worked with Detective Henson before, thus his informing
> on Melvin was not unusual.
>
> "Green rode his bicycle up to the two investigators, greeted Henson, and
> said that they needed to talk. Henson told him not to talk then and there,
> ascertained that Green still lived at the address Henson remembered, and
> told Green to go to his apartment and that they would meet him there. At
> that first meeting, Green told them that "Ishmel Melvin killed that kid"
> (referring to Abbott). He explained that he knew this from Melvin, whom
> he knew for over 40 years. Green said he had worked security for Melvin
> and was godfather to both of Melvin's children. Green said Melvin told him
> this because Melvin was upset that Harris had been talking to the
> investigators and said nothing to Melvin. Melvin was concerned that Harris
> might be "giving him up." Melvin told Green (according to Green) that
> Melvin stabbed Abbott about seven times because Abbott wouldn't stop
> messing with Melvin's "woman." Melvin also told Green (according

11

to Green) that Harris was present at the time of the stabbing. This is why
Melvin feared that Harris might be "giving him up." Id. *13-14

Judge Blumenfeld then made findings as to the steps the defense team took immediately upon

learning of Melvin's confession to Green.

> "The investigators immediately put Green in touch with Hoffman and
> Cravath, who in turn brought Green to the District Attorney's Office.
> Hoffman and Cravath scheduled a deposition for Green (to which the
> prosecutors were invited—(but declined) at the Cravath offices.
> In this deposition, Green under oath repeated everything he had told
> O'Brien and Henson about Melvin."

At the deposition Green swore that he had not met or spoken to any member of the legal team

before the deposition was taken.   (See Exh. "E", p. 5)

The prosecutors declined to wire Mr. Green. Mr. Green, after being provided with a tape recorder

by the defense team, produced a taped confession, which unknown to everyone at the time was

fraudulent.  Id.*14

Judge Blumenfeld then had to decide the source of the information of the initial report since

Mr. Green had falsely said in his sworn statement that reopened the hearing that the information was fed

to him by members of the defense team.

> "To secure the new hearing DA's office prepared an affidavit for Mr. Green
> to sign whereby he intimated that he was fed the information of the details
> of the murder by members of the defense team."  Id. *14

Based on Green's own testimony at the reopened 440, Judge Blumenfeld found that no member

of the defense team gave any information to Mr. Green.

> "The People, based on Green's affidavit, argue that this information was
> fed to him by Henson and O'Brien. However, the testimony of Green,
> Henson and O'Brien are all consistent that it was Green who gave the
> investigators the information and not the other way around. The
> investigators went into the area without mentioning names of Melvin/Ish
> and Harris/Turk. This testimony is consistent in both hearings. Moreover,
> Green, even after the affidavit proffered to this court and while under
> immunity, testified in the second hearing -- just as he had in the first
> one -- that he mentioned the Melvin and Harris names first."  Id.*22 & Id. 39

12

The court also noted "while Green testified that he divulged Mr. Melvin's name because he was

angry with him, he had no explanation at all as to why he included Mr. Harris' name as being the

accomplice."  Id.*22

Finding that Green's statement was "unprompted and unpaid" the court found the first report to

be reliable:

> *"What is left is the fact that unprompted and unpaid Green initially
> approached Henson and O'Brien and named as perpetrators of the Abbott
> murder, the same two people that Anna Simmons did six days after the
> murder.* The court also credits his testimony at the original hearing that Melvin
> did make an admission to him because he was furious with Harris for talking to
> investigators and not telling him. The court rejects Melvin's testimony that this
> conversation never took place, also rejects Melvin's testimony that Green made
> this up because Melvin fired Green from a job. Their families were close for
> years, Green and his wife are godparents to Melvin's first son and Melvin could
> very well have gone to Green to vent his anger with Harris. Furthermore, it rings
> true that Melvin feared Harris's conversation with the investigators because he
> thought Harris was implicating him".  Id. *27 (Italics added)

### B2B. Judge Blumenfeld Rejects Mr. Green's recantation

By all accounts Mr. Green was not a credible person, but liars sometimes do tell the truth.

Needless to say, the veracity of a statement from an untruthful person must be carefully assessed and

generally requires independent corroboration.    The court also had to weigh whether Mr. Green's

recantation was reliable using certain principles set forth in People v. Shilitano, 218 N.Y. 161,170 (1916)

("As the People remind us, [t]here is no form of proof so unreliable as recanting testimony.")

Such careful analysis was precisely what Judge Blumenfeld engaged in when he rejected Mr.

Green's recantation. The court found that the initial statement was reliable for two reasons:  first, once

Henson's and O'Brien's account was credited, the details of the murder as reported by Mr. Green could

only have come from the killer himself; and second, the report was independently corroborated through

other evidence given at the 440.   The corroboration came from Mr. Green's live-in girlfriend who

testified that Mr. Melvin had become violent when jealous, and her evasive testimony, as well as from

13

Deborah Abbott's suppressed report of problems Mr. Abbott had with his girlfriend's jealous boyfriend.

Most critically, the new confession traced the contents of the Simmons report, including the naming of

the same two perpetrators.   The coincidence was irrefutable rendering the second confession very

credible. Id. *29

The court also gave little weight to Mr. Green's recantation as Mr. Green in an interview with

The Wave, a local newspaper, said he "didn't want to be seen as an informant.   Id. FN 31

### B2C. Melvin's denial of involvement is discredited

After taking testimony from Mr. Melvin, Judge Blumenfeld discredited Mr. Melvin's denial of

any involvement in the murder.

> "Melvin did testify and denied even making a statement. He also denied
> any involvement with the Regulators gang. This court credits Henson and
> Dove's testimony that he was involved in the Regulators as a gang – not
> as a dance group. As for his denial as to any involvement in the Abbott
> stabbing, this court did not credit his testimony and his denial is not
> relevant for this decision. A trial jury should be making that determination."
> Id. FN 55

The Court then concluded that this newly discovered evidence, considering the tenuous

prosecution, if known to the jury, would likely have changed the outcome of the trial.

> "As this court credits Green's original testimony about Melvin's confession
> to him, it is worth noting that many a jury has convicted based on the
> testimony of someone whose reputation and background are less than savory.
> Had Bellamy's trial jury heard testimony that Melvin confessed to Green, and
> that Green who, without payment or prompting, informed Henson and O'Brien,
> a different verdict would likely have resulted. This is even more likely if the
> jury heard that Anna Simmons named the same two people as the perpetrators
> 14 years earlier.   A jury could also find that the corroborative testimony of
> Yolanda Dove and Deborah Abbott lend credence to Green's testimony. The
> coincidence itself would have raised a reasonable doubt in that jury's mind.
> There was never any strong identification testimony by Andrew Carter, who
> picked a different person out initially at the lineup, and was confused at trial.
> That jury deliberated for days and delivered a Christmas Eve verdict. This
> Court believes that the newly discovered evidence that comes from Green
> would have yielded a more favorable verdict to Bellamy and adheres to its
> original decision vacating his conviction and ordering a new trial."

14

Id. *34

Finally the court recognizing the weakness of the prosecution concluded that "This verdict appears to be a compromise verdict. Abbott was stabbed about seven times, yet the defendant was acquitted of intentional murder and only convicted of depraved indifference murder.   Unfortunately for Bellamy, his conviction became final before the Court of Appeals decided People v. Payne..." Id. FN 57

## C. The Appellate Division Unanimously Affirms

The Appellate Division unanimously affirmed and made its own independent findings.   While the tape was a fake, the AD concluded that the detailed information Mr. Green fed to the imposter corroborated the first statement.   Reviewing the entire trial and 440 records and acknowledging the weakness of the evidence against Mr. Bellamy, the A.D., held:

> "The Supreme Court properly determined that the likely cumulative effect of the newly discovered evidence, including the informant's original statements to investigators and counsel concerning Ishmael's alleged confession, his recantation of those statements, and the testimony concerning the faked confession tape, would have been a verdict more favorable to the defendant (see CPL 440.10 [1] [g]). A reasonable jury could find, as the Supreme Court did here, that the informant's original unsolicited implication of Ishmael was truthful, regardless of the informant's later recantation of those statements. Moreover, the fact that the informant implicated Ishmael and an accomplice, who were the same people as were implicated in a police report contemporaneous to the homicide, could raise a reasonable doubt in the jurors' minds, *especially given the less than overwhelming evidence against the defendant at trial."*
> People v. Bellamy, 84 A.D.3d 1260, 1261-1262 (2d Dep't 2011)   Emphasis Added.

The Appellate Division also denied the People's baseless motion to disqualify Mr. Bellamy's attorneys.  (See Exh. "F")  3  At the 12(b)(6) juncture the City asks this court to disregard the carefully

---

3  The QDAO engaged in a scorched earth attack on every member of the defense team, including the reputable firm of Cravath Swain Moore, and Detective Henson, the 20 year veteran of the NYPD.   The allegations of wrongdoing were found to be meritless.  (Id FN14) The 440 Judge was not immune to the QDAO's vicious attacks.  See: January 14, 2010 press release (QDAO website); See front page 8/31/11 NYLJ, Queens DA Blasts Judge Who Set Aside Murder Conviction.)   The QDAO also tried to prevent Judge Blumenfeld's reappointment in a letter submission to the Mayor's Judiciary Committee. 12/29/2010 NYLJ, Judge in Dispute with Queen's DA Reappointed by Bloomberg;10/15/2010 NYLJ, D.A. Brown Opposes Reappointment of Judge for Alleged Bias

15

made findings of the trial court and the Appellate Division and to permit it to show that the 440 was

vacated because of a fraud perpetrated upon the court.    Such endeavor at a 12(b)(6) motion is not only

unprecedented but simply unheard of.

Mr. Bellamy was granted a new trial based on the reliability of Mr. Melvin's oral confession, Mr.

Green's statement found to be "unpaid and unprompted" and untainted by fraud, as well as the

suppressed statement from Deborah Abbott pointing to the culpability of a third party.

### POINT 1

### HECK DOES NOT BAR MR. BELLAMY'S CLAIM (CLAIMS I AND II)

#### A.  Heck does not apply as a state court authorized to invalidate the conviction, did so under circumstances indicative of innocence.

City posits that the dismissal was not favorable because the New York judiciary embraced fraud

in granting Mr. Bellamy a new trial.    The City contends that "fraud had been perpetrated on the Court"

and that the conviction was vacated "based upon a fraud, not because of his innocence."    (Def. Brf.

---

First made at the premotion conference and without any relevance to the instant motion the City repeats again in Footnote 5 that Mr. Bellamy's counsel is a potential advocate /witness and that the City intends to move for disqualification should the case proceed to "discovery or trial."   This is another red herring and is absolutely without merit.   The vindictive nature of the application to strip Mr. Bellamy of his counsel of 8 years is evidenced by the threat that it will be made "at discovery." Witness- advocate disqualification as contrasted to conflict disqualification is implicated at the time of trial after an issue is identified and "necessarily" require attorney testimony.   It is no coincidence that counsel for the City is a former ADA with the QDAO.   This same threat was made at the 440, requiring that we voluntarily step down as counsel. After intimating that counsel would be called as witness by the QDAO, counsel was *never* called to testify.   This same ploy was tried again at the AD where the application made by the QDAO to disqualify was summarily denied. (See Exh. "F") The basis supposedly is that Mr. Green will be proffered by the City as a credible witness to refute the findings of Judge Blumenfeld. While disqualification of an attorney because of a conflict should be effected as early as possible, a disqualification on attorney/witness grounds is effected as late as possible.   We are confident that when the court learns the full facts of this case, it will agree as the AD understood that this is a ploy. There is no reason to remove Mr. Bellamy's counsel of 8 years.   The prejudice is manifest.   See Interpharm, Inc. v. Wells Fargo Bank, 2010 U.S. Dist. LEXIS 28802 *16 (S.D.N.Y.) ("Disqualification would be entirely premature at this stage.   As noted above, the concerns that justify disqualification of an attorney who will be a witness are not implicated at the pretrial stage.   Even if the complaint survives Wells Fargo's pending motion to dismiss, the matter is still a long way from trial. Discovery has yet to be completed, and, in all probability, summary judgment motions will have to be resolved before the matter is ready for trial.   Even if Wurst had admissible, non-privileged and non-cumulative testimony, the motion to disqualify is simply premature at this point in time").

16

2&9) Alternatively, the City maintains that the evidence that formed the basis for the new trial was of such "extremely flimsy nature" that the findings should be disregarded by this court.  Id. 13

Setting aside the implicit contemptuous insult this argument portends against Justice Blumenfeld, five members of the Appellate Division and Court of Appeals Justice Beatrice Ciparik, the City's contention is spun out of whole cloth.  The burden of proof to set aside a conviction is one of the highest standards found in the law.  The quality of the newly discovered evidence must meet a stringent threshold that in all *probability* Mr. Bellamy would have been acquitted if the jury had this evidence. CPL 440.10(1)(g)  Indeed, 440's are rarely granted.  In non-DNA cases in over 40 years less than 15 have prevailed out of tens of thousands that have been filed.  (Survey by counsel of annotated published decisions following CPL 440.10)

There are no legal grounds that a coordinate federal court may sit as a supernumerary court and review the quality of the underlying findings made by the state courts.  Mr. Bellamy was granted a new trial because "unprompted and unpaid" Mr. Green approached retired detective Henson and former FBI agent O'Brien and told them that Mr. Melvin had admitted to him that he, together with Rodney Harris, murdered James Abbott.  Fraud was expressly ruled out by three levels of the State Judiciary.   After an extensive hearing Mr. Melvin's second confession was deemed both reliable and independently corroborated.  The State findings are not subject to being relitigated.  The finding that in all probability someone else committed the murder goes to the very heart of Mr. Bellamy's claim of innocence.  There is no stronger evidence of innocence than evidence that someone else did commit the crime.

While the City uses the New York threshold of not "inconsistent with innocence", it is unclear whether the higher standard of "indicative of innocence" would apply for §1983 constitutional

17

violations. 4

There is no need to quibble over the appropriate standard to be applied, as Mr. Bellamy would easily meet both. That said, where the question of favorable termination is in dispute, that fact cannot be determined at the pre-pleading stage. See Kogut v. County of Nassau, supra, 14-19 ("it(court) recognizes that the Second Circuit interpreted Heck's favorable termination requirement very broadly, such that Plaintiffs' claims may proceed"); See Tankleff v. County of Suffolk, 2010 U.S. Dist. LEXIS 135020 *25-26 (E.D.N.Y. 2010) and McCray v. City of New York, 2007 U.S. Dist. LEXIS 90875, 76-77 (S.D.N.Y.)where claims survived a 12(b)(6) motion despite purported confession made by the Plaintiffs.

The dismissal of Mr. Bellamy's indictment is the same as if he had been acquitted of all charges. Mr. Bellamy was acquitted at trial of intentional murder. The remaining count of depraved indifference is not a crime Mr. Bellamy committed. People v. Suarez, 6 N.Y.3d 202, 218 (N.Y. 2005) ("A defendant who commits intentional murder should be convicted and punished for that crime, not for a crime that he or she did not commit and that a jury may mistakenly believe is less serious.") There is not a single piece of evidence connecting Mr. Bellamy to this crime, and it is of no small significance that neither the prosecutor nor the City points to any inculpating evidence that exists. Indeed, the evidence is overwhelming that Mr. Melvin and Mr. Harris murdered Mr. Abbott. Mr. Bellamy's steadfast refusal of any plea, including the Alford plea that would have given him his immediate freedom, speaks

---

4 Murphy v. Lynn, 118 F.3d 938, 948 (2d Cir. 1997) ("Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused"); Riccio v. City of NY 2012 US Dist Lexis 70024; Kogut v. County of Nassau, 2009 U.S. Dist. LEXIS 116354 *18 (E.D.N.Y.) ("Although ill-defined, the federal law standard for determining whether Plaintiffs have satisfied Heck's favorable termination requirement must be based on federal, not state law, else a Plaintiff's ability to seek redress for violations of his constitutional rights would vary by the state of his conviction. This cannot be what the Supreme Court intended. Accordingly, whether Plaintiffs obtained a favorable termination of the prior proceeding under Heck is a separate question from whether they obtained a favorable termination under New York law.")

18

volumes.

### B. Payne and its progeny completed the exoneration of Mr. Bellamy.

The prosecutor never once argued in his opening or summation that Mr. Bellamy acted with depravity. (See Exh."G")  Indeed, Guy emphasized that this was an intentional murder.  Id. 2 The word "depraved" or its derivatives were not used once by the prosecutor.  Mr. Bellamy was acquitted of the acts the prosecutor claimed he committed. Indeed the validity of the prosecutor's purported dismissal because of a change in law rather than the fact that there was no evidence of guilt is disputed.  While it is true that Mr. Bellamy could not be retried for depraved indifference as that is not a crime he allegedly committed he could have been retried for manslaughter 1, a lesser included charge that was submitted but not reached by the Bellamy jurors, when they convicted on depraved indifference. See Matter of Suarez v. Byrne, 10 N.Y.3d 523 (2008)

People v. Payne 3 NY. 3d 266(2004) and its progeny did not change the law as the City claims. Payne clarified that it is the state of mind (mens rea), not the depravity of the act, that establishes depraved indifference culpability. Policiano v. Herbert 7 N.Y. 3d 588 (2006).  Even before Payne depraved indifference murder had no application at all to one-on-one killings.  Darry v. People, 10 N.Y. 120 (1854). (A conviction for "depraved mind" murder required conduct that endangered many people indiscriminately.)  People v. Wall 29 N.Y.2d 863, 864(1971) ("It suffices for this case that the two bursts of shots, each shot hitting its victim, could not be found to be the result of negligence merely.")

Under any common sense notion, the intentional acts Mr. Bellamy was accused of foreclosed acts of "depravity".  A "person cannot at the same time act both intentionally and recklessly with respect to the same result - that is, death...rather, guilt of one necessarily negates guilt of the other, 'since an act' is either intended or not intended; it cannot simultaneously be both."  People v. Gallagher, 69 N.Y.2d 525, 529 (N.Y.)  Depraved indifference charge was a ruse used by prosecutors to induce a

19

compromise verdict.

It is not "impossible", as the City tries to spin, to charge the crime of depraved indifference. It is only "impossible' to charge Mr. Bellamy of that crime because the acts he was charged with did not constitute depraved indifference murder. It would be similarly "impossible" to charge Mr. Bellamy with theft since the acts he was charged with do not entail the stealing of property.   By way of analogy, a disposition because the acts of the defendant do not constitute a larceny is a dismissal that is indicative of innocence.

### C. Even if Mr. Bellamy's conviction is deemed not to have been invalidated, Heck does not apply as Mr. Bellamy is not eligible for Habeas Corpus.

Heck does not apply when Habeas is no longer an available recourse to a freed prisoner.   The favorable-termination requirement, although not a necessary element of a §1983 4th, 5th and 14th amendment violation (as compared to 1983 malicious prosecution claim where favorable termination was always a requirement), was adopted by Heck as a "simple way to avoid collisions at the intersection of habeas and §1983."   To allow a civil proceeding to collaterally attack a conviction would fall squarely up against congressional intent that dictates a conviction be appropriately challenged by Habeas.

However, where a litigant is not eligible for habeas relief, the broad sweep of §1983 to provide access to litigants whose federal rights have been violated trumps the Heck concern of inconsistent determinations.   Thus, in Spencer v. Kemna, 523 U.S. 1 (U.S. 1998), as the plaintiff was no longer in custody and Habeas was not available to him, five Justices (Souter, Blackman, Stevens, O'Connor and Ginsberg) agreed that Heck's favorable termination requirement does not apply to "a former prisoner, no longer in custody."

Justice Souter reasoned that:  "Heck should be read as permitting a prisoner to bring a §1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy

20

a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy."
Id. 20

The Second Circuit has followed the consensus of the Spencer majority and has allowed §1983
action to proceed where "no habeas remedy lies for an individual that has been released from custody."
See Huang v. Johnson, 251 F.3d 65, 74-75(2nd Cir. 2001); Leather v. Ten Eyck, 180 F.3d 420 424 (2nd
Cir. 1999) ("Because Leather is not and never was in the custody of the State, he ... has no remedy in
habeas corpus.   Having escaped the jaws of Heck, Leather should therefore be permitted to pursue his
Sect. 1983 claim in the district court...."); Green v. Montgomery, 219 F.3d 52, 61 (2d Cir. 2000) ("We
have held, however, that Heck acts only to bar §1983 suits when the plaintiff has a habeas corpus remedy
available to him (i.e., when he is in state custody.")

District courts have uniformly followed Leather, Green and Huang.   See Page v. Vt. Dep't of
Corr., 2012 U.S. Dist. LEXIS 81732 fn 1 (D. Vt.) ("The Second Circuit has held that Heck does not bar
a constitutional claim once the plaintiff has been released from custody"); Smith v. Duquesnay, 2012
U.S. Dist. LEXIS 47064 *5 (E.D.N.Y.) ("In both Huang and Jenkins, however, the Second Circuit
allowed Section 1983 actions to proceed based in part upon its observation that the concurring opinions
in Spencer v. Kemna, .....revealed that five justices hold the view that, where federal habeas corpus is
not available to address constitutional wrongs, §1983 must be.")

While it is true that Mr. Bellamy had previously unsuccessfully filed a Habeas, the issues were
far different than those new issues developed at the 440.   The previously unsuccessful Habeas raised
claims of ineffective assistance of counsel and prosecutorial misconduct relating to the second statement
made by Mr. Bellamy.   As to IAC, the defense lawyer allowed the statement to come in as
consciousness of guilt, although Gillen had previously testified at the suppression hearing that the
statement was admittedly responsive to his questioning of Mr. Bellamy about the Abbott murder.   The

21

misconduct alleged in the Habeas was based on Mr. Guy's failure to correct Gillen's trial testimony

when the statement came in as made spontaneously.   Bellamy v. Portuondo, 99CV1832 (E.D.N.Y.)   If

the 440 had been lost, Mr. Bellamy would have been entitled to file a second Habeas Petition.

As Habeas is no longer available to Mr. Bellamy, Heck is not a bar to Mr. Bellamy's

constitutional claim.

## POINT II

### THE DISMISSAL OF MR. BELLAMY'S INDICTMENT IS A FAVORABLE TERMINATION FOR PURPOSES OF A MALICIOUS PROSECUTION CLAIM, AS THE DISMISSAL IS "NOT INCONSISTENT WITH INNOCENCE." (CLAIMS II AND IX)

### A. The allegation that the case was dismissed favorably is plausible and hence sufficient to withstand a 12(b)(6) dismissal.

There is nothing implausible about an allegation that upon the People's motion to dismiss that on

September 16, 2008, the indictment was dismissed in favor of Mr. Bellamy.

It was also alleged that "pursuant to CPL 160.60, the arrest and prosecution are now a nullity."

(See Compl 25-27 Exh. "C") A certified record of dismissal is sufficient to overcome a 12(b)(6) motion.

See Lazaratos v. Ruiz, 2003 U.S. Dist. LEXIS 17511, 11-12 (2003) (" The Court will allow Lazaratos

leave to amend his Complaint to include a claim for malicious prosecution if he procures the necessary

certified records").   So while 160.60 sealing is not necessarily dispositive, it is sufficient to withstand a

12(b)(6) motion.

The City interprets Iqbal as requiring Mr. Bellamy to prove favorable termination at this early

stage, but that is not what is required.   Mr. Bellamy needs only to state a claim -- specific facts are

required only where necessary to render the claim plausible.

The City implicitly concedes the inappropriateness of a 12(b)(6) motion in our case by having to

go well outside the four corners of the pleading, and supporting this 12(b)(6) motion with 3 affidavits

and numerous references to 440 testimony.   While some courts have allowed the reference to

22

transcripts, such references are only used in a limited way regarding the question of plausibility and not

to create factual issues.   Global Network Commc'ns, Inc. v. City of N.Y., 458 F.3d 150, 156 (2d Cir.

2006 ("In reversing, "thus, not only did the district court consider external material in its ruling, it relied

on those materials to make a finding of fact that controverted the plaintiff's own factual assertions set out

in its complaint")   In light of a 3000 page record, the City's selected submissions and references should

be disregarded to the extent that it controverts the allegations in the Complaint.

## B. The dismissal of the indictment was "not inconsistent with innocence" and is favorable under State law.

While the "favorable standard" criteria applicable to 1983 4th,5[th] and 14th claims remain

unsettled, the standard applied to malicious prosecution under New York law cannot be clearer.   "[A]ny

termination of a criminal prosecution, such that the criminal charges may not be brought again, qualifies

as a favorable termination, so long as the circumstances surrounding the termination are not *inconsistent*

*with the innocence of the accused.*"   Cantolino v. Danner, 96 N.Y.2d 391, 395 (2001); Smith-Hunter v.

Harvey, 95 N.Y.2d 191 (2000).   Our circuit applied the change in New York law in Rothstein v.

Carriere, 373 F.3d 275, 286 (2d Cir. 2004) ("Although Defendants repeatedly declare that Plaintiffs have

not been exonerated or proven innocent, New York law does not require a malicious prosecution

plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of

innocence.")

Judge Seybert of this district court dramatically recognized the change brought about by the

Hunter/Cantolino decisions.   When brought to her attention, Judge Seybert recalled and vacated her

first decision that relied upon People v. Crimmins 38 N.Y.2d 407(1975) cited by the City as supportive

of their position (fn8) and found that Crimmins was no longer the law in New York.

> "The Crimmins decision led the Court to conclude that the 2003 vacatur
> of the Plaintiffs' convictions could not demonstrate the conviction's
> "unlawfulness" under New York State law. Nevertheless, much has

23

happened since the Crimmins decision, nearly thirty-five years ago. Upon reconsideration, the Court also finds that its prior determination was in error". Kogut v.County of Nassau, 2009 U.S. Dist. LEXIS 116354 *21 (E.D.N.Y.)

Dismissals that are neutral, such as dismissals because of failure to prosecute, speedy trial violations and complainant's failure to cooperate, are now favorable terminations, although not intuitively "indicative of innocence." Rivas v. Suffolk County, 2008 U.S. App. LEXIS 72 (2d Cir. 2008) (" The record makes clear that the criminal charges were dismissed for failure to prosecute, and with a speedy trial violation imminent. Under these circumstances, the district court erred in holding that Rivas failed to demonstrate a favorable termination"). The City proffers the hypothesis that where the dismissal is "beyond the control of the prosecution "through no fault of their own" then the dismissal is not favorable. (Def. Brf., p. 13) This hypothesis misstates the law. A dismissal because complainant refuses to testify is still a favorable termination, despite this circumstance being outside the "prosecutor's control." See Armatas v. Maroulleti, 2010 U.S. Dist. LEXIS 112921, 40-42 (E.D.N.Y) ("dismissal because of the failure of the complainant to cooperate, though not evidence of ... innocence, was not inconsistent with his innocence" and proceedings were terminated in favor of the plaintiff.); Naim v. City of New York, 2012 U.S. Dist. LEXIS 100009 (E.D.N.Y.) (dismissal because "the complaining witness [was] uncooperative" is still a favorable termination)

So too, a legal impediment to prosecute is also "not inconsistent with innocence" and thus a favorable termination. Morgan v. Nassau County, 2009 U.S. Dist. LEXIS 79180 (E.D.N.Y.) ("Considering that the dismissal based on Smith's failure to testify was not inconsistent with Plaintiff's innocence and that the declaration of an "impediment to conviction" under §170.30(1)(f) demonstrates a "formal abandonment" of the charges, the Court finds the termination of proceedings against Plaintiff was a favorable one"); Norton v. Town of Islip, 2009 U.S. Dist. LEXIS 27565, 2009 WL 804702, at *4, 8 (E.D.N.Y.); Jovanovic v. City of New York, 2010 U.S. Dist. LEXIS 144388, 17-18 (S.D.N.Y.) (" a

24

dismissal by the prosecution "in the interest of justice," may also properly be considered as "favorable" as [a]fter reversal and remand, Jovanovic was cloaked again in the constitutional presumption of innocence.")

Unless the dismissal is facially unfavorable, such as a plea or an ACD, it becomes a question of fact--whether, under the circumstances of each case, the disposition was *inconsistent with the innocence of the accused* . Cantolino v. Danner, supra, 96 N.Y.2d at 396.

### C. A prosecutor's statement regarding his/her belief as to whether there has been an exoneration has no relevancy to the "favorability" inquiry

The Prosecutor, perhaps anticipating this civil lawsuit, proclaimed that the dismissal should not be construed as exoneration.   This court is not bound by that self-serving statement in any way.   Of significance is that this was a conclusory statement unsupported by references to witnesses or evidence that connect Mr. Bellamy to the murder.   Sloughing off the mountains of exonerating evidence, the City uses circular logic and parrots the prosecutor's vacuous mantra that; Mr. Bellamy was convicted by a jury of 12, the conviction was unanimously affirmed and thus Mr. Bellamy must be guilty regardless of the exculpatory circumstances that granted Mr. Bellamy a new trial.

The defense team and the Judge looked at the nature of the dismissal differently than the prosecutor.   The dismissal was a celebration of the triumph of truth.   From the beginning, Mr. Bellamy had steadfastly maintained his innocence rejecting plea offers that would significantly reduce his sentence and finally rejecting an Alford plea.   (Deft. Exh. "A", p. 8-14)   The offer of the Alford plea starkly demonstrated that the prosecutor was not fully convinced of Mr. Bellamy's guilt, as Alford pleas are rarely offered. Also indicative of innocence, in 1999 Mr. Bellamy, passed a polygraph test given to him by the Legal Aid Society. (See Exh. "H")  5

_____

5 While polygraphs are generally not admissible at trial we submit the results which was part of the 440 record to show the plausibility of Mr. Bellamy's claim of innocence.

25

Judge Blumenfeld also saw the dismissal as exoneration.

> "The court:        He was exonerated for the only crime which the law
>                    now says he could be prosecuted?
> Mr. Leventhal:     That is correct"

The City asks this court to accept the prosecutor's remarks as gospel and to dismiss the complaint before the plaintiff has any opportunity through discovery to establish the circumstances of the dismissal.  As the City concedes, it has no cases to support their position.  A prosecutor's statement only comes into play when it is unclear if charges have been formally abandoned.  In McCray v. City of New York, 2007 U.S. Dist. LEXIS 90875, the case the City cites to, the prosecutor's statement was considered to show that the dismissal was favorable.  See Landon v. County of Orange, 2009 U.S. Dist. LEXIS 64927 *26 (S.D.N.Y.) ("Plaintiff is directed to specify, in any second amended complaint he files, what reasons were given by the District Attorney for deciding not to go forward with the VOP hearing and whether, under state law, it could be re-prosecuted.")

When it comes to the merits of the dismissal, prosecutor's self-serving statements are not considered at all.  See Smith-Hunter v. Harvey, supra, 95 N.Y.2d at 192 ("A special prosecutor's bald statement that he failed to oppose the CPL 30.30 motion to dismiss as a consequence of his conducting a trial out of town and not due to any determination that probable cause was lacking, was insufficient to overcome the general rule that a dismissal on speedy trial grounds is a favorable termination.  Plaintiff did not have to demonstrate innocence in order to satisfy the favorable termination prong of the malicious prosecution action."); Jovanovic v. City of New York, 2010 U.S. Dist. LEXIS 144388 at 17-18 (S.D.N.Y.) ("The subjective beliefs of the members of the District Attorney's Office, however, as well as the emotional state of the complainant, are of no consequence when considering whether Jovanovic received a favorable termination.  Because the termination of Jovanovic's prosecution 'in the

26

interest of justice,' was both final and 'not inconsistent with <u>Jovanovic's</u> innocence, the termination of the criminal case was favorable...."

<u>McCray v. City,</u> 2007 U.S. Dist. Lexis 90875 * 78 (S.D.N.Y) is not to the contrary as facts were tendered by the prosecutor that were incompatible with guilt.   Here no facts have been proffered by either the prosecutor or the City that there is any existing evidence connecting Mr. Bellamy to the murder.

Where the circumstances of the underlying dismissal are contested, whether there has been a favorable termination is a question of fact for the fact finder to decide.   See <u>Rounseville v. Zahl,</u> 13 F.3d 625, 629 ("when the grounds for the dismissal of a criminal proceeding are unclear, New York courts consider whether the proceeding was terminated in plaintiff's favor to be a question of fact that prevents summary judgment").

The allegations that the People moved to dismiss the indictment and that the termination was favorable supported by the certificate of disposition and Mr. Bellamy's clear innocence are more than enough to allow the case to proceed to discovery.

### D. Cases relied upon by the City are readily distinguishable.

The City acknowledges that there is no case supporting its position that a "change in the law" dismissal is not considered "not inconsistent with innocence."   However, three decisions are offered as supportive:   <u>Martinez v. Schenectady,</u> 97 N.Y.2d 78, 84-85 (2001); <u>Lazaratos v. Ruiz,</u> 2003 U.S. Dist. LEXIS 17511 (S.D.N.Y.); and <u>Mitchell v. City of Albany,</u> 2010 U.S. Dist. LEXIS 31426 (N.D.N.Y) It should be noted that all three cited decisions were decided by way of a motion for a summary judgment.

In <u>Martinez,</u> the conviction was reversed because a technical defect in the search warrant required the suppression of the evidence found.   The overwhelming evidence of guilt adduced at the

27

trial (including several witnesses who saw Martinez in possession of the drugs) was not implicated by the reversal that suppressed the contraband.    Martinez v. City of Schenectady, supra, 97 N.Y.2d at 84-85 ("Plaintiff's felony conviction was reversed not because of her lack of culpability--indeed, her guilt was proven beyond a reasonable doubt--but because the evidence that formed the basis for her conviction was obtained pursuant to a faulty search warrant.")

Mr. Bellamy was granted a new trial not because of some technical flaw in his trial but because there was evidence that two others identified 14 years earlier committed the murder and that important Brady information supporting third party culpability had been withheld.    The reasons for the vacatur, as contrasted with Martinez, pointed to Mr. Bellamy's lack of culpability.

Lazaratos is actually supportive of Mr. Bellamy's position.    The Lazaratos complaint had the bare allegation that the "charge was dropped."    There was no elaboration as to the reasons why the case was "dropped."    It was unclear from this allegation if the case had been abandoned by the prosecutor. The court allowed Lazaratos leave to amend his complaint so that he could produce "certified records to demonstrate a favorable termination...." Lazaratos v. Ruiz, supra at 11-12.    Mr. Bellamy has specified the circumstances of dismissal and also bolstered the factual allegations with the production of the certified record. (See Exh. "C")

It could easily be said that failure to prosecute because of the death of the defendant is not "inconsistent with innocence" and is a favorable termination.    Perhaps the court in Mitchell understood it was on shaky grounds and found that in any event there was no probable cause for the arrest or continued prosecution.    6    That said, it is a stretch of logic to its limits to compare "impossibility" due

_____

6 Other than to confuse it is unknown why the City cites to Donahue v. Gavin, 280 F.3d 371 (3d Cir. 2002).    In the Third Circuit the malicious prosecution plaintiff must show that the disposition is indicative of innocence.    That is not the law in New York.

to death with "impossibility" due to a change in law that negates that an act is a crime.    To be sure, death

of the defendant does not implicate innocence of the crime charged.

In Bellamy, the vacatur and the application of Payne went to the heart of Mr. Bellamy's

innocence.

**POINT III**

**A CLAIM FOR SUPERVISORY FAILURE TO INTERCEDE
HAS BEEN PLAUSIBLY STATED (CLAIMS IV AND V)**

**A. Supervisory Liability**

The City begins this Point by requesting that the Supervisory or Failure to Intercede Claim be

dismissed with a blanket general statement that "there has been no underlying violation of Mr. Bellamy's

rights by anyone."    Indeed, the City provides no further elaboration or explanation as to why the

enumerated allegations of misconduct, including suppression and fabrication of evidence, did not violate

Mr. Bellamy's constitutional rights.    Considering the plethora of factual allegations that have been

made against the police officers, it is hard to believe that this argument is seriously tendered.

There is no disagreement that personal involvement is a prerequisite to establishing supervisory

liability. Our claim is not, as the City assumes, founded on deliberate indifference based on a history of

subordinate misconduct.

The complaint plausibly sets forth the individual acts of John Doe 1 and John Doe 2 that allowed

their subordinates to manipulate Mr. Bellamy's wrongful conviction.    John Doe 1(Gillen and

Solomeno's supervisor) and John Doe 2 (John Doe 1's supervisor) were tasked with the duty to oversee

the criminal investigation and to make sure it was fairly undertaken.    The neglect of supervisory duties

that allows for subordinates to violate the constitutional rights of citizens is sufficient to state a claim

under Iqbal.    See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009), favorably citing an 1812 Supreme Court

decision in Dunlop v. Munroe, 11 U.S. 242, 269 (1812) ("a federal official's liability will only result

29

from his own neglect in not properly superintending the discharge of his subordinates' duties")

A criminal defendant has a constitutional right to a minimally fair criminal investigation, especially when, as here, there is evidence of third party culpability.   The Abbott killing was committed by two people.   The defendants' supervisors approved the closing of the case the very day Mr. Bellamy was arrested while at least one culprit was still at large. (Compl 246-256)   The two people identified as having committed the murder were not even interviewed.   The case, with approval by the Supervisors, was closed and no further investigative steps of any kind were undertaken after Mr. Bellamy was arrested.   Wheaton v. Gillen, supra, provides contemporaneous support that these supervisors were deliberately indifferent to the misfeasance of their subordinates.

The defendants' supervisors were also tasked to review and countersign police reports and monitor the investigation of their subordinates.   Police reports (DD5's) are sequentially numbered to make sure that all reports are turned over to the prosecutor and thereafter to the defense.   Sequential numbering also prevents the "cleansing" of the file, as happened here as regards to the Michelle Abbott police report which Judge Blumenfeld found to be a Brady violation. Id. 251-254   Both Supervisors neglected their duty to ensure that these police reports were numbered and reviewed, thereby allowing for the fabrication and suppression of exculpatory evidence by their subordinates.   These factual allegations are more than enough to "nudge this claim from the conceivable to plausible."   At this juncture, Plaintiff is not required to provide "evidentiary proof" to support his claims.   There must be sufficient factual content so that it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, supra, 556 U.S. at 663.

As the City acknowledges, Colon v. Coughlin, 58 F3d 865 (2nd Cir. 1995), which sets forth 5 factors to establish supervisor liability, has not been abrogated by our Circuit.   The general consensus from decisions after Iqbal is that at least the first factor ("the defendant participated directly in the

30

alleged constitutional violation") and part of the third factor ("the defendant created a policy or custom under which unconstitutional practices occurred") survive.   Some decisions hold that Colon was not implicated at all by Iqbal.   To be sure, after Iqbal was decided this Circuit continued to hold that "[S]upervisory liability may be imposed where an official demonstrates gross negligence or deliberate indifference to . . . constitutional rights . . . by failing to act on information indicating that unconstitutional practices are taking place." Platt v. Inc. Vill. of Southampton, 391 Fed. Appx. 62, 65 (2d Cir. 2010).   See Sash v. United States, 674 F. Supp. 2d 531, 543-544 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in Colon v. Coughlin may still apply."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing with interpretations that Iqbal eliminated all but the first and third Colon categories), aff'd, 462 F. App'x 79 (2d Cir. 2012); Gabriel v. County of Herkimer, 2012 U.S. Dist. LEXIS 126709, 66-67 (N.D.N.Y).   The City asks this court to do what it is not permitted to do, change existing law when the circuit has yet to do so.

## B. Failure to Intercede

It is well settled that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.") Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).   ("Liability will attach if the officer had a realistic opportunity to intervene to prevent the harm from occurring.")  See O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988).   Liability may be premised not only on action, but also on a refusal to act.   See United States v. City of Yonkers, 96 F.3d 600, 613 (2d Cir. 1996).   ("Thus, government officials may be held liable under Section 1983 for a failure to do what is required.")   See P.C. v. McLaughlin, 913 F.2d 1033,1044 (quoting Doe v. N.Y. City Dep't of Social Servs., 649 F.2d 134,

31

141 (2d Cir. 1981) ("W]hen individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the non-feasance of which may violate the constitution.")

The claim against John Doe 1 and 2 for supervisory liability and failure to intercede is supported by the factual allegations that John Doe 1 and 2 did not intercede when they knew that the police file was not properly maintained and that such failure would cause injury.   The supervisors were also required to intervene when the detectives closed the incomplete investigation despite an unapprehended culprit and evidence of third party culpability that would have exonerated Mr. Bellamy.   (Compl 246-256)

There is more than enough factual "heft" to this claim to allow Mr. Bellamy to go forward to prove the claim as he has easily crossed the line from mere possibility to plausibility.

## POINT IV

### THE COMPLAINT PLAUSIBLY ALLEGES THREE DISTINCT MUNICIPAL POLICIES THAT VIOLATED MR. BELLAMY'S RIGHT TO BE TRIED FAIRLY, AND THOSE POLICIES WERE SEPARATELY AND CUMULATIVELY THE "MOVING FORCE" THAT CAUSED MR. BELLAMY'S WRONGFUL CONVICTION. (CLAIMS VI, VII, AND VIII)

Monell claims are not held to a more stringent pleading standard than that required by Rule 8(a). Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993). Plaintiffs need not plead "with factual detail and particularity the basis for the claim."   Id. 168   All that is required is the same as any other claim--factual allegations allowing the reasonable inference that the City established a policy or practice that deprived criminal defendants of their constitutional rights.   The factual content must "nudge" the claim "across the line from conceivable to plausible." Ashcroft v. Iqbal, 556 U.S. 662, 683 (2009).

This is not the time to assess the merits of the claim.   While a claim may appear to be difficult to prove, such difficulty is insufficient to deny plaintiffs access to the court as long as a claim is stated.

32

See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (U.S. 2007) ("And, of course, a well-pleaded

complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and

that a recovery is very remote and unlikely."); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule

12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual

allegations"). We feel confident that once the court has had an opportunity to review the facts and

applicable law, it will find substantial merit to these claims.

The fundamental flaw in the City's argument is that the Monell claims require a pattern.

However, to satisfy the Monell pleading requirements, the plaintiff need allege *only one* of the

following:

(1) a formal policy promulgated or adopted by the City; or

(2) that an official with policymaking authority took action or made a specific decision which
    caused the alleged violation of constitutional rights; or

(3) that the existence of an unlawful practice by subordinate officials was so permanent or well
    settled so as to constitute a 'custom or usage' and that the practice was so widespread as to
    imply the constructive acquiescence of policymaking officials. Monell v. Department of
    Social Services, 436 U.S. 658, 690-691 (1978); Pembaur v. City of Cincinnati, 475 U.S. 469,
    483-84 (1986).

Only the third prong-custom and usage-requires a pattern showing "deliberate indifference." In

contrast, an express municipal policy provides the notice of wrongdoing.

## A. Monell Policy 1

### The Policy to Shield Trial Prosecutors from Information Regarding the Benefits
### Promised to, or Received by, Prosecution Witnesses

An express policy that shields trial prosecutors from information regarding the benefits a

prosecution witness receives is facially unconstitutional. Allegation of the existence of such a policy,

together with an allegation that the existing policy injured the plaintiff, suffices to withstand a 12(b)(6)

dismissal. The City counters that this claim is "conclusory" and implausible in that (1) the complaint

33

does not show a pattern as only one incident is alleged, (2) the City was *not* on notice that walling off exculpatory information from the trial prosecutor was unconstitutional, and (3) as Mr. Brown did not become Queens District attorney at the time Steadman was tried in 1991, he would not have been on notice of cases that preceded his tenure.   None of these arguments has merit.

Prior to and at the time of the November 1995 trial, the QDAO maintained an unconstitutional office policy that shielded from the trial prosecutor, information regarding the benefits witnesses receive from the trial prosecutor.   The existence of such "Chinese Wall" is conceded. (Def.'s Exh. "I", p. 211-212) This witness protection program confers benefits (described by Mr. Mansfield as food costs Id. 212) upon witnesses regardless of whether they testify or whether there is a need for protection. (Compl 353-366).   For instance, Ms. Sanchez did not feel threatened or intimidated by Mr. Bellamy or by the second unapprehended assailant.   Ms. Sanchez did not ask for and was not in need of protection. Id. 355-357

Where there is an express policy, a history of violations is not required. When the policy, in and of itself, is unconstitutional, and is implemented by a final policymaker, the policy provides notice of foreseeable constitutional injury.   See Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (U.S. 1986) (A single incident is sufficient to impose liability under Monell when it is caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.)See also Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 ("Thus, even a single action by a decision maker who 'possesses final authority to establish municipal policy with respect to the action ordered' is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983.")

The QDAO policy systemically evades the prosecutor's core constitutional Brady duty of disclosure and falls squarely under Monell that an express, unconstitutional policy states a claim against the municipality.   In the Monell case, the single governmental policy was to automatically terminate a

34

woman's employment who was in the seventh term of pregnancy regardless of medical necessity.   The

City had actual notice of the unconstitutionality of a "Chinese Wall" policy.   See People v. Steadman,

82 N.Y.2d 1 (1993) (policy that shielded trial prosecutors from benefits witnesses received to evade

Brady disclosure is unconstitutional.)

Mr. Mansfield justifies the wall ("we separate the role of the witness protection and we separate

it from the Assistant District Attorney trying the case") because the benefits conferred are not

conditioned on the witness testimony.   (Def. Exh. "I" p. 173-4, 211-212 )  The implicit 12(b)(6) danger

in allowing the City to engage the court in a factual analysis is most starkly revealed in the contradictory

testimony of Mr. Mansfield and Ms. Sanchez.   Mr. Mansfield's 440 testimony to which the City makes

reference in its Brief is:   "Here the purpose of relocating Ms. Sanchez was not to motivate her to testify,

but rather to insure her safety." (Def. Brf., p. 26; Def. Exh. "I", p. 211)   However, under questioning by

the Court, Ms. Sanchez disputed Mr. Mansfield's testimony. (See Exh. "I").

| | |
|---|---|
| The Court: | Did you say you felt the need for protection? |
| The Witness: | No I never said I needed protection that I recall |
| The Court: | So whose idea was it that you should move out of where you were living? |
| The Witness: | They just told me they would take me and put me in a witness protection program until this was over. |
| The Court: | You never asked for it? |
| The Witness: | No, I never asked. |
| The Court: | Did you want to leave your apartment? |
| The Witness: | No, I was living in a little room with my son and –my twins and my sons' father and that was it.                    Id. 320-321 |
| The Court: | You were never threatened, you never said to the DA's office I'm being threatened, I can't testify. |
| The Witness: | No, I never said I was being threatened.   I don't know. |
| The Court: | Did you say you were afraid to testify. |
| The Witness: | No. |

Id. 319

This 440 testimony not included in the city's selective submission adds to the already existing

doubt that Bellamy ever threatened Ms. Sanchez.   Drawing the court into a factual resolution arena

again, the City writes: "as plaintiff's counsel is well aware, numerous witnesses, including Linda

35

Sanchez, testified that she was unaware of any future benefits when she testified at the criminal trial."
(Def. Brf. FN 20)  Counsel knows no such thing.  Omitted from the City's selective excerpts from
Mr. Mansfield's testimony is that on November 28, 1995, the day of her testimony, she received $250.
On the receipt that she was given was written "every two weeks."  Ms. Sanchez' testimony continued
on December 3rd, five days after she received her first biweekly $250 installment.  The payments
continued biweekly over the next 10-12 months.  ( Exh. "J", p. 216)7

Without refuting that the factual allegation is plausible that Ms. Sanchez was promised assistance
in housing for the rest of her life, the City contends that factually this promise was never made.  Such
contention also is very much in dispute. Mr. Mansfield testified at the 440:  "We are going to make
her—we are going to be sure that she is safe for the rest of her life, in terms of the threat from this case"
(Def. Exh. "I", p. 175)

True to Mr. Mansfield's assurances, Ms. Sanchez is openly living in the same Section 8, three
bedroom apartment in Lefrak City where she was relocated nearly 20 years ago. (Exh "I" p311)  Ms.
Sanchez is living just a few miles from her family and previous home and is paying a fraction of her
apartment's market value. (Compl 91-100)  Ms. Sanchez never received "protection" services. (See
Exh. "J", p. 197)

While Mr. Mansfield describes the program as being separated by a "Chinese Wall", the City
counters that the trial prosecutor in fact had access to the information.  All that the prosecutor had to do
to obtain the information, the City says, is to ask Mr. Mansfield. (Def. Exh. "I", p. 212).  With this

---

7 The QDAO denied there even existed a relocation file whereby any benefits were conferred upon Ms. Sanchez. The QDAO
sought a writ of prohibition against the trial Judge from permitting testimony from Mr. Mansfield. The contents of the file
was disclosed only after the Appellate Division denied the People's writ.  People v. Bellamy, 45 A.D.3d 836 (2nd Dept.
2007).  When disclosed the cash and housing benefits Ms. Sanchez received were in the thousands of dollars.

"don't ask don't tell policy", Mr. Guy did not ask and thereby was thus able to represent that all Ms. Sanchez received was $50 or $100 and an overnight stay at a hotel. (Compl 95-96) Under this policy, a prosecutor can hide exculpatory information by simply not asking about it. Left to another day is whether this "don't ask, don't tell policy" passes constitutional muster.

As there is no right to discovery in criminal cases, Mr. Bellamy was unable to review the Sanchez "relocation" file. (See Exh. "J", p. 204) The QDAO FOIL Officer denied its existence under oath. (Compl 360).

The link between such unconstitutional policy and Mr. Bellamy's wrongful conviction is patently obvious. Ms. Sanchez received these benefits and promises only after being falsely classified as an "intimidated witness", and this explains the inexplicable disclosure on the eve of trial of threats supposedly made 17 months earlier. (Compl 79-112)

Plainly, there is enough disconcerting conduct that is factually alleged to allow Mr. Bellamy to go forward with discovery.

### People v. Steadman provided notice to the City that the Chinese Wall policy was unconstitutional.

Only a hyper technical or literal reading of Steadman distinguishes its holding from this case. Steadman held that "promises made to a defendant by one prosecutor are generally binding on others in the criminal law enforcement system and certainly promises made by a superior are binding on subordinates in the same office" People v. Steadman, 82 N.Y.2d 1, 7 (1993) Exculpatory information whether it is an agreement to provide leniency or benefits cannot be withheld by compartmentalization within the prosecutor's office. Id. at 7 ("it placed the trial assistants in the position of not only advising Malloy (prosecution witness) to testify that no promises of leniency had been made to him when they had been…"). If there is a difference between Steadman and Bellamy it is not discernible to the naked eye.

Grasping at straws, the City maintains that Mr. Brown did not have notice that the practice was

unconstitutional as he had not taken office when <u>Steadman</u> was tried in 1991.    However, <u>Steadman</u> was

decided in 1993 well after Mr. Brown took office and two years before the trial.    (Def. Exh. "J")    The

City cannot be serious when they say that Mr. Brown was unaware of a Court of Appeals decision that

implicated a practice in his office.    8

    While the policy itself provides notice, and nothing more needs to be shown, it is likely that

discovery will also establish a pattern. Recently, a newspaper reported the filing of a 440 based on the

QDAO withholding from the defendant cash payments that were made to a prosecution witness.

Http://www.nytimes.com/2012/08/14/nyregion/new-charge-of-prosecutorial-misconduct-in-queens.ht

ml?_r=1

    This media report adds to the plausibility of this allegation.    See <u>Meridian Horizon Fund, LP v.</u>

<u>Tremont Group Holdings Inc.</u>, 747 F. Supp. 2d 406, 410 (S.D.N.Y. 2010) (taking judicial notice of

media reports of a lawsuit brought by the New York Attorney General); Same <u>Staehr v. Hartford Fin.</u>

<u>Servs. Grp., Inc.</u>, 547 F.3d 406, 424-25 (2d Cir. 2008)

### Monell Policy 2

**The City's systemic custom that fails to correct, reprove, discipline or sanction trial prosecutors for summation misconduct shows a deliberate indifference to defendants' 5th, and 14th Amendment rights to a fair trial.**

    The complaint alleges that as final policymakers Mr. Brown and Mr. Ryan have a custom and

practice not to internally investigate, reprimand, sanction or discipline prosecutors for misconduct.    As

a result, they operate in a climate of impunity and intent on winning at all cost.    Mr. Guy delivered a

beyond the pale summation that caused Mr. Bellamy's wrongful conviction.    Compl 367-372

---

8 Also named in the complaint as policy makers are John Ryan, the QDAO executive director, and John Mansfield, head of the WPP.    The City does not dispute that both were policy makers or delegates prior to 1991.

The addendum cites 65 Appellate Division decisions before the Bellamy trial that gave notice to the City that QDAO trial prosecutors were committing summation misconduct depriving citizens of their constitutional right to a fair trial.    An additional 72 post-trial Appellate decisions show the existence of the policy.    The complaint plausibly alleges that QDAO never once in these 137 cases reproved or reprimanded an ADA, thereby encouraging, condoning and ratifying the trial prosecutors' deliberate and reckless disregard of the rights of citizens.

The City does not dispute the 137 cited examples of summation misconduct.    Nor does the City dispute that Mr. Guy's closing remarks constituted summation misconduct or that the QDAO has ever been reprimanded for summation misconduct after being placed on notice by the Appellate Division.9 Instead, the City says that as a matter of law a pattern has not been shown.    Again, demonstrating a fundamental misunderstanding of Iqbal, the City engages in an intensive factual analysis.    First, it whittles the 137 cases to 35 by deducting 30 cases that preceded Mr. Brown's tenure and 67 cases that came after Mr. Bellamy's trial.    Entering into the weeds of factual resolution, the City parses each of the remaining 35 cases to show that these summations, while misconduct, were dissimilar to the summation delivered by Mr. Guy.    According to the City, what Mr. Guy said in his closing is not, "word for word", of the type of summations that the AD found to be out of bounds.    Hence, according to the City, there is no pattern established that would give the City notice of rampant summation misconduct.    The City is not only legally wrong, but its reasoning defies logic if not common sense.

By way of analogy, the City's argument would be similar to one that if a CEO of a municipal hospital was made aware of doctors using unsterilized scalpels causing numerous deaths, the CEO would

---

9 At the pre-motion conference 4 months after the complaint was served, although it had plenty of time to investigate this allegation, the City had no answer to this court's inquiry if the allegation was true or not.

not be on notice of a problem if the operations were "dissimilar" (i.e., one was an appendix operation, another a gallbladder operation and another an operation to remove kidney stones). The notice to the City was that prosecutors were engaging in summation misconduct causing serious deprivation of defendants' rights. Period. By not correcting or reprimanding the misconduct, the City condoned and ratified the misconduct, allowing trial prosecutors to operate with impunity. See 8/13/2012 NYT Article, supra

Http://www.nytimes.com/2012/08/14/nyregion/new-charge-of-prosecutorial-misconduct-in-queens.ht ml?_r=1 ("As Mr. Rudin noted in his filing, in 70 known cases of prosecutorial mistakes and misbehavior in Queens over about a decade, the district attorney, Richard A. Brown, has disciplined just one lawyer.") The one instance of correction alluded to was a Brady violation and is not implicated in any decisions listed in the addendum. We stand by the allegation that no policy is in place and that no prosecutor was ever disciplined or reprimanded for summation misconduct.

The City does not dispute that Mr. Brown, the manager of the district attorney's office, acts as a county policymaker. See Walker v. City of New York, 974 F.2d 293, 301 (2d Cir. 1992) It has long been settled that the systemic failure of a policymaker to correct prosecutorial misconduct evinces "deliberate indifference" to serious and flagrant constitutional wrongdoing. See Gentile v. County of Suffolk, 926 F.2d 142, 152-53 (2d Cir. 1991). The existence of an unlawful policy or condoned custom or practice may be shown with evidence that an agency's policymaker ratified the misbehavior either by directly approving the employee's actions or by "consciously cho[osing] to ignore them...." ) See Bertuglia v. City of New York, 2012 U.S. Dist. LEXIS 36927, 75-82 (S.D.N.Y. Mar. 19, 2012) (refusing to dismiss a failure to discipline claim); See Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 123 (2d Cir. 1991) ("municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers ... [acted] in violation of the complainants' civil rights); Fiacco v. City of

40

Rensselaer, 783 F.2d 319, 331 (2d Cir. 1986) (City's failure to investigate prior incidents "would have been viewed by the officers ... as reflecting an indifference").

A history of deliberate indifference to constitutional violations is more than enough to allow for discovery to examine the disciplinary policy that is in place. See Ahern v. City of Syracuse, 411 F. Supp. 2d 132, 146 (N.D.N.Y. 2006) (citing Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir.1995)).

In fact, it is not the number of instances of misconduct that matters; "rather, it is the combination of such complaints with the municipality's response which "tip[s] the scales toward the probative." Mendoza v. City of Rome, 872 F. Supp. 1110, 1118 (N.D.N.Y.1994). A persistent failure to investigate complaints or discipline those whose conduct prompted the complaints amounts to "deliberate indifference". Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir.1986) (knowledge of prior allegations of excessive force can form the basis of a finding of deliberate indifference, even where "none of the claims ha[s] yet been adjudicated in favor of the claimant," so long as "the [municipality's] efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of the indifference to the truth of the claim").

It is not necessary to go far to show that the policy of looking away from blatant misconduct deprived Mr. Bellamy of a fair trial. Before delivering his summation, Mr. Guy knew that he was embarking on beyond- the- pale conduct but was undeterred because there was no disciplinary policy to hold him back. Only the most jaded prosecutor would not find Mr. Guy's closing statements egregious amounting to a deprivation of a citizen's constitutional right to a fair trial.

The complaint highlights 15 statements that were simply outside the bounds of acceptable rhetoric. (Compl 312-313)

"I know who committed the murder."
"...because the evidence shows that you are a murderer and that you are not going to get away

41

with it, not this time."

"Where is the proof of motive? There is none. Where is there proof defendant had no motive to kill somebody? I submit there is no proof that he had no motive."

Mr. Guy's summation misconduct was a foreseeable consequence of the City's custom and practice that failed to reprimand or discipline prosecutors who commit misconduct with over-the-top summations.

### Evidence of post-trial instances of the policy that misconduct is not corrected is evidence of the existence of the practice at the time of the trial

The City mistakenly claims the 72 post- trial instances are irrelevant as they cannot establish a pattern. While not relevant to notice, they are pertinent to show the existence of the policy at the time of Mr. Bellamy's trial. See Gentile v. County of Suffolk, supra 926 F.2d at 151 (post-incident ratification permits inference that unlawful policy existed at the time of the violation of the plaintiff's rights); Kogut v. County of Nassau, 2012 U.S. Dist. LEXIS 121458 (E.D.N.Y.) ("These later cases can be probative of policymakers' attitudes at the time of the ... case."); Chepilko v. City of N.Y., 2012 U.S. Dist. LEXIS 15110 *46 (E.D.N.Y.) ("Subsequent or contemporaneous conduct can be circumstantial evidence of the existence of preceding municipal policy or custom."); Jones v. Town of E. Haven, 2012 U.S. App. LEXIS 15928 *31 ("It is not unreasonable to infer that Town officials who were indifferent to such abuse in 2000 might have held similar attitudes three years earlier.")

At this pre-discovery stage, the only issue is whether the factual content alleged by the plaintiffs accepted as true "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." See Bertuglia v. City of New York, 2012 U.S. Dist. LEXIS 36927, 75-82 (S.D.N.Y. Mar. 19, 2012) (refusing to dismiss a failure to discipline claim) The instances of 137 cases of misconduct are plenty here to allow this claim to proceed.

### Monell Policy 3

### A policy, practice and custom of training and directing trial prosecutors to not take notes when

42

**interviewing prosecution witnesses evince deliberate indifference to the deprivation of defendants constitutional right to receive exculpatory evidence.**

At the time of the investigation, prosecution, and conviction of Kareem Bellamy, and continuing to date, the Queens County District Attorney's Office maintained a policy of training and directing Assistant District Attorneys not to take written notes when interviewing prosecution witnesses.   Such policy to train prosecutors never to take notes when interviewing prosecution witnesses for the sole purpose of concealing exculpatory evidence is per se unconstitutional.   Because of this very policy Mr. Guy did not record and turn over to the defense exculpatory statements from interviews he had with Ms. Sanchez and with Mr. Carter.   Compl 339-352. While this circuit has not yet addressed whether Iqbal has heightened the pleading requirements for Monell claims, most district courts have applied the standard articulated in Amnesty. Am v. Town of W. Hartford, supra. ("It is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation. After discovery, on the other hand, a plaintiff is expected to proffer evidence from which a reasonable fact finder could conclude that the training program was actually inadequate, and that the inadequacy was closely related to the violation.") See Castilla v. City of NY, 2011 WL4345934 (S.D.N.Y.)

It is foreseeable and predictable that this policy never to take notes will cause Brady violations. Amnesty Am. v. Town of W. Hartford, supra, 361 F.3d, at 127 n. 8 (citing City of Canton, 489 U.S. at 389-90, 109 S. Ct. 1197).   ("By badly training employees there was a disregard of the risk of future violations of clearly established constitutional rights.")   The City contends that even though notes are not taken, the prosecutors will fulfill their professional obligation by turning over any exculpatory information they receive during the interviews.   There is plausible indication that prosecutors do not always comply with their Brady obligation.

http://www.newyorklawjournal.com/PubArticleNY.jsp?id=1202564723093

43

It is true that prosecutors are not required to take notes when interviewing a particular witness. However, if prosecutors are directed never to take notes to deprive defendants of exculpatory information, such affirmative direction or training is unconstitutional.

Connick v. Thompson, 131 S. Ct. 1350 (2011), does not dictate a different result at this 12(b)(6) stage.   Connick was not an insufficient pleading case at all; it involved the sufficiency of a plaintiff's evidence at trial.   The procedural context of Connick is very different from the procedural context of the instant motion.   Only after full discovery and with a full record including a completed trial, did the Supreme Court in Connick find that four prior Brady violations did not constitute a pattern.

There is a direct link between the policy not to take notes and the exculpatory information Mr. Guy withheld after interviews with Sanchez and Carter.   Mr. Bellamy's allegations are sufficiently plausible to allow him to proceed and to demonstrate through discovery that such policy resulted in predictable violations of defendants' rights.

## B. The acts of the QDAO that fail to discipline for misconduct or walls off benefits that are conferred to witnesses are administrative in nature and do not fall within the judicial phase of the prosecution.

Alternatively, the City argues that even if there is a Monell violation, since the prosecutors are absolutely immunized so is the City.   To begin, while QDAO prosecutors have not been sued in either their personal or official capacity, the conduct alleged in two of the Monell claims is that of administrative functions.

Van de Kamp v. Goldstein, 555 U.S. 335, 342-43 (2009), did not change the law that when acting in a purely administrative capacity prosecutors are entitled to qualified, not absolute, immunity.   Van de Kamp simply held that "prosecutors involved in . . . supervision or training or information-system management enjoy absolute immunity from claims arising from such administrative obligation[s] when those obligations are directly connected with the conduct of a trial".

44

On the other hand, absolute immunity is not afforded to a prosecutor who is not acting as "an officer of the court," but is engaged in other tasks of an administrative nature.   See Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993)

Mr. Mansfield's acknowledgment that the program is intended to provide protection or benefits to witnesses unrelated to their testimony or whether or not they will testify is proof that this program is not part of the prosecutors' advocacy function.

The disciplining of employees is a routine function of running an office.   It does not entail trial tactical or strategic prosecutorial type decisions.   Indeed, it could be said that condoning misconduct and shielding exculpatory information are practices that undermine the true and fair administration of justice.

**C. Even if this court finds that the underlying Monell conduct committed by prosecutors is entitled to absolute immunity, such immunity does not extend to claims against the Municipality.**

Presumptuously, while acknowledging that Van de Kamp did not address governmental liability, the City illogically contends that the second circuit decision in Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992), which only addressed governmental liability has been sub silencio set aside by Van de Kamp.   The City asks this court to exceed its jurisdictional authority and disregard this Second Circuit precedent in light of Van de Kamp.   Walker held that a Monell claim that alleged a failure to adequately train prosecutors in fulfilling their Brady obligation survived a 12(b)(6) dismissal.   To be sure, the Walker plaintiff on remand would still have to establish "deliberate indifference" by showing a history of known Brady violations causally linked to a failure to train.   Nothing more needs to be said as a District Judge is bound by second circuit precedent.   However, even if we go beyond this seemingly insurmountable obstacle, The City's argument that Van De Kamp implicates Walker is flawed for two fundamental reasons.

45

First, the defendants in <u>Van de Kamp</u> were supervisory prosecutors alleged to have failed to adequately train their subordinates. The court reasoned that subjecting trial prosecutors or their supervisors to potential civil liability would chill prosecutorial decisions and interfere with the zealous prosecution of criminal cases. <u>Van De Kamp</u> extended the <u>Imbler</u> absolute immunity granted to trial prosecutors to their supervisors as well. Unlike <u>Van de Kamp</u>, however in <u>Bellamy</u> and in <u>Walker</u> the defendants sued the municipality. Imposing liability for a governmental action never carried the <u>Imbler</u> policy concern that prosecutorial decisions be unfettered. Because of the broad sweep of 1983 to afford redress for constitutional violations, the immunity (whether qualified or absolute) granted to governmental agents has not been extended to shield the government itself.

Second, the City gives <u>Van de Kamp</u> a most far reaching interpretation. Everything the prosecutors office does, the City contends, is now cloaked with absolute immunity regardless of whether acts are in a managerial or advocacy capacity. The City puts it this way: "Accordingly, plaintiff's municipal liability claims, all of which are based on acts of the district attorneys' office undertaken in a prosecutorial capacity, under <u>Van de Kamp</u> cannot lie." (Def. Brf., p. 20) No attempt or argument is made to explain why a systemic failure to discipline employees for misconduct is not a routine function of managing an office. Instead, the City argues that since disciplining is a function within the prosecutor's office under <u>Van de Kamp,</u> the supervisory personnel as well as the government is immunized. This is simply not the law.

<u>Monell</u> claims survive even where the underlying acts are committed by governmental actors who receive qualified immunity. See <u>Amore v. Novarro</u>, 624 F.3d 522, 535-536 (2d Cir. 2010) ("Our conclusion that <u>Novarro</u>'s motion for summary judgment on the section 1983 claim against him must be granted on qualified-immunity grounds does not detract, of course, from Amore's remaining failure-to-train claim against the City of Ithaca.")

46

A Louisiana District court directly addressed this question and, applying the reasoning in <u>Owen v. City of Independence</u>, 445 U.S. 622 (1980), set forth four policy reasons why absolute immunity conferred by <u>Van de Kamp</u> has not been, and should not be, extended to the municipality.   See <u>Johnson v. Louisiana</u>, 2010 U.S. Dist. LEXIS 24396 (W. Dist. La 2010)

1.  Monell claim does not attack advocacy decisions made by a prosecutor, or even the administrative decisions intimately connected with the advocacy functions. Instead, the challenge is to official policies and procedures of the entity itself that cause constitutional injury.  <u>Id</u>. 46

2.  Although imposing personal liability on public officials is likely to have an undue chilling effect on the exercise of their decision-making responsibilities, "no such pernicious consequences are likely to flow from the possibility of a recovery from public funds.")  <u>Owen v. City of Independence, Mo.</u>, <u>supra</u>. 445 U.S. at 653, n. 37.

3.  Section 1983 is broadly construed to afford a remedy unless there is an overriding policy consideration.  <u>Id</u>. at 651

> "A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed.   Yet owing to the qualified immunity enjoyed by most government officials…, many victims of municipal malfeasance would be left remediless if the city were also allowed to assert a good-faith defense.   Unless countervailing considerations counsel otherwise, the injustice of such a result should not be tolerated."

4.  While prosecutors may be called to account for misconduct, a governmental entity would be held unaccountable for their misconduct without civil redress and thus there would be no deterrence to the implementation of unconditional policies.  <u>Id</u>. 651-2.

> "Moreover, the threat that a municipal entity will be liable for damage to an aggrieved individual should encourage official policymakers to

47

> promulgate and implement internal rules and programs designed to
> minimize the likelihood of unintentional infringements on constitutional
> rights."

With one exception New York's District Courts have agreed that the prosecutor's absolute

immunity post Van de Kamp does not extend to Monell claims.   See Norton v. Town of Islip, 2009 U.S.

Dist. LEXIS 27565, 2009 WL 804702, at *18-19, *25-27 (E.D.N.Y. 2009) ("The availability of

immunity to a municipal official or policymaker does not necessarily preclude a Plaintiff's claims for

municipal liability premised on the same events."); Jovanovic v. City of New York, 2010 U.S. Dist.

LEXIS 144388, 51-52 (S.D.N.Y. 2010) Contra:   Hewitt v. City of NY, 2011 U.S. Dist. LEXIS 11479

(E.D.N.Y.)  However, even Hewitt made reference to the fact that municipal liability might be

appropriate "where the need for training or other affirmative action is so obvious and the inadequacy so

likely to result in the violation of constitutional rights that the policymakers of the district attorney's

office can reasonably be said to have been deliberately indifferent to the need"  Id. *10-11

While public policy may mandate that prosecutors be shielded from individual claims brought

against them, there is no such public policy consideration for the municipality.

## POINT V

### FRAMING A PERSON FOR A CRIME HE DID NOT COMMIT IS OUTRAGEOUS AND WELL OUTSIDE THE BOUNDS OF DECENCY EXPECTED IN A CIVILIZED SOCIETY, GIVING RISE TO A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS(CLAIMS III AND X).

Count XI for negligent infliction of emotional harm is withdrawn.

### A. The one year statute of Limitations begins when the harm caused by the officers' conduct has ceased.

Mr. Bellamy's claim is based on Gillen's and Solomeno's outrageous manipulation of witnesses

and evidence in order to frame Mr. Bellamy for a crime he did not commit.   While the detective's

nefarious conduct occurred years ago, Mr. Bellamy's claim did not accrue until the case was dismissed

48

or until he ceased suffering from a restriction of freedom caused by the acts of the defendants.   The one year period in which to file an IIED claim is triggered by the last actionable act.   Although Mr. Bellamy was released on August 14, 2008, his liberty and travel were restricted until the case was dismissed on September 16, 2011.   See Nuefeld v. Nuefeld, 910 F.Supp. 977, 983 (S.D.N.Y. 1996). (" An IIED claim accrues on the date of the "last actionable act."); Llerando-Phipps v. City of N.Y., 390 F. Supp. 372, 384 (S.D.N.Y. 2005) (holding that statute of limitations for IIED claim against police officers alleged to have falsified evidence against plaintiff ran from date charges were dropped because "[w]hat took place between [the] arrest, the grand jury adjournment, and the time the charges were dropped remain[ed] unclear" and the "last actionable act" was "the continuation of the prosecution despite the lack of probable cause); Samtani v. Cherukuri, 2012 U.S. Dist. LEXIS 70010 (E.D.N.Y.)(wrongdoing continued until DA dismissed the charges); Drury v. Tucker, 210 A.D.2d 891, 892 (4th Dept. 1994) (holding IIED action not time-barred because "plaintiff sufficiently set forth concrete factual allegations of a continuing course of conduct that terminated within one year" of commencement of the action)

**B. The outrageous conduct of Gillen and Solomeno would give rise to an IIED claim.**

The intentional fabrication and suppression of evidence in order to frame a person for a murder the person did not commit is the epitome of outrageous conduct and easily meets the "extreme and outrageous" test of conduct which "so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." Stuto v. Fleishman,164 F.3d 820, 827 (2d Cir. 1999)   Conduct some would consider less egregious than what occurred to Mr. Bellamy has given rise to an IIED claim. See Mejia v. City of New York, 119 F. Supp. 2d 232, 286 (E.D.N.Y. 2000)(strip search); Dana v. Oak Park Marina, Inc., 230 A.D.2d 204, 208-10 (4th Dept 1997) (wrongful videotaping)

**C. Whether IIED is duplicative of other claims must await completion of discovery and Summary Judgment or trial.**

In dicta, the New York Court of Appeals held "that it may be questioned whether the doctrine of

49

liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability." Fischer v. Maloney, 43 N.Y.2d 553, 557 (1978). Generally courts have followed this dicta as set forth in the decisions contained in the City's brief. However, it is too early at a pre-pleading stage to determine which claims will survive and which will be duplicative. Such view is confirmed as all of the decisions cited by the Defendants involving IIED dismissals were decided in the context of a motion for summary judgment.

The better and more logical course followed by District Judges is to deny dismissal or summary judgment and submit IIED claims to the jury with instructions to avoid awarding duplicative damages. See Wahhab v. City of New York, 386 F. Supp. 2d 277, 292-93 (S.D.N.Y. 2005) ("the tort of inflicting emotional distress in the context of a false arrest or a malicious prosecution possibly involves some component of damages over and above the damages that may be awarded for these police misconduct torts."); Bender v. City of New York, 78 F.3d 787, 793 (2d Cir. 1996)); Sylvester v. City of New York, 2006 U.S. Dist. LEXIS 81716(S.D.N.Y) (where the overlapping claims were with appropriate instructions were submitted to the jury.)

## CONCLUSION

There is nothing more troubling to a criminal judicial system then the conviction of an innocent person. When plausibly shown, a judicial system that prides itself on fairness must afford an opportunity to redress the wrong and to allow the victim to present evidence of misconduct that caused such a horrific injustice. Except for Count XI, the court should deny defendants' motion to dismiss in toto. In the event any of the remaining counts are dismissed, we ask leave to amend the complaint.

Dated:    October 5, 2012
          New York, NY

Law Offices of Thomas Hoffman, P.C.

By:
          Thomas Hoffman
          Attorneys for Plaintiff

Of Counsel, Marvin A. Artis