10.31.14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

Kareem Bellamy

2012 CIV 1025 (WFK)(VVP)

Plaintiff,

**FIRST AMENDED COMPLAINT**

v..

Jury Trial Demanded

City of New York,
John J. Gillen,
Michael F. Solomeno,
Sargent Vincent Pepe and Lt. Robert Schruhl,
Supervising Officers at the NYPD 101st Precinct

Defendants.

-------------------------------------------------------x

Plaintiff Kareem Bellamy, by and through his attorney, Thomas Hoffman, Law

Offices of Thomas Hoffman, P.C. states as follows:

## INTRODUCTION

There was never any evidence connecting Mr. Bellamy to the April 9, 1994 murder

of James Abbott, Jr.  Mr. Bellamy's wrongful conviction was induced by two rogue

detectives who through coercion and intimidation manipulated each of the prosecution's

fact witness and key pieces of evidence to frame Mr. Bellamy.

Evidence pointing away from Mr. Bellamy was suppressed.  Leads to the two

suspects who were identified as Mr. Abbott's murderers were not investigated.  The

detectives' nefarious conduct could not have been accomplished without police

supervisors who looked the other way and who ignored standard police practice that

1

safeguard the integrity of an investigation.  The trial prosecutor, without fear of

reprimand or discipline, in an atmosphere of impunity and a climate in which winning is

everything, disregarded his duty as representative of the citizens of New York  to do

justice and to seek the truth and instead engaged in a shockingly egregious summation.

Systemic failures of the defendant City of New York animated the wrongful conviction

with customs and practices that condoned prosecutorial misconduct and with carefully

calculated policies that secreted from the defense financial benefits promised to

prosecution witnesses.  As a result of the wilful actions of the defendants, or of their

deliberate indifference to his right to a fair trial, Mr. Bellamy suffered the catastrophic

loss of his liberty for 14 years and three months.

## JURISDICTION

1.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. §1331 and 1343

over claims arising under 42 U.S.C. §1983.

2.     Supplemental jurisdiction over Mr. Bellamy's pendent state law claims exists

pursuant to 28 U.S.C. §1367(a)

3.     Plaintiff has complied with the requirements of New York General Municipal Law

Section 50-I.  Mr. Bellamy served a notice of claim on the Municipal defendants,

within the time required by New York General Municipal law Section 50-e.  More

than thirty days have passed since the service of the Notice of Claim and no offer

of settlement has been made.

4.     On February 23, 2012 Mr. Bellamy submitted to a hearing pursuant to New York

General Municipal law Section 50-e.

## VENUE

5.     Pursuant to 28 U.S.C. §1391(b), venue is proper in the Eastern District of New

York, the judicial district in which the claims arose and in which Mr. Bellamy

currently resides, and in which the defendant City of New York and the individual

defendants conduct their business.

## PARTIES

6.     Plaintiff Kareem Bellamy is, and at all times material to this Complaint was a

citizen and resident of the State of New York, City of New York, County of

Queens.

7.     Defendant City of New York is a municipality that is a political subdivision of the

State of New York, was the employer of the New York City Police Department

("NYPD") defendants John J. Gillen and Michael F. Solomeno, Sargent Vincent

Pepe, Lt. Robert Schruhl (Tax #848781)  and is and was at all times relevant to this

Complaint responsible for the policies, practices, and customs of the New York

City Police Department ("NYPD") and the Queens County District Attorneys

Office ("QDAO")

8.     Defendant John J.. Gillen ("Gillen"), at all times relevant to this complaint was a

duly appointed police officer of the NYPD, acting under color of law pursuant to

3

the statutes, ordinances, regulations, policies, customs, and usage of the City of

New York and the State of New York.  Defendant Gillen was working as a

detective assigned to the 101st Precinct, Far Rockaway New York when he was

assigned a case involving the stabbing death of James Abbott, Jr.  At all times

stated herein defendant Gillen was acting within the scope of his employment.

9.      Defendant Michael F. Solomeno ("Solomeno") at all times relevant to this

complaint was a duly appointed police officer of the NYPD, acting under color of

law pursuant to the statutes, ordinances, regulations, policies, customs, and usage

of the City of New York and the State of New York.  Detective Solomeno was

working as a detective assigned to the 101st Precinct when he was assigned a case

involving the stabbing death of James Abbott, Jr.   At all times stated herein

defendant Solomeno was acting within the scope of his employment.

10.     Pepe, at all times relevant to this complaint was a duly appointed police officer of

the NYPD, acting under color of law pursuant to the statutes, ordinances,

regulations, policies, customs, and usage of the City of New York and the State of

New York and was the immediate supervisor of defendants Gillen and Solomeno,

and as supervisor had the direct responsibility to insure that the investigating

homicide detectives including defendants Gillen and Solomeno perform their

investigative duties in conformity with the rights of defendants and of suspects

under the United States Constitution.  At all times stated herein defendant  Pepe

4

was acting within the scope of his employment.

11.     Defendant Schruhl at all times relevant to this complaint was a duly appointed

police officer of the NYPD, acting under color of law pursuant to the statutes,

ordinances, regulations, policies, customs, and usage of the City of New York and

the State of New York and was the immediate supervisor of Defendant Pepe and

indirectly supervised defendants Gillen and Solomeno and as supervisor had the

responsibility to insure that the investigating homicide detectives including

defendants Gillen and Solomeno performed their investigative duties in conformity

with the rights of defendants and suspects under the United States Constitution.  At

all times stated herein defendant Schruhl was acting within the scope of his

employment.

### PROCEDURAL HISTORY FROM
### CONVICTION TO EXONERATION

12.     On December 13, 1995 after a trial by jury Mr. Bellamy was convicted of depraved

indifference murder.  Mr. Bellamy was acquitted of intentional murder.

13.     On January 16, 1996, Mr. Bellamy was sentenced to 25 years to life.

14.     The Appellate Division affirmed Mr. Bellamy's original conviction in a short, four

paragraph decision.  See People v. Bellamy, 247 A.D.2d 399, 667 N.Y.S.2d 925

(2d Dep't 1998).

15.     The Court of Appeals denied leave to appeal,  91 N.Y.2d 970, 672 N.Y.S.2d 849

(1998).

16.    The United States District Court for the Eastern District of New York denied

habeas corpus relief.  See Bellamy v. Superintendent of Shawangunk Correctional

Facility, No. 99-CV-1832 (CPS) (E.D.N.Y. Dec. 7, 1999).

17.    The certificate of appealability was denied and the appeal dismissed (2d Cir. Nov.

16, 2000).

18.    On October 3, 2006 , six years after his last appeal was denied, claimant filed a

motion pursuant to CPL 440 to vacate his conviction and to grant him a new trial.

19.    On April 10, 2007 Mr. Bellamy's request for a Writ of Coram Nobis based on

ineffective assistance of appellate counsel was denied.  People v. Bellamy, 39

A.D.3d 658 (2nd Dept. 2007) appeal denied 9 N.Y. 3d 920 (2007)

20.     On June 27, 2008 after two 440 hearings that included over 30 witnesses and

nearly 100 exhibits  Hon. Joel L. Blumenfeld, Acting Supreme Court Justice

vacated the judgment of conviction based on newly discovered evidence pursuant

to C.P.L. 440.10(1)(g) which evidence pointed toward the culpability of third

parties and which new evidence supported the actual innocence of Mr. Bellamy.

People v. Bellamy, 20 Misc. 3d 1131A (Queens S.Ct. 2008).  The Court stayed its

decision pending the People's appeal.

21.    On October 24, 2008 People moved to vacate the June 27, 2009 decision that

granted Mr. Bellamy a new trial.

22.    On January 14, 2010, after a hearing, Judge Blumenfeld denied People's Motion to

Vacate the June 27, 2008 Order.  In addition to vacating the conviction based on newly discovered evidence, the Court also found multiple Brady and Rosario constitutional violations. People v. Bellamy, 906 N.Y.S. 2d 781 (Queens S.Ct. 2010).

23.   On May 24, 2011 the New York Appellate Division, Second Department affirmed the Supreme Court's decision to grant Mr. Bellamy a new trial. People v. Bellamy, 84 A.D.3d 1260 (2nd Dept. 2011).

24.   On August 11, 2011 the People's request for Leave to Appeal to the New York Court of Appeals was denied.  People v. Bellamy, 2011 N.Y. Lexis 2735 (2011).

25.   On September 16, 2011 the murder indictment against Mr. Bellamy was dismissed with prejudice upon the motion of the District Attorney for Queens County.

26.   The conviction was terminated in favor of Mr. Bellamy.

27.   Pursuant to CPL 160.60, the arrest and prosecution are now a nullity.

28.   Mr. Bellamy had been imprisoned for 14 years and three months. After his release on bail on August 14, 2008 until the September 16, 2011 dismissal of the indictment Mr. Bellamy's freedom was restricted by his having to wear an ankle monitoring bracelet.

### Statement of the Case

### The Murder of James Abbott, Jr.

29.   At approximately 9:45 a.m. on Saturday, April 9, 1994, James Abbott, Jr. was

murdered on Beach Channel Drive at the intersection of Beach 48th Street in Far Rockaway, New York.

30.    On that morning, Mr. Abbott had gone to C-Town, a supermarket located one block away on Beach Channel Drive between Beach 49th Street and Beach 50th Street, to purchase some groceries.

31.    Shortly after he left C-Town, Mr. Abbott was murdered by two men.

32.    The homicide took place three blocks from Mr. Bellamy's home and one block from C-Town, where Mr. Bellamy shopped almost daily and continued to shop between the time of the murder and his arrest one month later.

### The Prosecution Case In Chief

33.    The prosecution did not proffer or establish a motive, and no connection was drawn between Mr. Bellamy and Mr. Abbott.

34.    The prosecution's case was based on the testimony of three fact witnesses – Linda Sanchez, Andrew Carter (the prosecution's only eyewitness to the murder) and Veronica Walker.

35.    Each of the three fact witnesses exculpated Mr. Bellamy, but defendants Gillen and Solomeno, through coercion and chicanery, manipulated these witnesses so as to appear to inculpate Mr. Bellamy.

36.    In support of the prosecution case, two statements that purportedly showed consciousness of guilt were admitted in the prosecutor's case in chief.

8

37.   The first statement supposedly made after Bellamy's arrest was fabricated by

defendant Gillen to establish probable cause for the arrest, where none existed.

> "This must be a case of mistaken identity.  Somebody probably accused me
> of murdering someone."

38.   The second statement was made at the police precinct where Bellamy told the

police that on the morning of the murder he was with his friend, Terrill Lee.

39.   Although defendants Gillen and Solomeno and also the trial prosecutor David Guy

knew that the second statement was made only after Bellamy had been told the

reason for his arrest, it was still falsely presented to the jury as spontaneous and as

evidence of consciousness of guilt.

### The Simmons Call

40.   Ten days after the Abbott murder the police received a telephone report from an

Anna Simmons reporting that she had overheard a LeVon "Ish" Melvin and a

Rodney "Turk" Harris, two members of a dangerous Far Rockaway gang named

the Regulators confess to the murder of James Abbott.

41.   The gang members description of how the murder occurred was consistent with

how the murder in fact happened.

42.   This lead that Melvin and Harris murdered Mr. Abbott was not followed up by

defendants Gillen and Solomeno.

### The Prosecution Case Against Mr. Bellamy By All Accounts Was Weak

43.   The prosecution was unable to make a connection between Mr. Abbott and Mr.

Bellamy nor was the prosecution able to establish a motive for the murder established.

44.   After three days of deliberation and an <u>Allen</u> charge[1], the jury arrived at what can only be described as a "compromise" verdict, acquitting Mr. Bellamy of intentional murder but convicting him of depraved indifference murder.

45.   The jury reached that verdict despite the fact that Mr. Abbott's killers could not have been acting out of depraved indifference when they stabbed Mr. Abbott eight times, including on the neck, chest and back.

46.   The trial judge, Justice Pearl Corrado, during an interview with Court TV, stated that the jury at Mr. Bellamy's trial had a very difficult time arriving at a verdict.

She explained:

> "They (the jurors) didn't seem to be making any progress.  They kept asking for read-backs. . . .  From what they're asking for, you can tell, and they just didn't seem to be moving at all. . . . [At the end of the trial] we found all of the jurors crying, which was an indication to me that they were suffering as much as the defendant. . . . "

47.   Assistant District Attorney David W. Guy who prosecuted the case also acknowledged the weakness of the People's case.  In an interview with Court TV he described that :  Ms. Sanchez and Mr. Carter had "crumbled"; Ms. Walker was

---

[1]Allen charge, named for the case *Allen v. United States*,164 U.S. 492, 501-502, 17 S.Ct. 154, 41 L.Ed. 528 (1896), is the set of instructions given to a jury when, after deliberation, it reports that it is deadlocked and unable to decide on a <u>verdict</u>. The purpose of the instruction is to encourage jurors to re-examine their opinions and attempt to reach a unanimous verdict if possible. Because it is used to dislodge jurors from entrenched positions that might otherwise lead to a hung jury and a mistrial, the Allen charge is often referred to as the "dynamite charge."

a "non-identification"; he was "in trouble".

48.     In the People's Sentencing Recommendation Memorandum, Mr. Guy admitted that

        "[t]he People's evidence at trial did not come in as cleanly or as clearly as the

        witness' prior statements and testimony might have led one to expect", and he

        characterized the testimony of the People's witnesses as "less than crystalline".

49.     During an interview with Court TV, Mr. Reiver, Bellamy's court-appointed

        counsel said:  "I just didn't see how rational people couldn't believe that there was

        at least a reasonable doubt in this case."

50.     At Mr. Bellamy's sentencing hearing, Mr. Reiver was so shocked by the jury's

        verdict that he could only describe Mr. Bellamy's conviction as a "breakdown in

        the jury system":  "I've been working in these courts for many years and this is the

        first time I feel obliged to make a statement of this nature.  I feel that what

        happened in this trial was a breakdown in the jury system."

51.     The Appellate Division in affirming the trial court's vacatur of the conviction, and

        after reviewing the entire record agreed that the trial evidence was underwhelming:

                "...given the less than overwhelming evidence against the defendant at trial
                ..."

                                        People v. Bellamy, 84 A.D.3d 1260, 1262 (2d
                                        Dept, 2011)

52.     To overcome the underwhelming evidence connecting Mr. Bellamy to the murder.

        Defendants Gillen and Solomeno together with the Queens District Attorney's

        Office and Assistant District Attorneys, Anthony Antignani and David Guy

engaged in misconduct to compel the conviction of an innocent man despite there

being no evidence of any nature connecting Mr. Bellamy to the murder.

53. The misconduct of Defendant Gillen and Solomeno that was condoned by their

superiors, Defendant Pepe and Defendant Schruhl included the manipulation and

coercion of each material prosecution witness, the fabrication and destruction of

evidence and the failure to conduct a minimal investigation.

54. The City of New York through its final policy makers, the Queens District

Attorney Richard A. Brown, John M. Ryan and Michael J. Mansfield established

policies and practices that animated the misconduct that 1) allowed prosecutors to

operate in a climate of impunity by never reprimanding or disciplining for

misconduct; 2) by withholding exculpatory and impeachment evidence from the

defense, with a policy that shielded the trial prosecutor from knowledge of the

benefits conferred by the District Attorney's Office to prosecution witnesses 3) by

withholding exculpatory and impeachment evidence from the defense through a

policy that directed the trial prosecutors not to take handwritten notes when

interviewing prosecution witnesses.

55. The policies, practices and customs of the defendant City of New York violated

Mr. Bellamy's constitutional right to a fair trial and his right not to be wrongfully

deprived of his liberty.

56. Defendant police officers Gillen and Solomeno separately and together,

12

deliberately, maliciously, wrongfully and illegally manipulated the testimony of each of the three fact witnesses:  Linda Sanchez, Andrew Carter and Veronica Walker, so as to compel a conviction when they were fully aware of Mr. Bellamy's actual innocence.

### The Manipulation of Linda Sanchez

### Defendant Gillen and Solomeno Concealed from the Prosecutor and Mr. Bellamy That on Day of the Murder Sanchez Told Them That She did Not See Anything

57.     Linda Sanchez – who did not witness the murder – was nineteen years old and was working as a cashier at C-Town, one block from the scene of the murder.

58.     At the trial Sanchez testified that shortly before the murder she saw Mr. Bellamy and another individual follow Mr. Abbott out of the C-Town grocery store.

59.     As Mr. Abbott had been carrying a C-Town shopping bag, immediately after the murder police homicide detectives entered C-Town with photographs of Abbott asking employees if they had seen Abbott alone or with anyone else.

60.     Ms. Sanchez, when interviewed shortly after the murder, told Defendants Gillen and Solomeno that she "didn't see anything" and "didn't know nothing".

61.     The fact that on the day of the murder Ms. Sanchez told the investigative detectives the she did not see anything, was withheld by Defendants Gillen and Solomeno from the prosecutor and from both the Grand and Petit Jury.

### Defendant Gillen and David Guy, the Trial Prosecutor Manipulated Sanchez' Observation that she saw Bellamy on Sunday not Saturday

62.     Even though on the day of the murder Sanchez told the investigative detectives that she "didn't see anything," ten days later Ms. Sanchez called the police to say that she had seen two men standing behind the victim on another cashier's line.

63.     Defendants Gillen and Solomeno interviewed Ms. Sanchez a day or two after her call.

64.     Ms. Sanchez told the defendants Gillen and Solomeno that she saw Mr. Bellamy on a day on which Mr. Bellamy was trying to purchase beer on a day that such purchase was illegal.

65.     As defendants Gillen and Solomeno knew it was illegal in 1994 to sell beer on Sunday morning, Sanchez was telling defendants Gillen and Solomeno that she saw Bellamy on a Sunday (the murder occurred on April 9, 1994, a Saturday).

66.     Ms. Sanchez telling defendants Gillen and Solomeno that she saw Mr. Bellamy on a day he was not allowed to buy beer, was not disclosed by either defendant Gillen or Solomeno to the prosecutor and therefore not to the defense.

67.     A few weeks after the interview, Defendant Gillen took Sanchez to the precinct to attend the May 14, 1994 lineup.  At the lineup Sanchez when identifying Mr. Bellamy, Sanchez again  told Defendant Gillen that she saw Mr. Bellamy on "Sunday".

68.     "Sunday" was then recorded on the original line up record.

69.     Sometime thereafter but before the September 9, 1994 suppression hearing,

defendant Gillen forged the original lineup record.

70.     Defendant Gillen changed "Sunday" to "Saturday," and then added a second

handwritten sentence to the lineup record, so as to obfuscate the alteration.

71.     The original form was destroyed by defendant Gillen and a photocopy of the

doctored document was turned over by Gillen to the prosecutor.

72.     Upon information and belief, Sanchez during her pre-trial preparation with the trial

prosecutor, also told the prosecutor, David Guy, that she saw Mr. Bellamy on a day

he could not buy beer; to wit: Sunday.

73.     Upon information and belief, during this interview during which no notes were

taken, Guy repeatedly coached and corrected Ms. Sanchez when she insisted she

saw Mr. Bellamy on Sunday.

**Sanchez telling Defendant Gillen and Solomeno that she Observed Bellamy
on Sunday was Consistent with her Testimony that the Sale Signs
Covering the C-Town Windows Were Down that Morning**

74.     At the trial Ms. Sanchez, guided with leading questions,  testified that shortly

before 9:30 a.m. on April 9, 1994, she saw Mr. Bellamy and another man standing

behind Mr. Abbott on the same cash register line at C-Town two or three rows

away from her cashier.

75.     When Mr. Abbott left C-Town, Ms. Sanchez testified that he walked toward a

vacant restaurant at the far end of the C-Town parking lot, passed the two men

who were standing there, and the three men then walked together away from C-

Town.

76.     Sanchez said she was able to make this observation in part because sale posters

ordinarily covering the C-Town windows were down.

77.     Defendants Gillen and Solomeno, having interviewed Ms. Sanchez knew she did

not see Mr. Bellamy on that Saturday morning.

78.     A cursory investigation by defendants Gillen and Solomeno would have

established that the sale posters covered the C-Town windows that Saturday

morning.

**Defendant Gillen and Solomeno Tell Sanchez that as an**
**"Intimidated Witness" She Would Be Entitled**
**to Financial and Housing Assistance**

79.     In 1995 at the time of the trial Sanchez was on public assistance and living with

her three children in one room located in her brother's home.

80.     As she knew she saw Mr. Bellamy on Sunday and not Saturday, the day of the

murder, Sanchez was reluctant to testify.  For months before the trial she would

not answer telephone calls from Defendants Gillen or Solomeno.

81.     Gillen and Solomeno, aware of her housing situation, knew she was in desperate

need of housing and financial assistance for herself and her children.

82.     Upon information and belief, Defendants Gillen and Solomeno told Sanchez that

the QDAO could provide financial and housing benefits if she claimed that she had

been threatened or was an intimidated witness.

16

83. Ms. Sanchez then "remembered" that 18 months earlier, a few days after the murder, that Mr. Bellamy came to her cashier line and threatened her by saying , "You know, you know, you fucking bitch, you're next."

84. Ms. Sanchez testified that on the day of Mr. Bellamy's arrest, upon seeing her across the street Mr. Bellamy menacingly wagged his finger at her.

85. Neither threat was reported to anyone at the time they were made, nor were the threats mentioned in her May 19, 1994 Grand Jury testimony or to the A.D.A. who prepared her for her testimony.

86. Sanchez never felt intimidated or threatened. For eighteen months after the murder she continued her normal daily routine and continued to work at C-Town long after the threats were made.

87. Ms. Sanchez did not tell any of her fellow employees at C-Town that she was threatened.

88. That Bellamy would threaten Sanchez made no sense, as Bellamy, according to Sanchez, had not been on Sanchez' cashier's line and had not been arrested at the time the threats were made.

89. Defendants Gillen and Solomeno knew or should have known or were deliberately indifferent to the fact that the threats were contrived so that Sanchez would be eligible to receive financial and housing assistance from the Queen's District Attorney's Office.

17

90. The trial had already begun and the supposed threats would bolster the very weak prosecution case.

91. Before Sanchez testified, the QDAO promised her housing assistance for the rest of her life.

92. First she was promised a rent-free three bedroom apartment for herself, her boyfriend (father of two of her children) and her three children.

93. The QDAO then transitioned Ms. Sanchez to a permanent three bedroom federally subsidized Section 8 apartment, the same apartment in which she continues to live today.

94. The subsidized Section 8 apartment promised to Sanchez is at a rental which is a fraction of the market value for a three bedroom apartment.

95. When Ms. Sanchez was called as a prosecution witness on November 28, 1995, she testified that all she received from the QDAO was $50 and a promise of an additional $50 for milk and diaper money.

96. On the very day of this testimony and undisclosed, Ms. Sanchez was given $250 by the QDAO and was promised that this $250 payment would continue every two weeks for an indefinite period.

97. These payments totaling over $6,000 then continued for at least 50 weeks until she was placed into the Section 8 apartment.

98. The financial assistance of the QDAO was in addition to the public assistance

monies she was already receiving.

99.    Sanchez was also promised that she would receive payment of the first and last months' rent upon her finding permanent housing.

100.    Eventually, Sanchez received an additional $2,800 lump sum payment for "relocation" expenses.

101.    These payments were made despite Ms. Sanchez being on public assistance and being ineligible for receiving outside income.

102.    These promised benefits were withheld from the trial prosecutor pursuant to a policy described by the QDAO as a "Chinese wall" that shielded the trial prosecutor from knowledge of the benefits the witness is promised by a separate internal department.

103.    This "Chinese wall" policy insures that disclosure of promises, which constitute Brady material, are not disclosed to the defense.

104.    At the time the QDAO promised Sanchez that they could assist her in obtaining permanent housing, the  eligibility list for Section 8 was closed to the general public.  http://www.nyc.gov/html/nycha/html/section8/lh_app_faqs.shtml#q7

105.    One of the few exceptions for eligibility when the Section 8 list is closed, is for those individuals who claim to be "intimidated prosecution witnesses."
http://www.nytimes.com/2007/01/30/nyregion/30housing.html

106.    As promised by the QDAO, Ms. Sanchez was certified to the Section 8 Housing

Administrator that in light of the threats Ms. Sanchez was an "intimidated

prosecution witness."

107.    The benefits promised to Sanchez was not because she was a witness who required

protection but to induce her testimony.

108.    Pursuant to the Witness Protection Program ("WPP") a witness receiving housing

assistance must agree to be relocated  to another borough.

109.    Sanchez who was not intimidated, refused to be relocated to a different borough as

required under the WPP policy and negotiated that her housing be close to her Far

Rockaway neighborhood.

110.    Sanchez' identity was not changed and she was given housing only a few miles

from her home and family in Far Rockaway.

111.     The substantial financial and housing assistance that Sanchez was promised and

received, if it had been disclosed, would have explained to the jury the

inexplicable purported threat first reported on the eve of trial 18 months after it

was made.

112.    The failure to disclose the full extent of the benefits that were promised, left the

defense lawyer unable to offer a plausible argument as to the reason the threats

were fabricated.

### The Chinese Wall Policy of the QDAO

113.    Because of the QDAO's policy that insulated the trial prosecutor from the

20

knowledge of the financial and housing benefits that were conferred on witnesses, the trial prosecutor did not know of the extensive benefits promised to Ms. Sanchez.  As a result, Mr. Bellamy was deprived of his constitutional right to Brady material.

114.   In 1994/1995 the law was well established that such an intra-office "wall" that would avoid disclosing to the trial prosecutor the promises of benefits made to witnesses, violated defendant's constitutional rights.   Giglio v. U.S., 405 U.S. 150 (1972); People v. Novoa, 70 N.Y. 2d 490 (1987).

115.   In People v. Steadman, 82 N.Y.2d 1 (1993), two years before Mr. Bellamy's trial New York's highest Court declared the QDAO's policy of shielding trial prosecutors from defendants' promises made to testifying witnesses deprived defendants of their constitutional right to a fair trial.

116.   Despite the Steadman decision this "Chinese Wall" policy continued at the time of Mr. Bellamy's trial and continues to date.

117.   This "Chinese wall" policy was formulated and implemented by John M. Ryan the Chief Assistant District Attorney, Queens County together with Bureau Chief Michael J. Mansfield in charge of the so-called Queens County District Attorney's Witness Protection Program and approved by Richard Brown, Queens County District Attorney.

### Gillen Suppresses Sanchez' Identification of Terrill Lee
### as the Second Person She Saw, Which Identification
### Exculpated Mr. Bellamy

118. On May 13, 1994, when told the reason for his arrest, Mr. Bellamy gave a statement that on the morning of the murder that he was with his friend Terrill Lee.

119. The following day, Defendant Gillen showed Ms. Sanchez the photograph of Lee and asked her if he was the second person she saw that morning with Mr. Bellamy.

120. Ms. Sanchez positively identified Lee as the second person who she saw with Mr. Bellamy.

121. Defendants Gillen and Solomeno, after interviewing Lee, were aware that Lee had a solid alibi for the morning of the murder.

122. Lee's alibi necessarily ruled out Mr. Bellamy as the perpetrator of the murder, since Sanchez supposedly saw Lee and Bellamy together.

123. Defendant Gillen deliberately withheld from the prosecutor that Sanchez had identified Lee as the second person she saw with Bellamy.

124. Sanchez' identification of Lee, who had a solid alibi for Saturday morning, would have confirmed that Sanchez saw Lee and Bellamy together on Sunday and not on Saturday.

125. So as not to alert the prosecutor and thus the defense that a photo of Lee was taken and had been shown and identified by Sanchez, Defendant Gillen removed from the police file the Lee photograph and any notes regarding the identification.

22

## Lee's Alibi for the Time of the Murder

126.   Mr. Lee in fact had been with Mr. Bellamy late that morning well after the time of
the murder.

127.   On the day of Mr. Bellamy's arrest Defendant Gillen went to Terrell Lee's home to
ask Mr. Lee and his wife Monique to accompany him to the station house for
questioning.

128.   At the station house Defendant Gillen questioned the Lees separately as to Mr.
Lee's whereabouts on the morning of the murder.

129.   Mr. Lee told Defendant Gillen that he had been at home at the time of the crime
and that he did not leave his home until after the homicide had occurred.

130.   Ms. Lee, interviewed separately by Gillen,  confirmed that her husband was home
on the morning of Mr. Abbott's murder.

131.   After the Monique and Terrill Lee interviews, Defendant Gillen and later A.D.A.
Antignani found Mr. Lee's alibi for 9:30 a.m credible and thus ruled Lee out as a
suspect.

132.   After the Lee interview no further steps were taken to investigate Lee as the
second assailant.

133.   Ruling out Lee as a suspect was of critical Brady importance since Sanchez
identified Lee as the second person she saw with Mr. Bellamy.

134.   If Sanchez saw Lee and Bellamy together, Lee's alibi necessarily ruled out Mr.

Bellamy.

135. The exculpatory Lee interviews were withheld from the defense.

**Defendant Gillen Manipulates Lee Into Saying that
Lee was Not With Bellamy that Morning**

136. Now that Defendant Gillen knew that Lee had an alibi for the morning of the

murder, Defendant Gillen then took steps to make sure that Bellamy would not use

Lee as an alibi witness at the upcoming trial.

137. To frighten and intimidate Mr. Lee, Detective Gillen falsely told him that Mr.

Bellamy said he was with Lee at 9:30 a.m. the time of the murder.

138. This was not true. Mr. Bellamy never told Defendant Gillen he was with Lee at

9:30 a.m.

139. Bellamy told Defendant Gillen he was with Lee that morning, but well after 9:30.

140. During the Lee questioning defendant Gillen drew a noose on a piece of paper.

141. Gillen then told Lee that if he says he was with his friend, Kareem, that morning,

Lee's head would be in that noose.

142. Defendant Gillen intentionally used this racially charged symbol to frighten Mr.

Lee who is an African American.

143. Lee, frightened by Defendant Gillen's conduct, then told A.D.A. Antignani in the

ensuing taped interview he was not with Mr. Bellamy virtually all that day.

144. Defendant Gillen's coercion of Lee to deprive Mr. Bellamy of an alibi witness,

violated Bellamy's right to a fair trial.

24

### Defendant Gillen's Manipulation of Andrew Carter

### Defendant Gillen and Solomeno Were Aware that Carter
### Could Not Describe the Assailants

145.   Andrew Carter, a felon who was on parole and was an admitted drug user, was the prosecution's only eyewitness to the murder.

146.   Mr. Carter was 41 years old and wheelchair bound because of an injury he received after being shot by the police while he was committing an armed robbery.

147.   While sitting in his wheelchair Mr. Carter witnessed the stabbing of Mr. Abbott.

148.   On the morning of April 9, 1994, Mr. Carter was waiting for a bus to take him to visit his mother in Jamaica, Queens.

149.   Mr. Carter was interviewed by the homicide detectives on the day of the murder and again one week later.

150.   During both interviews Mr. Carter was unable to provide a physical description of the two assailants, other than to say that they were "black" and that one man was "taller" and one was "smaller".

151.   Defendant Gillen and Solomeno were aware of this bare-boned description Carter gave to the detectives.

152.   Mr. Carter told Defendant Gillen and Solomeno that he had been focused on the knife and the boots while Mr. Abbott was being brutally stabbed and stomped and did not see the faces of the perpetrators.

153. Mr. Carter told Defendant Gillen and Solomeno that the "only thing" he noticed was the "Timberland boots they [the assailants] had on . . . I said I didn't notice hair, notice clothes they had on.  I didn't pay attention."

Defendant Gillen Suggests and Coerces Carter into Identifying Mr. Bellamy

154. Despite Defendants Gillen and Solomeno being told that Carter did not get a good look at the faces of the perpetrators, after Bellamy's arrest, Defendant Gillen took Carter to the lineup.

155. Defendant Gillen promised Carter drugs and a motel room for him and his girlfriend if he would make an identification.

156. Gillen knew that Carter was an active cocaine and crack user.

157. This information was not recorded in a police report and was withheld from the prosecutor.

158. The lineup was to be held on May 13, 1994, the day of Bellamy's arrest.

159. Carter could not attend the lineup that day due to supposed illness.

160. The next day, on the way to the lineup Mr. Carter repeated to Defendant Gillen that he "wasn't sure" if he could identify the person who committed the murder.

161. Defendant Gillen then falsely and improperly told Carter that the suspect had been apprehended and would be in the lineup and that the suspect had been bragging about the murder and had "changed his appearance".

162. Defendant Gillen telling Carter that the suspect had confessed and would be in the lineup and had "changed his appearance", violated Mr. Bellamy's constitutional right to a fair lineup identification procedure.

163. Defendant Gillen then placed Bellamy in position one at the lineup.

164. At the lineup Mr. Carter identified the filler in position two, as the person he saw attack Mr. Abbott.

165. Without the identification of Mr. Bellamy having been made by Mr. Carter, Gillen knew that there was no probable cause to arrest or indict Mr. Bellamy.

166. After Mr. Carter identified the filler, defendant Gillen who was at the lineup then wheeled Mr. Carter from the lineup room and took him into a separate room where they were alone.

167. In the private room Defendant Gillen then told Carter that Mr. Bellamy had "[c]ut his hair, changed his appearance" and that was why Mr. Carter "might not have recognized him" in the lineup.

168. Following this private conversation Mr. Carter, who was on parole, succumbed to Defendant Gillen's improper suggestions and coercion, and said that he had changed his mind and that he could now identify the assailant as sitting in position one (Bellamy).

169.   At trial, Mr. Carter, adopting Defendant Gillen's suggestions, said that he had been confused in the lineup room because Mr. Bellamy's hair was braided at the lineup but *was not braided* on the day of the murder.

170.   Carter's statement that Bellamy's hair was not braided was diametrically inconsistent with Sanchez' description that Bellamy wore "a million braids".

171.   At trial, Mr. Carter repeated Defendant Gillen's explanation that Mr. Bellamy's appearance had changed by the time of the lineup, and that Mr. Bellamy *did not have braids* on the day of the murder:

172.   Bellamy in fact wore braids both on April 9th and May 14, 1994 and did not change his braided hairstyle during this period of time.

173.   Consistent with Carter never having observed the faces,  at trial when shown the line up photo he was not able to and he did not identify Mr. Bellamy as the perpetrator.

174.   On at least eight different times at trial Carter repeated what he said at the lineup that he identified filler in position two as the perpetrator.

**Despite His Identification of the Filler When Looking at the
Line-Up Photo, Carter Made an In-Court I.D.**

175.   When asked to make an in-court identification, Carter pointed to Mr. Bellamy, sitting at the defendant's table.

176.   Defendant Gillen and Solomeno also knew that when Carter made the in-court identification of Bellamy that it was a product of Defendant Gillen's coercion and improper suggestion.

177.   Defendant Gillen's coercive and suggestive tactics violated Mr. Bellamy's constitutional right to a fair trial.

### Manipulation of Veronica Walker

### Walker Tells Defendant Gillen and Solomeno that It Was Not Bellamy She Saw

178.   After the trial commenced and Sanchez had testified, the case, as acknowledged by the prosecutor, had "crumbled".

179.   Another witness was needed to bolster the weakened case.

180.   On December 1, 1995, two weeks after the trial had begun and after Sanchez had testified, Defendant Gillen and Solomeno returned to the home of Veronica Walker.

181.   Months before the trial, Defendant Gillen and Solomeno had interviewed Ms. Walker at her home in connection with the murder of Mr. Abbott.

182.   Defendant Gillen and Solomeno had been told by Deborah Abbott, the victim's sister that Ms. Walker had told the sister that she had been at the scene of the murder and had seen the victim fighting on the corner of Beach Channel Drive and Beach 49th Street.

183.  At this first interview, Walker told Defendant Gillen and Solomeno that she in fact was at the scene and had seen a man run from behind her car to the intersection where a fight ensued.

184.  Defendant Gillen then took two photos out of his coat pocket, and told Ms. Walker that – although he was not supposed to show these photos to her – he wanted her to look at them and tell him whether she knew the person depicted.

185.  Defendant Gillen then placed the photos on the table.

186.  Ms. Walker told Defendant Gillen that she knew the person depicted in the photos – Kareem Bellamy – because the mother of Mr. Bellamy's son lived next door to Ms. Walker.

187.  Defendant Gillen falsely promised Walker that Mr. Bellamy had gone to the 101st police precinct and said "I heard you [are] looking for me for a murder" and that Mr. Bellamy had confessed to the murder.

188.  Walker then told Defendant Gillen and Solomeno that it "wasn't Kareem" who she saw run from behind a car, because she knew Mr. Bellamy.

189.  Defendant Gillen did not record or report this exculpatory statement and it was withheld from the prosecutor and the defense.

190.  Not satisfied by Walker's non-identification and using the same coercive suggestion used with Carter, defendant Gillen said that photos of Mr. Bellamy looked different because Mr. Bellamy had started to take the braids out of his hair

in one photo and Mr. Bellamy did not have any braids in his hair in the second photo.

191. Defendant Gillen also told Walker that the police could relocate her and her family if she was afraid of testifying.

192. When Walker would still not identify Mr. Bellamy,  to further frighten and intimidate her Defendant Gillen told Ms. Walker that if she did not confirm Deborah Abbott's (sister of James Abbott) account of what Ms. Walker supposedly observed on the day of the murder, Ms. Walker would be charged with perjury.

193. Ms. Walker repeated to defendant Gillen that it was not Mr. Bellamy who she saw.

194. Fearful that Walker might make an identification that would undermine their case against Mr. Bellamy, Defendants Gillen and Solomeno, who had no interest in conducting an investigation to find the real culprits, did not ask Walker to view photos of LeVon Melvin or Rodney Harris, suspects identified in the Simmons report.

195. Solomeno prepared a false handwritten statement for Ms. Walker to sign that stated that Walker identified Kareem Bellamy as the person she saw stabbing and kicking Mr. Abbott.

196. Walker refused to sign the false statement given to her by Solomeno and repeated that it was not true that it was Mr. Bellamy whom she saw that morning.

31

197.   When Defendants Gillen and Solomeno persisted in their effort to coerce Ms. Walker into identifying Mr. Bellamy, Ms. Walker demanded that the detectives leave her home.

198.   Before Ms. Walker took the witness stand, Defendants Gillen and Solomeno knew that Walker specifically told them that Bellamy was not the person she saw.

199.   Gillen and Solomeno suppressed from the prosecutor this interview of Ms. Walker which exculpated Mr. Bellamy.

200.   As Gillen and Solemeno either purposefully did not prepare a police record of this interview or destroyed the notes of the interview, the defense was in the dark both as to Ms. Walker having seen the struggle and also that she said she had not seen Mr. Bellamy on the corner at the scene of the murder.

201.   On December 1st, with the prosecution case crumbling and desperate to bolster the case Defendants Gillen and Solomeno served a subpoena on Ms. Walker despite knowing that Walker positively did not identify Mr. Bellamy.

202.   Solomeno prepared a false DD5, and gave it to the prosecutor and the defense, stating that Ms. Walker told defendant Solomeno that she had identified Mr. Bellamy as fighting, punching and kicking James Abbott, Jr. at the intersection where the murder occurred.

203.   On her way to the courthouse to testify at the original  trial, Ms. Walker again told Defendants Gillen and Solomeno that they were not going to get what they wanted.

204.    At the 440, Ms. Walker explained what she meant by that statement:

> "What I meant by that was that I wasn't gonna corroborate what Detective Gillen wanted me to say, that I seen him [Kareem Bellamy] do it. And they weren't going to get that. I'm not gonna lie to them. I'm not gonna say that I saw him do something and he didn't do it."

205.    Ms. Walker testified at the trial that on the morning of April 9, 1994, she went to C-Town for some groceries.

206.    As she walked into C-Town, she saw Mr. Abbott leave the store and exchanged brief pleasantries with him.

207.    After shopping for several minutes, Ms. Walker returned to her car and began to drive down Beach Channel Drive to her hairdresser.

208.    Ms. Walker testified that at the intersection of Beach Channel Drive and Beach 49th Street, she observed someone run behind her car.

209.    That person, whom she described as a "slim" black man with braided hair, then joined another person who was fighting with Mr. Abbott at the corner of Beach Channel Drive and Beach 48th Street.

210.    When Ms. Walker was asked at trial to identify the man she saw run behind her car, to the prosecutor's dismay, as he had relied upon Solomeno's false DD5, Ms. Walker, as she had previously told defendants Gillen and Solomeno, did not identify Mr. Bellamy as the person she saw.

211.    Guy then used the falsified DD5 to attempt to impeach Ms. Walker.

212. Pursuant to the QDAO's policy that winning is everything and intent on winning the case at any cost, in his closing statement Mr. Guy twisted Ms. Walker's "non-identification" into a corroboration of Mr. Carter's and Ms. Sanchez's (contradictory) identifications since Ms. Walker described the person who ran behind her car as "short with braided hair".

213. Walker's numerous statements to Defendants Gillen and Solomeno that it was not Mr. Bellamy she saw, were deliberately withheld by Defendants Gillen and Solomeno from the prosecutor and thus from the defense.

### Defendant Gillen Fabricates that Mr. Bellamy Made a Statement After His Arrest

214. Defendant Gillen knew that there had been no probable cause to arrest Mr. Bellamy and to hold Mr. Bellamy overnight, awaiting the Carter and Sanchez lineup.

215. A hearing to suppress the statements of Mr. Bellamy and the identification of Mr. Bellamy was scheduled for September 9, 1994.

216. To establish probable cause for the arrest, Defendant Gillen falsely recorded that Bellamy made a statement in the police car after his arrest for drinking in public: "This must be a case of mistaken identity.  Somebody probably accused me of murdering someone."

217. Bellamy's purported statement made in the police car was not recorded in a police report (DD5).

34

218.   None of the other officers who were also in the police car corroborated Defendant Gillen's account that the statement was made.

219.   Gillen, having forgotten that he previously prepared and submitted the fabricated statement, prepared a second version. The second version of the note is an exact duplicate of the first version, except that it also includes the following sentence added by Defendant Gillen at a later point in time: "Statement made by def while being asked his pedigree – Spontaneous & unsolicited."

220.   This addendum "spontaneous & unsolicited" was also fabricated to support the alleged spontaneity of the statement.

221.   The prosecution repeatedly pointed to this fabricated statement, to bolster their weak evidentiary case, as evidence of consciousness of guilt.

222.   The Hearing Judge relied on this fabricated statement to establish probable cause for the arrest and deny suppression of Bellamy's statement and the Sanchez and Carter identifications.

### Defendant Gillen and Solomeno Deliberately
### Do Not Investigate Third Party Culpability

223.   Defendant Gillen and Solomeno did not investigate credible evidence of third party culpability as further investigation could only exculpate Mr. Bellamy.

224.   Shortly after the murder Defendant Gillen received a telephone report from a person who identified herself as "Anna Simmons".

225. Ms. Simmons told the police that she overheard two men named Rodney Harris and an Ishmael, who was later identified as LeVon Melvin, confess to being "involved in [the] homicide" of Mr. Abbott.

226. The Simmons' report also described the way the murder in fact happened:

> ". .. They followed the victim from the supermarket. She stated that they had waited for the victim to come out of the supermarket. They followed him to the c/o the incident and while he was on the phone got out of their care and "snuffed him". She went on to inform the undersigned that she understood "snuffed" to mean kill. The female continued, saying that these two males were part of a gang who call themselves the Regulators. The victim may have ben asked to join the gang and had refused. After the incident the two males got back into the car and left. She stated that she is familiar with both males and gave the following description of them:

> 1. Rodney Harris M/B 26-27 yoa
> 5610 Beach channel Drive
> Apartment 7g or 7H
> Short possibly 5'2 - 5'4
> Wears read hoodies

> 2. Ishmel
> 5449 Almeda Avenue
> m/b 27-29 yoa
> Possibly head of the Regulators"

**Defendant Gillen and Solomeno Do Not Interview Either
Levon "Ish" Melvin or Rodney "Turk" Harris**

227. Although they received the Simmons' report only days after the murder, no steps were taken to investigate this Simmons' lead.

228. Defendants Gillen and Solomeno made no efforts to ascertain the whereabouts of Mr. Harris or Mr. Melvin on the morning of Mr. Abbott's murder.

36

229.   Defendants Gillen and Solomeno never sought to question Mr. Melvin or Mr.

Harris.

230.   Defendant Gillen testified that two photo arrays of Harris and Melvin were

prepared and shown to Mr. Carter and Ms. Sanchez.

231.   Although it is standard police practice to prepare a police report (DD5) to record

investigative events, a DD5 was not prepared for the viewing of the photo array of

either Harris or Melvin.

232.   After the conclusion of the suppression hearing on September 9, 1994, Bellamy's

counsel asked for the police report detailing steps taken to investigate the Simmons

lead as no police records of the purported follow-up existed.

233.   In November, six months after the fact, Defendant Gillen then prepared a DD5

falsely stating that he went to the apartment mentioned in the Simmons report and

to the laundromat to look for Ms. Simmons.

234.   The usual and customary contemporaneous police reports of efforts made to

follow-up on the Simmons' lead are not contained in the file.

**Defendant Gillen Does Not Allow Mr. Bellamy to Make a Telephone Call
to His Family so as to Prevent Mr. Bellamy from Having an Attorney
Present at the Lineup**

235.   On May 13, 1994, Mr. Bellamy, while standing in front of his home, was taken

into custody at gunpoint by Defendant Gillen accompanied by two other officers,

all with guns drawn and  pointed at Mr. Bellamy.

37

236.    Defendant Gillen told Mr. Bellamy that he was being taken to the precinct to

receive a fine for drinking in public.

237.    After arriving at the precinct, Mr. Bellamy was shown a photo of Mr. Abbott's

dead body and told that two people had identified Mr. Bellamy as one of the

murderers.

238.    While Mr. Bellamy denied any involvement in the murder, he was placed in a

holding pen to await a lineup.

239.    Defendant Gillen would not allow Mr. Bellamy's repeated requests to call his

family.

240.    Defendant Gillen would not permit Mr. Bellamy to call his family so as to be sure

that Mr. Bellamy would be unable to retain an attorney to be present at the lineup.

241.    The lineup was held on May 14, 1994, the day following Mr. Bellamy's arrest.

**After Bellamy's Arrest, the Case was Closed and No**
**Further Steps To Investigate the Murder Were Undertaken**

242.    Defendant Gillen told Mr. Bellamy while he was in the holding cell, "Once I close

the door, it closes for good."

243.    After Carter's May 14th coerced lineup identification, Defendants Gillen,

Solomeno, Pepe and Schruhl  closed the murder investigation.

244.    Defendants Gillen, Solomeno, Pepe and Schruhl  took no steps to investigate to

test for blood samples on the boots worn  by Mr. Bellamy, Terrell Lee, LeVon

Melvin or Rodney Harris, or to even find the second perpetrator after May 19, 1994.

245.   Detectives Gillen and Solomeno knew that further investigation could only exonerate the innocent Mr. Bellamy.

### Defendants Pepe and Schruhl Fail to Supervise
### Defendants Gillen and Solomeno

**246.**   NYPD has established investigative procedures and practices that are intended in part to safeguard the integrity of the investigation and to safeguard the constitutional rights of suspects or defendants during the investigation of a crime.

247.   Defendants Schruhl and Pepe had the superintendent responsibility of insuring that their subordinate detectives follow these police practices.  Despite this responsibility, Schruhl and Pepe were deliberately indifferent to the fact that these investigatory practices (more fully described in paragraphs 248-256 herein) were being circumvented by their subordinates thereby potentially causing constitutional violations.

248.   NYPD police investigative practices provide for the preparation of police reports (DD5's) to document the progress of the criminal investigation and to record important investigative events including but not limited to witness follow-ups and interviews, the recording of statements of suspects when made, referrals for forensic testing and the identification procedures that are undertaken.

39

249.  Defendants Schruhl and Pepe were aware of the importance of these police reports to the criminal defendant as the investigative file including the DD5's is sent to the assigned trial prosecutor to be reviewed for potential exculpatory information that is constitutionally required to be turned over to the defendant.

250.  To insure that investigations are fairly conducted and to preserve the integrity of the investigation and to avoid the removal of DD5's from the investigative file or the altering of the police reports, DD5's are required to be  1) sequentially numbered; 2) reviewed and then countersigned by a supervisor; 3) incorporated into a main Index Sheet; and 4) copies transmitted to the NYPD District and/or Central Office.

251.  As a direct cause of defendant's Schruhl and Pepe's failure to supervise or train and their deliberate indifference to the constitutional rights of the defendants, DD5's were not prepared for important investigative events, when prepared  were not numbered, were not reviewed by a supervisor, were not incorporated into an Index Sheet and were not transmitted to the District and Central offices of the NYPD.

252.  Standard police investigative practices and procedures provide for the preparation of photo arrays to be shown to witnesses.  To insure that the arrays are in fact shown and to accurately record the results of the witness  police practice and procedures require that after the array is assembled and presented to a witness that

such be  incorporated into a police report and that a record made on the array form as to the result of the identification and then confirmed by the signature of  the viewing  witness.

253.  Defendants Schruhl and Pepe were either aware of or deliberately indifferent and grossly negligent to the fact that these photo array  procedures were not followed and failed to adequately supervise, train or discipline their subordinates to insure that the procedures that safeguard the constitutional rights of the defendant are implemented, and were aware that the failure to follow these practices would cause constitutional violations.

254.  There is no police report reflecting that the photo arrays that included the suspects Levon "Ish" Melvin and Rodney "Turk" Harris were ever shown to the only eyewitness Carter.   Despite the trial testimony of defendant Gillen as part of the case in chief that Harris and Melvin were carefully ruled out as suspects, the Harris/Melvin arrays were not shown to  Carter, the only  eyewitness.

255.  As a direct cause  of Schruhl's and Pepe's failure to supervise or their deliberate indifference to, and/or failure to adequately supervise, train or discipline their subordinates to follow proper police investigative procedures and practices, Bellamy's constitutional rights to a fair trial were violated in that it allowed Gillen and Solomeno to:

a.   fabricate Bellamy's statement that "This must be a case of mistaken identity.  Somebody probably accused me of murdering someone."

b.   Fail to document and thus suppress Michelle Abbott's report that a few days before her husband's murder, she had witnessed her husband and his friend, Eric Jefferies packaging marijuana; and

c.   Fail to document and thus suppress Deborah Abbott's report that her brother may have been murdered by a jealous boyfriend;

d.   Fail to document and thus suppress evidence that Eric Jefferies was a suspect in the murder;

e.   Fail to document and thus suppress the fact that Sanchez identified Lee as the second person she saw with Bellamy;

f.   allow the original line up sheet that recorded that Sanchez saw Bellamy on a Sunday to be "lost."

g.   falsify that the arrays of Melvin and Harris were shown to Carter;

h.   fail to conduct any investigation or follow up of the Simmons call that had reported that Melvin and Harris had bragged about killing Abbott.  Melvin and Harris were never interviewed.

i.   allow the alteration of the Lila police report, a witness who saw the perpetrators wearing hoods while struggling with the victim, but the police report recorded that Lila had not seen anything.  Hoods would have

corroborated the Simmons' report that Melvin and Harris wore "Hoodies," and would be consistent with Sanchez' description of Bellamy as wearing a hat.

j.    fail to take any steps to investigate the unapprehended second perpetrator;

k.    close the investigation upon Bellamy's arrest and thereafter taking no further investigatory steps of any kind;

l.    fail to conduct any forensic testing including blood tests on the clothes and boots of Bellamy, Melvin or Harris;

m.    deprived Bellamy of a third party culpability defense;

n.    fail to transmit to the trial prosecutor exculpatory information to which Bellamy was constitutionally entitled.

256.    Defendants Schruhl and Pepe were personally involved in defendants Gillen's and Solomeno's misconduct through their gross negligence, deliberate indifference, and failure to supervise, train or discipline defendants Gillen and Solomeno to follow the aforementioned procedures and practices which failure established a policy or custom that would necessarily lead to constitutional violations and the deprivation of a defendant's right to a fair trial.

**Defendant Gillen and Solomeno Suppress Evidence
that The Perpetrators Were Wearing Hoods**

43

257.   The Simmons' report identified the two perpetrators LeVon Melvin and Rodney
       Harris as wearing "hoodies".

258.   As testified to by Ms. Sanchez, during the period of time of the murder Mr.
       Bellamy was known to and wore a green hat.

259.   Mr. Bellamy did not wear or own a hooded sweater.

260.   Defendants Gillen and Solomeno purposefully concealed the witness interviews of
       Brijmohan Lila and Maria Vega, that the perpetrators wore hoods.

**Brijmohan Lila Sees Perpetrators Wearing Hoods**

261.   Mr. Lila lives on the northeast corner of Beach Channel Drive and Beach 48th
       Street, across the street diagonally from where the murder of Mr. Abbott took
       place.

262.   Mr. Lila had an unobstructed view of the murder scene.

263.   On the morning of April 9, 1994, Mr. Lila looked outside his front door window
       and saw three men fighting by the phone booth across the street from his house.

264.   Mr. Lila observed that two of the men were wearing sweatshirts with hoods that
       covered their heads.

265.   After viewing the fight for a few seconds, Mr. Lila went to his bedroom and called
       the police.

266.   When he returned to the front window a couple minutes later, Mr. Lila saw one
       man lying in the street and the two hooded men running down Beach 48th Street.

267. As Mr. Lila lived across the street from where the murder took place, Mr. Lila was interviewed by two police officers on the morning of April 9, 1994.

268. Mr. Lila told the police that he saw part of the struggle and showed them where he was standing in his house when he viewed the attack.

269. During two separate police interviews Mr. Lila said that the men who were involved in the fight were wearing hoods.

270. To conceal this observation, a false DD5 was prepared of Mr. Lila's April 9, 1994 interview which DD5 stated that Mr. Lila did not witness the fight at all.

271. The DD5 falsely recounts that Lila, when asked by a police officer if he heard gun shots, said he did not see the struggle:

> "On this date at 1100 hrs. the undersigned interviewed Mr. Brijmohan at which time he stated that on this date at approx. 0945 hrs. he walked out of his residence and looked across the street at the c/o B 48 St. and B.C.D. by the telephone and observed a M/B with a green jacket with packages on the phone (public)[.] He then went back inside and went down into the basement and looked outside the basement door and observed a police car at the corner on B 48 St. and B.C.D.  He asked [them] what happened at which time a police officer told him that someone was shot and asked me if I heard any gunshots at which time I told him no."

272. Mr. Lila's account of hooded men attacking Mr. Abbott was never disclosed to the prosecutor by Defendant Gillen or Solomeno as that account would exculpate Mr. Bellamy who was known to wear a hat.

273. The false DD5 also served to mislead the defense from interviewing Mr. Lila.

274.   The record of any canvass or interviews of residents at the scene of the murder is missing from the police file.

275.   The fabricated DD5 was turned over to the prosecutor and later to the defense.

276.   Defendant Gillen and Solomeno also suppressed a witness interview of Maria Vega who also saw that the assailants were hooded.

## Maria Vega Also Sees Perpetrators Wearing Hoods

277.   Ms. Vega arrived at the scene of the crime shortly after Mr. Abbott was stabbed.

278.   Ms. Vega was riding in a car with her husband (Victor Vargas), her parents and her daughter on the morning of April 9, 1994.

279.   They had just left C-Town – where they had gone shopping – and were driving down Beach Channel Drive when they saw a man lying in the street near the phone booth on the corner of Beach 48th Street.

280.   When she first saw the man lying in the street, she also saw a man wearing a hood walking "real fast", "[l]ike running away" from the scene toward Beach 49th Street.

281.   Ms. Vega told the police, who took notes,  that she saw someone wearing a hood "walking fast, like running away" from the crime scene.

282.   Before turning over the file to the prosecutor, Defendant Gillen removed these notes of the Vega interview as the fact that the perpetrators were seen to be hooded, exculpated Mr. Bellamy.

46

283. Defendant Gillen and Solomeno conspired to withhold witness interviews that provided alternate theories of the murder.

### Defendant Gillen and Solomeno Suppress Interviews that Establish A Third Party Culpability Motive

### Michelle Abbott Observes Her Husband with a Gun, Bullet-proof Vest, and Packaging Drugs

284. Michelle Abbott is the widow of James Abbott, Jr.

285. On the day of her husband's murder, Mrs. Abbott told the police about an incident that occurred at her house involving her husband and his best friend, Eric Jefferies.

286. Mrs. Abbott said that she told Defendant Gillen that a few weeks before the murder, she saw her husband James Abbott and his best friend Mr. Eric Jefferies packaging bags of marijuana in her kitchen.

287. There was a bulletproof vest on the table, and Mr. Jefferies had a gun with him.

288. The DD5 turned over to the prosecutor prepared by Solomeno left out any mention of what Mrs. Abbott told him regarding this theory of third-party motive.

289. Before turning over the file to the prosecutor, defendants Gillen and Solomeno either altered or removed this interview from the file.

290.  Instead and to mislead the defense, defendants Gillen and Solomeno prepared a police report that omitted this alternate theory of the murder.

### Eric Jefferies Confirms that James Abbott was Packaging Drugs and Had a Gun and a Bullet-Proof Vest

291.  Eric Jefferies was the best friend of Mr. Abbott.

292.  At approximately 3:00 p.m. on the day of the murder, Defendant Gillen and Solomeno contacted Mr. Jefferies and asked him to come to the police precinct.

293.  Jefferies corroborated the widow's statement that Mr. Abbott had drugs (he said he had "oregano"), a gun and a bulletproof vest at Mr. Abbott's home.

294.  Before turning over the file to the prosecutor, defendants Gillen and Solomeno removed this Jefferies' interview that established an alternate theory of the murder.

295.  Instead Defendant Gillen turned over to the prosecutor a DD5 that omitted this alternate theory of the murder.

### Deborah Abbott Provides Jealousy as a Theory of the Murder

296.  On April 9, 1994 defendants Gillen and Solomeno interviewed Deborah Abbott, sister of James.

297.  Deborah Abbott provided a possible motive for the murder.

298.  Ms. Abbott told the detectives that her husband had been threatened by a boyfriend of Mr. Abbott's former girlfriend.

299.  It was ascertained at the 440 hearing that the motive for the murder was jealousy.

300.   The DD5 regarding this alternate theory of the murder was not turned over to the defense.

301.   Defendants Gillen and Solomeno's failure to investigate and/or to turn over to the prosecution evidence of an alternative theory of the crime deprived Mr. Bellamy of his constitutional right to a fair trial.

302.   Defendants Pepe and Schruhl's deliberate indifference to police practice and procedures and their failure to supervise this investigation deprived Mr. Bellamy of his constitutional right to a fair trial.

**Mr. Bellamy's Indictment for Murder Was A Product of Gillen's Manipulation of Carter's Identification of Bellamy's and Gillen's Concealment of the Sanchez Exculpatory Evidence From the Grand Jury**

303.   At the time the case was presented to the Grand Jury on May 19, 1994, the only evidence connecting Mr. Bellamy to the murder was Mr. Carter's identification.

304.   At the Grand Jury Mr. Carter unequivocally testified that he picked out Number one (Bellamy) at the lineup.

305.   ADA Antignani who presented the case to the Grand Jury and who attended the lineup was aware that Carter's Grand Jury testimony that he identified Number One (Bellamy) at the line-up was false.

306.   Gillen failed to tell A.D.A. Antignani that Carter's change of heart was coerced and suggested by him.

49

307. Gillen also knew that the testimony that Carter's identification testimony at the Grand Jury was a product of his suggestions and coercion.

308. Defendant Gillen also withheld from the Grand Jury prosecutor that Linda Sanchez had identified Mr. Lee as the second person she saw with Mr. Bellamy and that Lee had provided an alibi for the time of the murder.

309. As a result of Defendant Gillen's misconduct Mr. Bellamy was indicted for murder based on suppressed evidence and a coerced identification.

**Desperate to Win the Case at Any Cost and**
**Operating in a Climate of Impunity, Trial Prosecutor**
**Delivers an Egregious Closing Argument**

310. Mr. Guy acknowledged the case against Mr. Bellamy was weak.

311. Guy, in a Court TV interview before the summation was delivered, said that Ms. Sanchez and Mr. Carter had "crumbled;" that Ms. Walker was a "non-identification" and he was "in trouble" and needed a strong closing argument.

312. Mr. Guy was faced with an ethical dilemma. As his witnesses had crumbled and there was no motive and no evidence to connect Mr. Bellamy to the murder.

313. Guy had to decide whether the witnesses had "crumbled" because Mr. Bellamy was innocent or to disregard the non-existent evidence and to knowingly commit summation misconduct so that he would "win" a conviction.

314. Guy also knew that the QDAO maintains a win/lost scorecard for each trial prosecutor.

315.   Guy also knew that the scorecard is one of the considerations in determining promotions of trial prosecutors.

316.   Guy was also aware of the QDAO's custom and practice of never reprimanding or disciplining prosecutors for misconduct.

317.   At this ethical crossroads, without fear of reprimand or discipline Guy then elected to take the path of winning at any cost and to coerce a conviction by delivering the most egregious closing argument imaginable, where virtually each page of the closing transcript contains statements that exceed all reasonable bounds of constitutionally acceptable rhetoric.

318.   Mr. Guy told the jury that he had personal information, not revealed to the jury, as to who committed the murder:

"I know who committed the murder."   You know it was an intentional murder and you know there is no rational explanation for why so many people are pointing their fingers at the guy just like the needle of the compass unless he is in fact the right man." (Addendum 3, 8).

319.   Then Mr. Guy tells the jury that Mr. Bellamy had gotten away with murder before:

"It's because the evidence shows that you are a murderer and that you are not going to get away with it, not this time." (Addendum 33, 41)

320.   Not having evidence of motive, Mr. Guy then incredibly shifts the burden of proof to Mr. Bellamy to prove the negative, that he had no motive to kill Mr. Abbott:

"Where is there proof of motive?  There is none.  Where is there proof defendant had no motive to kill somebody?  I submit there is no proof that he had no motive." (Addendum 4, 30)

321.   The prosecutor improperly argued that the very fact that Mr. Bellamy put forth an

alibi is proof of guilt.

322.   During his closing Mr. Guy argued that the fact that Mr. Bellamy presented an

alibi (from his stepfather) is itself evidence that he committed the murder because

guilty people fabricate alibis:

> "Did anybody think that the defendant's stepfather was going to come in
> and say well, you know, in all truth the defendant really wasn't home.  I
> guess he really was out committing the murder.  Wasn't going to happen.'

(Addendum 1, 23, 50)

323.   The prosecutor then tells the jury that Mr. Bellamy concocted his alibi:

> "Why do you suppose he makes such a point of trying to say he left at ten
> o'clock?  Why do you suppose he would have his alibi witness come in and
> say that he left at ten o'clock?
>
> . . .
> Ten o'clock is a very important time in this case because the murder had
> been committed before ten o'clock as the murderer would well know.  So if
> you are going to claim you were somewhere else, whether you have been
> asked or not, and you don't want to be convicted of this crime you're going
> to make sure it comes after the time that you know the crime had actually
> been committed."

(Addendum 8, 23)

324.   The Prosecutor then twists the evidence and says:  "Every single witness described

the defendant." despite the fact that every witness described the assailant in a

different way.

> "I asked for the description of the shorter of the two males engaged in that
> fight with that victim on that corner on April 9, 1994 and she described a

52

male black, small in height, I think she said about five foot six. She wasn't very tall herself. I asked her to describe the build. She hesitated there, but when push came to shove she said thin build. What else did she say about that thin male? Black, short in stature, had braids in his hair. Isn't it interesting every single witness describes the defendant? Is that just another major coincidence or is there a pattern emerging that the witnesses got it right?

(Addendum 4, 5)

325.    Guy vouches that Carter must have identified Bellamy at the lineup, since Bellamy

was sitting at the defense table.

"[Mr. Carter] told you he wasn't sure, and that in the next room he spoke with the detectives, and when I asked him on the stand about that conversation he told you he picked out number two and I showed him the lineup photographs and he still is stuck with number two but you know he didn't pick out number two. Number two, isn't sitting over there. Number one is sitting over there."

Addendum (1, 14)

326.    The prosecutor then twists Ms. Walker's non-identification as an identification:

"And then I asked her who do you recognize the subject of that photograph to be. And what did she say? She didn't say oh, I recognize this guy to be the guy sitting at that table sitting over – over at the table over there. That's not what she didn't say. What she did say was that's Kareem. That's Kareem. She knows the defendant. Even in her non-identification, I suggest to you that she corroborates the positive identification given to you by Andrew Carter and Linda Sanchez."

327.    The prosecutor falsely claimed that Mr. Bellamy's trial counsel called the

prosecution' witnesses "liars":

"So now we have defense arguing [Ms. Sanchez] is a liar because she didn't say something, and how do we know she didn't say it? Because he says so. That's the

53

logic she is a liar because he says so.  That's not enough.  There is no evidence she is a liar, and I submit the only evidence that you have is evidence corroborated."

328.   Not once during the entire trial did defense counsel call Ms. Sanchez or any other prosecution witness a liar.  Neither the word "liar" nor "lying" was ever used by Mr. Bellamy's attorney at any time.

329.   The prosecutor, however, used the word "lying", "liar" or "lies" 23 times during his over-the-top closing argument   (Addendum 4, 6).

330.   With his office having promised Sanchez tens of thousands of dollars in housing and cash benefits, Guy then vouches for Ms. Sanchez as having no motive to lie:

> "As you sit there now did you think for one second that she have a motive to lie in this case?"

> "Why would she come in and lie about the defendant?  Is there any evidence that she had any motivation to come in and lie about the defendant?"

> "She didn't lie to you.  She didn't embellish."

> "So now we have defense arguing [Ms. Sanchez] is a liar because she didn't say something, and how do we know she didn't say it?  Because he says so. That's the logic she is a liar because he says so.  That's not enough.  There is no evidence she is a liar and I submit the only evidence that you have is evidence corroborated." (Addendum 8, 12, 31, 48, 52)

331.   Guy then tells the jury that Walker failed to identify Bellamy because she was in fear of him.

> "And even in identifying the defendant in court I submit to you she said something interesting, because when I asked her to look around the courtroom and see if she recognized anybody in this courtroom who she saw

54

and recognized as being in that fight . . . she stopped, she paused, she looked around the courtroom and she looked on his face and then and only then did she say I can't really say."  (Addendum 32)

332.  The Prosecutor then called Mr. Bellamy "a Liar".

"[Mr. Bellamy can't keep his lies straight.  And he is a liar because his own

statements contradict themselves and they contradict the other evidence."

333.  The prosecutor inflames the jury by accusing defense counsel of injecting race into

the courtroom because defense counsel noted that when Carter identified Mr.

Bellamy, Mr. Bellamy was the only African-American in the court room.

"Mr. Reiver will have you believe that an in-court identification is somehow suspect because after all, he is the only black man sitting at the table in this case. About race, if this is a case about race, what is the race of the victim?  This is not a case about race.   That is case about identification.   This is a case about recognition."   (Addendum 18)

334.  Guy's misconduct was a foreseeable result of the defendant City's custom and

practice of failing to reprimand and discipline prosecutors who commit misconduct

with "over-the-top" summations that were repeatedly condemned by the Second

Department.

**Defendant City's Policy Makers**

335.   Richard A. Brown ("Brown") is the elected District Attorney of Queens County

and as a delagee of defendant City of New York has general supervisory duties to

administer and comply with existing Federal and State laws and regulations and to

55

establish policies, procedures and practices for the District Attorney's Office.
Pertinent to this complaint, Brown had the responsibility for formulating and
implementing policies that discipline prosecutors when appropriate; for establishing
policies to be followed by prosecutors in case preparation including the taking and
maintaining notes of witness interviews; and for formulating and implementing
policies regarding benefits promised to or conferred upon prosecution witnesses,
and *not* disclosing those benefits to the trial prosecutor.

336.   John M. Ryan, ("Ryan") is Chief Assistant Queens County District Attorney. As
Chief Assistant, Ryan as delagee of the defendants City of New York has general
supervisory duties to administer and comply with existing Federal and State laws
and regulations and to establish policies, procedures and practices for the District
Attorney's Office, <u>inter alia</u>, defendant Ryan had responsibility for making policy
decisions; that investigated, sanctioned or disciplined prosecutors for misconduct;
and for policy decisions regarding benefits promised to or conferred upon
prosecution witnesses and *not* disclosing those benefits to the trial prosecutor.

337.   Michael J. Mansfield ("Mansfield") was Bureau Chief in Charge of the Queens
Witness Protection Program (WPP) and as delagee of Richard A. Brown had
policy-making  responsibility for the Relocation and Benefit Department of Queens
County District Attorney's Office with responsibility for formulating and
implementing policies regarding benefits to be conferred to prosecution witnesses.

338.   Richard A. Brown as elected Queens County District Attorney together with his

delegate Deputy Assistant Ryan are the final policy makers for the defendant City

of New York in regard to establishing and formulating policies regarding note

taking when interviewing prosecution witnesses.

**Unconstitutional Monell Policies**

**That Trial Prosecutors are Not to Take
Notes When Interviewing Trial Witnesses So that
Exculpatory Statements are not Recorded or Disclosed**

339.   Prior to and at the time of the November 1995 trial, the defendant City of New

York, through its final policy makers, Queens District Attorney Brown and  his

delegate Deputy District Attorney  Ryan, maintained a policy that expressly trained

and directed Assistant District Attorneys *to not* take notes when interviewing

potential trial prosecution witnesses.

340.   The purpose of this policy is to make sure that exculpatory or impeachment

evidence of the prosecution's testifying witness not be recorded so that such

evidence <u>not</u> be disclosed to the defense.

341.   On the other hand, the policy encourages notes to be taken of non prosecution

witnesses so as to allow the prosecutors to impeach potential defense witnesses

with prior inconsistent statements.

342.   Because of this policy, custom and training Guy took no notes of his interviews

with prosecution witnesses Carter and Sanchez.

343. Guy was trained that when conducting interviews with a prosecution witness, the prosecutor would hold up to the witness a pen or pencil and then show the witness that the writing instrument is being placed on the desk and not to be used.

344. In this way when the witness is cross examined by the defense, the witness will confirm that notes were not taken.

345. Shortly before the trial Sanchez was interviewed by A.D.A. Guy.

346. At this interview Sanchez told Guy that she saw Mr. Bellamy on a Sunday, a day on which beer could not be purchased.

347. During this interview whenever Sanchez said "Sunday", Guy immediately corrected Sanchez to say "Saturday".

348. At trial Sanchez again said Sunday but because of Guy's rehearsals, she reflexively corrected herself to say "Saturday".

349. Guy also interviewed Carter before his trial testimony.

350. Carter told Guy that he could not identify the faces of the assailants.

351. Guy, pursuant to the Queens District Attorney's office policy, took no notes and thus Sanchez' and Carter's statements that tended to establish Mr. Bellamy's innocence was not recorded and not disclosed to the defense.

352. As a result of this carefully crafted policy that notes of prosecution witness interviews not be taken, Mr. Bellamy was deprived of his constitutional right to Brady material.

### QDAO Policy to Shield Trial Prosecutors from the
### Benefits Prosecution Witnesses are Promised or Receive
### So As Not to Disclose Those Benefits to the Defendant

353.    Prior to and at the time of the December, 1995 trial, the defendant City of New

York, through its final policy makers, District Attorney Brown and his Delegate

Deputy District Attorney Ryan and Bureau Chief Michael T. Mansfield,

maintained a policy that relocation and other benefits received by testifying

prosecution witnesses from the WPP be shielded from disclosure to the trial

prosecutor and thus from the defense.

354.    Although designated as a witness protection program the QDAO's benefit

department is used both to protect some prosecution witnesses but is also used to

confer benefits to witnesses regardless of whether they are in need of protection.

355.    Sanchez did not feel threatened or intimidated by Mr. Bellamy or by the second

assailant.

356.    Ms. Sanchez did not ask for and was not in need of protection.

357.    Because of the wall between the benefit department and the trial prosecutor, the

substantial benefits given and promised to Ms. Sanchez was not made known to the

defense.

358.    Because of the  intra-office wall, criminal defendants even after a conviction are

unaware of the benefits promised or received even when a FOIL request is made.

359.    On January 6, 2005, Mr. Bellamy made a FOIL request to the QDAO asking for:

"Records of reward monies or other remuneration paid to Linda Sanchez and/or Andrew Carter or to any other witness.

"Records of relocation assistance rendered to Linda Sanchez."

360.   On March 9, 2005, Rona Kluger the Queens District Attorney's Office Records

Access Officer denied any such records existed:

"The review of our records has also revealed that the following documents are not disclosable because no document in the case file satisfies your request for these items:...

3) Records of payments on behalf of Linda Sanchez or Andrew Carter;
. . .
6) Records of relocation assistance for Linda Sanchez;"

361.   This representation was false and in violation of Penal Law 240.65.

362.   Despite the file containing evidence that Sanchez was promised and received

substantial housing and cash assistance, prosecutors falsely represented to the 440

Court that no undisclosed Brady material existed in the Sanchez file.

363.   The QDAO did not disclose the contents of the file until after the Appellate

Division dismissed the writ of prohibition to prohibit the 440 Judge, Joel L.

Blumenfeld from enforcing a subpoena for the files. Matter of Brown v.

Blumenfeld, 45 A.D.3d 836 (2nd Dept. 2007); leave to appeal denied 9 N.Y. 3d

1026 (2008).

364.   This calculated scheme of the QDAO to evade its constitutional duty to disclose the

benefits prosecution witnesses receive was expressly condemned two years prior to

the Bellamy trial by the New York Court of Appeals in People v. Stedman, 82

N.Y.2d 1 (1993).

365.   Despite the Stedman decision, the QDAO policy continued to shield trial

prosecutors from knowledge of benefits witnesses receive.

366.   As a result of this policy of shielding prosecutors from knowledge of benefits

conferred on witnesses, Mr. Bellamy was deprived of his liberty without receiving a

fair trial.

### City Defendant's Policy and Practice that Fails to Discipline or Sanction Trial Prosecutors for Misconduct

367.   The QDAO as delagee of the defendant City of New York has a custom and

practice not to internally investigate, reprimand, sanction or discipline prosecutors

for misconduct.

368.   This custom and practice encourages, condones and ratifies the prosecutors'

deliberate and reckless disregard of their constitutional and ethical duties.

369.   As a result of this practice and custom, trial district attorneys and supervisors,

including but not limited to A.D.A. Guy engaged in prosecutorial misconduct in a

climate of impunity.

370.   The defendant City of New York was on actual and constructive notice of the

misconduct of Queens County Assistant District Attorneys from at least the mid-

1980's through the date of Mr. Bellamy's trial in December 1995, by at least 65

Appellate Court decisions that alerted the final policy maker that defendants were

deprived of their constitutional rights because of prosecution misconduct occurring

during summation.

371.   The historical failure of the District Attorney's Office to discipline assistant district

attorneys was known to Brown and Ryan, or in the absence of their deliberate and

reckless indifference should have been known to the policymakers at and prior to

the time of Mr. Bellamy's prosecution.

372.   Of the more than 130 instances, occurring after 1985 and continuing to date, of

prosecutorial misconduct in summations, no trial prosecutor has been disciplined or

sanctioned for actions which the Appellate Division, Second Department

condemned as prosecutorial misconduct.

## DAMAGES

373.   The actions of the defendants deprived plaintiff Kareem Bellamy of his civil rights

under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States

Constitution and under the constitution and laws of the State of New York.

374.   The unlawful, intentional, wilful, deliberately indifferent, reckless and/or bad-faith

acts and omissions of the defendants caused Kareem Bellamy to be wrongfully

seized, maliciously prosecuted, unfairly tried, wrongfully convicted, and forced to

serve over fourteen years in prison for a crime he did not commit.

375. The unlawful, intentional, willful, deliberately indifferent reckless, negligent, and/or bad-faith acts and omissions of the defendants caused Kareem Bellamy the following injuries and damages, which continue to date and will continue into the future: multiple physical assaults and batteries, and other physical injuries; pain and suffering; severe mental anguish, multiple suicide attempts; emotional distress; loss of family relationships; severe psychological damages; loss of educational opportunity; loss of professional opportunity; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, televisions, movies, travel, engagements, and expression, all for which Mr. Bellamy is entitled to monetary relief.

376. All the acts and omissions committed by the defendants Gillen and Solomeno described herein for which liability is claimed were done intentionally, unlawfully maliciously, wantonly, recklessly, negligently and/or with bad faith and said acts meet all of the standards for imposition of punitive damages.

# CLAIMS

## CLAIM 1

### 42 USC § 1983 Claim for Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial

### (Against Defendants Gillen, Solomeno, Pepe and Schruhl)

377.   Mr. Bellamy hereby incorporates and references all of the foregoing paragraphs and further alleges as follows:

378.   Defendants Gillen and Solomeno acting individually and in concert, fabricated evidence, concealed material exculpatory and impeachment evidence, and deliberately and reckless failed to conduct a constitutionally adequate criminal investigation, thereby depriving Mr. Bellamy of his Fourth, Sixth and Fourteenth Amendment rights.

379.   Defendants Gillen and Solomeno deliberately and recklessly coerced and/or fabricated statements from witnesses including but not limited to Linda Sanchez, Andrew Carter and Veronica Walker and concealed additional material, exculpatory and impeachment evidence concerning witness interviews conducted by them in the case, including Maria Vega, Brijmohan Lila, Michelle Abbott, Eric Jefferies and Veronica Walker.

380.   Defendants Gillen and Solomeno deliberately and recklessly failed to investigate leads pointing toward other suspects, including LeVon Melvin and Rodney Harris, that would establish Mr. Bellamy's innocence.

381.   The defendants' deliberate conduct undermined probable cause to arrest, to indict and to prosecute Mr. Bellamy.

382.   Defendants Gillen and Solomeno knowingly and deliberately chose not to document or disclose to the prosecutors information that was favorable and material to Mr. Bellamy's defense.  The suppressed evidence included but is not limited to:

    a.   That Lee, having an alibi, was ruled out as a perpetrator of the murder;

    b.   That Sanchez identified Lee as the second person she saw;

    c.   That Lee had an alibi for the time when the murder occurred;

    d.   That Brijmohan Lila and Maria Vega both told police that the perpetrators were "hooded," consistent with the Simmons' report that the perpetrators wore hoods;

    e.   That on the day of the murder Sanchez told Gillen and Solomeno that "she saw nothing";

    f.   That Eric Jefferies and Michelle Abbott gave statements that supported third party culpability as a few days before the murder Mr. Abbott was engaged in packaging marijuana and was in possession of a gun and a bullet proof vest;

    g.   That Walker was interviewed months before the trial and told defendants Gillen and Solomeno that she knew Mr. Bellamy and it was not Mr. Bellamy she saw the morning of the murder;

    h.   That just before Carter changed his identification from "No.2" to "No.1" defendant Gillen suggested to Carter that Mr. Bellamy had changed his "hair style".

383.   The Defendants Gillen and Solomeno manufactured, created and forwarded false evidence to the prosecutor that included but is not limited to:

a.   Brijmohan Lila DD5 stating the Lila did not witness the struggle;

b.   DD5 report stating that Simmons' lead was followed up;

c.   Bellamy's statement allegedly made in the police car;

d.   Lee's taped statement ;

e.   Carter's line-up identification of Bellamy;

f.   Sanchez' statement that Bellamy threatened her;

g.   Walker's DD5 that she told Solomeno that she saw Mr. Bellamy stabbing and kicking Mr. Abbott; and

h.   Linda Sanchez' original line-up sheet wherein "Sunday" was altered to "Saturday".

384.   If the defendants' fabrications and exculpatory and material impeachment evidence known to them had been documented and/or disclosed such evidence would have tended to prove Mr. Bellamy's innocence, cast doubt on the entire police investigation and prosecution, and impeached the critical trial testimony.

385.   The aforesaid conduct, which Defendants committed operated to deprive Mr. Bellamy of his rights under the Constitution and the laws of the United States:

a.   Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses

who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth amendments to the United States Constitution;

b.   Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

c.   To timely disclosure of all material evidence favorable to the defense pursuant to the Due process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

386.   No reasonable police officer in 1994-1995 would have believed that the actions taken by the defendants in fabricating evidence failing to document and disclose material, exculpatory evidence, and failing to investigate exculpatory evidence were lawful.

387.   The forgoing violations of Plaintiff's federal constitutional rights by the defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiff's criminal prosecution, his loss of liberty, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

388.   The defendant's deliberate and reckless failure to investigate exculpatory evidence that was known to them, or that in the absence of their deliberate and reckless indifference should have been known to them, caused Mr. Bellamy to be deprived of a fair trial.

389.   In withholding material exculpatory and impeachment information from the prosecutors, they also deprived Mr. Bellamy's defense of the information in violation of his clearly established Sixth and Fourteenth Amendment right to a fair trial.

390.   As a direct and proximate result of the defendants' action Mr. Bellamy who was innocent was wrongly convicted and imprisoned for over fourteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## CLAIM II

### 42 U.S.C. §1983 Malicious Prosecution in
### Violation of the Fourth and Fourteenth Amendments

### (Against Defendants Gillen and Solomeno )

391.   Defendants Gillen and Solomeno, despite knowing that probable cause did not exist to arrest and prosecute Mr. Bellamy for the murder of James Abbott, Jr. and despite the fact that the grand jury's probable cause determination was vitiated by these defendants' undisclosed misconduct and by their concealment of material, exculpatory and impeachment evidence and acting individually and in concert to cause Mr. Bellamy to be wrongfully arrested and prosecuted for those crimes.

392. Defendant Gillen lacked probable cause to initiate the prosecution of Mr. Bellamy and the indictment and conviction of Mr. Bellamy was procured by fraud, perjury, the manipulation of witnesses and the fabrication and suppression of evidence.

393. False and fabricated evidence was given by Defendants Gillen and Solomeno to the prosecutor, the Grand Jury and to the Petit Jury.

394. Defendants Gillen and Solomeno knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest, indict and prosecute Mr. Bellamy, including but not limited to the facts that additional material, exculpatory and impeachment evidence which was not disclosed to the grand jury or prosecutors undermined the evidence presented in support of a probable cause finding against Mr. Bellamy.

395. The deliberate and reckless investigative failure of the defendants included but were not limited to failing to investigate known exculpatory and potentially exculpatory information provided by witnesses, failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to blood evidence.

396. Notwithstanding the fact that no physical or forensic evidence connecting Mr. Bellamy to the crime and that the police received a report shortly after the murder that LeVon "Ish" Melvin and Rodney "Turk" Harris committed the murder, and notwithstanding that Mr. Bellamy had been exonerated by Sanchez' identification

69

of Lee as the second perpetrator, Carter's non-identification, and Walker's statement that Bellamy was not at the scene of the murder and third party culpability provided to them by Eric Jefferies, Michelle Abbott and Deborah Abbott, defendants Gillen and Solomeno refused to investigate evidence demonstrating Mr. Bellamy's innocence.

397. Defendants Gillen and Solomeno prosecuted Mr. Bellamy regardless of the fact that defendants Gillen and Solomeno possessed evidence that Mr. Bellamy was innocent.

398. This conscience-shocking failure to investigate obvious and known exculpatory leads deprived Mr. Bellamy of his liberty, in violation of the Fourth and Fourteenth Amendments.

399. Mr. Bellamy is in fact innocent and there is no evidence of any nature connecting Mr. Bellamy to the murder, and there is overwhelming evidence of Mr. Bellamy's innocence, including:

    a.     Sanchez' identification of Lee as the second person she saw with Mr. Bellamy, and Gillen knowing that Lee had an alibi;

    b.     Veronica Walker positively saying that it was not Mr. Bellamy who she saw who ran from behind her car onto the corner where the murder took place;

    c.     Robert Burgos who saw Mr. Bellamy shortly after the murder standing together with Mr. Lee in front of his building a few blocks from and on the same thoroughfare as where the murder took place; and

    d.     that Ms. Sanchez saw Mr. Bellamy on Sunday not Saturday;

    e.     The Simmons report later corroborated by Mr. Melvin's confession in the fall of 2007 to Michael Green, that LeVon Melvin and Rodney Harris murdered James Abbott.

400.    Defendants Gillen and Solomeno's conduct was critical to the continued prosecution of Mr. Bellamy and which defendants Gillen and Solomeno knew or in the absence of their deliberate and reckless indifference should have known would cause Mr. Bellamy's prosecution to continue.

401.    On September 16, 2011, the prosecution terminated in Mr. Bellamy's favor when all charges against him were dismissed.

402.    The dismissal followed the 440 Hearing Judge's and the Appellate Division's separate independent findings that credible newly discovered evidence existed of third party culpability.

403.    Defendants' actions to deprive Mr. Bellamy of his liberty without probable cause were in violation of clearly established constitutional law, and no reasonable police officer in 1994 and 1995 would have believed that the defendants' actions were lawful.

404.    As a direct and proximate result of the defendants' actions Mr. Bellamy was wrongly prosecuted, convicted, and imprisoned over fourteen years and suffered the other grievous and continuing injuries and damages as set forth above.

## CLAIM III

### 42 U.S.C. §1983 Claim for Engaging in Conduct that Shocks the Conscience in Violation of the Fourteenth Amendment

### (Against Defendants Gillen and Solomeno)

405.   Mr. Bellamy hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

406.   In their drive to frame Mr. Bellamy and to secure Mr. Bellamy's wrongful conviction, defendants Gillen and Solomeno deliberately engaged in arbitrary and conscious-shocking conduct that contravened fundamental canons of decency and fairness.

407.   No reasonable police officer in 1994 and 1995 would have believed that the actions taken by the defendants in deliberately fabricating and concealing exculpatory evidence, coercing witness testimony and failing to conduct a constitutionally adequate investigation were lawful.

408.   The defendants' conduct violated Mr. Bellamy's right pursuant to the Fourth, Sixth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures and not to be deprived of his liberty without receiving a fair trial.

409.   As a direct and proximate result of the defendants' actions Mr. Bellamy was wrongfully convicted and imprisoned for over fourteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## CLAIM IV

### 42 U.S.C. §1983 Claim for Failure to Intercede

### (Against Defendants Pepe and Schruhl)

410.    Mr. Bellamy hereby incorporates by reference all of the foregoing paragraphs and
further alleges as follows:

411.    Defendants Pepe and Schruhl had an affirmative constitutionally duty to intercede
on behalf of Mr. Bellamy to prevent his deprivation of liberty without due process
of law.

412.    Pepe and Schruhl declined, or with deliberate indifference, refused to intercede to
avoid the constitutional deprivation by defendant's Gillen and Solomeno of Mr.
Bellamy's rights.

413.    Pepe and Schruhl knew of, or were deliberately indifferent to Defendants Gillen's
and Solomeno's conduct that allowed the file to be purged of exculpatory DD5's
that allowed police reports and DD5s to be destroyed, and/or falsified and allowed
the investigation to be closed even though there were credible leads to third parties
that would have established Mr. Bellamy's innocence.

414.    The defendants' failure to intercede violated Mr. Bellamy's clearly established
constitutional right to be free from unreasonable search and seizure and not to be
deprived of liberty without due process of law as guaranteed by the Fourth and
Fourteenth Amendments.

415.    No reasonable police officer in 1994-1995 would have believed that failing to

intercede to prevent defendants Gillen and Solomeno from suppressing evidence,

manipulating witnesses, fabricating evidence, failing to document and disclose

material exculpatory evidence, deliberately failing to conduct a constitutionally

adequate investigation, and causing Mr. Bellamy to be arrested and prosecuted

without probable cause were lawful.

416.    As a direct and proximate result of the defendants' failure to intercede Mr. Bellamy

was wrongly convicted and imprisoned for over 14 years, and suffered the other

grievous and continuing injuries and damages as set forth above.

## CLAIM V

### 42 U.S.C. §1983 Claim for Supervisory
### Liability Against NYPD Supervisors

### (Against Defendants Pepe and Schruhl)

417.    Mr. Bellamy hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

418.    Defendants Pepe and Schruhl, supervisory police officers, acting deliberately,

recklessly and under color of law, were, at the relevant times, supervisory personnel

with the New York Police Department with oversight responsibility for training,

hiring, screening, instruction, supervision and discipline of Defendant Gillen and

Solomeno police officer defendants who deprived Mr. Bellamy of his clearly

established constitutional rights.

419.   Defendants Pepe and Schruhl, NYPD supervisors were personally involved in both the deprivation of Mr. Bellamy's constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations, by failing to review the DD5's, failing to supervise the investigative efforts, failing to supervise the investigation of the Melvin/Harris lead; allowing the investigation to be closed on the day of Mr. Bellamy's arrest and failing to direct that blood samples be taken of Mr. Bellamy's boots.

420.   Defendants Pepe and Schruhl, NYPD supervisors were reckless in their failure to supervise defendants Gillen and Solomeno.  Defendants Pepe and Schruhl either knew or should have known that defendant officers were grossly negligent and deliberately indifferent to the rights of defendants including the suppression and the fabrication of evidence.

421.   Defendants Pepe and Schruhl failed to train Defendants Gillen and Solomeno in how to conduct an adequate homicide investigations, and to number DD5's and to document exculpatory evidence.

422.   These supervisory defendants knew or in the exercise of due diligence would have known that the misconduct of defendants Gillen and Solomeno against Mr. Bellamy was likely to occur.

423.   The failure of these supervisory defendants to train, supervise and discipline defendants Gillen and Solomeno amounted to gross negligence, deliberate indifference or intentional misconduct deprived Mr. Bellamy of due process of law.

424.   Defendants Pepe and Schruhl actions and omissions proximately and directly caused Mr. Bellamy to be wrongfully prosecuted, convicted, and imprisoned for over fourteen years, and to suffer the other grievous and continuing injuries and damages set forth above.

## CLAIM VI

### 42 U.S.C. §1983 Monell Claim

### Policy, Practice and Custom of Failing to Reprimand or Discipline Trial Prosecutors for Summation Misconduct

### (Against Defendant City of New York)

425.   Mr. Bellamy hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

426.   Under the principles of municipal liability for federal civil rights violations, the District Attorney of Queens County (or his authorized delegates) has final authority and is the City's policymaker in the training, instructing, supervising and disciplining attorneys .

427.   The District Attorney of Queens County, Richard Brown, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to such conduct.

428.  In the Queens County District Attorney's office there was a history of epidemic proportion of prosecutorial misconduct during summations.

429.  Between 1985 and 1995 there were at least 65 instances in which the Appellate Division alerted the final policy makers that misconduct during summations deprived defendants of their constitutional rights to a fair trial.

430.  Brown as policymaker failed to take any steps to protect against the constitutional harm that was certain to occur without a disciplinary policy in place.

431.  Brown failed to implement a policy to deter or to correct the prosecutorial misconduct repeatedly identified by the Appellate Division, Second Department as depriving defendants of their constitutional right to a fair trial.

432.  Prior to and at the time of the investigation, prosecution, and conviction of Kareem Bellamy, defendant City of New York by and through the final policymaker, Richard A. Brown and his delagates, maintained a practice and custom not to reprimand or discipline assistant district attorneys in connection with summation misconduct.

433.  The misconduct was condoned and often prosecutors who engaged in the misconduct were promoted.

434.  The misconduct was encouraged, condoned and ratified by a policy that "winning is everything," and which policy superseded the constitutional duty of the prosecutor that justice be done.

435.   As a direct and proximate result of the Queens County District Attorney's office custom, and practice of failing to reprimand or discipline trial prosecutors  allowed in this instance David Guy, to deliver an egregious summation of a nature that was interchangeable with summations that had been consistently condemned by the Appellate Division as a deprivation of the rights of criminal defendants.

436.   The policy of allowing prosecutor to commit misconduct during summations without fear of consequences made it foreseeable to defendant City of New York, that prosecutors would predictably confront decisions as to the delivery of a summation and that constitutional violations that affect the rights of the defendants would likely result.

437.   David Guy was at such a crossroad, having acknowledged that the prosecution's case had crumbled and that a "strong" summation was needed.  Without a disciplinary policy in place Guy elected to take the path of "winning at all costs" and to deliver an over-the-top summation that deprived Mr. Bellamy of a fair trial.

438.   The aforesaid unlawful policy, practice and/or custom of defendant City was a substantial factor in bringing about the violations of plaintiff's rights under the Constitution and laws of the United States and in causing his conviction, imprisonment and related damages.

439.   As a direct and proximate result of the City's deliberate indifference to custom and practice that caused the unconstitutional  deprivation of defendants rights to a fair

trial, Mr. Bellamy was wrongfully prosecuted, convicted and imprisoned for over fourteen years and suffered the other grievous and continuing injuries and damages set forth above.

## CLAIM VII

### 42 U.S.C. §1983 - Monell

**Policy, Practice and Custom of Training and Directing Trial Prosecutors to Not Take Notes When Interviewing Prosecution Witnesses, or Being Deliberately Indifferent to Such Practice, So As to Deprive Defendants of Exculpatory Evidence**

### (Against Defendant City of New York)

440.   Mr. Bellamy hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

441.   Prior to and at the time of the investigation, prosecution, and conviction of Kareem Bellamy, and continuing to date, the Queens County District Attorney's Office maintained a policy of training and directing Assistant District Attorneys not to take written notes when interviewing prosecution witnesses, or were deliberately indifferent to the practice that notes were never taken.

442.   This policy and practice of the City of New York that was maintained by and through its final policymakers made it foreseeable that exculpatory evidence would be withheld and  constitutional violations of the type Mr. Bellamy suffered would be a predictable result of such policies.

79

443.    As a direct result of this policy ADA David S. Guy did not record exculpatory

statements from Ms. Sanchez that she saw Mr. Bellamy on Sunday and Mr. Carter's

statement that he could not identify the faces of the assailants.

444.    The aforesaid unlawful policies, procedures, regulations, practices and/or customs

of defendant City were individually and collectively a substantial factor in bringing

about the violations of plaintiff's rights under the Constitution and laws of the

United States and in causing his conviction, imprisonment and related damages.

445.    As a direct and proximate result of the City's policies, customs or patterns and

practice, Mr. Bellamy was wrongfully prosecuted, convicted and imprisoned for

over fourteen years and suffered the other grievous and continuing injuries and

damages set forth above.

### CLAIM VIII

### 42 U.S.C. §1983 - Monell

### Policy Practice and Custom of
### Shielding the Trial Prosecutor from Knowledge of
### the Financial and Housing Assistance Given
### to Prosecution Witnesses

### (Against Defendant City of New York)

446.    Mr. Bellamy hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

447.    Prior to and at the time of the investigation, prosecution, and conviction of Kareem

Bellamy, and continuing to date, the Queens County District Attorney's Office,

80

through its policy maker, Brown and his delagees Ryan and Mansfield, maintained

a "Chinese wall" policy of shielding trial prosecutors from knowledge of benefits

promised to or conferred upon testifying prosecution witnesses.

448.  It was reasonably foreseeable that this policy would deprive defendants of their

constitutional right to exculpatory and impeachment information of benefits

conferred upon testifying prosecution witnesses.

449.  The policy, practice and custom allowed the prosecutor David Guy to falsely tell

the jury that Sanchez had no motive to fabricate the threats.

450.  In fact at the time of Guy's summation, Sanchez had already received hundreds of

dollars with a promise that she would continue to receive thousands of dollars in

financial and housing assistance.

451.  The QDAO, in December 1995, was well aware that the policy of shielding trial

prosecutors from knowledge of the scope of benefits and promises made by the

walled-off-benefits department to a testifying witness was unconstitutional. People

v. Steadman, 82 N.Y.2d 1 (1993), U.S. v. Giglio, 405 U.S. 150 (1972)

452.  The aforesaid unlawful policies, practices and/or customs of defendant City were

individually and collectively a substantial factor in bringing about the violations of

plaintiff's rights under the Constitution and laws of the United States and in causing

his conviction, imprisonment and related damages.

453.   As a direct and proximate result of the City's policy, custom and practice of shielding trial prosecutors from <u>Brady</u> evidence, Mr. Bellamy was wrongfully prosecuted, convicted and imprisoned for over fourteen years and suffered the other grievous and continuing injuries and damages set forth above.

## CLAIM IX

### State Law Claim for Malicious Prosecution

### (Against Defendants Gillen and Solomeno)

454.   Mr. Bellamy hereby incorporates by reference all of the foregoing paragraphs and further allege as follows

455.   Defendants Gillen, Solomeno, despite knowing that probable cause did not exist to arrest, indict and prosecute Mr. Bellamy for the murder of James Abbott, and despite the fact that the grand jury's probable cause determination was undermined by the defendants' undisclosed misconduct and by other concealed, material, exculpatory and impeachment evidence, acted individually and in concert to cause Mr. Bellamy to be arrested and prosecuted for those crimes.   The defendants' conduct violated Mr. Bellamy's right pursuant to the Constitution of the State of New York and proximately caused his wrongful conviction.

456.   Specifically, Defendants Gillen and Solomeno knew or in the absence of their deliberate and reckless indifference to the truth should have known of information

that probable cause did not exist to arrest, indict and prosecute Mr. Bellamy.  That those factors as well as additional material, exculpatory and impeachment evidence which was not disclosed to the grand jury or prosecutors undermined the evidence presented in support of a probable cause finding against Mr. Bellamy.

457.   Additionally, prior and subsequent to Mr. Bellamy's indictment and being notified of exculpatory evidence, defendants Gillen and Solomeno deliberately and recklessly failed to investigate evidence that they knew, or in the absence of their deliberate and reckless indifference should have known, vitiated probable cause for Mr. Bellamy's prosecution.   The deliberate and reckless investigative failures of the defendants included but were not limited to failing to investigate known exculpatory and potentially exculpatory information provided by witnesses, failing to investigate exculpatory and potentially exculpatory forensic evidence including taking blood evidence from the boots of Mr. Bellamy, Mr. Lee, Mr. Melvin or Mr. Harris.

458.   Defendants Gillen, Solomeno, Pepe and Schruhl caused Mr. Bellamy to be maliciously prosecuted by deliberately and recklessly fabricating evidence which was critical to the continued prosecution of Mr. Bellamy and by suppressing exculpatory evidence.  Defendant Gillen and Solomeno knew or in the absence of their deliberate and reckless indifference should have known that their conduct would cause Mr. Bellamy's prosecution to continue.

459. The defendants performed the above-described acts deliberately, with reckless disregard for the truth and as to Defendant Gillen and Solomeno with malice.

460. In fact, Mr. Bellamy was innocent of the murder of James Abbott.  On September 16, 2011, the prosecution terminated in Mr. Bellamy's favor when charges against him were dismissed on motion of the Queens County District Attorney.

461. Defendants' actions to deprive Mr. Bellamy of his liberty without probable cause were in violation of clearly established constitutional law, and no reasonable police officer in 1994/1995 would have believed that the defendants' actions were lawful.

462. As a direct and proximate result of the defendants' actions Mr. Bellamy was wrongly prosecuted, convicted, and imprisoned for over fourteen years and suffered the other grievous and continuing injuries and damages as set forth above.


## CLAIM X

### State Law Claim for Intentional or Reckless Infliction of Emotional Distress

### (Against Defendant Gillen and Solomeno)

463. Mr. Bellamy hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

464. The conduct of defendants Gillen and Solomeno in framing Mr. Bellamy for this murder and in deliberately causing or recklessly disregarding the risk of causing the wrongful arrest, prosecution and incarceration of Kareem Bellamy, including the

falsification and fabrication of evidence  was so extreme and outrageous in

character, and so extreme in degree as to go beyond all bounds of decency and to be

regarded as atrocious and utterly intolerable in a civilized community.

465.   Defendants' actions intentionally to inflict emotional distress upon Mr. Bellamy

were in violation of clearly established law, and no reasonable police officer in

1994 and 1995, would have believed that the defendants' actions were lawful.

466.   Defendants' outrageous conduct directly and proximately caused the grievous and

continuing injuries and damages set forth above.

467.   As a direct and proximate result of the defendants' actions Mr. Bellamy was

wrongly prosecuted, convicted, and imprisoned for fourteen years, and suffered the

other grievous and continuing injuries and damages as set forth above.


## CLAIM XI

### State Law Claim for Negligent Infliction of Emotional Distress

### (Against Defendants Gillen and Solomeno)

468.   Mr. Bellamy hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

469.   Defendants Gillen, Solomeno negligently and grossly negligently, and in breach of

their duties owed to Mr. Bellamy to refrain from (a) fabricating evidence, (b)

withholding material, exculpatory and impeachment evidence, ( c ) failing to

85

conduct a constitutionally adequate investigation and (d) maliciously prosecuting

and causing Mr. Bellamy's false arrest and imprisonment, directly and proximately

caused Mr. Bellamy, an innocent man, to be falsely arrested, maliciously

prosecuted, and wrongfully imprisoned for fourteen years and three months.

470.    Defendants' actions of negligent infliction of emotional distress upon Mr. Bellamy

were in violation of clearly established law and no reasonable police officer in 1994

and 1995 would have believed that the defendants' actions were lawful.

471.    As a direct and proximate result of the defendants' actions Mr. Bellamy was

wrongly prosecuted, convicted, and imprisoned for over fourteen years, and

suffered the other grievous and continuing injuries and damages as set forth above.

## CLAIM XII

### Respondent Superior Claim

### ( Against Defendant the City of New York)

472.    Mr. Bellamy hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

473.    At all times relevant to this complaint defendants Gillen, Solomeno, Pepe and

Schruhl acted as agents of and in the scope of their employment with, defendant

City of New York.   The conduct by which the defendants committed the torts of

malicious prosecution, false imprisonment, intentional or reckless infliction of

emotional distress, and negligent infliction of emotional distress was undertaken

while the defendants were carrying out their routine investigative functions as

NYPD detectives, and engaging in such conduct as would have been reasonably

expected, and was in fact foreseen by their employer.

474.   The City of New York is liable for its agents' state law torts of malicious

prosecution, intentional or reckless infliction of emotional distress, and negligent

infliction of emotional distress under the doctrine of respondent superior.

WHEREFORE, Kareem Bellamy prays as follows:

A.   That the court award compensatory damages to claimant and against the
defendants City of New York, John J. Gillen, Michael F. Solomeno, Vincent
Pepe and Robert Schruhl, jointly and severally, in an amount to be
determined at trial.

B.   That the Court award punitive damages against Defendants John J. Gillen
and Michael F. Solomeno in an amount that will deter such conduct by these
defendants in the future in an amount to be determined at trial;

C.   For a trial by jury;

D.   For pre-judgment and post-judgment interest and recovery of his costs,
including reasonable attorney's fees pursuant to 42 U.S.C.§1988 for all 42
U.S.C. §1983 claims; and

E.   For any and all other relief to which he may be entitled.


Dated:                                    Respectfully submitted,
        New York, N.Y.
        October 31,  2014
                                          Thomas Hoffman  (TH 2797)
                                          Law Offices of Thomas Hoffman, P.C.
                                          250 West 57 Street, Suite 1020
                                          New York, NY 10107

87

Tel. 212 581 1180
Fax: 212 581 8002
Attorneys for Plaintiff Kareem Bellamy