# LAW OFFICES OF THOMAS HOFFMAN, P. C.

250 WEST 57 STREET, Suite 901, NEW YORK, NEW YORK 10107 • (212) 581-1180

June 25, 2015

ECF
Hon. Magistrate Judge Victor V. Pohorelsky
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   Kareem Bellamy v. The City of New York, et. al.
      12 CV 1025 (WFK)(VVP)
      Plaintiff's First Motion for Sanctions

Dear Magistrate Judge Pohorelsky:

    We respectfully request that the defendants be sanctioned for their failure to turn over several key discovery requests, now nearly one year overdue, and their failure to comply with the April 22 and May 22, 2015 discovery orders, which directed the production of outstanding documents, fixed dates for the depositions of three witnesses and directed that certain original QDA documents be made available for inspection. (ECF 97, 103). The sanctions requested include:[1]

1. Defendant's Answer be stricken; and /or

2. <u>Monell</u> discovery be permitted to proceed; and / or

3. The facts that could have been developed by the withheld discovery, enumerated below, be deemed as true; and/or

4. The Court award plaintiff reasonable legal fees for this motion.

---

[1] FRCP 37 provides a wide array of sanctions that can be imposed for discovery violations. The three applicable are:
"1.    directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
2.    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
3.    striking pleadings in whole or in part."

1

### Procedural History and Timeline of City's Non-Compliance

This litigation is in its fourth year. The complaint was filed on March 3, 2012, after which the City moved to dismiss. On February 10, 2014, the Hon. William F. Kuntz denied the City's motion in its entirety and allowed the parties to resume discovery.

On April 10, 2014, the City requested that <u>Monell</u> discovery relating to the Queens DA be bifurcated from discovery of misconduct by individual New York City police officers. On May 8, 2014, the court postponed <u>Monell</u> discovery on the basis that bifurcation would be more efficient in terms of resources and time. This efficiency calculus has since been reversed by the City's non-compliance with its own timelines and the timelines set by Your Honor. Despite the Court's direction on May 8th, 2014 that all document production be completed in 90 days, critical police records, medical records and media files – among other evidence – remain outstanding. Plaintiff has consented to repeated delays while timely complying with discovery requests.

### Plaintiff's April 7th Letter Motion to Compel (ECF 95)

After numerous delays and informal requests, on January 30, 2015, defendants were formally requested to comply with outstanding document demands initially made in May 2014, and to make available for review certain original QDA records. The letter also requested that the two court-authorized depositions – of the lineup and trial ADA – be scheduled for examination. Five dates in February were proposed for these depositions. A 30b6 witness was noticed for February 13, 2015. ECF 95-2, 3.

When the City failed to comply with any of these requests, and after several unsuccessful phone calls and e-mails requesting compliance, Plaintiff moved to compel. Neither sanctions nor legal fees were demanded.

On April 7, 2015, Plaintiff requested that outstanding document production be completed by April 30, 2015; that Judge Stephen Antignani, trial ADA David Guy and the 30b6 witness be made available for depositions on April 27, 28 and 29, respectively; and that the original QDA records be available for review on April 28, 2015. (ECF 95)

Shortly after the letter motion was filed, the City agreed to comply with outstanding disclosure: The City would submit withheld privileged documents for an <u>in-camera</u> review by April 24, 2015; the original QDA documents would be made available for review by June 19, 2015; outstanding document requests would be produced by May 1st; and the depositions of Judge Antignani, Mr. Guy and the 30b6 witness would be held on May 7, 8 and 11th, respectively. On April 28, 2015, Your Honor "So Ordered" this revised schedule. (ECF 97). The City has not complied with any of the discovery that the Court ordered.

<u>Plaintiff's Efforts to Obtain Compliance</u>

On May 4th and May 5th, plaintiff confirmed the deposition dates that were set to begin on May 7th. (Exh. "A")

On May 6th, the day before the depositions were slated to begin, the City advised that the next two days of depositions would have to be canceled. (Exh. "B")

Plaintiff offered to reschedule for the following Monday, May 11th, but that date too was rejected. Plaintiff requested that the City submit new dates for the depositions. So far the City has not provided times for which any of these three witnesses would be available for depositions. (Exh. "C")

On May 27, 2015, plaintiff by e-mail advised the City that discovery remained outstanding and again requested dates for compliance. Plaintiff offered to conduct the depositions during the week of June 8th but the City did not respond. Finally, plaintiff alerted the City that if it did not comply by June 19, 2015, Plaintiff would move to strike the answer. (Exh. "D")

On May 22, 2015, the court granted in part plaintiff's motion to compel production for certain withheld documents. (ECF 103). A month later the City has yet to turn over the four documents Your Honor ordered to be disclosed.

<u>Outline of Argument</u>

There are three sections. Section I explains why striking the answer, to the claims of misconduct by NYC Police Detectives, is a proportional response to the City's flagrant disregard of discovery rules and Court orders. Section II shows why the commencement of Monell discovery is justified to compensate for the City's delay, especially given the irrefutable evidence of underlying violations. Section III details the evidence the City has failed to produce – through multiple document requests as well as depositions – and sets forth the likely facts therein contained, which should now be deemed as true. Of course, the outstanding discovery is also likely to include unknown facts helpful to Plaintiff.

**I. The Answer Should Be Struck**

The City's conduct defying the April 28, 2015 Discovery Order can only be described as an egregious defiance of discovery and Court orders. The City has not sought to explain its failure to comply. Neither has the City requested an extension of time for compliance. Plaintiff has been more than accommodating, indeed willing to reschedule the deposition dates, even while they had been Court Ordered. There has been no response to the May 27, 2015 letter requesting compliance, which was itself preceded by numerous phone calls and emails. The May 27th letter also forewarned that failure to comply, or to at least begin compliance, by June 19th would result in plaintiff's request that the Answer be struck. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d

Cir. 1999) (willfulness, bad faith, or fault by the sanctioned party will result in the dismissal of the pleading). The City's utter silence since then is simply inexcusable.

While the court has generally been reluctant to impose such a harsh sanction of dismissal, where appropriate and where the circumstances are sufficiently egregious, the court has not been hesitant to strike the pleading. *Lukasiewicz v. Polish & Slavic Fed. Credit Union*, 2013 U.S. Dist. LEXIS 33307, 3-4 (E.D.N.Y. Feb. 12, 2013); *Williams v. Lutheran Med. Ctr.*, 2012 U.S. Dist. LEXIS 184194, 4-5 (E.D.N.Y. Dec. 10, 2012); *Baez v. Majuri*, 2013 U.S. Dist. LEXIS 117305, 4-5 (E.D.N.Y. July 29, 2013). In our view such drastic remedy is warranted under the facts of this case.

## II. Monell Discovery Should Be allowed to Proceed

This court bifurcated discovery on the assumption that fact-finding discovery would proceed expeditiously. The City's serious non-cooperation will substantially prolong this ligation as the defendant's motion for summary judgment will be delayed. If Monell discovery is allowed to proceed it will compensate plaintiff for City's delay by reducing the potential summary judgment motions from two to one. This will shorten the litigation by about one year – close to the length of time defendant will have delayed it even if it soon takes corrective action.

Plaintiff has two Monell claims arising from a Brady violation and summation misconduct. For the first, the underlying misconduct has been established not only through documentary evidence but also the testimony of former Witness Protection Program (WPP) Director Mike Mansfield, WPP Coordinator Daniel Cox and Linda Sanchez. All three have testified that, prior to Ms. Sanchez' trial testimony, she received assurances of: free temporary housing; a per-diem rate that would continue until she found permanent housing; $2,800 in moving costs - one month's free rent, one month's security, the costs of new furniture and a brokerage fee – at the time permanent housing was found. Ms. Sanchez' also received undisclosed per diem payments and free rent during the trial (Exh. "L"). However, these receipts are missing from the Sanchez WPP file and the City has not produced a QDA 30b6 witness to testify to the administrative office document retention policy and practice. The receipts would have fully eviscerated the City's denial of an underlying violation, a weak argument that yet delays the case.

Since the City has prevented the development of concrete evidence of this Brady violation, Plaintiff should be allowed to proceed with Monell discovery to establish that the violation was due to a systemic policy or practice that shielded from the trial prosecutor benefits witnesses received from the WPP program.

Discovery should also proceed on Plaintiff's second Monell claim: That summation misconduct was due to a City policy that condoned such misconduct through a failure to discipline wrongdoing. Of the more than 130 instances, occurring after 1985 and continuing to date, of prosecutorial misconduct in summations, no trial prosecutor

4

has been disciplined or sanctioned for actions which the Appellate Division, Second Department condemned as prosecutorial misconduct. (Compl pars 367-72). The underlying violation is clear from the trial transcript. For example, ADA Guy said, "I know who committed the murder," " you are not going to get away with it, not this time," and shifted the burden of proof: "where is there proof defendant had no motive to kill somebody?" (ECF 47-2; ECF 1. Pars 318-333).

Since the Monell actions (QDA) and the individual defendants (NYPD) are two different entities the policy considerations for bifurcation is not as strong. Bellamy can theoretically lose his claim against the detectives but still prevail against the City. See *Ambrose v. City of New York*, 623 F. Supp. 2d 454 (S.D.N.Y. 2009) (Denying trial and discovery bifurcation and holding that "…because all of the Individual Defendants are police officers -- and not employees of the District Attorney's Office a judgment in favor of the Individual Defendants would not preclude Monell liability pertaining to the City's training of its prosecutors."); Same: *McCoy v. City of New York*, 2008 U.S. Dist. LEXIS 62567, 6-7 (E.D.N.Y. Aug. 13, 2008).

### III. The Following Identifiable Facts That Could Have Been Developed Through Withheld Discovery Should Be Deemed as True

#### (A) City's Failure to Comply with Document Discovery Requests

<u>First Document Request</u>

On May 20, 2014, plaintiff served his First Document Production Request. More than a year later, documents material to Mr. Bellamy's claim remain outstanding. These missing records include police sign-in sheets, movement logs, precinct daily activity reports, DD5's, and the QDA media file that include tape recordings of witnesses.

The information contained in these records is critical to support Mr. Bellamy's constitutional claim that he was deprived of a fair trial. The April 1994 precinct police sign-in sheets, movement logs and daily activity reports, if they had been produced, would have shown that Det. Gillen and Solomeno never followed up on a confidential report from "Anna Simmons" - that she overheard Levon "Ish" Melvin and Rodney "Turk" Harris "bragging" about the murder. (Exh. "E", Simmons Report). Specifically, the records would confirm that neither of the Detectives visit Simmons' apartment or the Laundromat where she worked. In addition, the City's production would have further confirmed that alleged photo arrays of "Ish" and "Turk" – documented well after-the-fact – were never shown to either Carter or Sanchez.

The City's limited disclosures already provide strong evidence supporting plaintiff's claims. Defendant Gillen provided false police records to the prosecutor that Melvin and Harris had been investigated. Compare Exh. "F", the original handwritten report that does not contain evidence of a follow-up, and Exh. "G", the report where the

5

"4/19" follow-up and the showing of the Melvin/Harris arrays was added. Gillen prepared the false follow up report (Exh. "G") seven months after the event. Only Exh. "G" that showed the doctored follow-up was turned over to the defense. This false report allowed the prosecution to present in its case in chief that Harris and Melvin were investigated and ruled out.

These undisclosed precinct reports will also corroborate Veronica Walker's statement that she was interviewed by Gillen and Solomeno months before the trial – when logs would document a visit to her home – and told them that she did not see Bellamy the morning of the murder fighting with the deceased. Solomeno prepared a deceptive report that he spoke to Walker for the first time after the trial had started which he gave to the trial prosecutor. (Exh. "H").[2]

> *Established Fact 1*
> Defendants' Gillen or Solomeno did not, on April 19, 1994 or any other day, go to the Laundromat where Simmons said she worked or to the apartment where Simmons said she lived.
>
> *Established Fact 2*
> Photo arrays of Levon Melvin and Rodney Harris were not shown to either Andrew Carter or Linda Sanchez.
>
> *Established Fact 3*
> The Veronica Walker interview with defendants Gillen and Solomeno on December 1, 1995 was Walker's second interview with Gillen and Solomeno.
>
> *Established Fact 4*
> Months before the second interview Walker was interviewed by Gillen and Solomeno and told them that she did not see Mr. Bellamy the morning of April 9th at the corner of Beach 48th St and Beach Channel Drive.

## Second and Third Document Requests

On January 30, 2015 and March 10, 2015, Plaintiff served Second and Third Production Requests that arose out of deposition testimony taken in January 2015. (ECF 95-4). These follow-up requests were narrowly targeted to obtain information regarding the missing receipts from the Sanchez WPP file (ECF 94-5 reqs 1-8) and information regarding the dubious Simmons follow-up. (ECF95- 4, 5).

The Third Request for documents also sought information regarding a citizen complaint lodged against Gillen for wearing a storm troopers uniform in public. Id. 95-5.

---

[2] We refer the Court to ECF 63.

This disturbing report would support a statement of Terrill Lee given in 2007 to Bellamy's investigator that Gillen coerced Lee by drawing a "noose" on a sheet of paper. While being interrogated, Bellamy claimed to have met up with Lee around 11:30-12:00 on the day of the murder (which occurred at 9:45am), a fact Lee corroborated during an interview with Gillen. Although Lee was not an alibi, his rendezvous with Bellamy was strong evidence of innocence. Consequently, Gillen drew a noose on a sheet of paper and told Lee his head would be in it unless he distanced himself from Bellamy. Frightened by this "lynching" innuendo, Lee acquiesced and said that he could not recall seeing Bellamy until late in the day. After the trial, Lee confirmed the 11:30-12:00 meeting time in both written letters and an interview with an investigator.

> *Established Fact 5*
> On the evening of May 14,1994 while interviewing Terrill Lee, Gillen drew a noose on a sheet of paper and told Lee his head would be in that noose if he said he was with Bellamy any time close to the morning of the murder.

### City's Failure to Allow Review of Original QDA Records

In September 2014, plaintiff requested that original files of the QDA be made available for review. The City objected as such review would be too burdensome. On January 8, 2015, the parties agreed to a substantially reduced number of original documents that would be subject to review. (ECF 95-1). Parties agreed that by June 12, 2015, the plaintiff would review the originals of certain QDA records. The City has not made these records available for review as agreed and as Court Ordered.

The original Linda Sanchez' lineup sheet would show that Gillen changed the day on which she claim to have seen Bellamy. Ms. Sanchez testified at both the 440 and at her deposition – and at trial, before a coached self-correction – that she saw Bellamy trying to buy beer on a *Sunday* morning, which was the one time beer could not be sold. The copy of the lineup sheet bears indications that the word "Saturday" was written over a whited-out "Sunday." There are suspicious dots before and after "Sunday." Also indicative of doctoring to mask the "Saturday" change is that the next sentence is awkwardly spaced, and the handwriting has changed from script to print. (Exh. "I").

> *Established fact 6*
> The word "Sunday" on the original Sanchez lineup sheet was changed to "Saturday."

### (B) City's Failure to Produce Witnesses for Depositions

On August 4, 2014, plaintiff moved to compel the depositions of Brooklyn Supreme Court Judge Stephen Antignani and David Guy. (ECF 63). Judge Antignani as

former Queens ADA supervised the lineup and presented the Bellamy criminal case to the Grand Jury. Mr. Guy was the trial prosecutor. On September 3, 2014, ruling from the bench the court granted permission to take these two depositions. To date, nine months later, the City has not made either witness available for examination.

### Judge Stephen Antignani

Antignani's testimony would establish that Gillen fabricated the statement Bellamy allegedly made in the police car, "This must be a case of mistaken identity. Someone probably accused me of murdering someone." Only Det. Gillen has testified to this statement, even though there were two other detectives in the police car, and both have testified. Gillen did not record the statement in a DD5 and made no reference to it in his charge or at the Grand Jury, nor was it mentioned in a "confessions and admissions" form filled out two days after the arrest. Gillen also altered his note on the statement months after the fact (at the time of the suppression hearing). He added, "Statement made by def while being asked his pedigree - spontaneous and unsolicited." (Exh. "J" & "K"). Plainly, Gillen fabricated the statement, and then further revised it, in order to establish probable cause for Bellamy's arrest.[3]

Judge Antignani's testimony would have corroborated this fact by confirming that Gillen did not give him a contemporaneous report of Bellamy's alleged statement.

> *Established Fact 7*
> On May 13, 1994, Bellamy did not make the statement "This must be a case of mistaken identity. Someone probably accused me of murdering someone" in the police car on the ride to the precinct.

### David W. Guy

Mr. Guy's testimony would have established that he was well aware that his summation remarks exceeded the bounds of permissible closing rhetoric. Going into his summation, ADA Guy conceded that his case had "crumbled," that he was "in trouble" and that he "needed a very strong summation" to "salvage" his case." Unfortunately, the summation involved outright falsehoods and gross misconduct. Included among 15 out-of-bounds invectives were the statements:[4]

1. "I know who committed the murder";

2. "because the evidence shows that you are a murderer and that you are not going to get away with it, not this time";

---

[3] At trial the statement was presented as key evidence, evincing of consciousness of guilt.
[4] (The System: Anything You Say . . . , at 11 (Court TV television broadcast 1996). These statements were made during an interview with a Court TV reporter and aired in broadcast that has been entered into evidence.

8

3. "Where is there proof of motive? There is none. Where is there proof defendant had no motive to kill somebody? I submit there is no proof that he had no motive." ECF 47-2; ECF 1. Pars 318-333).

These patently improper comments go to the heart of the defendant's right to a fair trial, the presumption of innocence, and the government's burden to prove the case beyond a reasonable doubt. The prosecutor's remarks that he had evidence the jury did not have that Bellamy committed the murder, that Bellamy had gotten away with murder before,[5] and that Bellamy did not prove that he had no motive for the killing so "infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (U.S. 1986).

> *Established Fact 8*
> David Guy committed summation misconduct and, before and at the time he delivered his summation, was aware that his remarks exceeded constitutionally permissible bounds.

### 30(b)6 Witness

On February 13, 2015, a 30(b)6 Notice was served for defendants to produce a witness from the QDA Operations and Management Office to testify as to the procedure to approve witness payments and the retention system that kept copies of witness receipts or records of payments. A 30b6 witness became necessary when former WPP Director Michael Mansfield testified that receipts were missing from the Sanchez Witness Protection file. According to Mansfield and former WPP Coordinator Daniel Cox, the QDA Administrative Office retained copies of all receipts or requests for payments. These records would have established that prior to her trial testimony Sanchez was promised $250 every two weeks; a free apartment until she obtained permanent housing; and when permanent housing was found Sanchez would receive an additional one month's rent, one month's security and the payment of the brokerage fees. (Exh. "L").

Failure to disclose these promises prevented Bellamy from telling the Jury that Sanchez had a motive to fabricate the inexplicable threat, which she first concocted during the trial 18 months later. The evidence suppression also allowed the prosecutor to argue that Sanchez had no motive to fabricate the threat.

> *Established Fact 9*
> Prior to her testimony, Sanchez was promised by the QDA $250 every two weeks, which payments would continue biweekly until Sanchez found a permanent apartment.

---

[5] Bellamy's two prior robbery arrests were when he was 16 (Youthful Offender) and 17. Neither involved a weapon.

9

*Established Fact 10*
Prior to her testimony, Sanchez was promised by the QDA an apartment which rental would be paid by the QDA until Sanchez found a permanent apartment.

*Established Fact 11*
Prior to her testimony, Sanchez was promised by the QDA one month's free rent, one month's security and broker's fee at the time Sanchez found a permanent apartment.

## Conclusion

We respectively request that the following sanction(s) be imposed:

1. The eleven aforementioned facts be established as true;

2. Defendants' Answer be stricken, and/or

3. Monell discovery be allowed to proceed; and/or

4. Plaintiff be awarded reasonable counsel fees pursuant to FRCP 37(a)(5) for services necessary to prepare this motion.

Thank you for your consideration.

Respectfully submitted,

Thomas Hoffman

Enc.