UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X      **Docket#**
KAREEM BELLAMY,                 :     12-cv-01025-AMD-PK
                 Plaintiff,     :
                                :
     - versus -                 :     U.S. Courthouse
                                :     Brooklyn, New York
                                :
CITY OF NEW YORK, et al.,       :     February 16, 2016
                 Defendant      :
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**

**For the Plaintiff**:        **Thomas Hoffman, Esq.**
                              250 West 57 Street
                              Suite 1020
                              New York, NY 10107


**For the Defendant**:        **Matthew J. Modafferi, Esq.**
                              New York City Law Department
                              100 Church St Rm 3-183
                              New York, NY 10007


**Transcription Service**:    **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  the Honorable Magistrate Judge

2   Peggy Kuo presiding, Civil Cause for Status Conference,

3   docket number 12-cv-1025, Bellamy v. The City of New

4   York, et al.

5          Counsel, please state your names for the

6   record, starting with the plaintiff.

7          MR. HOFFMAN:  Your Honor, my name is Thomas

8   Hoffman.  I represent the plaintiff.  With me is Jonathan

9   Hiles, who has been authorized by Judge Donnelly to

10   appear as a law intern in this case.

11          THE COURT:  All right.  Good morning.

12          MR. MODAFFERI:  And Matthew Modafferi on behalf

13   of the City defendants.

14          Good morning, your Honor.

15          THE COURT:  Good morning.

16          Okay.  So I owe the parties some rulings, so

17   I'll try to see if we can go through those.  The first

18   one is a ruling on the Monell depositions, right?  Is

19   that still -- there's no movement on that, right?

20          MR. HOFFMAN:  Right.

21          THE COURT:  All right.  So let me just go

22   through that.  So the City is making the argument that

23   these are really (30)(b)(6) witnesses but it seems to me

24   that they are really more fact-based witnesses who have

25   specific knowledge of the practice and so, the plaintiff

Transcriptions Plus II, Inc.

3

Proceedings

1    has also withdrawn their request to depose Judge

2    Blumenfeld.

3              The only question I have is with regard to the

4    Chief of Appeals, Judge -- John Castellano (ph.).  I

5    wasn't sure where his knowledge -- what knowledge he had

6    of the discipline.

7              MR. HOFFMAN:  With the Court's permission,

8    we've agreed that Mr. Hiles can address individual

9    depositions this Court may have concerns about.

10             THE COURT:  All right.

11             MR. HILES:  Thank you, your Honor.

12             So actually, ADA Castellano was deposed in the

13   Sui (ph.) case which we mentioned in our papers and his

14   deposition testimony, although many questions remain was

15   by a significant amount in that case, the most

16   informative.  He communicated both through e-mails and

17   verbally with Jack Ryan, the chief assistant, with

18   Richard Brown, about cases of prosecutorial misconduct

19   that became apparent when the appeals bureau ADA, was

20   reviewing the record or when the appellate division said

21   this is really unacceptable in oral argument.  John

22   Castellano would deal with that.

23             Additionally, he testified one of the main

24   areas we need to go deeper into that was just sort of

25   grazed over in Sui was that he received calls from the

4

Proceedings

1  appellate division which was concerned about repeated

2  instances of prosecutorial misconduct of prosecutorial

3  misconduct and wanted to know what was being done about

4  it.  He didn't field all of those calls.  Some of them

5  went, I believe, to Mr. Brown and Mr. Ryan, although

6  we'll have to confirm that but that's also a very

7  important area for us.

8  (Pause)

9         MR. HILES:  Oh, and I guess the last thing I'd

10  say is that there's reversal memos.  We haven't received

11  those.  That's one of our issues that are alluded to in

12  the Sui depositions in the late 1990s that were prepared

13  by the appeals bureau ADA and they were circulated with

14  Mr. Castellano, Mr. Ryan, Mr. Brown and then Castellano

15  would talk to Brown and Ryan about what he thought about

16  it.  Was this really intentional misconduct or was this

17  just an unfortunate thing and we'll retry the case.

18         THE COURT:  All right.  So ADA Castellano was

19  not involved in the specific -- in Bellamy's case?

20         MR. HILES:  And I apologize because he was.  He

21  was.  He appears on a couple of the Court papers.  The

22  lead appeals bureau ADAs were Sharon Bratt (ph.) and Ron

23  Hana Diplany (ph.).  So I don't know if Mr. Castellano's

24  name appears because he signed off or was more intimately

25  involved in the actual editing process.  From Ms. Sui's

5

Proceedings

1  deposition, I think he would at least read it before it

2  was filed.

3          And we know that this case, the Bellamy case,

4  was a big deal at the Queens DA from top to bottom and so

5  we also would assume he was -- he was not the most

6  involved by any means but he was somewhat involved.

7          THE COURT:  Okay.  And then I also had a

8  question about Ms. Kugler (ph.), the FOIL officer.

9          MR. HILES:  Would you like --

10          THE COURT:  No.  Yeah.  Let me just hear what

11  relevance her testimony would have --

12          MR. HILES:  Sure.

13          THE COURT:  -- would have.

14          MR. HILES:  So it always seemed like there was

15  something very fishy with the testimony of this witness,

16  Linda Sanchez and so when Mr. Hoffman and Cravath Swaine

17  Moore took Mr. Bellamy's case, they -- one of the first

18  things they did was they made a FOIL request and after

19  over a year, the Queens DA record access officer Rona

20  Kugler wrote back that there were no files.  I quote it

21  here, "The review of our records reveals that the

22  following documents are not disclosable...records of

23  payments on payments on behalf of Linda Sanchez, records

24  of relocation assistance for Linda Sanchez."

25          The implication was that such documents didn't

6

Proceedings

1  even exist and it was only by coincidence at the 440

2  towards the end of it that it became clear that that was

3  not true.

4          Now I believe that she didn't intentionally do

5  that but what was the process where they were making

6  these representations and in the Betty (ph.) case, a

7  different records access officer also made a

8  representation repeatedly that there were not files

9  pertaining to witness benefits and it turns out there was

10  this file.  So this was important in our case and it also

11  suggestive of a pretty egregiously unconstitutional

12  policy.

13          THE COURT:  All right.  So did you want to be

14  heard on those two?

15          MR. MODAFFERI:  Yes, I did, your Honor.

16          THE COURT:  Okay.

17          MR. MODAFFERI:  I think basically my motion for

18  a protective order can be broken down as follows.  With

19  respect to any depositions that are relevant and binding

20  to a Monell claim, those witnesses would have to be

21  designed by the City of New York as people who can bind

22  them for purposes of a Monell claim.

23          THE COURT:  Why is that?

24          MR. MODAFFERI:  I'm sorry?

25          THE COURT:  Why do they have to be binding.

7

Proceedings

1    MR. MODAFFERI:  because, you know, you can

2 depose a random City employees and what he or she says

3 regarding an incident has no bearing upon a policymaker's

4 decision to set forth a policy.  They're just people who

5 are doing their job.  So nothing that a low-level City

6 employee can never bind the City of New York.

7        THE COURT:  But if these are --

8        MR. MODAFFERI:  Well, that's what I am getting

9 to, your Honor.

10        THE COURT:  Okay.

11        MR. MODAFFERI:  So that's separate and apart

12 from fact witnesses.

13        THE COURT:  Okay.

14        MR. MODAFFERI:  Fact witnesses would be

15 witnesses who are noticed or subpoenaed under Rule 30 and

16 at this point, would require leave of court and good

17 cause because we've or plaintiff has surpassed the number

18 of depositions allotted under the Rules.

19        THE COURT:  Which is ten, right?

20        MR. MODAFFERI:  Which is ten.

21        THE COURT:  All right.  Mr. Hiles, you can sit.

22 You don't have to stand.

23        MR. HILES:  Sorry.

24        MR. MODAFFERI:  Oh, sorry.

25        THE COURT:  No, whatever you're comfortable

8

Proceedings

1   with but Mr. Hiles was not speaking, so I just wanted to

2   let him know that he doesn't have to stand when he's not

3   speaking.

4            MR. MODAFFERI:  So now getting to the witnesses

5   that were mentioned, the ADA --

6            THE COURT:  Hold on a second.  There are

7   allotted ten witnesses --

8            MR. MODAFFERI:  Right.

9            THE COURT:  -- right, for Monell and the

10  twelve --

11           MR. MODAFFERI:  No, no, no.

12           THE COURT:  No?

13           MR. MODAFFERI:  They're allotted ten fact

14  witnesses period, not just for Monell, for the case in

15  total, pursuant to Rule 38.

16           With respect to the --

17           THE COURT:  But with the bifurcated -- you

18  can't have fact witnesses during the Monell stage of

19  discovery?

20           MR. MODAFFERI:  Oh, sure you can.

21           THE COURT:  Okay.

22           MR. MODAFFERI:  Just again, provided that you

23  have some left over in the ten, unless leave of court and

24  good cause is shown.

25           THE COURT:  Okay.

9

Proceedings

1          MR. MODAFFERI:  So that's -- I'm getting to

2     that point now.

3          With respect to the appeals to ADAs, really

4     they're can't be good cause shown because everything that

5     these ADAs said regarding the Brady material was said to

6     Judge Blumenfeld and Judge Blumenfeld held that it was

7     not Brady and agreed with everything that they had said.

8          So essentially by allowing these depositions to

9     go forward, we are relitigating an issue that was already

10    decided previously and this was mentioned in my papers as

11    having collateral estoppel effect.

12         THE COURT:  Yeah, can you explain that a little

13    bit more?  The -- at the 440, Judge Blumenfeld heard

14    evidence from these individuals, is that --

15         MR. MODAFFERI:  Yes.

16         THE COURT:  Okay.  And you're saying that he

17    made a ruling that what they refer to was not Brady?

18         MR. MODAFFERI:  Correct.  And I cited it in my

19    papers with a case citation.

20         THE COURT:  And specifically, the payments made

21    to Ms. Sanchez.  Is that -- what was designated as not

22    Brady?

23         MR. MODAFFERI:  Well, both the payments that

24    were made to Ms. Sanchez --

25         THE COURT:  Uh-huh.

10

Proceedings

1          MR. MODAFFERI:  -- which were disclosed, so

2     clearly it was Brady but it was satisfied, the obligation

3     to turn over that material.

4          THE COURT:  Okay.

5          MR. MODAFFERI:  With respect to any additional

6     payments for the allegation of Section 8 housing that was

7     promised --

8          THE COURT:  Right.

9          MR. MODAFFERI:  That specifically was held not

10    to be Brady because at the time -- and if I can get the

11    quote specific -- it was known to both the jury and

12    plaintiff's counsel that -- pardon me, your Honor.  The

13    jury was told that "Ms. Sanchez had been relocated and it

14    was not known to anyone at the time of trial that she

15    would eventually obtain Section 9 housing.  This was not

16    a Brady violation and knowledge of it would have still

17    left the trial jury with the unanswered question of why

18    she called the police that day and why the defendant said

19    what he did."

20          THE COURT:  Are you reading from Judge

21    Blumenfeld's decision?

22          MR. MODAFFERI:  Correct.

23          THE COURT:  Okay.

24          MR. MODAFFERI:  And it's the Bellamy decision

25    from 2008 at *21 through 23.

11

Proceedings

1          THE COURT:  Uh-huh.

2          MR. MODAFFERI:  So that's really what our

3     argument is with respect to the -- some of the additional

4     fact witnesses.  With respect to the executives, which

5     stems from Mr. Castellano, all the way through the

6     district attorney, those would be your typical (30)(b)(6)

7     witness or a Monell witness because they really have no

8     involvement in Bellamy because they really have no

9     involvement in Bellamy.

10          For example, Mr. Hiles said that Mr.

11     Castellano's name was on some of the appeals papers.

12     That's tantamount to saying that Zachary Carter's name is

13     on my letter.  There's no involvement there.

14          So really what we're trying to do and we're

15     trying to play by the rules is set forth one witness who

16     can bind the City with respect to each of the plaintiff's

17     Monell claims.  It appears based on a review of

18     everything and as set forth in my letters, that the chief

19     assistant would be the relevant person with respect to

20     any claim for failure to discipline and the individual

21     with knowledge of the witness protection program is Mike

22     Mansky (ph.) and he was already deposed and questioned

23     with respect to the policies of the witness protection

24     program in this case, not only at the 440 but in a civil

25     deposition.

Proceedings

1        So again, our papers speak for themselves.

2  this is, you know, sort of we're going through the

3  gauntlet of every person who could possibly be deposed at

4  the Queens DA's office and really, the new rules limit

5  the amount of discovery based on the proportionality of

6  the case.

7        So, you know, I did have a conversation with

8  Mr. Hoffman about trying to limit some of these people.

9  It's just at the end of the day, it was just so expansive

10 that we couldn't reach an agreement.

11        THE COURT:  Okay, so when you said the chief

12 assistant, do you mean John Ryan?

13        MR. MODAFFERI:  Correct.

14        THE COURT:  Okay.  All right.  So, Mr. Hoffman

15 is it possible to combine some of these witnesses and

16 designate the ones that are the more important ones

17 rather than going through everyone?  So for example, it

18 wasn't clear with Mr. Castellano if his name appears just

19 -- you know, if he really didn't have much to do with the

20 case --

21        MR. HOFFMAN:  Just --

22        THE COURT:  -- is he really necessary?

23        MR. HOFFMAN:  Mr. Castellano is very necessary.

24 Your Honor, Mr. Castellano was chief of the appeals

25 bureau.  He received the notifications from the appellate

13

Proceedings

1   division that misconduct had occurred.  We've listed 65

2   of vindications by the appellate division both in

3   remands, reversals or criticism where they say the

4   misconduct was egregious, flagrant.

5          He received notification of the reversals and

6   prepared memos to the chief and to DA Brown in the last

7   1990s regarding those reversals and a description of the

8   misconduct of the individual district attorney.

9          He has indicated in Sui, he doesn't know of one

10  instance of where one of these prosecutors, not one, was

11  disciplined or reprimanded.

12         He also, as Mr. Hiles said, fielded telephone

13  calls from the appellate division which was not developed

14  in Sui whether the appellate division made calls and said

15  some of this conduct is egregious and unacceptable.  What

16  happened when he received those calls?

17         Each of those witnesses, your Honor, before we

18  take the (30)(b)(6) witness, will tell us how the

19  practice and policy of shielding Brady, which is what we

20  are talking about, shielding the constitutional

21  obligation of Brady to a defendant, how was it

22  practically implicated?

23         And Mr. Modafferi's reference to this Section 8

24  Judge Blumenfeld decision, shows how that policy

25  continued with Judge Blumenfeld, if I may, your Honor,

14

Proceedings

1   tell you a little bit about how that came about.

2           To begin, we did not know exactly what Ms.

3   Sanchez received.  We knew she --

4           THE COURT:  We who?  When?

5           MR. HOFFMAN:  Ms. Sanchez, during the 440.

6           THE COURT:  Okay.

7           MR. HOFFMAN:  At the 440, or when we filed the

8   FOIL, we did not know the extent of the benefits or the

9   promises that she received.  So we were asking what did

10  she receive on Section 8?  What did she receive on other

11  housing benefits?  What did she receive regarding cash?

12          As you know, your Honor, criminal law,

13  discovery is very, very restricted.  We were not allowed

14  to look at the WPP file.  Your Honor what happened is Ms.

15  Bratt and Ms. Piplotti went in to Judge Blumenfeld and

16  had an in camera discussion.  And they told Judge

17  Blumenfeld, regarding Section 8, your Honor, that

18  happened a year after the trial.  That could not be

19  Brady.  That was true.  And Judge Blumenfeld concluded

20  that it was not Brady because they said it happened much

21  later.

22          What Ms. Bratt and Ms. Piplotti did not tell

23  the judge are, one, that on November 28th, 1995, three

24  days before Ms. Sanchez testified, she was promised that

25  she would receive fr an indefinite period of time an

15

Proceedings

1   apartment which she would not have to --

2            THE COURT:  Okay.  Mr. Hoffman --

3            MR. HOFFMAN:  You know all of this.

4            THE COURT:  I know all this.  So I think --

5            MR. HOFFMAN:  You know all of this.

6            THE COURT:  -- your point is just that there

7   was information that came to light after Judge Blumenfeld

8   made his ruling that this was not Brady.

9            MR. HOFFMAN:  But he did not --

10            THE COURT:  Okay.  So that's fine.

11            MR. HOFFMAN:  It continued to be

12   (indiscernible).

13            THE COURT:  Yes.

14            MR. HOFFMAN:  But it --

15            MR. HILES:  Can I just (indiscernible) briefly

16   --

17            MR. HOFFMAN:  Do you mind?

18            MR. HILES:  -- on a couple of things.  I'm

19   sorry.

20            THE COURT:  Yes.

21            MR. HILES:  So yes, that's important and that

22   wasn't -- we just don't have testimony with that, we also

23   have documentary evidence.  So it's in the file as we've

24   written.  You know, with the Sui case, nine ADAs

25   testified before scheduled deposition of John Ryan which

Proceedings

1   did not occur because the case was settled a week

2   beforehand.

3           So I mean, this is standard practice.  I think

4   also, we need people who are on the ground for two

5   reasons; one, because we're going to have to show

6   proximate cause that it was the policies that caused the

7   violations.  I mean that's essential.

8           Second, because there was no written policy for

9   discipline or the witness protection program.  And so

10  they say that certain things happened but we need to talk

11  to the people on the ground to see if they actually did.

12  We suspect they did not and with the witness protection

13  program in particular, at first the defense was that we

14  separated those living expenses and other benefits

15  provided from the prosecutor's file, so the witness

16  wouldn't think there was a quid pro quo.  Admitting that

17  there was this so-called Chinese wall.

18          Now the position is that it's on a case-by-case

19  basis that Mr. Mansfield (ph.), who of course doesn't

20  actually know what's going on in the specific cases,

21  makes disclosures about what's given to the -- decides

22  what's given to the prosecutor.  So I mean all of these

23  people are absolutely essentially.

24          THE COURT:  All right.

25          MR. HOFFMAN:  I mean, if I may very quickly, I

Proceedings

1  know it's not right to have two against one, this

2  argument regarding that our Monell individual depositions

3  could have been taken earlier, I would just attribute

4  that to Mr. Modafferi not being aware of the earlier

5  procedures in this case.

6         I was not allowed to ask questions to Mr.

7  Mansfield regarding the Monell.  That was the agreement

8  that we had.  I was not allowed to call Monell fact

9  witnesses, whether individual or policy maker.  That was

10 a motion that was made by the City and precluded us after

11 it was bifurcated from taking those depositions.

12        Your Honor, if I may just quickly say, these

13 are widespread very important policies that we must be

14 able to look at.  It has far reaching effect, not only

15 Mr. Bellamy but on a lot of other defendants who have

16 been subjected to this policy and practice.

17        There is a limit of ten and we've asked -- I

18 think we're now at twelve but there's a still burden upon

19 the City to show why us exceeding the number by two.  It

20 is their burden to really show that what we're asking for

21 is not necessary or not relevant.

22        Each of those witnesses, your Honor, if I may,

23 we've looked at it carefully.  We didn't ask for

24 everybody.  There's a lot more administrators in Queens.

25 We asked for those who had information regarding this

18

Proceedings

1   practice and policy.   Thank you, your Honor.

2          THE COURT:   All right.   Thank you, Mr. Hoffman.

3          So did you want to say anything -- I'll just

4   give you an opportunity very briefly to say something

5   that you haven't said already.

6          MR. MODAFFERI:   Your Honor, it's really -- you

7   know, the point is here, you know, we're willing to

8   provide the documents to counsel.   I've believe we've

9   provided maybe close to 60,000 pages of documents

10  relevant to anywhere from training to personnel files, to

11  -- you know, the case Betty is one case that's semi-

12  related to this because there, you did have a threatened

13  witness who was promised living expenses but the

14  difference between Bellamy and that case is when the

15  threatened witness took the stand, the witness lied about

16  the expenses that were given to him and the prosecutor

17  never corrected it and that's why there was a finding

18  against the DA's office.

19          In Bellamy, the prosecutor affirmatively

20  elicited evidence of payments that were made and payments

21  that were promised at that time and there wasn't any

22  Brady violation with respect to that.

23          So here we're trying to, you know, provide them

24  with as much documentation as possible and provide the

25  relevant witnesses but here, you know, this is discovery

Proceedings

1    that's tantamount to a case where plaintiff pled guilty

2    to a crime and then wants, you know extensive discovery

3    for false arrest when you know at summary judgment

4    they're not going to get anywhere.

5           So again, going through the list, John Ryan

6    would be the individual who can handle all questions

7    relating to policies, practices and procedures with

8    respect to disciplining ADAs.  That should cut out

9    Castellano, Saunders, Masters and the DA himself.

10          With respect to the witness protection program,

11   I think it's undisputed that Mike Mansfield is the

12   witness.  If counsel wants an unfettered right to

13   question him about the policies and practices where there

14   was an agreement before, that's fine.  I'll reproduce

15   him.

16          But going through the first six witnesses on

17   the list, the only witness who I can see as possibly

18   being factually related to this case would be Brad

19   Leventhal because he's the ADA who handled the 440

20   motion.

21          Some of these, you know, ancillary ADAs who

22   made an appearance or handled the FOIL request, that's

23   just getting a little ridiculous.  And just with respect

24   to the argument that was made where ADAs were deposed in

25   Sui prior to the scheduled deposition of John Ryan, the

Proceedings

1    ADAs who were involved in Bellamy were deposed.  There

2    was an ADA who was present for the lineups and handled

3    the grand jury.  That's ADA Antignoni (ph.).  He's

4    currently a judge.  He was deposed.

5              For trial purposes, the ADA was David Guy.

6    David Guy was produced and deposed.  So --

7              THE COURT:  But they weren't -- that was --

8    because there's bifurcated discovery, the Monell claims

9    were not the subject of those depositions, correct?

10             MR. MODAFFERI:  Well, that's not true because

11   the underlying basis for counsel's Monell claim with

12   respect to failing to discipline ADAs was that there was

13   summation misconduct that took place and failing to

14   discipline ADAs brought about this culture where in

15   summation, ADAs could say what they want.  Counsel asked

16   the prosecutor about his summation from beginning to end.

17             THE COURT:  Uh-huh.

18             MR. MODAFFERI:  So with respect to the facts

19   underlying the Monell claim, yes, there was ample

20   discovery with respect to that.

21             Now we're at the point where we're producing

22   discovery with respect to the policies and procedures

23   themselves and that's why we're dealing with (30)(b)(6)

24   witnesses and witnesses who are the high-ups who --        l

25             THE COURT:  Yes, I --

21

Proceedings

1          MR. MODAFFERI:  -- have set forth those

2    policies.

3          THE COURT:  Right, my understanding of how

4    (30)(b)(6) works is that if there's a request for the

5    policies, then the defendant in this case has the

6    opportunity to designate the people who are in the best

7    position to do that.

8          MR. MODAFFERI:  That's correct.

9          THE COURT:  This is not a (30)(b)(6).  This is

10   actually asking for specific witnesses and you're trying

11   to covert it into a (30)(b)(6) and so that's where I

12   think there's a disagreement.

13          I don't think the City gets to say, no, no, no,

14   we don't think these are the right witnesses.  We're

15   going to give you alternative witnesses, so --

16          MR. MODAFFERI:  Your Honor, if I may, the only

17   reason why we're saying that we're talking about them as

18   being (30)(b)(6) witnesses is because the list of

19   witnesses were provided to us as witnesses for the Monell

20   claim.

21          THE COURT:  Correct.

22          MR. MODAFFERI:  And the witnesses who could

23   bind the city for purposes of a Monell claim, would only

24   be (30)(b)(6) witnesses.  That's where we are right now.

25   I am not trying to limit, you know, for example, I agree,

22

Proceedings

1   Brad Leventhal may have factual information relevant to

2   the claims underlying this case --

3          THE COURT:  Uh-huh.

4          MR. MODAFFERI:  -- having nothing to do with

5   the Monell claim.

6          THE COURT:  Right.  So let me hear from

7   plaintiff very, very briefly on the question -- sorry --

8   on the question of in a Monell --in a bifurcated

9   discovery situation where we have now, like we have now

10  we're now just talking about Monell, can you have fact

11  witnesses or is what the City saying true that you can

12  only have (30)(b)(6) witness who can bind the City?

13         MR. HOFFMAN:  No, there's no such precedent and

14  the statute itself says we don't have to go by

15  (30)(b)(6).  We could take the witnesses who we know are

16  the policymakers.

17         THE COURT:  Okay.

18         MR. HOFFMAN:  We know who the policymaker in

19  this case is.

20         THE COURT:  Right.

21         MR. HOFFMAN:  Generally, (30)(b)(6) is done

22  when you have a (30)(b)(6) is done when you have a big

23  corporation and you don't know who has made the final

24  decision.

25         THE COURT:  Right.  That's --

Transcriptions Plus II, Inc.

23

Proceedings

1          MR. HOFFMAN:  We know who has made the final --

2          THE COURT:  And I think also the allegations

3    are it's the practice and things --

4          MR. HOFFMAN:  And --

5          THE COURT:  There may have been a policy.  The

6    policy may not have been good and then there may have

7    been a policy that was fine but in practice, it wasn't

8    implemented properly, so --

9          MR. HOFFMAN:  Right.  How it was implemented is

10   why the --

11         THE COURT:  Yeah.

12         MR. HOFFMAN:  -- the other would --

13         THE COURT:  Yes.  And I think up till this

14   point, just the complicated procedures in this case where

15   information is coming out piecemeal, and for example with

16   the FOIL officer, the fact that the representation was

17   searched.  There is no such document and then later a

18   document shows up.  I think that that speaks to what the

19   policy was in terms of disclosing information and this

20   internal wall, how it was set up and how that as

21   implemented.

22         So I am going to allow those witnesses to go

23   forward but I think that there is one -- the list that

24   was attached to filing 125, so 125-1, had thirteen people

25   listed.  You've withdrawn Judge Blumenfeld, so that

24

Proceedings

1   leaves it at twelve but also with regard to Robert

2   Masters, it says that plaintiffs are deferring taking his

3   deposition at this time.

4           MR. HOFFMAN:  We understood that he had a

5   personal family tragedy --

6           THE COURT:  All right.

7           MR. HOFFMAN:  -- and we thought that we

8   shouldn't be taking that time.

9           THE COURT:  All right.  So --

10          MR. HOFFMAN:  But as we do these depositions,

11  we may not take Mr. Masters --

12          THE COURT:  Right.

13          MR. HOFFMAN:  -- under the circumstances.

14          THE COURT:  All right.  So that, if you take

15  him off the list, that's eleven.  So what I am going to

16  do is to limit you to ten.

17          MR. HOFFMAN:  All right.

18          THE COURT:  All right.  And let you decide

19  which person you're going to drop.

20          MR. HOFFMAN:  All right.

21          THE COURT:  But I would also that you start

22  with the witnesses that the City has offered -- Manfeld -

23  - Manfield and Ryan, I believe.  Start with them.  Yes?

24          MR. HOFFMAN:  I would rather not.

25          MR. HILES:  I'm sorry.

25

Proceedings

1          THE COURT:  Why not?

2          MR. HILES:  I'm very sorry.  So one of the

3   reasons is that these fact witnesses are witnesses that

4   we can depose right away.  There's been a lot of delay in

5   this case.  I know it's not Mr. Modafferi's fault but --

6   and now we're going to need to get a lot more documents

7   which I'm sure we'll discuss next.

8          And so, I mean, we're talking about summertime

9   depositions for these people, not only could we use those

10  depositions more effectively, if we talked to the other

11  people first but also, these are depositions between we

12  can get going with right away.  And that's been very

13  important to us to hurry this along.

14         THE COURT:  Well, how will you -- I mean, if

15  you're saying that you can -- it's possible that you'll

16  winnow that list of ten down even further, I would say

17  you should start with the people who have the most

18  knowledge that would enable you to winnow the list down,

19  as opposed to starting with the minor ones first, just

20  because they're easier to schedule.

21         MR. HILES:  I think that there's two kinds of

22  knowledge.  There's the underlying factual knowledge

23  which we know who has that and we know that the people at

24  the top don't.  Then there's the policy knowledge and I

25  think that that does make sense for the policy issue and

26

Proceedings

1    that we could do that with regards to the policy issue

2    but it's really two separate tracts and it would be

3    several months of dely in addition to less effective and

4    efficient policy witness depositions, your Honor.

5            MR. HOFFMAN:  If I may say, as a practical

6    matter, okay, we asked Ms. Bratt, you know, at the in

7    camera review, did you show -- you know, Mr. Modafferi

8    says there's no Brady but there's a December 7th, before

9    the trial was ended, $2,800 payment requisition.  So we

10   asked Ms. Bratt, why didn't you look at it?  What -- how

11   -- why -- why weren't you permitted to look at it?

12           And then we could go to Mr. Ryan and say look,

13   Ms. Bratt says this and that.  Was that the policy?  Was

14   that the practice?  So it seems that us being able to

15   establish how the practice worked and was implemented and

16   then go to the policymaker, to us anyway makes more

17   sense.  You know, to start at the lower level to see what

18   it was.  So that's our position on that.

19           THE COURT:  All right.

20           MR. MODAFFERI:  Your Honor?

21           THE COURT:  Yes, Mr. Modafferi?

22           MR. MODAFFERI:  Sorry, just to further

23   complicate matters, I would just ask is your Honor going

24   to put this in an order on ECF or actually issue a formal

25   written --

27

Proceedings

1      THE COURT:  I wasn't intending on writing

2  anything extensive.

3      MR. MODAFFERI:  Okay.  No, that's fine.

4      THE COURT:  Uh-huh.

5      MR. MODAFFERI:  It's very likely that after

6  speaking to my clients or my office, that there might be

7  a motion made under Rule 72.  So I just want to make sure

8  that there's something -- an order somewhere and that may

9  further delay things if that's the course that my client

10  wishes to take.

11      THE COURT:  All right.  So I mean, I will issue

12  something.  I would issue something that just states what

13  my conclusion is --

14      MR. MODAFFERI:  That's fine.

15      THE COURT:  -- and a very brief justification

16  for it.  I wasn't intending on writing something that had

17  a lot of legal precedent and --

18      MR. MODAFFERI:  That's fine.

19      THE COURT:  -- because I understand people want

20  to keep moving.  So I hope there won't be delay on my

21  part.  All right.

22      So I will allow plaintiffs to take those

23  depositions in the order that you want but with two

24  caveats, one is keep in mind that it would be best if you

25  could drop additional witnesses as they become

28

Proceedings

1   unnecessary as you proceed and the other is that be

2   mindful of the time of people who are indisputedly busy.

3   So when you embark on their depositions, especially of

4   the higher-up people, please be very targeted in the

5   areas that you're looking to ask questions of.

6           And then also as a courtesy, you could speak

7   with Mr. Modafferi in advance about the areas you want to

8   get into, so that he can prepare his witness and not, you

9   know, have the witness be surprised.  This exercise is

10  not one of ambush.  So in advance, you should just let

11  him know what you're seeking to explore, the areas, the

12  documents, all that stuff.

13          MR. HOFFMAN:  We'll give him the cases that

14  we're going to be questioning on.

15          THE COURT:  Yes.  All right.  So then that will

16  be respectful of the witness' time.

17          MR. MODAFFERI:  Your Honor, I would also

18  request that to the extent that any of these witnesses

19  are being proffered as (30)(b)(6) witnesses now, I --

20  quite frankly, because the procedure wasn't plaintiff

21  provide a list of areas of topics and then the City

22  designate a witness to cover all of them, at this point,

23  we don't know who would be the (30)(b)(6) witness or are

24  all of these fact witness.

25          THE COURT:  Right.

29

Proceedings

1          MR. MODAFFERI:  If they're all fact witnesses,

2   you know, they come into the deposition with their

3   factual knowledge and that's it.  So you'll probably get

4   a lot of "I don't knows."

5          So that would be crucial to, you know,

6   producing any witness prior to a deposition because at

7   this point, you know, we wouldn't know who is speaking on

8   behalf of the DA's Office and who is speaking on behalf

9   of their personal knowledge.

10          THE COURT:  Yes, that's a fair point and

11   especially if you're asking, for example, District

12   Attorney Brown about cases he will not know without prior

13   preparation.  So --

14          MR. HOFFMAN:  We will do that.

15          THE COURT:  Yeah.

16          MR. HOFFMAN:  We will do that.  We will -- we

17   won't surprise anybody.  We'll advise what cases we want

18   an explanation as to what happened or what did not

19   happen.

20          THE COURT:  And if you are asking the City to

21   produce witnesses who are biding the City, as far as the

22   policy, then you do need to make the 30(b)(6) request.

23          MR. HOFFMAN:  We will do that.  Yes, your

24   Honor.

25          THE COURT:  Okay.  All right.  So I know

30

Proceedings

1   there's still some document discovery issues.  We're

2   running late and I don't want to keep other parties

3   waiting.  Are there things that can be --

4            MR. HOFFMAN:  I think it's -- well --

5            THE COURT:  Give me an overview of what you

6   would need for me to decide today.

7            MR. HOFFMAN:  Uhm.

8            THE COURT:  I mean it's just a lot of stuff.

9            MR. HOFFMAN:  It is a lot of stuff.

10            THE COURT:  So --

11            MR. HOFFMAN:  I will --

12            THE COURT:  -- I just don't know what's the

13   best use of your time --

14            MR. HOFFMAN:  Certain --

15            THE COURT:  -- and my time.  We can go through

16   each category of dispute.  We can go through, you know,

17   general categories.

18            MR. HOFFMAN:  Oh.

19            THE COURT:  I can send the parties back to

20   continue working together.  I'm just not sure how to

21   handle --

22            MR. HOFFMAN:  We are willing to continue to

23   work together.  I guess one of the rulings you could make

24   is allowing us to file a motion to compel which we could

25   do in a couple of days.  We have had extensive

31

Proceedings

1    discussions.  It will be approximately twelve pages.

2    There are a lot of interrogatories and document requests.

3            During that time, we could keep talking.  I'll

4    say it is --

5            MR. HILES:  And just one quick thing is that

6    when we meet and talk to the City, I mean, your Honor

7    will have to rule on the motion to compel because the

8    City's basically said it's given us all it's going to

9    give us but when we mean talk to the City, that would be

10   sort of after a decision and saying, all right, so if

11   we're allowed to get these documents, how can we do that

12   in a way that's like least cumbersome, those --

13           THE COURT:  Okay.

14           MR. HILES:  -- that sort of thing.

15           THE COURT:  Okay.  So you've reached an impasse

16   in terms of what the City's willing to turn over and you

17   want to file a motion to compel.  Okay.  And I read the

18   recent filings which were not -- which were termed

19   "status reports" as opposed to a motion to compel.  So

20   that's why it didn't feel like there was something for me

21   to decide.

22           So I will grant you the opportunity to file a

23   motion to compel.  I'll let you have a page limit of

24   twelve.

25           MR. HOFFMAN:  Right.

Proceedings

1          THE COURT:  And the City can respond also with

2     twelve pages and then I'll take a look at the specific

3     requests and try to make rulings on them, just by reading

4     your pleadings, but if not, then I'll allow -- I'll ask

5     for an oral argument on those points.  Okay?

6               So as far as the motion to -- there's also this

7     motion to strike and I'm denying it, okay?  So just to

8     clear that off.  In general, in order to file a reply,

9     there does need to be permission from the Court.  In this

10    case, the City did not seek prior permission but I don't

11    -- I am not going to make a big deal out of that.  All

12    right.  So I've read the pleadings.  I'll consider them.

13    But in the future, I just don't want back and forth, back

14    and forth, because that could go on forever.  So if you

15    want to file a reply, just ask permission.

16              MR. MODAFFERI:  I apologize, your Honor.  It

17    was really just, you know, my initial motion for a

18    protective order was --

19              THE COURT:  Yes.

20              MR. MODAFFERI:  -- semi-limited.

21              THE COURT:  I understand.

22              MR. MODAFFERI:  And then the response was, I

23    believe like sixteen pages.

24              THE COURT:  Yes, and that's the same thing.

25    Also, with the page limits, just ask in advance.  I know

Proceedings

1    this is a case that's been hotly contested.  I know

2    people want to have their say and I also feel the parties

3    are repeating a lot.  And it may be because I am new to

4    the case and you want to make sure I get your salient

5    points, but I've now familiarized myself with the case

6    and so I just need to know the specific point that you

7    want me to look at and you don't need to go back into all

8    the facts of the case.  Okay?

9            Again, it's a very hotly contested case.  Have

10   the parties engaged in any kind of attempts to settle or

11   there's just no way?  It just seems like there's a lot of

12   work still to be done and this might be an opportunity,

13   since we're now moving to the Monell phase for the

14   parties to think about whether settlement is possible.

15           MR. MODAFFERI:  Your Honor, I am not sure if

16   there were any talks with my predecessor.

17           THE COURT:  Uh-huh.

18           MR. MODAFFERI:  But I do know and this kind of

19   goes back to the conversation that we had with your Honor

20   when I was first assigned to the case and appeared before

21   your Honor, my knowledge is that it's been a case that's

22   been flagged for trial purposes.

23           THE COURT:  Uh-huh.

24           MR. MODAFFERI:  But again, I'm not quite sure

25   if there were settlement talks and counsel could probably

34

Proceedings

1   bring me up to speed if there were or there were not but,

2   you know, it doesn't hurt to keep lines of communication

3   open.

4            THE COURT:  Okay.  So I would encourage the

5   parties at this point just to take a step back, look at

6   whether resolution is possible and let me know if you

7   need help in that regard.  All right?

8            So I will memorialize my oral ruling in writing

9   and let's set another status -- oh, I need to give you a

10  deadline for the motion to compel.  You said, Mr.

11  Hoffman, how much time?  You said two weeks, you could

12  have it done?

13           MR. HOFFMAN:  Oh, no we can have our motion in

14  two days.

15           THE COURT:  Two days.  Okay.  So I will give

16  you until February 19.

17           MR. HOFFMAN:  Right.

18           THE COURT:  And then the City, is a week enough

19  time or do you need more time to respond?

20           MR. MODAFFERI:  Your Honor, if I can

21  respectfully have a little more time.

22           THE COURT:  All right.

23           MR. MODAFFERI:  I'm starting a trial in the

24  southern district on Monday.

25           THE COURT:  Oh, okay.

35

                         Proceedings

1          MR. MODAFFERI:  So that --

2          THE COURT:  Name your deadline.

3          MR. MODAFFERI:  March -- I mean, it's most

4    likely material that we've discussed and put in our

5    letters.  So March 4th would be ample time.

6          THE COURT:  All right.  Great.  March 4th then.

7    And let's go ahead and have another date.

8          MR. HOFFMAN:  Of course we would like the next

9    conference as early as possible.

10         THE COURT:  Yes.

11         MR. HOFFMAN:  That's subject to the convenience

12   of the Court, of course, and Mr. Modafferi.

13         THE COURT:  All right.  I will schedule it, so

14   that if I need oral argument on the motion to compel, we

15   can do that.  So the week of March 15th is really full.

16   Sorry.  I could do -- on March 14th in the afternoon,

17   like around 3 o'clock.

18         MR. HOFFMAN:  Yes.

19         THE COURT:  Is that possible?

20         MR. MODAFFERI:  That works.

21         THE COURT:  Okay.  So let's do that.  March

22   14th, 3 o'clock.  We'll do a status conference and like I

23   said, if I need oral argument on the motion to compel,

24   we'll do it then.  Otherwise, I hope to have made a

25   ruling and then we can just move on.

Proceedings

1    (Pause)

2             THE COURT:  Okay.  So is that it?

3             MR. MODAFFERI:  I believe it is, your Honor.

4             THE COURT:  All right.  Thank you very much.

5             MR. MODAFFERI:  Thank you.

6                      (Matter concluded)

7                         -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **8th** day of **March**, 2016.

*Linda Ferrara*
Linda Ferrara
Transcription Plus II, Inc.
AAERT CET**D 656