UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
Kareem Bellamy,

                              Plaintiff,

                                                        12-CIV-1025 (AMD) (PK)

        v.

City of New York,
John J. Gillen,
Michael F. Solomeno,
John Doe 1 and John Doe 2, Supervising
Officers at the NYPD 101st Precinct,

                              Defendants.
--------------------------------------------------------x


                    ---------------------------------------------------------
                    **Plaintiff's Memorandum of Law in Opposition
                    to Motion for Summary Judgment
                    and
                    In Support of Cross Motion
                    for Partial Summary Judgment**


                    ---------------------------------------------------------


                              Thomas Hoffman
                              Jonathan G. Hiles
                    **Law Offices of Thomas Hoffman, P.C.**
                    5 Columbus Circle @ 1790 Broadway, 6th Floor
                              New York, New York 10019
                                    212 581 1180


                              Attorney for Plaintiff

# TABLE OF CONTENTS

Table of Authorities ..................................................................................... v

**PRELIMINARY STATEMENT** ................................................................ 1

**STATEMENT OF FACTS** ......................................................................... 2

**STANDARD FOR SUMMARY JUDGMENT** ........................................ 3

**PLAINTIFF'S WITHDRAWN CLAIMS** ................................................. 3

**ARGUMENT**

**POINT I**

        **PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY
JUDGMENT THAT THE DISMISSAL OF HIS INDICTMENT
WAS A FAVORABLE TERMINATION AS A MATTER OF
LAW, AND DEFENDANTS ARE NOT ENTITLED TO
SUMMARY JUDGMENT ON HIS MALICIOUS
PROSECUTION CLAIMS** ............................................................... 3

        **A. Favorable Termination** ................................................................ 3

        **B. Initiation** .......................................................................................... 6

        **C. Lack of Probable Cause** ............................................................... 7

            **i.**   **There was no probable cause to arrest or prosecute
Bellamy)** ................................................................................... 7

                **1. Multiple reports by Sanchez indicated that she had
seen Bellamy on a *Sunday*, but Gillen, assisted by
Solomeno, withheld these reports and doctored
evidence to conceal them)** ........................................... 8

i

       2.  Gillen pressured Carter to make a post-lineup "identification" of Bellamy, which Gillen bolstered by lying to Antignani and suppressing a report that the killers wore hoods) ................................................ 9

**D. Malice** ............................................................................ 12

## POINT II

    **DETECTIVES GILLEN AND SOLOMENO ARE NOT ENTITLED TO THE DEFENSE OF QUALIFIED IMMUNITY)** ....................................................................... 13

## POINT III

    **DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S BRADY AND EVIDENCE-MANUFACTURING CLAIMS)** ..................................... 13

    **A.** The disclosure of *Brady* information respecting Sanchez would have negated all formerly incriminating parts of testimony) ................................................................. 15

    **B.** Had Gillen not coerced Carter into identifying Bellamy, there would have been no case against Bellamy) ........................... 16

    **C.** The "consciousness of guilt" statement that Gillen manufactured was the center-piece of the prosecutions weak case) ........................................................................... 17

    **D.** Gillen and Solomeno's false report that Walker identified Bellamy as the perpetrator led to prejudicial speculation by jurors) ......................................................................... 17

    **E.** Gillen's false report that he had investigated a lead regarding Melvin and Harris created the misimpression that they had been "ruled out" ) .................................................... 18

**POINT IV**

**DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON EITHER OF PLAINTIFF'S TWO *MONELL* CLAIMS** ............................................................ 19

A. Plaintiff's *Monell* claims do not fall as a matter of law ......... 20

B. Since Plaintiff has established the suppression of *Brady* benefits to Sanchez, discovery should proceed on his *Monell* claim that the Queens DA systemically shielded trial prosecutors from knowledge of witness benefits given through the Witness Protection Program ............................ 22

C. Since Queens prosecutors failed to disclose *Brady*, as they were required to do, and ADA Guy committed summation misconduct that deprived Plaintiff of a fair trial, discovery should proceed on his *Monell* claim that the Queens DA had a policy of deliberate indifference to prosecutorial misconduct

    i.  Prosecutors withheld impeachment evidence regarding Sanchez ............................................... 26

    ii.  ADA Guy's summation violated Bellamy's Fair Trial rights ........................................................ 28

**POINT V**

**FRAMING AN INNOCENT PERSON FOR A CRIME GIVES RISE TO A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** ............................................................ 34

**POINT VI**

**PLAINTIFF'S FOURTEENTH AMENDMENT DUE PROCESS CLAIM IS NOT AT PRESENT DUPLICATIVE OF THE FOURTH AMENDMENT MALICIOUS PROSECUTION CLAIM** ............................................................ 35

iii

**CONCLUSION** ............................................................................................................ 35

# TABLE OF AUTHORITIES

**Cases:**

*Allen ex rel. Allen v. Devine,* 726 F. Supp. 2d 240, 254 (E.D.N.Y. 2010) ...................... 11

*Armatas v. Maroulleti*, 2010 U.S. Dist. LEXIS 112921, 40-42 (E.D.N.Y) ...................... 5

*Banks v. Dretke*, 540 U.S. 668, 695 (2004) ...................................................... 25

*Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996) ................................... 34, 35

*Bermudez v. City of New York*, 790 F.3d 368, 376, 2015 U.S. App. LEXIS 10070,
        *17 (2d Cir. 2015) ................................................................... 14

*Bouche v. City of Mt. Vernon*, 2012 WL 987592, at *7 ...................................... 8

*Boyd v. City of New York*, 14 Civ. 2091, 2015 WL220940 (E.D.N.Y. Jan. 15, 2015) .... 12

*Boyette  v. Lefevre*, 246 F. 3d 76, 91 (2d Cir. 2001) ....................................... 16

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................. passim

*Breeden v. City of New York*, No. 09-CV-4995, 2014 WL 173249,
        at *10 (E.D.N.Y. Jan. 12, 2014) ................................................... 7,

*Bristol v. Nassau County* 2015 US Dist Lexis 63034 (May 12, 2016, E.D.N.Y.) ........... 12

*Cantolino v. Danner*, 96 N.Y.2d 391 (2001) ................................................. 4,5

*Charter Oak Fire Ins. Co. v. Electrolux Home Products, Inc.*,
        882 F. Supp. 2d 396, 403 (E.D.N.Y. 2012) ......................................... 12

*County of Los Angeles v. Goldstein*, - S. Ct.-, 2014 WL 102431 (Jan. 13, 2014) .......... 21

*Farakesh v. Artuz*, 2000 WL 1480896 (E.D.N.Y. Oct. 3, 2000) .................................... 28

*Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990) ............................................. passim

v

*Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir. 1993) ............................................................... 13

*Franklin Development Co., Inc. v. Atlantic Mut. Ins. Co.*, 60 A.D.3d 897, 899
    (2d Dept. 2009) ............................................................................................................... 11

*Garcia v. Dutchess County*, 43 F. Supp. 3d 281, 299 (S.D.N.Y. 2014) ........................ 14

*Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir.1986) ...................................................... 29

*Gentile v. County of Suffolk*, 926 F.2d 142, 152 n.5 (2d Cir. 1991) ...................................

*Giglio v. United States*, 405 U.S. 150, 154-55 (1972) ...................................................... 23

*Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013) ....................................... 21

*Haus v. City of New York*, 2011 U.S. Dist. LEXIS 155735, *257-58
    (S.D.N.Y. Aug. 31, 2011) ............................................................................................... 35

*Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) ........................................... 14, 15

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. N.Y. 1992) ............................................................ 5

*Jocks v. Tavernier*, 316 F.3d 128, 136-37 (2d Cir. 2003) .................................................. 8

*Johnson v. Louisiana*, No. CIV.A. 09-55, 2010 WL 996475, at *12
    (W.D. La. Mar. 16, 2010) ............................................................................................... 21

*Jovanovic v. City of New York,* 2010 U.S. Dist. LEXIS 144388 at 17-18
    (S.D.N.Y.) ................................................................................................................... 4, 21

*Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001) ........................................ 7

*Kogut v. County of Nassau*, Nos. 06-CV-6695(JS)(WDW), 2009 WL 5033937,
    at *9 (E.D.N.Y. 2009) ................................................................................................ 4, 12

*Kyles v. Whitley,* 514 U.S. 419, 434 (1995) ..................................................................... 26

*Leather v. Eyck,* 180 F.3d 420, 425 (1999) ...................................................................... 28

vi

*Leatherman v. Tarrant Co. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166 (1993) ................................................................................................ 19

*Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001) ................................................. 24, 25

*Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) ......................... 3, 13

*Manuel v Joliet* 590 Fed APPX 641 (7th Cir 1013) ......................................................... 35

*McCray v. City of New York*, No. 03 CIV 10080 DAB, 2007 WL 4352748, at *12-13 (S.D.N.Y. Dec. 11, 2007) ...................................................................... 12

*Mitchell v. City of Albany*, *4 (2010 U.S. Dist. LEXIS 31426 (N.D.N.Y. 2010) ............. 5

*Monell v. Department of Social Services*, 436 U.S. 658, 690-691 (1978) ............... passim

*Morgan v. Nassau Cty.*, No. 03CV5109SLTWDW, 2009 WL 2882823, at *9 (E.D.N.Y. Sept. 2, 2009) ........................................................................................ 5

*Moulton v. State of New York*, 114 A.D.3d 115, 125-126 (3d Dept. 2013) ...................... 5

*Murphy v. Lynn* 118 F.3d 938, 944 (2d Cir. 1997) ......................................................... 35

*Myers v. County of Orange*, 157 F.3d 66, 76-77 (2d Cir. 1998) ...................................... 20

*Newton v. City of New York*, 566 F. Supp. 2d 256, 281, 2008 U.S. Dist. LEXIS 54084, *51-52 (S.D.N.Y. 2008) ......................................................................... 34

*Owen v. City of Independence, Mo.*, 445 U.S. 622, 653 (1980) ...................................... 21

*Parker v. Blauvelt Volunteer Fire Co., Inc.*, 93 N.Y.2d 343, 712 N.E.2d 647, 650 (1999) ...................................................................................................... 28

*Parker v. Herbert*, No. 02-CV-0373RJA/VEB, 2009 WL 2971575, at *62 (W.D.N.Y. May 28, 2009) ................................................................................ 29

*People v. Ashwal*, 39 N.Y.2d 105, 109 (1976) ................................................................ 32

*People v. Bailey*, 58 N.Y.2d 272, 277, 460 N.Y.S.2d 912, 914 15 (1983) ..................... 33

*People v. Bedi* 4107/96 ............................................................................................... 22

*People v. Goldstein*, 196 Misc.2d 741, 743 744, 763 N.Y.S.2d 390, 393
    (N.Y. Sup. Ct. 2003) ........................................................................................ 33

*People v. Hernandez*, 92 A.D.2d 875, 875 76, 459 N.Y.S.2d 822, 823
    (2d Dept. 1983) ............................................................................................... 32

*People v. Jackson*, 143 A.D.2d 363, 364, 532 N.Y.S.2d 303, 304 (2d Dept. 1988) ........ 31

*People v. Moye*, 12 N.Y.3d 743, 744, (N.Y. 2009) ........................................................ 33

*People v. Ortiz*, 125 A.D.2d 502, 503, 509 N.Y.S.2d 418, 419 (2d Dept. 1986) ............ 33

*People v. Paperno*, 54 N.Y.2d 294, 300-301 (N.Y. 1981) ............................................ 30

*People v. Payne* 3 N.Y.3d 266 (2004) ........................................................................... 5

*People v. Steadman*, 82 N.Y.2d 1 (N.Y. 1993) ............................................................. 22

*People v. Tassiello*, 300 N.Y. 425, 430, 91 N.E.2d 872, 874 (N.Y. 1950) ..................... 30

*People v. Torres*, 223 A.D.2d 741, 742, 637 N.Y.S.2d 214, 215 16 (2d Dept. 1996) ..... 30

*People v. Woodhull*, 105 A.D.2d 815, 818, 481 N.Y.S.2d 749, 751 (2d Dept. 1984) ...... 30

*Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999) ............................ 7

*Poventud v. City of New York*, J50 F.3d 121, 132-33 (2d Cir. 2014) .............................. 14

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130-31 (2d Cir. 1997) .................... 14, 15

*Richardson v. City of New York*, No. 02 Civ. 3651, 2006 WL 2792768, at *7
    (E.D.N.Y. Sept. 27, 2006) .............................................................................. 8,

*Rivas v. Suffolk County*, 2008 WL 45406, at *1 (2d Cir. Jan. 3, 2008) ............................ 5

*Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004) ............................................ 3, 4

*Seabrook v. City of New York*, 2016 U.S. Dist. LEXIS 17113, \*9-10 (E.D.N.Y.) ............ 3

*Sheldon v. Khanal*, 396 F. App'x 737, 739 (2d Cir. 2010) ................................................ 11

*Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1124 (C.D. Cal. 2007) ..................... 28

*Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195, 734 N.E.2d 750, 753 (2000) ................. 4,5

*Stampf v. Long Island R. Co.*, 761 F.3d 192, 198 (2d Cir. 2014) ...................................... 3

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) ........................................................... 23

*Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) .................................................... 34

*Su v. City of New York,* 06 cv 687 (EDNY) ..................................................................... 22

*Suarez v. Byrne*, 10 N.Y.3d 523, 890 N.E.2d 201 (2008) .................................................. 6

*Sucher v. Kutscher's Country Club*, 113 A.D.2d 928, 931 (2d Dept. 1985) .................. 12

*Sylvester v. City of New York*, 2006 U.S. Dist. LEXIS 81716 (S.D.N.Y) ....................... 35

*Tankleff v. County of Suffolk*, No. 09-CV-1207(JS)(WDW), 2010 WL 5341929
   (E.D.N.Y. 2010) ........................................................................................... 12, 15

*U.S. v. Friedman*, 909 F.2d 705 (2d Cir. 1990) ............................................................... 28

*United States v. Garcia*, 596 Fed. Appx. 24, 26,  (2d Cir. N.Y. 2015) ........................ 9, 25

*United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) ........................................ 34

*United States v. Puco*, 436 F.2d 761, 763 (2d Cir. 1971) ................................................ 30

*United States v. Rodriguez*, 496 F.3d 221, 226, 2007 U.S. App. LEXIS 17508, \*14 ...... 24

*Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911, 919 (S.D.N.Y.1983) .... 28

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009) ........................................................ 20,21

*Wahhab v. City of New York*, 386 F. Supp. 2d 277, 292-93 (S.D.N.Y. 2005)................. 35

*Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992) ........................................ 20

*Wheaton v. Gillen*, 99 cv 4712 (DGT), DKT12 (E.D.N.Y.) ............................................ 16

*Wynters v. Poole*, 464 F. Supp. 2d 167, 182 (W.D.N.Y. 2006) ....................................... 34

*Zahrey v. Coffey*, 221 F.3d 342, 348-49 (2d Cir. 2000) .................................................... 14

http://www.supremecourt.gov/qp/14-09496qp.pdf. ........................................................ 35

x

Plaintiff respectfully submits this memorandum of law in opposition to the Defendants' motion for summary judgment and in support of Plaintiff's cross-motion for partial summary judgment.

## PRELIMINARY STATEMENT

Kareem Bellamy was wrongfully of convicted of murder in 1995 and spent a total of 14 years in prison before a respected state judge vacated his conviction based upon newly-discovered evidence of his innocence. Plaintiff's 56.1 ¶1. This decision was affirmed unanimously by the State Appellate Division, and was followed by the dismissal of all charges "in favor of Mr. Bellamy," and New York State's payment of $2.75 million to settle his Unjust Conviction lawsuit, under which he was required to prove his innocence by clear and convincing evidence. *Id.* ¶¶ 2-5, 9. Bellamy seeks, by this § 1983 lawsuit, to hold New York City and individual detectives liable for numerous violations of his federal constitutional rights which brought about his wrongful conviction.

The Defendants' motion for summary judgment misstates the record and resurrects smears first leveled eight years ago by the Queens District Attorney's Office ("QDA") as a diversion from its suppression of evidence of Bellamy's innocence, its other trial-related misconduct, and its refusal to investigate the real killers: two gang members who confessed to murdering the victim. *Id.* ¶¶ 324-347. The QDA accused not only Plaintiff's present counsel, but decorated law enforcement officers and lawyers from Cravath, Swaine & Moore, of conspiring to free Mr. Bellamy through fraud. *Id.* ¶¶ 367-373; Plaintiff's Answer to City's 56.1 ¶¶ 199(a), 203. After the Honorable Joel L. Blumenfeld dismissed these baseless claims and affirmed Bellamy's right to a new trial, the QDA maligned him and tried to block his reappointment. *Id.* ¶ 203(g). The QDA's attacks have been repeatedly rejected, and Plaintiff's 56.1(b)(3)(c)

1

Statement of Additional, Undisputed Material Facts sets forth facts that disprove them, as well as facts that, if credited by a jury, would establish his constitutional claims. *Id.* ¶¶ 324-382.

Defendants' motion argues that Bellamy cannot show that his constitutional rights to disclosure of *Brady* material, and to be free of prejudicial summation misconduct, were violated. Defendants are wrong on both counts. First, the evidence shows that crucial prosecution witness Linda Sanchez was promised, and then received, substantial payments and housing assistance that were not disclosed, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Second, trial prosecutor David Guy, after failing his *Brady* disclosure obligations, gave a misleading and inflammatory summation that violated Mr. Bellamy's constitutional right to a fair trial. Since Plaintiff has established these violations, he should be able to proceed with discovery to show that they resulted from two municipal polices of the Queens District Attorney's Office ("QDA"): deliberate indifference to prosecutorial misconduct and systematic non-disclosure of witness benefits given through the Witness Protection Program.

After discovery is completed,  Plaintiff's claims of police misconduct should also proceed to trial. There is sufficient evidence for a reasonable jury to infer that that the detective Defendants coerced witnesses, suppressed *Brady*, and manufactured statements in order to create the illusion of probable cause and of Bellamy's guilt.

## STATEMENT OF FACTS

Plaintiff respectfully refers the Court to Plaintiff's Rule 56.1(b)(3) Response to Defendant's Statement of Undisputed, Material Facts and to Plaintiff's 56.1(b)(3)(c) Statement of Additional, Undisputed Material Facts, which we incorporate by reference.

## STANDARD FOR SUMMARY JUDGMENT

A court may grant summary judgment when "the evidence. . . demonstrates that there are

no genuine issues of material fact and that the judgment is warranted as a matter of law."

*Seabrook v. City of New York*, 2016 U.S. Dist. LEXIS 17113, *9 (E.D.N.Y. Feb. 10, 2016)

(Donnelly, J.) (Citations omitted). "In ruling on a motion for summary judgment the court is to

resolve all ambiguities and draw all factual inferences in favor of the party against whom

summary judgment is sought." *Id*. at 10.

**PLAINTIFF'S WITHDRAWN CLAIMS**

Plaintiff has withdrawn his claim of Negligent infliction of Emotional Distress (Count

XI). Dkt. 24, p.2. Plaintiff withdrew his claims against the John Doe defendants by stipulation

when the City agreed to allow *Monell* discovery to proceed. Dkt. 112.

**ARGUMENT**

**POINT I:**

**PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT THAT THE
DISMISSAL OF HIS INDICTMENT WAS A FAVORABLE TERMINATION AS
A MATTER OF LAW, AND DEFENDANTS ARE NOT ENTITLED TO
SUMMARY JUDGMENT ON HIS MALICIOUS PROSECUTION CLAIMS**

In order to prevail on a malicious prosecution claim under New York law, a plaintiff must

show that: (1) his criminal proceedings terminated favorably, and that the defendant (2) initiated

those proceedings (3), did so without probable cause, (4) and acting maliciously. *Stampf v. Long

Island R. Co*., 761 F.3d 192, 198 (2d Cir. 2014) (citing *Manganiello v. City of New York*, 612

F.3d 149, 161 (2d Cir. 2010)).

**A.      Favorable Termination**

Since there is no federal analogy to a malicious prosecution claim, the State law in the

forum of litigation applies. 42 U.S.C. § 1988.  Under New York law, the dismissal of criminal

charges "qualifies as a favorable termination, so long as the circumstances surrounding the

termination are not inconsistent with the innocence of the accused." *Rothstein v. Carriere*, 373

3

F.3d 275, 286 (2d Cir. 2004). To satisfy this standard, a plaintiff need not "prove her innocence,

or even that the termination of the criminal proceeding was indicative of innocence." *Id.* (citing

*Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)). The "indicative of innocence" standard

had applied until the New York Court of Appeals switched to the "not inconsistent with

innocence" standard in *Smith-Hunter* and *Cantolino v. Danner*, 96 N.Y.2d 391 (2001). In

adopting this new standard, the Second Circuit has recognized that it sets a much lower bar for

Plaintiff's than existed under prior law. *See Rothstein, supra; see also Kogut v. County of*

*Nassau*, 2009 U.S. Dist. LEXIS 116354 *21 (E.D.N.Y) (revisiting and reversing decision after

being notified of the new standard introduced by *Smith-Hunter* and *Cantolino*) (Seybert, J.).

      Mr. Bellamy's receipt of a favorable termination is settled by the fact all charges against

him were dismissed, such that his certificate of disposition states, "the conviction was terminated

in favor of Mr. Bellamy." Plaintiff's 56.1 ¶¶ 3-5. Under the favorable standard set forth by

*Smith-Hunter* and *Cantolino*, whether or not a disposition is favorable is determined by facial

review, without regard to extrinsic evidence. ADA Leventhal's baseless, self-serving assertion

that Bellamy was not exonerated is therefore irrelevant. *See Jovanovic v. City of New York* 2010

U.S. Dist. LEXIS 144388 at 17-18 (S.D.N.Y. 2009) ("subjective beliefs of the members of the

District Attorney's Office … are of no consequence when considering whether Jovanovic

received a favorable termination. *see Smith-Hunter, supra,* 95 N.Y.2d at 192 ("special

prosecutor's bald statement that he failed to oppose the CPL 30.30 motion to dismiss as a

consequence of his conducting a trial out of town and not due to any determination that probable

cause was lacking, was insufficient to overcome the general rule that a dismissal on speedy trial

grounds is a favorable termination").

      Given that the dismissal of all charges against Bellamy is a favorable termination on its

face, it could not be "inconsistent with innocence" even if, as the City suggests, the Court of

Appeals' decision in *People v. Payne,* 3 N.Y.3d 266 (2004) foreclosed the possibility of a retrial.

Dismissals that are facially neutral, such as for a complainant's failure to cooperate, a legal

"impediment," or a change in the law, are favorable terminations.  *See Moulton v. State of New*

*York*, 114 A.D.3d 115, 125-126 (3d Dept. 2013) ("claimant's release … based on the term of his

[Post Release Service] being a legal nullity" due to a change in the law, "was not 'inconsistent

with [his] innocence' of the parole violation and, thus, it constituted a favorable termination").

*See Morgan v. Nassau Cty.*, No. 03cv5109, 2009 WL 2882823, at *9 (E.D.N.Y. Sept. 2, 2009)

(since "the declaration of an 'impediment to conviction' under § 170.30(1)(f) demonstrates a

'formal abandonment' of the charges, the Court finds the termination … was a favorable one")

(citing *Rivas v. Suffolk County*, 2008 WL 45406, at *1 (2d Cir. Jan. 3, 2008); *see Armatas v.*

*Maroulleti*, 2010 U.S. Dist. LEXIS 112921, 40-42 (E.D.N.Y. 2010) ("dismissal because of the

failure of the complainant to cooperate, though not evidence of ... innocence, was not

inconsistent with his innocence" and therefore was favorable).[1]

It is a mystery how the dismissal of the charge of depraved indifference murder can be

viewed as anything other than favorable. Defendants imply that the QDA, when it dismissed the

murder charge, still believed Bellamy intentionally murdered the victim, but the jury *acquitted*

Bellamy of this charge. Judge Blumenfeld recognized this. He pointed out, and the QDA

conceded, that Mr. Bellamy was exonerated of the crime of which he was wrongfully convicted.

> "Court:      He was exonerated for the only crime which the law now says he
> could be prosecuted?

---

[1] The City's reliance on the doctrine of "impossibility" is misplaced. Its main case, *Mitchell v. City of Albany*, is factually distinct, as the defendant had died and the undisputed facts showed there to be probable cause for her arrest. *4 (2010 U.S. Dist. LEXIS 31426 (N.D.N.Y. 2010). *Mitchell* also mistakenly relied on a holding in *Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. N.Y. 1992) that was overturned by the Second Circuit's adoption of *Smith-Hunter* and *Cantolino*.

Leventhal:      That is correct." Plaintiff's 56.1 ¶ 384.

In any event, it was not *Payne*, but the People's inability to prove that Bellamy was

guilty, that prevented a retrial. Had there been evidence of guilt, the DA could have charged

Bellamy with depraved indifference murder based on the alternative theory, presented at trial by

ADA Guy, "that he whaled away at the guy and caused lots of injuries and coincidentally he

caused the guy's death[.]" *Id*. ¶315. In addition, the QDA could have tried Bellamy for weapons

possession and first-degree manslaughter, a lesser-included charge that was not reached by the

trial jury. *Id*. ¶ 318; *see Suarez v. Byrne*, 10 N.Y.3d 523 (2008) (holding that a defendant whose

conviction for second-degree murder had been vacated could be retried for manslaughter one,

since the jury had not reached that charge in convicting him of the higher offense). These

charges were foreclosed, not by *Payne*, but by the absence of any evidence of Bellamy's guilt.

The People's three fact witness from the first trial would have helped Bellamy at a retrial.

Lone eyewitness Andrew Carter would have testified that Gillen coerced his quasi-identification

of Bellamy. Plaintiff's 56.1 ¶¶ 117-119. Veronica Walker would have corroborated this account

of misconduct and reaffirmed that she did not see Mr. Bellamy fighting Mr. Abbott. *Id*. ¶¶ 200-

207, 281-283. The Linda Sanchez *quid pro quo* would have been disclosed, along with the fact

that she saw Bellamy on a *Sunday* (not the *Saturday* of the murder). *Id*. ¶¶ 65-74. Added to this

would be evidence that two gang members "stabbed" and "stomped [Abbott]." *Id*. ¶¶ 329-352.

Mr. Bellamy was exonerated, but even a neutral dismissal would be favorable as a matter

of law. Thus, on this issue, the Defendants' motion to dismiss should be denied, and Plaintiff's

cross motion for partial summary judgment should be granted.

### B.      Initiation

Where an official "(1) create[s] false information and forward[s] it to prosecutors or (2)

withh[olds] relevant and material information," he initiates the prosecution, even if the formal decision is made by a prosecutor. *Breeden v. City of New York*, No. 09-CV-4995, 2014 WL 173249, at *10 (E.D.N.Y. Jan. 12, 2014) (Ross, D.J.).

Defendant Gillen, the assigned case detective, initiated the prosecution. If Plaintiff's allegations are true, Gillen decided to arrest Bellamy and put him in a lineup without probable cause, and then illegally influenced the results of the lineup to manufacture identification "evidence." Plaintiff's 56.1 ¶¶ 103-122. Gillen further induced the prosecution of Bellamy by suppressing *Brady* information and fabricating evidence of guilt, which he forwarded to grand jury ADA Stephen Antignani. Gillen closed the case and filled out the police paperwork that initiated the prosecution, including the charge and the Criminal Court complaint. *Id.* ¶¶ 128-129.

### C.    Lack of Probable Cause

Defendants argue there was probable cause as a matter of law and that this Court should consider itself bound by a State court's decision upholding the prosecution.  They are wrong on the facts and on the State decision, which is not preclusive because it was vacated and premised upon the People's presentation of false or misleading "facts."

#### i.    There was no probable cause to arrest or prosecute Bellamy

In a malicious prosecution action, the probable cause determination hinges on whether the defendant officer had sufficient evidence to believe that the prosecution would succeed. *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999). An officer may not disregard "plainly exculpatory evidence." *Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001).

While a grand jury indictment creates a rebuttable presumption of probable cause, a plaintiff may overcome the presumption by "establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that

they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Bouche v. City of Mt. Vernon*, 2012 WL 987592, at *7 (S.D.N.Y. 2012). If the plaintiff can show that the defendant officer "fabricated material evidence against [him] ... then not only is the presumption of probable cause overcome, but the existence of probable cause based on non-fabricated evidence ceases to be a defense[.]" *Richardson v. City of New York*, No. 02 Civ. 3651, 2006 WL 2792768, at *7 (E.D.N.Y. Sept. 27, 2006) (Gleeson, D.J.) (citing *Jocks v. Tavernier*, 316 F.3d 128, 136-37 (2d Cir. 2003)).

Plaintiff has sufficient evidence to overcome and eviscerate the presumption of probable cause, which defendants attribute to three things: 1) Sanchez' alleged identification of Bellamy as one of two men who was near Abbott in a C-Town line and in the C-Town parking lot; 2) Carter's alleged identification of Bellamy in a lineup; 3) and Bellamy's supposed statements to police. City's Br. at 4-6. These pieces of "evidence" cannot establish probable cause as a matter of law, since they are disputed and indeed discredited by evidence of misconduct.

1. Multiple reports by Sanchez indicated that she had seen Bellamy on a *Sunday*, but Gillen, assisted by Solomeno, withheld these reports and doctored evidence to conceal them.

Assuming Plaintiff's evidence to be true and giving him the benefit of all reasonable inferences from such evidence, Sanchez provided several exculpatory reports. First, she told Gillen on the morning of the murder, when he canvassed C-Town with a photo of Mr. Abbott, that she "didn't see anything." Plaintiff's 56.1¶ 65. Second, weeks later but before Bellamy was charged, Sanchez told Gillen and Solomeno that she had seen Bellamy in C-Town with Abbott on a *Sunday*, which she remembered because Bellamy was trying to buy beer on a day that it was illegal to sell beer. Plaintiff's 56.1 ¶¶ 68-74. The disclosure of this suppressed *Brady* material would have prevented the late Honorable Supreme Court Justice Steven Fisher's finding of probable cause for Bellamy's arrest, which he based entirely on Sanchez' report and the fact that

Carter had observed Abbott and his killers walking from the direction of C-Town. *Id*. ¶ 182.

Third, after Bellamy's arrest, Gillen doctored Sanchez' lineup sheet to conceal that she had seen Bellamy on a Sunday. *Id*. ¶¶ 103-106. The original lineup sheet is missing, and the copy bears indications that the word "Saturday" was written over a whited-out "Sunday." A handwriting expert found that unusual dots before and after "Sunday," and Gillen's handwriting around those words, were "indicative" of an alteration. *Id*. Plaintiff is entitled to an adverse inference, for summary judgment purposes and at the trial, that the original line up sheet has written on it "Sunday." *United States v. Garcia*, 596 Fed. Appx. 24 (2d Cir. N.Y. 2015)  Fourth, Gillen withheld from both the grand jury and ADA Antignani, the fact that after viewing the lineup Sanchez identified Terrill Lee as the second person she saw with Bellamy. *Id*. ¶¶ 142-144. Since Lee was never a suspect and police accepted his alibi that he was at home on April 9, 1994 at the time of the murder, Sanchez' recollection of seeing Lee and Bellamy (who had bought beer together on other days) suggested that she was mistaken about when she saw Bellamy. *Id*. ¶¶ 145-150.  Fifth, in order to manufacture probable cause, at a September 20, 1994 suppression hearing Gillen produced a detailed DD5, without supporting notes, of an alleged April 22, 1994 interview of Sanchez that embellished her supposed observations of Bellamy on the day of the murder. *Id*. ¶¶ 172-177.

   2. Gillen pressured Carter to make a post-lineup "identification" of Bellamy, which Gillen bolstered by lying to Antignani and suppressing a report that the killers wore hoods.

During Carter's lineup Gillen indicated towards Bellamy, whom he had positioned in position one. Carter said "number two," and then "1 or 2, I'm not sure" after Gillen urged him to identify number one (Bellamy). *Id*. ¶¶ 113-116. It is undisputed that Carter did not indicate, in the lineup room, that he thought it was more likely that number one was the perpetrator, much less that he was 99 percent sure, as the City asserts incorrectly. *Id*. ¶¶ 116, 125. After the lineup,

9

Gillen wheeled Carter into another room, where he told Carter that number one (Bellamy) was the perpetrator but that he had "[c]ut his hair[.]" *Id.* ¶¶ 117-119. When ADA Antignani joined them several minutes later, Carter, who seemed "frightened" and "apologetic," told him that number one was the perpetrator but that he was confused during the lineup because number one had changed his braids. *Id.* ¶ 120. Carter had never before mentioned the assailants' hair. *Id.* ¶¶ 121-122. Gillen, who reiterated the (false) hair story to Antignani, had "patted down" Bellamy's braids prior to the lineup. *Id.* ¶ 110. A reasonable jury could infer that Gillen's coercion caused Carter to tell ADA Antignani, out of fear, that he could identify Bellamy.

A reasonable jury could also conclude that Gillen then concealed a report, which he received from Lila Brijmohan and repeated to Eric Jeffries, that the killers had worn hoodies. *Id.* ¶¶ 36, 123. This report would have further undermined Carter's change-of-braids epiphany.

3.  The only incriminating statement allegedly made by Bellamy was fabricated by Gillen.

Assuming Plaintiff's facts are true, Plaintiff never exclaimed on the ride to the police precinct, "This must be a case of mistaken identity – someone probably accused me of murdering someone." *Id.* ¶ 162. Gillen did not mention this alleged statement in his grand jury testimony or any police report, and he only wrote it down in an undated note that he later doctored. *Id.* ¶¶ 163-166. Moreover, the alleged statement was not included in a "confessions and admissions" form filled out two days after the arrest, nor was it corroborated by the other two detectives in the police car, even though Bellamy had supposedly "yelled" from the backseat. *Id.* ¶¶ 167-168. Gillen's fabricated "mistaken identity" statement did not influence the suppression hearing, as planned, since Judge Fisher found that Bellamy was arrested before he was put into the police car. However, it contributed to the false appearance of probable cause to prosecute Bellamy.

The statements that Bellamy made to Gillen at the police precinct, during an unlawful pre-*Miranda* interrogation, were not incriminating. Bellamy's candid report that he had seen Abbott's body hours after the killing while en route to C-Town was unremarkable because, as Gillen well knew, Bellamy shopped almost daily at C-Town (one of two neighborhood grocery stores), and hundreds of people from his Housing Project saw Abbott's body during the three hours that it lay in the street, blocking a major thoroughfare. *Id.* ¶¶ 85-101.[2]

Based on the facts set forth by Plaintiff, a reasonable jury could find that every piece of evidence that allegedly supported probable cause was in fact manufactured, while crucial *Brady* information was suppressed.

### ii.      Plaintiff is not estopped from arguing lack of probable cause

There is no merit to the City's remaining argument that Plaintiff's malicious prosecution claims are estopped because of Judge Fisher's ruling, at a suppression hearing, that there was probable cause to arrest Bellamy, and that Carter's alleged lineup identification should not be suppressed. *Id.* ¶¶ 181-186. Judge Fisher's decision is not preclusive because Mr. Bellamy's conviction has been vacated, and once concealed *Brady* information has since come to light.

For a previous judgment to be given preclusive effect under New York law, which is controlling, there must have been a final order with respect to the relevant issue. *Allen ex rel. Allen v. Devine,* 726 F. Supp. 2d 240, 254 (E.D.N.Y. 2010) (Spatt, D.J.) (citing *Franklin Development Co., Inc. v. Atlantic Mut. Ins. Co.,* 60 A.D.3d 897, 899 (2d Dept. 2009). Collateral estoppel therefore cannot apply if the issue for which preclusion is sought was litigated in the

---

[2] At the trial, Gillen falsely denied that he had interrogated Bellamy and made Bellamy's innocuous statements at the precinct sound suspicious by testifying that he had "said nothing to [Bellamy]" beforehand "other than I am arresting you … because you were drinking a beer." However, as Gillen admitted in *Wade* Hearing, 440 and deposition testimony, he accused Bellamy of the murder *before* Bellamy tried to recall the day it occurred. *Id.* ¶¶ 169-170.

11

context of a conviction that has now been vacated. "A judgment vacated or set aside has no preclusive effect." *Sheldon v. Khanal*, 396 F. App'x 737, 739 (2d Cir. 2010).

The courts in this District have applied this principle in two recent § 1983 suits brought by plaintiffs whose criminal convictions had been vacated. *See Tankleff v. County of Suffolk*, No. 09-CV-1207(JS)(WDW), 2010 WL 5341929 (E.D.N.Y. 2010) (vacated conviction had no preclusive effect on plaintiff's claims of coerced confession and *Miranda* violations, even though those same issues had been litigated and decided against the plaintiff in his direct appeal and habeas proceedings); *Kogut v. County of Nassau*, Nos. 06-CV-6695(JS)(WDW), 2009 WL 5033937, at *9 (E.D.N.Y. 2009) (same). Indeed, collateral estoppel cannot be applied even if the judgment of conviction was vacated on other grounds. *Id*; *see also McCray v. City of New York*, No. 03 CIV 10080 DAB, 2007 WL 4352748, at *12-13 (S.D.N.Y. Dec. 11, 2007); *contrast Bristol v. Nassau County* 2015 US Dist. Lexis 63034 (May 12, 2016, E.D.N.Y.) (where the conviction was reversed but the action was still pending).

Moreover, Plaintiff was denied a full and fair opportunity to litigate, since Detective Gillen suppressed *Brady* material while also fabricating the evidence that Judge Fisher relied on in his decision. Since collateral estoppel can only apply where a Plaintiff has had a "full and fair opportunity" to litigate, New York courts refuse to apply collateral estoppel where newly discovered evidence would have changed the result of the prior judgment. *See Charter Oak Fire Ins. Co. v. Electrolux Home Products, Inc.*, 882 F. Supp. 2d 396, 403 (E.D.N.Y. 2012) (citing *Sucher v. Kutscher's Country Club*, 113 A.D.2d 928, 931 (2d Dept. 1985)).

**D.    Malice**

Courts have found "[a] lack of probable cause generally creates an inference of malice." *Boyd v. City of New York* 336 F.3d 72, 78 (2d Cir. 2003). Here, malice may be presumed for the

absence of probable cause, from the defendants' manufacturing of false evidence, from Gillen's suggestion that Carter identify Bellamy, and from his withholding of exculpatory evidence.

## POINT II:

### DETECTIVES GILLEN AND SOLOMENO ARE NOT ENTITLED TO THE DEFENSE OF QUALIFIED IMMUNITY

Qualified immunity for malicious prosecution is unavailable where "[the defendant officer] mis\represented the evidence to the prosecutors, or failed to pass on material information, or made statements that were false, and engaged in such misconduct knowingly." *Manganiello*, 612 F.3d 149 at 165. "Absent extraordinary circumstances, if the law was clearly established, the defendant official is not entitled to summary judgment on his immunity defense." *Frank v. Relin* 1 F.3d 1317, 1328 (2d Cir. 1993).

Defendants Gillen and Solomeno are not entitled to the defense of qualified immunity. This was not a case of good faith mistakes. Neither detective could have reasonably believed that it was lawful to suppress Sanchez' statements indicating that she had not seen Bellamy on the day of the murder, nor could Gillen have reasonably believed that he could lawfully coerce Carter to identify Bellamy. Defendants cannot possibly meet their heavy burden of demonstrating their entitlement to qualified immunity as a matter of law.

## POINT III:

### DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S BRADY AND EVIDENCE-MANUFACTURING CLAIMS

The City asserts that police misconduct did not proximately cause Bellamy's conviction because it was superseded by untainted evidence that caused the conviction. The body of evidence that the City points to consists of the testimonies of Sanchez and Carter, their alleged identifications of Plaintiff, and Plaintiff's purported threats and outbursts. City's Br. at 14. But

each of these alleged identifications and statements is *disputed*, and if the facts are seen in the light most favorable to Plaintiff, each one was fabricated. This misconduct proximately caused Mr. Bellamy's conviction, as did other fabricated evidence, including the false report that Walker had identified Bellamy and that Melvin and Harris had been "ruled out" as suspects.

A plaintiff may establish liability under § 1983 for the violation of his Fifth, Sixth and Fourteenth Amendment due process and fair trial rights by showing that a police officer forwarded false evidence to a prosecutor knowing that it would likely influence a jury, and the evidence in fact causes the plaintiff to be deprived of his liberty. *See Zahrey v. Coffey*, 221 F.3d 342, 348-49 (2d Cir. 2000) (substantive due process violation); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (violation of right to a fair trial). Plaintiff's civil *Brady* claim requires him to prove that the Defendants withheld exculpatory or impeachment evidence, and that such withholding caused the denial of his right to a fair trial. *See Poventud v. City of New York*, 750 F.3d 121, 132-33 (2d Cir. 2014) (en banc). A constitutional violation under § 1983 need not be the exclusive cause of the criminal defendant's injury, just a "substantial cause." *Garcia v. Dutchess County*, 43 F. Supp. 3d 281, 299 (S.D.N.Y. 2014) (Stein, D.J.) (citation omitted). If this proximate cause requirement is satisfied, a prosecutor's unwitting reliance on fabricated evidence cannot be a superseding cause. *See Bermudez v. City of New York*, 790 F.3d 368, 376, 2015 U.S. App. LEXIS 10070, *17 (2d Cir. 2015) ("a jury could find that [the officers'] alleged failure to inform [the prosecutor] about problems in the initial questioning of these witnesses could have prevented [the prosecutor] from making an informed decision about the reliability of that evidence"). Proximate cause is a quintessential jury issue that is seldom resolvable on summary judgment. *See Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007).

14

Defendants cannot present any undisputed evidence that was not tainted by their misconduct, much less meet their burden of presenting undisputed evidence that supersedes such misconduct. There is no merit to the City's claim that "Plaintiff is collaterally estopped from re-litigating the constitutionality of the line-up identifications and his spontaneous statement," or that this *alleged* evidence justifies summary judgment. City's Br. at 15. Collateral estoppel does not apply where a conviction is later vacated, *see Tankleff, supra*, and fair trial claims may be brought regardless of whether there was independent probable cause. *See Ricciuti*, 124 F.3d at 130. A jury could reasonably conclude that any one of several instances of misconduct was a substantial and proximate cause of Bellamy's conviction, which occurred by the barest of margins and in spite of the fact that the People's case had "crumbled," as ADA Guy conceded. Plaintiff's 56.1 ¶¶ 278, 298-299; *see Higazy, supra* ("foreseeability and causation ... are issues generally and more suitably entrusted to fact finder adjudication") (citations omitted).

If Plaintiff's facts are true, all of the evidence against Bellamy was fabricated by Gillen and Solomeno, or bolstered by their suppression of *Brady*. This includes the evidence that, the City argues, superseded any police misconduct: 1) Sanchez' testimony that she saw Bellamy near Abbott in C-Town shortly before the murder, 2) the alleged lineup and in-court identifications of Sanchez and Carter, 3) and Bellamy's purported outbursts and threats. City's Br. at 14.

    **A.**    **The disclosure of *Brady* information respecting Sanchez would have negated all formerly incriminating parts of testimony.**

Assuming Plaintiff's evidence to be true and giving him the benefit of all reasonable inferences, Sanchez did, as she has testified, see Bellamy on a Sunday, report this to Gillen and Solomeno and, on the day of the murder, tell Gillen that she "didn't see anything." Plaintiff's 56.1 ¶¶ 65-74. In addition, Sanchez identified Terrill Lee, a non-suspect who bought beer with Bellamy on prior occasions, as the other man she saw with Bellamy. *Id*. ¶¶ 142-144. Disclosure

15

of these reports would have refuted Sanchez' identification of Bellamy as the person that she had seen near Abbott on the Saturday that he was killed. *See Boyette v. Lefevre*, 246 F. 3d 76, 91 (2d Cir. 2001) (evidence that undercuts identification testimony is "classic *Brady* material"). Combined with forensic evidence, these reports also support the inference that Gillen substituted "Saturday" for "Sunday" on Sanchez' lineup sheet. Plaintiff's 56.1 ¶¶ 103-106.

In addition, had jurors known that Sanchez was confused about the day that she Bellamy, her threat report would have seemed even more incomprehensible and suspect.

**B.     Had Gillen not coerced Carter into identifying Bellamy, there would have been no case against Bellamy**

As discussed earlier, Gillen pressured Carter to identify Bellamy. *Id.* ¶¶ 113-120. For this reason, jurors heard (from ADA Antignani) that Carter had identified Bellamy after the lineup, and they saw Carter make an in-court identification (before proceeding to identify the lineup filler). *Id.* ¶¶ 269-272. These identifications were self-contradictory and ambiguous, but without them, the People's case would have been dead on arrival.

The City's request that Carter's recantation be written off as "discredited" lacks support in law as well as in facts, especially if they are viewed in the light most favorable to Plaintiff. Judge Blumenfeld's decision not to credit Carter's recantation at the 440 – which was qualified by his finding that Carter's *trial* testimony was "self-recanting" – has no preclusive effect. *Id.* ¶ 272. In addition, Judge Blumenfeld chose not to credit Carter's claims of misconduct only after his *in camera* review of Gillen's personnel file. *Id.* ¶ 141. The file only contained documents regarding Gillen's NYPD application and pension, and one letter of commendation – for Gillen's work on Bellamy's case. *Id.* It did not include multiple disciplinary complaints against Gillen or the fact that the City paid a $120,000 settlement to Emmett Wheaton, who, after being acquitted of robbery, sued Gillen for suggesting that the eyewitness falsely identify him at a lineup.

16

*Wheaton v. Gillen*, 99 cv 4712 (DGT) (E.D.N.Y. 1999). Plaintiff's 56.1 ¶¶ 130-131. After

assigning Wheaton seat four, Gillen had asked the eyewitness, "Is it number four? Is it number

four? Is it number four?" *Id*. ¶¶ 134-137. Judge Blumenfeld did not know about Wheaton's case.

It is appropriate for jurors to consider that Carter received compensation for his time, a

precondition that he had set for any meeting. Plaintiff's Answer to City's 56.1 ¶¶ 192-193. They

should weigh this fact against evidence that corroborates Carter's allegations of misconduct,

including his inability to ever describe the perpetrators, his uncertainty at the lineup, his private

talk with Gillen and sudden epiphany afterward, and his "self-recanting" trial testimony.

### C. The "consciousness of guilt" statement that Gillen manufactured was the center-piece of the prosecutions weak case

Based on facts set forth earlier, a reasonable jury could conclude that Plaintiff never said,

"This must be a case of mistaken identity – someone probably accused me of murdering

someone." Plaintiff's 56.1 ¶¶ 162-168. Bellamy's only blurt-out in front of the jury – in which

he protested his innocence – hurt him only to the extent that it "corroborated" the statement that

Gillen fabricated. Plaintiff's Answer to City's 56.1 ¶ 133. The City's suggestion that Plaintiff's

protestations of innocence and the fabricated statement by Detective Gillen were the "most

damning evidence" underscores the weakness of the People's case and the decisive influence of

police misconduct. City's Br. at 15.

### D. Gillen and Solomeno's false report that Walker identified Bellamy as the perpetrator led to prejudicial speculation by jurors

Walker has testified that, during an interview, she told Gillen and Solomeno that she

knew Bellamy and that it was not him she saw running from behind her car to the corner where

Abbott was fighting with two men. Plaintiff's 56.1 ¶¶ 195-203. The Defendants presented two

photos of Bellamy and told Walker that he had committed the murder and changed his braids

afterwards. *Id*. Detectives then tried, and failed, to persuade Walker to identify Bellamy, first by proposing that they could relocate her to a better neighborhood and then by threatening to charge her with perjury if she did not cooperate. *Id*. ¶¶ 201, 204.

After the interview, Solomeno gave ADA Guy a false DD5 statement that Walker identified Bellamy when that was not what she told them. *Id*. ¶¶ 205-211. Solomeno did not tell Guy that Walker refused to sign the statement after reading it because it was not true. *Id*. Relying on this false DD5, ADA Guy elicited testimony from Walker that she had mentioned "Kareem" to detectives but not that she had done so only after they showed her photos of him. ADA Guy found that the detectives' DD5 had "proved most helpful" in convicting Kareem. *Id*. ¶¶ 282-284.

### E.   Gillen's false report that he had investigated a lead regarding Melvin and Harris created the misimpression that they had been "ruled out"

If Plaintiff's facts are true, the suppression and fabrication of evidence regarding third-party suspects was also a substantial cause of Bellamy's conviction. One of the prosecution's main themes at trial was that suspects other than Bellamy had been ruled out. Six days after the murder, Detective Gillen received a telephone report from an "Anna Simmons," who claimed to have heard Levon "Ish" Melvin and Rodney "Turk" Harris, members of the violent Regulators gang, "bragging" that they had killed Abbott. *Id*. ¶¶ 38-44. Defendants admit that they did not question Melvin or Harris. *Id*. ¶ 45. Gillen fabricated evidence that he searched for "Anna Simmons" by visiting her given apartment address and place of employment on April 19, 1994. *See id*. ¶¶ 47-53. Gillen first documented this investigative step in a November 18, 1994 DD5, which he claimed was based on a note taken contemporaneously with his investigation: "Does not live here 4/19." However, the notation, "Does not live here 4/19," is absent from the original page of notes, which is stapled to an October 20, 1994 letter from ADA Guy asking Gillen to document his follow-up on the "Anna Simmons" report. *Id*.

18

Also missing from that original page of notes is a reference to Melvin and Harris photo arrays that appears on the copied page of notes that Gillen turned over to ADA Guy on November 18. Photo arrays of Melvin and Harris were never shown to witnesses, as indicated by the absence of a police report, witness signature or other kind of documentation for the arrays. *Id*.

Gillen also suppressed the criminal histories of Melvin and Harris, and a complaint report implicating them in a shooting six blocks from the Abbott murder, months prior. *Id*. ¶¶ 54-57.

Defendants' misconduct was legion and includes further Constitutional violations enumerated in Plaintiff's 56.1 ¶¶ 58-62, 285-297.

## POINT IV:

### DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON EITHER OF PLAINTIFF'S TWO *MONELL* CLAIMS

The City argues that Plaintiff's *Monell* claims fail, first, because they are legally barred by prosecutorial immunity and, second, because Plaintiff has not proven the constitutional violations that he attributes to unlawful QDA policies. Both of these arguments fail. First, while Queens prosecutors enjoy absolute immunity, the City of New York and other municipalities "do not enjoy immunity from suit – either absolute or qualified – under § 1983." *Leatherman v. Tarrant Co. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166 (1993). The law is clear, and the denial of the City's motion to dismiss, which also conflated personal immunity and municipal liability, should prevent relitigation of this issue prior to *Monell* discovery. Second, Plaintiff has established the constitutional violations that underlie his two *Monell* claims. First, substantial benefits given to Sanchez were suppressed, in violation of *Brady*. Plaintiff seeks to prove through discovery that this *Brady* violation resulted from a QDA policy of shielding trial prosecutors from knowledge of witness benefits given through the Witness Protection Program (WPP). Second, ADA Guy and 440 prosecutors consciously avoided knowledge of these

19

benefits, which they were required to disclose, and ADA Guy gave a misleading and inflammatory summation that violated Mr. Bellamy's Due Process and Fair Trial Rights. Plaintiff intends to prove through further discovery that this misconduct resulted from a QDA policy of deliberate indifference to such prosecutorial misconduct.

To support a *Monell* claim, a plaintiff must prove that his injury was caused by the unconstitutional policies, customs, or practices of the municipal defendant. *See Monell v. Department of Social Services*, 436 U.S. 658, 690-691 (1978); A municipality may be liable under this standard if it promulgated or approved unconstitutional practices or showed a pattern of "deliberate indifference" to them over a period of time. *Id.*

### A.    Plaintiff's *Monell* claims do not fail as a matter of law

There is a long line of Second Circuit decisions upholding municipal liability where a D.A.'s overall management policies caused constitutional injury to a plaintiff during his criminal prosecution. *See Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) (upholding claim of deliberate indifference for failure to train or discipline ADAs regarding their *Brady* obligations); *Myers v. County of Orange*, 157 F.3d 66, 76-77 (2d Cir. 1998) (county liable for district attorney's unconstitutional cross-complaint prosecutorial policy); *see also Gentile v. County of Suffolk*, 926 F.2d 142, 152 n.5 (2d Cir. 1991).

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009) did not, as the City suggests, remove municipal liability for the managerial policies of a county district attorney's office. *Van de Kamp* implicated personal, not municipal liability. The civil defendants were supervisory prosecutors alleged to have failed to adequately train their subordinates or maintain an information system for disclosing *Brady*. The Supreme Court held that absolute immunity absolves these and other supervising prosecutors from *personal* liability for unconstitutional policies. *Id.* at 345-50.

20

This distinction made sense to the Supreme Court as a matter of policy, as subjecting prosecutors to civil liability could chill prosecutorial decisions, *Id*. However, this policy consideration is "less compelling, if not wholly inapplicable, when the liability of the municipal entity is at issue." *Owen v. City of Independence, Mo*., 445 U.S. 622, 653 (1980); *see Johnson v. Louisiana*, 2010 WL 996475, at *12 (W.D. La. Mar. 16, 2010) (explaining why, as a matter of policy, *Van de Kamp* did not confer immunity to municipalities). For this reason, *Van de Kamp* extended personal immunity to supervisors engaged in "administrative obligation[s]" that are "directly connected with … trial advocacy duties," without limiting *Monell* liability for these very same kinds of managerial policies. *Van de Kamp* 555 U.S. at 345-46.

Indeed, in a subsequent decision in the same lawsuit, the Ninth Circuit held that, even though the district attorney had absolute immunity, the municipality he represented could be held liable for the very same administrative policies. See *Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013), cert. denied sub nom. *County of Los Angeles v. Goldstein*, - S. Ct.-, 2014 WL 102431 (Jan. 13, 2014). In short, "*Van de Kamp* did not address *Monell* liability." *Jovanovic v. City of New York*, 2010 WL 8500283, at *16 (S.D.N.Y. Sept. 28, 2010) aff'd, 486 F. App'x 149 (2d Cir. 2012). That it did not overrule *Walker*, which held that New York City can be liable under *Monell* for a D.A.'s administrative policies that lead to constitutional violations, is clear from the fact that the Second Circuit continues to cite its *Walker* holding.

The City's concern that a plaintiff could attempt an end-run around prosecutorial immunity by disguising any claim as a *Monell* claim is inapplicable to this case. City's Br. at 22 n.7. While Plaintiff is entitled to conduct discovery on QDA administrative policies, there is already powerful evidence that the Office had policies of indifference to prosecutorial misconduct and of suppressing *Brady* benefits given through the WPP. Mr. Bellamy's own case

21

illustrates the QDA's policy of not disclosing WPP benefits to prosecutors or defense counsel. Indeed, WPP Director Mike Mansfield testified at the 440 that, in Bellamy's case as in others, "we separate the role of the witness protection … from the Assistant District Attorney trying the case," and that "we keep a Chinese wall up with respect to everything." Plaintiff's 56.1 ¶ 261.

Like Mr. Bellamy's case, *People v. Bedi*, 4107/96 (Sup. Queens, 2013) and *Su v. City of New York*, 06 cv 687 (E.D.N.Y.) corroborate the existence of such an internal wall. In a 2012 motion in *Bedi*, the QDA verified that "records relating to the Witness Security Program are maintained by the Investigators in their office and … not made part of the trial Assistant's litigation file." Plaintiff's 56.1 ¶¶ 260, 262. In the *Su* civil suit, which resulted in the suppression of witness benefits, none of the nine ADAs deposed knew of a policy for detecting and disclosing witness benefits, and none could recall corrective steps taken after *People v. Steadman*, 82 N.Y.2d 1 (N.Y. 1993), in which the Court of Appeals condemned the QDA's compartmentalization of witness benefits. Plaintiff's 56.1 ¶¶ 264-266. In *Su* and *Bedi*, as in *Bellamy*, the QDA ratified its unconstitutional policies by defending them on appeal.

The *Su* case and the City's recent production also support Plaintiff's claim that the QDA had a practice of deliberate indifference to prosecutorial misconduct. The personnel files produced in *Su*, like the small number produced thus far in Bellamy's case, contain no evidence of any discipline or reprimand for prosecutors who were reversed. *Id.* ¶ 252.

**B.    Since Plaintiff has established the suppression of *Brady* benefits to Sanchez, discovery should proceed on his *Monell* claim that the Queens DA systemically shielded trial prosecutors from knowledge of witness benefits given through the Witness Protection Program**

The City claims that the full extent of the housing and financial assistance Sanchez would receive had not been known at trial, and that the disclosure elicited by ADA Guy that she was receiving an "overnight" stay at a different and $25 per day for four days satisfied *Brady*. City's

Br. at 26. However, depositions and document discovery have revealed what was suppressed at both the trial and 440: Prior to Sanchez' testimony, and on the same day that she fabricated her incredible threat report, she was promised thousands of dollars in direct payments, free housing for an indefinite period, and assistance relocating to subsidized housing.[3] Also undisclosed were benefits that the QDA provided Sanchez during the trial, including daily payments and approval of a $2,800 expense request for her relocation. Plaintiff's 56.1 ¶¶ 226-232.

The suppression of these benefits and promises is a clear *Brady* violation because the impeachment material was favorable and its non-disclosure caused prejudice. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (promise or agreement between prosecution and witness is *Brady*). Disclosure would have prevented Guy from vouching for Sanchez' "tremendously valuable" threat report and indicated to jurors that she had perjured herself in order to secure substantial benefits.

On the first day of trial, November 28, 1995, QDA detectives served Sanchez with a Material Witness Order, which was not disclosed, and took her to the QDA's and then to a motel (instead of to a Judge). Plaintiff's 56.1 ¶¶ 213-216. After being served with the Order, Sanchez reported for the first time that Bellamy had threatened her. It is reasonable to infer that, prior to her threat report, Sanchez was given to know what benefits she would receive if she had been threatened – or could at least say that she had been. *Id.* ¶¶ 217-220. *No notes* about the "threat" exist, even as QDA detectives began noting hours or even minutes after serving the Material Witness Order what benefits Sanchez wanted and could expect to receive. *Id.* ¶¶ 216, 225-233.

One note from that day, November 28, states that Sanchez lives in one room with twins, receives public assistance and wants a 2-bedroom apartment, ideally in Manhattan. *Id.* ¶ 226.

---

[3] Ultimately, Sanchez received roughly $6,000, one year of free rent and permanent relocation to a subsidized 3-bedroom Section 8 apartment, where she still resides. Plaintiff's 56.1 ¶ 237.

Another note, from one week later, references a visit she made to potential new apartments during the trial. *Id*. ¶ 231. A "personal expense" voucher dated December 7, 1995 four days before closing arguments, requests $2,800 for Sanchez' relocation. *Id*. ¶ 232. The People's failure to disclose these notes or the information they contained violated their continuing obligation to disclose *Brady* material. *See Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001) ("*Brady* obligation continues throughout the trial and even after the verdict is rendered").

Verbal promises to Sanchez also were withheld in violation of *Brady*. *See United States v. Rodriguez*, 496 F.3d 221, 226, 2007 U.S. App. LEXIS 17508, *14 ("obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information had been recorded in tangible form"). Detective Daniel Cox, the WPP Coordinator, testified that, beginning on November 28, he explained to Sanchez how the QDA would:

- help her find and move into a permanent, *rent-subsidized* apartment.

- pay one month's rent, one month's security, brokerage fees, and moving and furniture costs for her new apartment.

- pay her $25 per day or $250 every two weeks until her relocation.

- provide her with free housing until her relocation. Plaintiff's 56.1 ¶¶ 228-230.

Sanchez confirmed that these promises were made to her before she testified. ADA Guy was unaware of these promises but testified at his deposition that he would have disclosed all of those listed above as well as the $2,800 expense request for Sanchez' relocation. *Id*.

This record eviscerates the City's claim that all *Brady* obligations were satisfied by the disclosure that Sanchez had been relocated and that she "had received $50 and was receiving $25 a day[.]" City's Br. at 26. First, even this vague and incomplete information was not genuinely disclosed. Sanchez' testimony that she was staying "overnight" at a "different location" did not suggest that she was being permanently relocated, much less to subsidized housing at the QDA's

24

expense. Plaintiff's 56.1 ¶ 239. Similarly, her testimony that she had received $50 and would be

receiving another $50, followed immediately by Guy's question, "Is that $25 a day"? gave the

misimpression that she was getting a total of $100 through four daily payments of $25. *Id*. ¶ 238.

Certainly, neither jurors nor defense counsel knew that Sanchez was promised per diem

payments that could (and did) continue for a full year.  Missing from the WPP file are the

receipts Sanchez signed for  the payments she received during the trial in November and

December 1995.Plaintiff's 56.1¶ 235-236. An adverse inference should be made that these *Brady*

and *Rosario* receipts would have shown a written  promise of  an indefinite payment of $25 per

day or  $250 every two weeks. See:  *United States v. Garcia*, 596 Fed. Appx. 24, 26 (bad faith

need not be shown to justify an inference of spoliation, and that "an adverse inference instruction

may be appropriate in some cases involving the negligent destruction of evidence").

Such partial, misleading disclosures do not come close to satisfying *Brady*. "Disclosures

must be sufficiently specific and complete to be useful." *Rodriguez*, 496 F.3d at 226; *see Banks

v. Dretke*, 540 U.S. 668, 695 (2004) (defense has no duty to "scavenge for hints of undisclosed

*Brady* material"); *Leka, supra*, 257 F.3d at 101-03 (*Brady* not satisfied where government did

not disclose details of potential witness's knowledge, as defendant was left to gamble on what

witness would say). This standard is even more stringent for a last-minute disclosure, which may

be "insufficient unless it is fuller and more thorough than may have been requested if the

disclosure had been made at an earlier stage." *Id*. The severity of the *Brady* violation against

Bellamy is highlighted by the 2013 *Bedi* decision, in which the Hon. James Griffin, Justice of

Queens Supreme Court, vacated the defendant's conviction despite the prosecution's disclosure,

in advance of trial, of most of the $20,000 worth of benefits received by a WPP witness.

Plaintiff's 56.1 ¶¶  255-258. In Bellamy's case, the disclosure was not incomplete but negligible.

Disclosure of any of the suppressed benefits given to Sanchez would have discredited her threat report, since nothing about it added up. She had not claimed to see the murder or be Bellamy's cashier on the morning it occurred, she kept changing the wording of the supposed "threat," and during the 18 months prior to trial she had not reported it to *anyone*. *Id.* ¶ 219-224. The only factor that gave Sanchez any credibility was jurors' misimpression that she had nothing to gain from fabricating the threat. "Why would she come in and lie"? ADA Guy asked the jury. "Do you think for one second that she had a motive to lie...?" *Id.* ¶¶ 309-310.

        **C.**    **Since Queens prosecutors failed to disclose *Brady*, as they were required to do, and ADA Guy committed summation misconduct that deprived Plaintiff of a fair trial, discovery should proceed on his *Monell* claim that the Queens DA had a policy of deliberate indifference to prosecutorial misconduct**

           **i.**  **Prosecutors withheld impeachment evidence regarding Sanchez**

Notwithstanding the WPP policy of not disclosing *Brady*, ADA Guy had an independent constitutional responsibility to find out all the facts and to disclose them to the defense. His awareness that the District Attorney did not discipline ADAs who withheld *Brady*, as a way to obtain convictions, may be the reason that he did not ask about what Sanchez was receiving. *Id.* ¶ 240; *see Kyles v. Whitley*, 514 U.S. 419, 437-438 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf"). A reasonably jury could infer that the absence of a disciplinary policy encouraged the indifference not only of ADA Guy, but of prosecutors who perpetuated the same *Brady* violation during 440 litigation, thereby prolonging Mr. Bellamy's wrongful imprisonment. Discovery has revealed that 440 prosecutors misled Judge Blumenfeld. His ruling that no *Brady* violation occurred with respect to Sanchez resulted from this prosecutorial misconduct. Plaintiff's 56.1 ¶¶ 242-256.

26

During the 440, ADA Rona Kugler denied, in response to a FOIL request, that records of housing or financial assistance existed. *Id*. ¶ 242. The 440 prosecutors, ADAs Brad Leventhal, Sharon Brodt, and Ranjana Piplani, asserted that they knew of no WPP file that might show what their Office gave Sanchez. *Id*. ¶ 243. When Judge Blumenfeld directed that they locate and review any such file, ADAs Brodt and Piplani reviewed Sanchez' WPP file, and then falsely represented *in camera* that it contained no *Brady*. *Id*. ¶ 244-249.

> Court: "Anything indicating any promises that were made to her or offers that were made to her?"
>
> Piplani: "Not a thing. Not a thing…
> …
>
> Brodt: "[T]here was a commitment to keep her safe. So to the extent that could be a promise, that was the extent of it."

Judge Blumenfeld was not shown the contents of Sanchez' WPP file, including notes and receipts that contained the following *Brady* information. On November 28, 1995, Ms. Sanchez informed QDA detectives that her first and second preferences for relocation were, respectively, a two-bedroom apartment in Manhattan or Brooklyn. *Id*. ¶ 253. During the trial Ms. Sanchez visited potential apartments. *Id*. The QDA requested $2,800 for Sanchez' relocation on December 7, four days before closing arguments. *Id*.

In legal briefs that followed the *in camera* misrepresentations, the Queens DA continued to maintain that Sanchez had received no promises prior to her testimony, for example writing that "there was no need to promise [Ms. Sanchez] anything, since she never showed any reluctance to cooperate." *Id*. ¶ 251. In fact, as was suppressed from the defense, Sanchez' testimony was compelled with a Material Witness Order. In opposing a motion for further discovery relating to WPP benefits, the QDA falsely affirmed that "inferences that … on November 28, 1995, there was 'an implicit agreement or understanding' that the Office would

27

pay [Sanchez'] housing expenses for an 'indefinite period' and that the Office would help her

find a permanent place to live … simply do not lie." *Id*. In fact this agreement is borne out by the

documents in Sanchez' WPP file as well as her and Detective Cox's testimony.

### ii.   ADA Guy's summation violated Bellamy's Fair Trial rights

ADA Guy's summation included more than a dozen misleading and inflammatory

remarks that were not responsive to the defense summation and that, cumulatively, deprived

Bellamy of a fair trial. Plaintiff is not estopped from arguing summation misconduct simply

because his Legal Aid attorney failed to raise the issue in his direct appeal and habeas petition.

"A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all

conclusive effect, both as res judicata and as collateral estoppel." *Siegel v. Time Warner Inc.*, 496

F. Supp. 2d 1111, 1124 (C.D. Cal. 2007) (applying New York law and quoting *Universal City*

*Studios, Inc. v. Nintendo Co.,* 578 F. Supp. 911, 919 (S.D.N.Y.1983)). In all of the res judicata

cases cited by the City (some of which apply Illinois state law) the guilty verdict was still in

place. The vacatur of Mr. Bellamy's conviction precludes claim preclusion.

So does the fact that Plaintiff could not have brought his § 1983 summation misconduct

claim in criminal proceedings. *Leather v. Eyck,* 180 F.3d 420, 425 (1999) (holding that, under

State law, which controls, res judicata cannot preclude a damages action that was not available in

prior proceedings); *Parker v. Blauvelt Volunteer Fire Co., Inc.*, 93 N.Y.2d 343 (1999) (same).

ADA Guy's numerous misleading, false and inflammatory remarks satisfy the heavy

burden placed on Fair Trial claims based on summation misconduct. A § 1983 action lies where

remarks in summation render the trial "fundamentally unfair." *Garofolo v. Coomb*, 804 F.2d 201,

206 (2d Cir.1986). To do so, the summation must cause "actual prejudice" as judged by a three-

part test that considers "the severity of the misconduct; the measures adopted to cure the

misconduct; and the certainty of conviction absent the improper statements." *Parker v. Herbert*, No. 02-CV-0373RJA/VEB, 2009 WL 2971575, at *62 (W.D.N.Y. May 28, 2009).

ADA Guy's summation misconduct was severe because it contained at least fourteen egregiously improper comments. *Farakesh v. Artuz*, 2000 WL 1480896 (E.D.N.Y. Oct. 3, 2000) (Queens) (granting habeas petition based on summation misconduct that was "neither isolated nor infrequent"); *see Floyd v. Meachum*, 907 F.2d 347, 352-356 (2d Cir. 1990) (holding that the "cumulative effect of … repeated and escalating prosecutorial misconduct" deprived the defendant of a fair trial, even though no single improper remark did so on its own).

Given the weakness of the case against Bellamy, "the certainty of conviction absent the improper statements" is very low. Guy acknowledged that the case had "crumbled" and was "in trouble" heading into his summation. Plaintiff's 56.1 ¶¶ 278, 298-99. He then vouched for witnesses, misrepresented their testimonies, shifted the burden of proof, called Bellamy a liar who had fabricated his alibi, and told jurors that he knew Bellamy was guilty of the murder and other crimes. If there was ever a trial in which "the certainty of conviction absent improper statements" was low, Bellamy's was it. *See U.S. v. Friedman*, 909 F.2d 705, 710 (2d Cir. 1990) (conviction reversed because "it could not be said that conviction would surely have been obtained in absence of misconduct").

Guy's improper remarks, enumerated in Plaintiff's 56.1 Statement, include the following nine. Plaintiff's 56.1 ¶¶ 300-313.

1. "I know who committed the murder." *Id.* ¶ 300.

"It is unquestionably improper for a prosecutor to interject personal beliefs into a summation." *United States v. Puco*, 436 F.2d 761, 763 (2d Cir. 1971). This prohibition is founded "upon the possible danger that the jury, impressed by the prestige of the office of the

29

District Attorney, will accord great weight to the beliefs and opinions of the prosecutor." *People v. Paperno*, 54 N.Y.2d 294, 300-301 (N.Y. 1981). A prosecutor's claim that he or she knows that a defendant is guilty is so prejudicial that it can justify reversal in itself, and even if there were curative instructions. *See People v. Tassiello*, 300 N.Y. 425, 430 (N.Y. 1950). ADA Guy's claim that his statement was "improperly transcribed," even though it fits a pattern and the transcript was never resettled, is a fact question for jurors.

2. "It's because the evidence shows that you [Bellamy] are a murderer, and that you are not going to get away with it, not this time." *Id.* ¶ 301.

Few events at trial could be more prejudicial than a prosecutor's implication that the defendant had gotten away with another murder. *People v. Woodhull*, 105 A.D.2d 815, 818 (2d Dept. 1984) ("commenting on irrelevant uncharged crimes is one of the most egregious of trial errors.") This utterly baseless statement encouraged jurors to convict Bellamy, lest they be the ones to let him off *this time*, possibly to commit another murder.

3. "Where is there proof of motive? There is none. Where is there proof defendant had no motive to kill somebody? I submit there is no proof that he had no motive." *Id.* ¶ 302.

Mr. Guy's suggestion that Bellamy had the burden to prove any part of his case undermined the presumption of innocence. *See, e.g., People v. Torres*, 223 A.D.2d 741 (2nd Dept. 1996) (reversing conviction where prosecutor suggested that defendant had an obligation to present an alibi); *see also Floyd* 907 F.2d at 353 (prosecutor undermined presumption of innocence by suggesting that, "If there were facts left out in this case," it was because the defendant had not provided them).

These first three statements, in which Guy suggested that Bellamy was a repeat murderer who bore some burden of proof, violated Mr. Bellamy's Fair Trial rights in themselves.

4. "Mr. Carter told you when he testified that when he saw the lineup he picked either one or two. He wasn't sure, and that in the next room ... he told you he picked out number

30

two and I showed him the lineup photographs and he still is stuck with number two, but you know he didn't pick out number two.  Number two, isn't sitting over there.  Number one is sitting over there…"

"[Y]ou don't have to take my word.  Common sense will tell you that it's the defendant, number one, who is on trial, not some filler in a lineup." *Id.* ¶ 304-305.

Guy's assertion that Bellamy must have been identified as the killer because he was the man on trial undermined the presumption of innocence no less than his attempt to shift the burden of proof on motive. Guy's impeachment of Carter, his own witness, was also troubling because Guy knew that Carter did not identify Bellamy while viewing the lineup. *Id.* ¶¶ 114-115.

5.   "GUY:        Why do you suppose [the defendant] makes such a point of trying to say he left at ten o'clock?  Why do you suppose he would have his alibi witness come in and say that he left at ten o'clock?

REIVER:        Objection…

COURT:        … Objection is noted … Please, Mr. Guy, fair comment.

GUY:  I believe this is, Judge. Ten o'clock is a very important time … because the murder had been committed before ten o'clock as the murderer would well know.  So if you are going to claim you were somewhere else … you're going to make sure it comes after the time that you know the crime had actually been committed." *Id.* ¶ 303.

There is no defense for Guy's improper claim that Bellamy arranged for his stepfather to fabricate an alibi, a claim that Guy made in spite of the judge's warning and based solely on the stepfather's testimony that Bellamy was home on the morning of the murder that set their Housing Project abuzz. *People v. Jackson*, 143 A.D. 2d 363, 364  (2d Dept .1988) (reversing conviction where prosecutor stated that defendant's version of the facts was fabricated after hearing the People's witnesses); *People v. Hernandez*, 92 A.D.2d 875 (2d Dept. 1983) (reversing conviction where the prosecutor accused the defendant of asking his father to tell an alibi story to the jury).

6.   "[W]hen I asked [Walker] to look around the courtroom and see if she recognized anybody in this courtroom who she saw and recognized as being in that fight . . . she

31

stopped, she paused, she looked around the courtroom and she looked on his face and then and only then did she say I can't really say." *Id*. ¶ 308.

Guy's suggestion that Walker failed to identify Bellamy out of fear was yet another baseless claim that, like the warning, "don't let him get away with, not this time," portrayed Bellamy as a dangerous thug. It was improper and prejudicial for Guy to invite juror speculation, given that Walker never claimed to be (and never was) afraid of Bellamy. *People v. Ashwal*, 39 N.Y.2d 105, 109 (1976) ("Above all [the prosecutor] should not seek to lead the jury away from issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to prejudice the jury against the defendant."

7.  "[D]o you think for one second that [Sanchez] had a motive to lie in this case?"

    "Why would she come in and lie about the defendant?  Is there any evidence that she had any motivation to come in and lie about the defendant?"

    "She didn't lie to you.  She didn't embellish." *Id*. ¶ 309-311.

    These comments may well have caused Bellamy's conviction, by misleading jurors about the benefits Sanchez received and encouraging them to conflate her credibility with that of a charismatic prosecutor. It is for this reason that prosecutors are strictly forbidden from any hint that they can vouch for a witnesses. *Floyd* at 907 F.2d at 354 ("prosecutor's implied 'voucher' for [a witness'] credibility invited the jury to view its verdict as a vindication of the prosecutor's integrity rather than as an assessment of guilt or innocence based upon the evidence").

8.  "[Mr. Bellamy] can't keep his lies straight.  And he is a liar because his own statements contradict themselves and they contradict the other evidence." *Id*. ¶ 312.

    It is  improper for a prosecutor to "repeatedly call [the] defendant a liar," even when the defendant testifies. *See People v. Ortiz*, 125 A.D. 2d 502, 503 (2d Dept. 1986). Mr. Bellamy did not testify. It is prejudicial for a prosecutor to call a defendant a liar because, as in the case of vouching, the jury accords great weight to the beliefs of the prosecutor. *See People v. Bailey*, 58

32

N.Y.2d 272, 277 (1983) (reversing conviction where prosecutor expressed his personal

conviction that a witness was a lying and thus presented himself as an unsworn witness).

9.   "So now we have defense arguing [Ms. Sanchez] is a liar because she didn't say something, and how do we know she didn't say it?  Because he says so.  That's the logic she is a liar because he says so." *Id*. ¶ 313.

Not once during did defense counsel call any witness, including Ms. Sanchez, a liar.

Defense counsel argued that her testimony was "not credible" and "doesn't make any sense."

ADA Guy, in contrast, used the words "lying," "liar" or "lies" 23 times in his summation. *See*

*People v. Goldstein*, 196 Misc. 2d 741, 743-44 (N.Y. Sup. Ct. 2003) (reversing conviction where

prosecutor attacked defense for calling complainant a liar, when it had not done so).

Guy's improper comments are not excused by the fact that a few of them aimed to

counter the defense summation. A prosecutor may not rebut permissible arguments from defense

counsel by committing Constitutional violations. *See People v. Moye*, 12 N.Y.3d 743, 744, (N.Y.

2009) ("the prosecutor's vouching remarks in summation may not be excused as fair response to

defense provocation). Moreover, Guy planned the improper statements in advance knowing that

his summation needed to "overcome the hole that [had been] dug." Plaintiff's 56.1 ¶ 299.

Guy's misconduct also is not excused by the fact that Reiver objected just three times,

and the judge only admonished, "fair comment."[4] Federal and State courts reverse convictions,

even where no objection was made, if the misconduct caused Constitutional violations. *Wynters*

*v. Poole*, 464 F. Supp. 2d 167, 182 (W.D.N.Y. 2006) ("prosecutor's misconduct, and trial

counsel's failure to address it, impermissibly impinged upon the fundamental fairness of []

trial"). The Second Circuit has also consistently held that where misconduct is severe, it is not

cured by standard curative instructions. *See Floyd*, 907 F.2d at 355-56 ("the only arguably

---

[4] Bellamy's 18-b lawyer, Kenneth Reiver, who spent eleven out-of-court hours on the case prior to trial, said of Guy's summation, "I probably could have objected, but I felt that the case was so weak and so bad that I really didn't care what the District Attorney said..." *Id*. ¶ 314.

curative measure adopted by the trial judge – the normal instruction in the course of his charge that argument of counsel is not evidence – was inadequate") (citing *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) (per curiam)).

In short, ADA Guy was not entitled to exploit an ineffective 18-b lawyer by violating basic rules concerning fair process, burden of proof, presumption of innocence, and vouching. Guy's suggestions that he possessed undisclosed evidence of guilt, that Bellamy had committed other crimes, that evidence of innocence could not be so because Bellamy had been charged, and that the defendant had the burden of proof, violated Bellamy's Fair Trial rights. A jury should decide whether this misconduct was a proximate cause of Bellamy's conviction.

### POINT V:

### FRAMING AN INNOCENT PERSON FOR A CRIME GIVES RISE TO A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

IIED liability is imposed where the "conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). The intentional fabrication and suppression of evidence in order to frame a person for a murder he did not commit fulfills every element of this test.. *See e.g., Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996) (police biting plaintiff); *Newton v. City of New York*, 566 F. Supp. 2d 256, 281, 2008 U.S. Dist. LEXIS 54084, *51-52 (S.D.N.Y. 2008) (maliciously falsifying evidence).

The most logical course is to deny summary judgment and submit IIED claims to the jury with instructions to avoid awarding duplicative damages. *See Wahhab v. City of New York*, 386 F. Supp. 2d 277, 292-93 (S.D.N.Y. 2005) *Bender* 78 F.3d at 793; *Sylvester v. City of New York*,

2006 U.S. Dist. LEXIS 81716 (S.D.N.Y) (*Haus v. City of New York*, 2011 U.S. Dist. LEXIS 155735, *257-58 (S.D.N.Y. Aug. 31, 2011)

### POINT VI:

### PLAINTIFF'S FOURTEENTH AMENDMENT DUE PROCESS CLAIM IS NOT AT PRESENT DUPLICATIVE OF THE FOURTH AMENDMENT MALICIOUS PROSECUTION CLAIM

Whether Plaintiff's Fourth Amendment claim is duplicative should be deferred at least until resolution of an upcoming Supreme Court case. This Circuit, together with nine other circuits, has held that the Fourth Amendment provides a constitutional basis for malicious prosecution claims. *Murphy v. Lynn* 118 F.3d 938, 944 (2d Cir. 1997). However, in October the Supreme Court will be hearing an appeal from a Seventh Circuit case holding that there is no Fourth Amendment malicious prosecution claim. *Manuel v. Joliet* 590 Fed APPX 641 (7th Cir 1013). *See question presented at* http://www.supremecourt.gov/qp/14-09496qp.pdf. If the Supreme Court agrees with the Seventh Circuit, Plaintiff's Fourth Amendment malicious prosecution claim would fail and the only remaining claim for malicious prosecution would be through the 14th Amendment. If the Supreme Court permits Fourth Amendment malicious prosecution claims to proceed, then this Court can determine whether there is duplication before submitting the case to the jury.

### CONCLUSION

City's motion for Summary Judgement should be denied entirely and Plaintiff's cross motion for partial summary judgement, that the dismissal of the indictment was a favorable termination for purposes of the malicious prosecution claim, should be granted.

Dated: New York, N.Y.          Respectfully submitted,
      June 24, 2016

                        **Law Offices of Thomas Hoffman, P.C.**

By:
                    Thomas Hoffman
                    Jonathan G. Hiles
                    5 Columbus Circle
                    @ 1790 Broadway, 6th Floor
                    New York, N.Y. 10019
                    Attorney for Plaintiff