UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

KAREEM BELLAMY,

                Plaintiff,

**- against -**

CITY OF NEW YORK, JOHN J. GILLEN, and
MICHAEL F. SOLOMENO,

                Defendants.

-------------------------------------------------------------- X

**MEMORANDUM DECISION AND
ORDER**

12 Civ. 1025 (AMD) (PK)

**ANN DONNELLY,** District Judge.

The plaintiff brought this action on March 1, 2012 against Detectives John Gillen and

Michael Solomeno, as well as the City of New York, for alleged violations of federal and state

law, in connection with his prosecution for the April 9, 1994 murder of James Abbott.

The plaintiff alleges misconduct on the part of the detectives who investigated the

murder.  Specifically, he asserts that Detectives Gillen and Solomeno fabricated evidence against

him, and coerced an eyewitness into identifying him.  His claims against the City are premised

on the trial prosecutor's summation comments, and on a perceived policy not to disclose

relocation assistance for threatened witnesses.

The defendants move for summary judgment on all claims; the plaintiff cross-moves.  For

the reasons set out below, the defendants' motion for summary judgment is granted in its

entirety, and the action is dismissed.

**OVERVIEW**

James Abbott was stabbed to death on April 9, 1994. A jury found the plaintiff guilty of Murder in the Second Degree, on a theory that he acted with depraved indifference to human life.

At that trial, the critical issue was identification. The jury heard evidence from two witnesses. One witness saw the plaintiff shortly before the murder; this witness also said that the plaintiff had threatened her after the murder. The second witness saw the killing itself. Both of these witnesses identified the plaintiff in separate lineups. The jury also heard that the plaintiff made statements to police. The plaintiff's stepfather testified for the defense, and said that the plaintiff was home at the time of the murder.

The jury acquitted the plaintiff of intentional murder, and convicted him of depraved indifference murder. The plaintiff appealed his conviction to the Appellate Division, Second Department, which affirmed his conviction. The New York Court of Appeals denied the plaintiff's application for leave to appeal. The plaintiff filed a petition for habeas corpus in this district, and the Honorable Charles Sifton denied the petition in a written opinion.

More than ten years after his conviction, the plaintiff persuaded a state court judge to vacate his conviction, pursuant to Criminal Procedure Law Section 440.10, and to grant him a new trial. The path to that decision was a tortured one, and spanned more than three years and two lengthy hearings.

The plaintiff's initial claims at the 440 hearing were that his trial lawyer was ineffective, that one of the eyewitnesses had come forward with new evidence calling into question the reliability of his identification of the plaintiff, and that the prosecutor withheld *Brady* material. The plaintiff called many witnesses who purported to have seen either the crime or its aftermath, but none of them gave evidence that would have warranted setting aside the conviction. The

record also revealed that the plaintiff's team of lawyers and investigators, including his current lawyer, Thomas Hoffman, engaged in questionable tactics in their dealings with witnesses. For example, the plaintiff's team told the witnesses—many of whom had testified at the plaintiff's criminal trial—that the plaintiff was innocent, that prosecutors knew he was innocent, that the real killer had been identified and was still at large. Most troubling, the lawyers paid a substantial fee to one of these witnesses—the eyewitness, Andrew Carter—who changed his testimony only after negotiating a payment.

After the close of the evidence, however, the plaintiff's team announced that they had located a new witness, Michael Green, who claimed that Levon "Ishmel" Melvin had confided to Green that he had killed someone—presumably James Abbott—who was having an affair with Melvin's wife. Moreover, Green produced a tape recording, which he said that he had surreptitiously made of Melvin admitting to the murder. There were certainly problems with his testimony at the first hearing; like Carter, the defense team paid Green a significant amount of money, and told him that the plaintiff was innocent. Additionally, his account of how Melvin supposedly confessed to him was not entirely believable. Nevertheless, the recording itself was powerful evidence, and the judge granted the plaintiff's motion to vacate the conviction.

Shortly thereafter, however, Green's story was revealed to be a hoax. After an investigation, Green admitted that Melvin had never confessed to him, and that he paid a friend to play Melvin's role on the tape. Judge Blumenfeld granted the prosecutor's application to reopen the hearing, at which Green admitted that his previous testimony was a lie, that Melvin had never confessed to him, and that he fabricated the entire story. He also claimed that the defense team employed indefensible tactics: that they fed him evidence and played on his sympathies, and that Mr. Hoffman paid him far more than Green admitted at the first hearing,

and that after the tape was proved to be false, Mr. Hoffman told him to "disappear." Green also described fabricating a second recording purporting to be a witness who had overheard "the real killers" discussing the murder.

Despite Green's admission that the entire story was fabricated, Judge Blumenfeld adhered to his initial decision granting the plaintiff a new trial. He reasoned that Green could have been telling the truth when he testified that Melvin had confessed to him, and was only lying about the tape. Although the court ordered a new trial, the Queens County District Attorney's Office could not go forward with the case. In the years following the plaintiff's conviction, the New York Court of Appeals sharply restricted the circumstances under which depraved indifference murder, the crime for which the plaintiff was convicted, could be established. As a result, the Office could not retry the plaintiff for the murder of James Abbott.

The Queens County District Attorney's Office dismissed the indictment against the plaintiff in September of 2011. Six months later, the plaintiff—represented by Mr. Hoffman— brought this lawsuit against the detectives who had investigated the murder of James Abbott and the City of New York.

# BACKGROUND

## I.    Factual History[1]

### A.  Murder Investigation

James Abbott was stabbed to death on Beach Channel Drive at the intersection of Beach 48th Street in Far Rockaway, Queens, at around 9:40 a.m. on April 9, 1994.  (Defendants' 56.1 Statement (ECF No. 156) ("Defs.' 56.1") ¶¶ 4, 9; Plaintiff's 56.1 Counterstatement (ECF No. 165) ("Pl.'s 56.1 Counterstatement") ¶¶ 4, 9.)  The murder site was three blocks from the Edgemere Houses, the public housing complex in which the plaintiff lived, and one or two blocks from the C-Town supermarket at 4909 Beach Channel Drive where Abbott had purchased groceries minutes before he was killed,  (Plaintiff's Additional 56.1 Statement (ECF No. 167) ("Pl.'s Add. 56.1") ¶ 21; Defendants' Responsive 56.1 Statement (ECF No. 172) ("Defs.' Resp. 56.1") ¶ 21), and where the plaintiff bought beer on April 9, 1994.  (Defs.' 56.1 ¶ 18; Pl.'s 56.1 Counterstatement ¶ 18.)

The case was first assigned to Detective Michael Solomeno of the 101st Precinct, and transferred to his colleague, Detective John Gillen, before the plaintiff's arrest, which took place five weeks after the murder.  (Pl.'s Add. 56.1 ¶ 22; Defs.' Resp. 56.1 ¶ 22.)  In the weeks that followed the murder, the detectives continued to investigate.  They went to the C-Town

---

[1] The plaintiff's submissions do not comply with Local Rule 56.1, which requires a summary judgment opponent to "specifically controvert[]" the movant's Rule 56.1 Statement of Material Facts, with citation to admissible record evidence.  Local Rule 56.1(c) & (d).  Instead, the plaintiff includes citations to evidence that does not support the claims being made, and draws strained or unwarranted inferences by combining evidence from different sources.  In many instances, the plaintiff's factual claims seem to be premised on counsel's own theories about the case, rather than the actual evidence.  I give no weight to statements that are not supported by the record.  Narrative and argument in a 56.1 Counterstatement violate the Local Rules, and is of no help to the Court, as it requires the Court to sift through thousands of pages of transcripts and depositions in order to ascertain the factual basis, if any, for the plaintiff's allegations.  *See Kruger v. Virgin Atlantic Airways, Ltd.*, 976 F. Supp. 2d 290, 308–09 (E.D.N.Y. 2013).  While the record in this case is voluminous, and is comprised of thousands of pages of trial testimony, testimony from two lengthy 440.10 hearings, and multiple depositions, I have undertaken a thorough review of the record.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73–74 (2d Cir. 2001) (The court, in considering the parties' submissions, has broad discretion to "conduct an assiduous review of the record," or to "deem as admitted" facts that are not controverted by the opposing party's statement).

supermarket shortly after the murder, and learned that Abbott had been in the store moments before he was killed.  (Pl.'s 56.1 Counterstatement ¶ 16; Pl.'s Add. 56.1 ¶¶ 30–31; Defs.' Resp. 56.1 ¶¶ 30–31.)

They also spoke at least twice to Andrew Carter,[2] who told the police he saw two men attack the victim, and that the shorter man stabbed Abbott repeatedly.[3]  (Defs.' 56.1 ¶¶ 6–9; Pl.'s 56.1 Counterstatement ¶¶ 6–9, Defs.' Ex. E (ECF No. 157-5).)

Detectives Gillen and Solomeno interviewed Linda Sanchez, who was working at the C-Town the morning of the murder.  (Defs.' 56.1 ¶ 12; Defs.' Ex. G (ECF No. 157-7).)  She said that Abbott came to the store at about 9:30 a.m.  (Defs.' 56.1 ¶ 13; Defs.' Ex. G.)  Two other men also came in, picked up some beer, and got in the same line as Abbott.  (Defs.' 56.1 ¶ 14; Defs.' Ex. G.)  The two men left the store before Abbott, walked through the C-Town parking lot, turned back to the store, and then continued walking.  (Defs.' 56.1 ¶ 15; Defs.' Ex. G.) Abbott also left, heading in the same direction as the two men.  (Defs.' 56.1 ¶ 16; Defs.' Ex. G.)

On April 15, 1994, Detective Gillen received a telephone call from someone identifying herself as "Anna Simmons."[4]  (Defs.' Ex. I (ECF No. 157-9).)  The caller claimed to have overheard two men bragging about stabbing a man on Beach 48th Street.  (Defs.' Ex. I.) According to the caller, the men said that they waited for the victim to leave the supermarket, and followed him to the scene of the stabbing; while he was on the telephone, they got out of their car, "snuffed him," and then drove away.  (Defs.' Ex. I.)  The woman added that the men were members of "the Regulators" gang, and that the victim may have been asked to join, but

---

[2] The parties agree that Carter used a wheelchair, and was a drug user who had served prison time for an armed robbery.  (Pl.'s Add. 56.1 ¶ 32; Defs.' Resp. 56.1 ¶ 32.)

[3] A DD5 dated April 9, 1994, indicates that Carter spoke with Detective Lane.  (Defs.' Ex. E.) The DD-5 did not include a description of the two men.  (Pl.'s Add. 56.1 ¶ 33; Defs.' Resp. 56.1 ¶ 33.)

[4] Detective Gillen prepared a DD5 memorializing the call.  (Defs.' Ex. I.)  The caller is identified in the DD5 as "FKD," which stands for "female known to the department."

refused.  (Defs.' Ex. I.)  The caller said that she knew both men and gave the following

description:

> 1. Rodney Harris [male/black] 26-27 [years of age]
>    5610 Beach Channel Drive
>    Apartment 7g or 7H
>    Short possibly 5'2-5'4"
>    wears red hoodies

> 2. Ishael [sic]
>    5449 Almeda Avenue
>    [male/black] 27-29 [years of age]
>    possibly the head of the Regulators

(Defs.' Ex. I.)  Although the caller promised to come to the precinct after she left work at 3:00

p.m., she never arrived.  (Defs.' 56.1 ¶ 23; Pl.'s 56.1 ¶ 23; Defs.' Ex. I.)

As documented in a DD5, Detectives Solomeno and Gillen, in an effort to interview the

caller, visited two locations that the caller had given: a laundromat where she claimed to work,

and an apartment at 411 Beach 54th Street, Apartment 2G.  (Defs.' 56.1 ¶ 25; Defs.' Ex. K (ECF

No. 157-11).)  They could not find Simmons or anyone who knew her.  (Defs.' 56.1 ¶¶ 25–27;

Defs.' Ex. K.)  Detective Solomeno showed both Carter and Sanchez, separately, two

photographic arrays—one with Levon Melvin's[5] photograph, and the other with Rodney

Harris's photograph—but neither Carter nor Sanchez identified either Melvin or Harris.[6]  (Defs.'

56.1 ¶¶ 28–29; Solomeno Dep. Tr. 53:22–25, 55:9–60:5.)

On October 20, 1994, ADA David Guy sent a letter to Detective Gillen, requesting the

female caller's name, and appended a copy of Detective Gillen's notes from the April 15, 1994

---

[5] The parties agree that "Ishmel" was a nickname for someone named Levon Melvin.  (Defs.' 56.1 ¶ 28 n.2.)
[6] On a November 18, 1994 printout of Harris's arrest record, someone wrote the name "Mage Styles," as well as an address.  (Pl.'s Add. 56.1 ¶ 54; Defs.' Resp. 56.1 ¶ 54.)  Harris and Styles were "wanted" in connection with a shooting on Beach 54th Street and Beach Channel Drive that occurred five months before Abbott's murder.  (Pl.'s Add. 56.1 ¶ 55; Defs.' Resp. 56.1 ¶ 55.)

conversation.  (Pl.'s Ex. S (ECF No. 169-3 at ECF Page Nos. 10–11).)  Detective Gillen created

a DD5 in response, dated November 18, 1994, which documented the visit to the apartment and

the laundromat the caller described.[7]  (Defs.' Ex. K.)  Detective Gillen added the phrases "does

not live here 4/19" and "Photos neg 16 m/w 22 p/w" to his notes.[8]  (Pl.'s Ex. S (ECF No. 169 at

ECF Page No. 20).)

It is undisputed that Detective Gillen never looked for or questioned Harris or Melvin.[9]

(Pl.'s Add. 56.1 ¶ 45; Defs.' Resp. 56.1 ¶ 45.)

## B.  The Arrest and Lineups

On May 13, 1994, Linda Sanchez called the 101st Precinct Detective Squad and said the

person she saw immediately before the stabbing was now in front of 5132 Beach Channel Drive.

(Defs.' 56.1 ¶ 30; Pl.'s 56.1 Counterstatement ¶ 30; Defs.' Ex. M.)  The detectives arrived and

directed the plaintiff to get into the squad car, which he did.[10]  (Defs.' 56.1 ¶ 33; Pl.'s 56.1

Counterstatement ¶ 33.)

The plaintiff says that he asked detectives why they picked him up.  (Defs.' 56.1 ¶ 38;

Pl.'s 56.1 Counterstatement ¶ 38.)  Both sides agree that Detective Gillen told the plaintiff that

they were bringing him back to the precinct stationhouse because he was drinking beer in public,

and he would be fined for disorderly conduct and drinking a beer in the street.  (Defs.' 56.1 ¶¶

---

[7] During his deposition, ADA Guy testified that unless he had a separate telephone conversation with Detective Gillen, which he did not recall, he would not have known the April 15, 1994 caller had identified herself as Anna Simmons, until he received the November 18, 1994 DD5.  (Guy Dep. Tr. 91:25–92:17.)

[8] The plaintiff says that Detective Gillen made these notes after ADA Guy requested the identity of the female caller.  (Pl.'s Ex. S (ECF No. 169 at ECF Page No. 20).)  Detective Gillen testified at his deposition that he made this addition to his notes, but did not recall when he did so.  (Gillen Dep. Tr. at 82:5–84:1.)

[9] The defendants contend that Detective Gillen did not question Harris or Melvin because the detectives had nothing more than the telephone call from an unverifiable source, which did not give them a basis to make an arrest.  (Defs.' Resp. 56.1 ¶ 45.)  Moreover, questioning either or both men about a murder would have compromised the investigation, and caused potential suspects to flee.  (Defs.' Resp. 56.1 ¶ 45.)

[10] According to the plaintiff, one of the detectives pointed a gun at him.  (Pl.'s 56.1 Counterstatement ¶ 33.)  The defendants say they asked the plaintiff to get into their car.  (Defs.' 56.1 ¶ 33.)

35, 36; Pl.'s 56.1 Counterstatement ¶¶ 35, 36.)  At this point, according to the defendants, the

plaintiff replied, "This must be a case of mistaken identity—someone probably accused me of

murdering someone.  Why would someone accuse me of something I didn't do?"  (Defs.' 56.1 ¶

37; Defs.' Ex. N (ECF No. 157-14).)  Detective Gillen made a note of the statement in his spiral

notebook.  (Defs.' Ex. N.)  Sometime later, Detective Gillen added to the note: "Statement made

by def while being asked his pedigree – spontaneous & unsolicited."  (Pl.'s Ex. S (ECF No. 169-

2 at ECF Page No. 30); Gillen Dep. Tr. 58:14–59:5.)  The plaintiff denies making this

statement.[11]  (Pl.'s 56.1 Counterstatement ¶ 37.)

On May 14, 1994, Detective Gillen conducted a lineup at the 101st Precinct.  (Defs.' 56.1

¶ 42; Pl.'s 56.1 Counterstatement ¶ 42.)  Both Linda Sanchez and Andrew Carter viewed the

lineup.  (Defs.' 56.1 ¶ 46; Pl.'s 56.1 Counterstatement ¶ 46.)  The witnesses were asked three

questions: (1) Do you recognize anybody? (2) Whom do you recognize? (3) From where do you

recognize that person?  (Defs.' 56.1 ¶ 48; Pl.'s 56.1 Counterstatement ¶ 48.)  A sergeant from a

different precinct and Assistant District Attorney Stephen Antignani were in the viewing room

when the witnesses looked at the lineup.  (Defs.' 56.1 ¶ 186; Pl.'s 56.1 Counterstatement ¶

186.[12])

It is undisputed that Sanchez identified the plaintiff.  (Defs.' 56.1 ¶ 49; Pl.'s 56.1

Counterstatement ¶ 49.)  Detective Gillen documented this identification in a DD5 dated May 14,

1994.  (Defs.' Ex. P (ECF No. 157-16).)  Further, Sanchez signed a lineup report memorializing

the identification.  (Defs.' Ex. Q (ECF No. 157-17).)  On this form, in response to the question,

---

[11] The plaintiff contends that Detective Gillen fabricated the statement, and argues, without support, that prosecutors would necessarily have introduced the statement in the grand jury.  (Pl.'s 56.1 Counterstatement ¶ 37.)  The plaintiff does not explain why this would be so, nor cite to any evidence that prosecutors regularly present all the evidence that they have gathered to the grand jury.

[12] In support of this fact, the defendants cite ADA Antignani's 440 testimony; ADA Antignani testified that he, Detective Gillen, and "one of Detective Gillen's supervisors, a sergeant who was not from that precinct" were in the lineup room.  (Defs.' Ex. MM, 440 Tr. 1109:3–8.)

"Where do you recognize him/her from," Detective Gillen wrote that Sanchez answered, "From C-town he was with the guy who got stabbed on that Saturday & he is the guy who I called up on with the yellow shirt yesterday and the brown boots." (Defs.' Ex. Q.)

When Carter first viewed the lineup, he said that the person who stabbed the victim was either the person seated in position one, or the person in position two.[13] (Defs.' 56.1 ¶ 51; Defs.' Ex. R (ECF No. 157-18).) The signed lineup form reflects this identification: in response to the question "Do you recognize anyone?" Carter answered, "Either 1 or 2 I'm not sure." (Defs.' 56.1 ¶ 52; Pl.'s 56.1 Counterstatement ¶ 52; Defs.' Ex. S (ECF No. 157-19).)

After the lineup, ADA Antignani joined Detective Gillen and Carter in another room. (Antignani Dep. Tr. 94:15–96:22.) When Detective Gillen left, Carter told ADA Antignani that he knew that the stabber was the person in position number one, but that the hair was different. (Antignani Dep. Tr. 94:15–96:22.) Detective Gillen prepared a DD5 that summarized Carter's statements:

> The line up was viewed by Andrew Carter and he stated that it was either position #1 or #2 that stabbed the victim at the c/o B.48 Street and Beach Channel Drive. He stated that it was more likely it was number one but could not be absolutely sure it was him. He stated that he was 99% sure but could not say for sure. Carter stated that it appeared that number one was the guy but it seemed as if he had cut his hair as he didn't have any braids.

(Defs.' Ex. R.)

---

[13] The plaintiff maintains that Carter "initially indicated that the perpetrator was number two, a filler." (Pl.'s 56.1 ¶ 51.) The plaintiff's citations to the record evidence do not support this proposition. At trial, Carter repeatedly testified that he initially indicated that the person who stabbed the victim was in "either one or two." (*See* Trial Tr. 880:11–883:22.) When Carter was asked, "Did you then pick out either one or two from that lineup at that time," Carter answered, "Two." (*See* Trial Tr. 882:25–883:3.) This testimony, however, does not support the plaintiff's argument that Carter first identified the person in position two, and then—after a "private conversation with Gillen outside of the lineup room" identified the person in position one. The plaintiff also cites the testimony of ADA Guy, who stated that Carter said, "One or two, I'm not sure." (Guy Dep. Tr. at 52:24–53:2.) Finally, the plaintiff testified at his deposition that during the lineup, he was able to hear voices from the other side of the door, and he "heard a guy say number two." (Bellamy Dep. Tr. at 158:23–159:21.)

ADA Antignani memorialized his exchange with Carter in a memorandum dated June 30, 1994.  (Defs.' Ex. U (ECF No. 157-21).)  ADA Antignani said that Carter initially said that both the plaintiff, in position one, and a filler, in position two, "resembled" the stabber.  (Defs.' Ex. U.)  In a second conversation immediately after the lineup, Carter explained that his statement in the lineup room "reflected only that there was a resemblance between the persons holding numbers one and two in the lineup, and that the stabber on the date of the incident had a different style haircut than he did on the date of the lineup."  (Defs.' Ex. U.)

The plaintiff asserts that Detective Gillen and Carter had a conversation outside the lineup room, during which Detective Gillen directed Carter to identify the person in position one—the plaintiff—and told Carter that "Bellamy was the right person to identify but that he had 'cut his hair' and shortened his braids."  (Pl.'s 56.1 Counterstatement ¶ 53.)  Detective Gillen denies this accusation.

After the plaintiff was returned to his holding cell, Detective Gillen told him that both witnesses picked him out of the lineup.  (Defs.' 56.1 ¶ 58; Pl.'s 56.1 Counterstatement ¶ 58.)  According to the plaintiff, he fainted for a moment, and when he woke up, Detective Gillen said, "Once I close the door, I close it for good."  (Pl.'s Add. 56.1 ¶ 127.)

The plaintiff told the detectives that he was with a friend, Terrell Lee, at the time of the murder.  (Defs.' 56.1 ¶ 39; Pl.'s 56.1 Counterstatement ¶ 39.)  On May 15, 1995, ADA Antignani, accompanied by Detective Gillen, took a sworn statement from Terrell Lee.  Lee said that while he knew the plaintiff, he was not with him at the time of the murder:

> ADA Antignani: [I]f Kareem told us that he was with you at the time, the morning or April 9th, would he be telling the truth?
>
> Lee:  I can't say if he would be telling the truth and I'm not going to try to justify what he's saying, but . . .

Antignani:  So, were you with him?

Lee: No, I wasn't.[14]

(Lee Interview, Pl.'s Ex. S (ECF No. 169-1 at ECF Page Nos. 6).)  On May 15, 1994, Detective

Gillen arrested the plaintiff for murder, and signed the criminal court complaint.  (Pl.'s Add. 56.1

¶ 128; Defs.' Resp. 56.1 ¶ 128.)

## C.  The Grand Jury

ADA Antignani presented the case to the Grand Jury on May 19, 1994.  Four witnesses

testified: Police Officer Frank Perez, Linda Sanchez, Andrew Carter, and Detective John Gillen.

Police Officer Frank Perez testified that on Saturday, April 9, 1994, at about 9:45 a.m., he

saw James Abbott lying in a pool of blood on the corner of Beach 48th Street and Beach Channel

Drive.  (Defs.' 56.1 ¶ 63; Pl.'s 56.1 Counterstatement ¶ 63.)

On April 9, 1994, Linda Sanchez was working as a cashier at C-Town.  (Defs.' Ex. X,

Grand Jury Tr. 8:16–9:8.)  At 9:30 a.m., James Abbott, whom she knew as "a quiet customer"

came into the store.  (Grand Jury Tr. 9:9–10:2.)  While he was checking out, Sanchez saw two

other men in line: the plaintiff, whom she recognized as a customer, and a taller man.  (Grand

Jury Tr. 10:3–11:12.)  Abbott stopped to talk to the store manager, and the plaintiff and the other

man left the store.  (Grand Jury Tr. 11:16–12:2.)  As they left, the plaintiff stopped, turned back,

and looked inside the store.  (Grand Jury Tr. 12:3–12:13.)  Sanchez went outside to the parking

lot to get shopping carts, and saw that the plaintiff and the other men had stopped near a chicken

place.  (Grand Jury Tr. 12:10–14:2.)  Abbott then walked through the parking lot, in the same

---

[14] The plaintiff claims, without support, that Lee only gave these answers because Detective Gillen threatened him.
The plaintiff also refers to his Exhibit W (ECF No. 164-31), which appears to be fragments of unsigned letters, in
what seems to be different handwriting.  The plaintiff does not explain how unsworn, unsigned fragments of letters
would ever be admissible.  In any event, to the extent that the plaintiff is claiming that these pages are parts of letters
from Lee, it is noteworthy that Lee does not provide him with an alibi.  (Pl.'s Ex. W at 3167.)

direction as the plaintiff and the other men.  (Grand Jury Tr. 14:3–14:16.)   Sanchez learned later that morning that James Abbott had been killed.  (Grand Jury Tr. 14:17–15:4.)

In a lineup held on May 14, 1994, Sanchez identified the plaintiff as the shorter man behind Abbott in the supermarket on April 9, 1994.  (Grand Jury Tr. 15:8–16:5.)  The plaintiff's hair was different at the lineup; it was not as "loose" as it was on April 9th.  (Grand Jury Tr. 15:8–16:16.)

Andrew Carter, the third witness, testified that on April 9, 1994, he was waiting for the bus on Beach Channel Drive between Beach 48th and 49th Streets when he observed three men walk over from the direction of the C-Town.  (Defs.' 56.1 ¶¶ 73, 74; Pl.'s 56.1 Counterstatement ¶¶ 73, 74.)  One of them had two bags.  (Grand Jury Tr. 19:9–13.)  Two of the three passed him, while one stopped to light a cigarette, and nodded to Carter.  (Grand Jury Tr. 19:14–20.)  The man with the bags went to use the telephone.  (Grand Jury Tr. 19:14–20.)  When the man with the bags hung up the telephone, the other two men started hitting him.  (Grand Jury Tr. 20:2–10.)  The "little" man who had lit the cigarette pulled out a knife and starting stabbing the man in his head, neck, and chest.  (Defs.' 56.1 ¶ 75; Pl.'s 56.1 Counterstatement ¶ 75.)  The man fell to the ground, and both men kicked him "[a]ll in the chest, face, everywhere."  (Grand Jury Tr. 21:16–17.)

On May 14, 1994, Carter went to the 101st Precinct and viewed a lineup.  (Grand Jury Tr. 21:21–22:2.)  Carter testified that the person in position one—the plaintiff—"stabbed the guy to death in front of the bus stop;" his hair had been in short, kinky braids on the day of the stabbing, but "cut" on the day of the lineup.  (Grand Jury Tr. 22:3–22:20.)

Detective Gillen was the last witness to testify before the Grand Jury.  (Defs.' 56.1 ¶ 78; Pl.'s 56.1 Counterstatement ¶ 78.)  He conducted two separate lineups—one that Sanchez saw,

and the other that Carter saw; the plaintiff was seated in position number one for both lineups.[15]
(Defs.' 56.1 ¶ 79; Pl.'s 56.1 Counterstatement ¶ 79.)

The Grand Jury indicted the plaintiff for two counts of Murder in the Second Degree, and one count of Criminal Possession of a Weapon in the Fourth Degree. (Defs.' 56.1 ¶ 80; Pl.'s 56.1 Counterstatement ¶ 80.)

### D. The Suppression Hearing

Prior to trial, the plaintiff's attorney, Kenneth Reiver, moved to suppress the lineup identifications and the plaintiff's post-arrest statements.[16] At a hearing held on three dates before the Honorable Steven Fisher, the State called Detective Gillen and ADA Antignani. Detective Gillen testified that on May 13, 1994, Linda Sanchez called the 101st Precinct, and said that the person who had been with James Abbott shortly before his murder was in front of 5132 Beach Channel Drive. (Sept. 9, 1994 Tr. 9:7–15.) The detectives, including Detective Gillen, arrived at the address and saw the plaintiff, who matched Sanchez's description, and was drinking a forty ounce beer. (Sept. 9, 1994 Tr. 9:7–10:3.)

The detectives put the plaintiff in the back seat of their car. (Sept. 9, 1994 Tr. 13:15–17.) The plaintiff was not handcuffed, but was "getting a little aggravated." (Sept. 9, 1994 Tr. 54:6–25.) One of the detectives said they would "overlook" the fact that the plaintiff was drinking beer "in front of the project," but that he had to come to the precinct. (Sept. 9, 1994 Tr. 54:20–25.) As they drove to the precinct, Detective Gillen attempted to get the plaintiff's pedigree information, and the plaintiff said, "This must be a mistake. Somebody must have accused me of

---

[15] The prosecutor also introduced a document entitled "Identification of Body," and James Abbott's death certificate, which indicated that he died from stab wounds to the torso with perforations of the lung, liver, and aorta. (Grand Jury Tr. 27:1–30:7.)
[16] Counsel's pre-trial motion to suppress physical evidence was denied without a hearing.

murdering somebody. Why would somebody accuse me of something I didn't do?"[17] (Sept. 9, 1994 Tr. 12:23–13:5, 52:13–53:6.) When they got to the precinct, Detective Gillen advised the plaintiff of his constitutional rights. (Sept. 9, 1994 Tr. 13:23–16:21.) The plaintiff said that he did not want to talk, refused to sign a form to that effect, and was put in a cell. (Sept. 9, 1994 Tr. 16:3–17:23.) Then the plaintiff started talking. (Sept. 9, 1994 Tr. 18:4–12.) He said that he woke up at 10:00 a.m. on the day of the murder, and was in C-Town with a friend. (Sept. 9, 1994 Tr. 18:22–19:9.) He also said that he saw the victim's body, covered by a sheet, in the street, and that he knew the victim and his family. (Sept. 9, 1994 Tr. 18:22–19:9.)

Detective Gillen arranged a lineup with five fillers.[18] (Sept. 9, 1994 Tr. 22:2–8, 33:2–5.) Because the plaintiff was the only one with short braids, Detective Gillen asked the plaintiff to push back his braids. (Sept. 9, 1994 Tr. 84:14–85:5.) The plaintiff chose the first seat.[19] (Sept. 9, 1994 Tr. 22:5–10.) Sanchez was the first to look at the lineup.[20] (Sept. 9, 1994 Tr. 22:19–23:2.) She stated that she recognized number one, the plaintiff, as "the guy who was with the victim in C-Town the day he got stabbed," and that the plaintiff was "the guy I called up on yesterday." (Sept. 9, 1994 Tr. 30:25–31:11.)

Carter viewed the lineup after Sanchez. (Sept. 9, 1994 Tr. 32:6–11.) He said that he wanted to get a closer look at the people in the lineup, so the detective asked that each participant step closer to the window. (Sept. 9, 1994 Tr. 60:18–61:11, 86:4–18.) Carter said that it was "either number one or number two," that he "thought it was number one," but that he was "also looking at number two." (Sept. 9, 1994 Tr. 33:18–34:21.) When they got outside of the lineup

---

[17] As noted above, the plaintiff denies making this statement.

[18] Carter was designated as "the male witness" in the transcript. The lineup could not take place until the day after the plaintiff was taken into custody, because Carter was in the hospital. (Sept. 9, 1994 Tr. 87:8–17.)

[19] The plaintiff disputes this, and says that he was directed to take the first seat. (Pl.'s Add. 56.1 ¶ 111.)

[20] Sanchez was designated in the transcript as "the female witness."

room, Carter said he was "99 percent sure it was number one," but "the hair is throwing me off." (Sept. 9, 1994 Tr. 85:9–14.) Carter was then taken to another room. (Sept. 9, 1994 Tr. 85:15–86:3.) He called the detective over and said that he thought it was "definitely number one," but that his hair was "shorter," and repeated that "the hair was just throwing [him] off." (Sept. 9, 1994 Tr. 34:14–21, 85:15–86:3.) Then he said that "it was definitely, without a doubt, number one." (Sept. 9, 1994 Tr. 34:14–21, 85:15–86:3.)

In addition to asking about the statements and the lineups, defense counsel questioned Detective Gillen about the caller who claimed to have overheard two men talking about the murder. (Sept. 9, 1994 Tr. 45:17–20.) Detective Gillen testified that he could not find the caller. (Sept. 9, 1994 Tr. 46:14–24.) He did not question the people that the caller had named because he did not have anyone to "verify" her information, and he did not want to compromise the investigation. (Sept. 9, 1994 Tr. 46:14–47:18.)

ADA Stephen Antignani testified that he was present in the room when both witnesses viewed the lineup, as was a sergeant. (Sept. 9, 1994 Tr. 94:24–95:6, 103:21–104:5.) While Carter was looking at the lineup, the participants were asked to step closer to the window. Carter said that he recognized "either one or two. I'm not sure," and that he saw "one or two stab the black guy on Beach Channel Drive between Beach 47 or Beach 48 Street." (Sept. 9, 1994 Tr. 104:24–105:11.) Less than five minutes after Carter looked at the lineup, ADA Antignani went to talk to him in order to schedule his grand jury testimony. (Sept. 9, 1994 Tr. 109:21–110:7.) Carter, who was "sort of apologetic," told the prosecutor that he "knew it was number one" who stabbed James Abbott, but that numbers one and two "resembled each other." (Sept. 9, 1994 Tr. 99:17–100:6, 124:22–125:18.) He explained that he was "positive" that it was number one, but that his hair was different on the day of the stabbing than it was at the lineup, and that the

16

plaintiff's braids were "looser" on the day of the murder.  (Sept. 9, 1994 Tr. 99:17–100:6, 113:7–19.)  ADA Antignani spoke to Carter before the grand jury presentation.  (Sept. 9, 1994 Tr. 100:11–25.)  Carter repeated what he said after the lineup: that numbers one and two "looked alike," but that he was "definite it was number one," but that he had "different hair on the date of the stabbing."  (Sept. 9, 1994 Tr. 100:11–25.)

Detective Gillen was recalled on September 20, 1994, and testified about the April 22, 1994 interview of Linda Sanchez.  At some point between the April 9 and April 22, 1994, Sanchez called Detective Solomeno, and said that she had some information about the homicide.  (Sept. 20, 1994 Tr. 8:8–13.)  During an April 22, 1994 interview of Sanchez, Detectives Solomeno and Gillen learned that she had seen Abbott in the supermarket at around 9:30 a.m. on the day that he was killed.  (Sept. 20, 1994 Tr. 9:10–10:9.)  She saw two black men get in line behind Abbott.  (Sept. 20, 1994 Tr. 9:10–10:9, 11:17–22.)  She described one man as 5'5", wearing a green jacket and green hat, with short braided hair.  (Sept. 20, 1994 Tr. 10:19–11:6.)  The other man was between 5'7" and 5'8".  (Sept. 20, 1994 Tr. 10:19–11:6.)

Before Abbott left the store, he spoke with the store manager.  (Sept. 20, 1994 Tr. 9:10–10:9.)  The two other men paid for their things and left.  (Sept. 20, 1994 Tr. 9:10–10:9.)  Sanchez saw them walk through the parking lot, towards Beach Channel Drive.  (Sept. 20, 1994 Tr. 9:10–10:9.)  About halfway across the parking lot, they stopped and looked back at the store.  (Sept. 20, 1994 Tr. 9:10–10:9.)  Abbott left the store, and walked in the same direction as the two men, towards the chicken store.  (Sept. 20, 1994 Tr. 9:10–10:9.)  Sanchez went out to retrieve some shopping carts; as she walked back towards the store, she looked back, but did not see Abbott or the two men.  (Sept. 20, 1994 Tr. 9:10–10:9.)  Sanchez told the detectives that she knew the men

from "coming into the store all the time," and that if she saw them again, or saw a photo of them, she would "definitely recognize them." (Sept. 20, 1994 Tr. 12:6–12.)

After both sides rested, the plaintiff's lawyer argued that the plaintiff's statements and both lineup identifications should be suppressed. (Sept. 20, 1994 Tr. 57:10–64:17.) He contended that the plaintiff was arrested without probable cause, that the lineup was unduly suggestive, and that ADA Antignani must have "suggested" to Carter that he should identify the plaintiff. (Sept. 20, 1994 Tr. 57:10–64:17.)

Judge Fisher credited the testimony of both witnesses; he found that the detectives had probable cause to arrest the plaintiff, that the lineup was not unduly suggestive, and that the plaintiff's statements were spontaneous.[21]  (Sept. 30, 1994 Tr. (ECF No. 182-1).)

### E.  Criminal Trial

The central issue in the plaintiff's trial was identification.  The witnesses for the prosecution included Detectives John Gillen and Michael Solomeno, Andrew Carter, Linda Sanchez, Veronica Walker, and Deborah Abbott, the victim's sister.  The plaintiff's stepfather testified for the defense.  I summarize the testimony of the relevant witnesses.

#### i.  Detective John Gillen

Detective John Gillen testified about his role in the investigation of James Abbott's murder and the arrest of the plaintiff.  On April 9, 1994, Detective Gillen and other detectives, including Detectives Michael Solomeno and Darren Lane, went to the scene of the stabbing; when they arrived, Abbott's body was still there.  (Trial Tr. 480:4–81:7.)  Detective Lane spoke to Andrew Carter, who lived in a nursing home.  (Trial Tr. 482:1–12.)  The detectives canvassed the area for witnesses.  (Trial Tr. 481:13–25.)  About a week later, on April 15, 1994, Detective

---

[21] As Judge Fisher was discussing Sanchez's familiarity with the plaintiff, the plaintiff interjected, "I live around there, she sees me come in the store all the time."  (Sept. 30, 1994 Tr. 12:25–13:2.)

Gillen got a call from a woman who identified herself as "Anna Simmons." (Trial Tr. 482:16–24.) She said that she overheard two men talking about a murder; she identified them as "Ishmel" and "Rodney Harris." (Trial Tr. 482:16–83:9.) Detective Solomeno checked precinct files, determined that Rodney Harris and Levon "Ishmel" Melvin had been arrested in the precinct, and got their arrest photographs. (Trial Tr. 483:7–22, 546:10–14.) He put together two photographic arrays, one containing Harris's photograph and the other containing Melvin's photograph, and showed them, separately, to Carter and Sanchez. (Trial Tr. 483:7–22, 484:2–6, 486:18–87:4.) Neither witness identified either Harris or Melvin. (Trial Tr. 486:22–24, 487:10–12.)

Detective Gillen tried to find the caller at both the home address that she gave and at her workplace. (Trial Tr. 490:9–91:15.) No one at either location knew who she was. (Trial Tr. 490:9–91:15.) He did not question or arrest Harris or Melvin because he had "nothing to arrest them for." (Trial Tr. 553:21–54:24.) He was "not going to approach a suspect and ask him questions about a homicide" when he could not verify whether the caller actually heard the statement. (Trial Tr. 553:21–54:24.) He did not believe that he had probable cause to arrest either man. (Trial Tr. 608:2–7.) Moreover, Detective Gillen was never able to verify that Anna Simmons existed. (Trial Tr. 490:9–91:15, 546:18–22, 605:3–6:10.)

Detective Gillen was with Detective Solomeno at an April 22, 1994 interview of Linda Sanchez. In that interview, she said that she recognized one of the men who was behind the victim in line as a regular C-Town customer. (Trial Tr. 565:9–14, 570:3–10.)

At about 6:00 p.m. on May 13, 1994, in response to a call to the precinct, detectives went to 5124 Beach Channel Drive. (Trial Tr. 491:16–92:12.) They stopped the plaintiff, who was wearing a bright yellow sweatshirt and dark pants tucked into Timberland boots, as described in

the call.  (Trial Tr. 493:7–17.)  He was also drinking a forty ounce beer.  (Trial Tr. 493:11–13.)  One of the detectives told him that they were arresting him for drinking a beer in public, and put him in the back seat of their car.  (Trial Tr. 493:14–94:15, 529:23–30:11.)  As Detective Gillen tried to get the plaintiff's pedigree information, but before any mention of James Abbott's murder, the plaintiff yelled, "This must be a case of mistaken identity.  Somebody probably accused me of murdering someone."  (Trial Tr. 494:23–95:3, 529:12–16, 599:15–22, 600:2–5.)  Detective Gillen wrote down what the plaintiff said in his spiral notebook, along with the notation "Statement made by defendant while being asked pedigree."  (Trial Tr. 535:24–36:1.)  Sometime later, the detective gave a copy of that notebook page to the prosecutor; he subsequently wrote, "spontaneous and unsolicited" on the original page, copied that page, and gave it to the prosecutor.  (Trial Tr. 535:24–40:4.)  Defense counsel had both versions at trial, and questioned Detective Gillen about them.  (Trial Tr. 535:24–40:4.)

When they arrived at the precinct, Detective Gillen advised the plaintiff of his constitutional rights; the plaintiff said that he did not want to answer questions.  (Trial Tr. 496:17–97:2, 531:18–20, 560:10–61:16.)  Detective Gillen put the plaintiff in a holding cell, and started filling out paperwork.  (Trial Tr. 497:14–16.)  The plaintiff told the detective that he was "there that day."  (Trial Tr. 499:2–501:25, 531:21–32:11.)  He said that in the afternoon, he and Terrell Lee walked from the C-Town and saw James Abbott's body in the street.  (Trial Tr. 499:2–501:25, 531:21–32:11.)  He added that he had known Abbott "his whole life," and saw him "all the time" when he went to C-Town to buy beer.  (Trial Tr. 499:2–501:25, 531:21–32:11.)

The next day, May 14, 1994, Detective Gillen put together a lineup with the plaintiff in seat number one, and five fillers.  (Trial Tr. 502:14–5:7.)  He asked the plaintiff to push his

braids back and to flatten them so that he would not stand out.  (Trial Tr. 510:9–19.)  Two

witnesses viewed the lineup: Linda Sanchez and Andrew Carter.  (Trial Tr. 504:8–12, 505:11–

12.)  Both witnesses identified the plaintiff, but Carter was hesitant.  (Trial Tr. 509:12–21.)

Carter said that "it was either one or two," and that he was not sure.  (Trial Tr. 628:7–9.)  Carter,

who was in a wheelchair, was having a difficult time seeing, and was trying to lift himself up.

(Trial Tr. 609:23–10:11.)  He asked that the participants step closer.  (Trial Tr. 627:22–28:6.)

After each participant stepped forward, Carter repeated that he was not sure, and that it was

either one or two.  (Trial Tr. 628:4–9.)

Detective Gillen also testified that at the suppression hearing, the plaintiff repeatedly

blurted out statements during the examination of witnesses, including "It wasn't me," "That's a

lie," and "He did not read me my rights."  (Trial Tr. 615:12–26:17.)

On cross examination, defense counsel established that the detectives had never found a

motive for the murder, nor any proof that the plaintiff had any relationship with the victim.[22]

(Trial Tr. 565:3–8.)

### ii.  Detective Michael Solomeno

Detective Michael Solomeno was originally the assigned detective on the case.  (Trial Tr.

791:8–11.)  He prepared the photographic arrays containing Rodney Harris' and Levon Melvin's

photographs, and was with Detective Gillen when they were shown to Linda Sanchez and

Andrew Carter.  (Trial Tr. 791:19–94:18.)  He interviewed Sanchez on April 22, 1994.  (Trial Tr.

794:24–95:2.)  Sanchez never told him that the plaintiff threatened her.  (Trial Tr. 795:3–5,

---

[22] Counsel asked the following question: "Did you ever learn that a former boyfriend had a confrontation with Mr. Abbott in reference to Mr. Abbott's present wife?  Did you ever learn that?"  (Trial Tr. 564:17–23.)  The prosecutor objected on the grounds that the question called for hearsay, and that it was "improperly phrased."  (Trial Tr. 564:24–65:1.)  The judge sustained the objection, and the defense attorney moved on to a different topic.  (Trial Tr. 565:2–8.)

803:14–17, 813:3–5.)  Shortly before Detective Solomeno's testimony, the victim's sister gave

him Veronica Walker's name and contact information.  (Trial Tr. 801:14–802:5.)  He

interviewed Walker on December 1, 1995, while the trial was underway.  (Trial Tr. 802:2–12,

807:4–8.)

### iii.  Linda Sanchez

Linda Sanchez was the next witness.[23]  (Trial Tr. 631:20–789:1.)  The prosecutor had

previously disclosed, without the jury present, that he had only recently learned from Sanchez

that about a week after the murder, the plaintiff came into C-Town, threatened her,[24] and warned

her not to talk.[25]  (Trial Tr. 520:3–21:12, 657:12–60:2.)  In addition, on the day she called the

police to report that the plaintiff was standing in front of 5132 Beach Channel Drive, the plaintiff

gestured and wagged his finger at her, which she took as a threat.  (Trial Tr. 660:3–14.)  The

prosecutor advised the court and counsel that his office was "mak[ing] efforts to relocate"

Sanchez and was "proceeding with relocation."  (Trial Tr. 520:14–21:12.)  He also said that for

four days they had given her $25.00 a day.  (Trial Tr. 520:14–21:12.)  Mr. Reiver protested that

it was "amazing that 18 months after this indictment . . . that I am advised after a trial starts that

there is some incident that allegedly concerns my client, and I submit to the court that this is

totally unfair and unethical.  I withdraw the unethical part.  It's unfair and highly prejudicial."

(Trial Tr. 521:13–22:2.)  After a hearing at which Sanchez testified, the court ruled, over defense

---

[23] ADA David Guy got a Material Witness Order to secure Sanchez's attendance at the trial.  (Pl.'s Ex. S (ECF No. 169 at ECF Page Nos. 10–11).)

[24] In a memorandum dated December 1, 1995, ADA Guy spelled out the details of the threat:

> The reason she needs to be relocated is that roughly one week after the incident in question, the defendant came back to her work location and, calling her a "fu**-ing bitch," he told her that she "knew" and that she was "next."

(Defs.' Ex. AA.)

[25] The plaintiff interjected, "I don't even know her."  (Trial Tr. 520:12.)

counsel's objections, that her testimony about the threats was relevant and admissible.[26] (Trial Tr. 700:25–01:3.)

In the presence of the jury, Sanchez testified that she was unemployed and on public assistance, and had eight month old twins. (Trial Tr. 633:11–22.) She was not staying at her home, but at a place where a detective had taken her. (Trial Tr. 634:18–35:4.) She was receiving money from the District Attorney's Office: $25 a day for her and her children, to cover the cost of items like food and diapers. (Trial Tr. 633:23–34:14.)

In April of 1994, Sanchez was a cashier at the C-Town at Beach Channel Drive and 49th Street in Far Rockaway, Queens. (Trial Tr. 635:5–17, 716:19–23.) On April 9, 1994, at around 9:30 a.m., James Abbott, who was a regular customer, was in another cashier's checkout line. (Trial Tr. 636:16–38:18, 641:8–21, 785:19–21.) Standing just behind him were the plaintiff and another man, buying beer. (Trial Tr. 641:8–25, 773:15–74:7.) The plaintiff was wearing a green camouflage jacket, and had "a lot of braids sticking up." (Trial Tr. 640:21–41:4, 729:19–22, 774:3–19.) He also had a green hat, which he removed when he came into the store. (Trial Tr. 640:21–23, 729:19–22, 734:15–22.) Sanchez recognized the plaintiff as a frequent customer. (Trial Tr. 642:8–12.) In addition, she had once lived near him, and used to see him "hanging out." (Trial Tr. 767:15–68:1.) The second man, who once sold Sanchez a packet of incense sticks, was light skinned and taller than the plaintiff. (Trial Tr. 730:1–14, 733:3–10, 777:15–19.) He was wearing glasses and had braids that were "going back." (Trial Tr. 753:22–24, 730:1–4, 773:23–74:10.)

---

[26] The hearing was held in the middle of Sanchez's direct examination, but before she gave any testimony about the threats. (Trial Tr. 661:1–700:24.)

Abbott stopped to talk to the store manager, later identified as Judeh.[27]  (Trial Tr. 754:10–17, 765:4–6.)  The plaintiff and the other man left the store; once outside, one of them turned to look back inside the store, and then both turned to the right.  (Trial Tr. 647:12–48:24, 649:12–50:10, 764:18–66:3, 768:19–25.)  Abbott left shortly thereafter, and also went to the right.[28]  (Trial Tr. 649:12–50:10, 768:19–25.)  At that point, Sanchez's boss told her to retrieve shopping carts from the store's parking lot.  (Trial Tr. 651:9–16, 755:19–56:5.)  When she went outside, she noticed that Abbott had passed the plaintiff and the other man, who were now "right behind" Abbott, near what had formerly been a chicken store.  (Trial Tr. 651:13–52:6.)

Sanchez did not speak to any of the police officers who subsequently came to the store.  (Trial Tr. 652:13–53:2, 744:7–11, 745:21–46:2, 763:18–22, 784:5–11.)  She did not find out that Abbott had been murdered until after the police left; her boss told her what happened.  (Trial Tr. 763:18–22, 784:16–85:5.)  Although the plaintiff had previously been an almost daily customer, Sanchez did not see him again until about a week later, when he approached her at her register and said, "You know, you know, you fucking bitch.  You're next."  (Trial Tr. 705:3–06:16, 747:12–16.)  Sanchez worked the rest of the day, and thought that she called the precinct the next day.  (Trial Tr. 706:20–07:9.)  She spoke to "a lady," and asked to be transferred to Detective Solomeno, whose name she had seen in a local newspaper article about Abbott's murder.  (Trial Tr. 707:10–20, 708:18–24, 741:10–48:10.)  No one picked up the telephone after her call was transferred.  (Trial Tr. 707:10–20, 708:18–24, 741:10–48:10.)

She spoke with detectives, including Detective Solomeno, on April 22, 1994.  (Trial Tr. 715:15–18, 750:25–51:7.)  She told them about what she saw in the store on the day of the

---

[27] Sanchez referred to him as "Jay Jay."  (Trial Tr. 754:10–17.)
[28] When the plaintiff left the store on other occasions, he headed to the left, in the direction of Edgemere Houses.  (Trial Tr. 650:11–23, 769:1–18.)

murder, but did not tell them about the plaintiff's threat to her a week after the murder. (Trial Tr. 749:9–20.) Detective Solomeno showed her two photographic arrays, but she did not recognize any of the people in the photographs. (Trial Tr. 715:15–16:10, 779:8–80:23.)

### iv. Andrew Carter

Andrew Carter, who had used a wheelchair since the 1980s, testified that on the morning of the murder, he was waiting for the bus on Beach Channel Drive and Beach 48th Street. (Trial Tr. 865:15–23.) Three men, one of whom he identified as the plaintiff, came toward him from C-Town, said hello, and walked "right past" him. (Trial Tr. 866:14–69:10.) One of the men, later identified as James Abbott, was carrying a C-Town shopping bag. (Trial Tr. 867:16–68:2.) The plaintiff, who was the shortest of the three men, stopped to light a "crack joint." (Trial Tr. 898:14–23.) Abbott went to use the payphone. (Trial Tr. 869:11–15.) Carter turned to look for the bus, and when he turned back, the plaintiff and the other man were "beating the hell" out of Abbott, "[k]icking him, boxing him." (Trial Tr. 869:13–70:2.) At one point, the plaintiff pulled out a "brass knuckle knife," and stabbed Abbott repeatedly. (Trial Tr. 869:18–70:2; Defs.' 56.1 ¶ 113; Pl.'s 56.1 Counterstatement ¶ 113.) Both the plaintiff and the other man kicked Abbott as he lay on the ground. (Trial Tr. 872:9–13.) When they were finished, they looked at Carter, turned around, and ran away. (Trial Tr. 872:9–13, 874:7–75:12.) Carter, shocked, went closer to where Abbott was lying, and "saw him take his last breath." (Trial Tr. 874:23–24; 875:17–21.)

On May 14, 1994, Carter viewed a lineup at the 101st Precinct, and identified "either one or two, because they got their hair different." (Trial Tr. 878:25–80:21.) After the lineup, he was put in another room. (Trial Tr. 881:4–7.) He told either the assistant district attorney or the detective that "it was either one or two because he had his hair different." (Trial Tr. 881:8–24, 883:18–84:8.) When asked whether he ultimately picked one or two from the lineup, Carter said

"Two."  (Trial Tr. 882:25–83:3.)  After Carter left the lineup room, he told Detective Gillen that he recognized the person in position number one; he could not be absolutely certain, but was 99 percent sure.  (Trial Tr. 884:11–19.)

Carter made an in-court identification of the plaintiff as the person who stabbed Abbott. (Trial Tr. 869:16–70:20; 871:6–14.)  He testified that he got a good look at the faces of Abbott's attackers, and that there was "no doubt" in his mind that the plaintiff was the one that stabbed the victim on the morning of April 9, 1994.  (Trial Tr. 872:14–20.)

### v. Veronica Walker

During the trial, ADA Guy advised the court and counsel that he had learned from Deborah Abbott, the victim's sister, that Veronica Walker had information about the homicide. (Defs.' 56.1 ¶ 117; Defs.' Ex. EE (ECF No. 157-31).)  The detectives interviewed Walker on December 1, 1995.  (Defs.' 56.1 ¶ 118; Pl.'s 56.1 Counterstatement ¶ 118.)  The parties dispute whether Walker gave the detectives the plaintiff's name, or as the plaintiff contends, the detectives said his name and showed her a photograph of the plaintiff.  (Defs.' 56.1 ¶ 119; Pl.'s 56.1 Counterstatement ¶ 119.)

Detective Solomeno prepared a DD5 that summarized his interview with Walker.  (Defs.' Ex. EE.)  According to that report, Walker drove to the C-Town on Beach Channel Drive on April 9, 1994, and saw James Abbott leaving the store.  (Defs.' Ex. EE.)  He greeted her, and walked away through the parking lot.  (Defs.' Ex. EE.)  Walker left the store after ten minutes. (Defs.' Ex. EE.)  As she drove out of the parking lot onto Beach Channel Drive, she saw Abbott hang up the payphone on the corner of Beach 48th Street.  (Defs.' Ex. EE.)  A black man dressed in dark clothing approached Abbott, and they started fighting.  (Defs.' Ex. EE.)  Walker drove past the two men, and then looked back and saw the plaintiff join the other man in kicking and

punching Abbott. (Defs.' Ex. EE.) Walker did not stop, and did not learn until later that a man was killed in that area; even then, she did not connect it with what she had seen. (Defs.' Ex. EE.) She did not tell anyone about these events until she saw Deborah Abbott in July of 1994.[29] (Defs.' Ex. EE.)

Walker was then called as a witness.[30] She testified that on April 9, 1994 at about 9:30 a.m., she went to C-Town. (Trial Tr. 996:11–97:1.) As she walked in, she saw James Abbott, whom she knew from the area, coming out of the store. (Trial Tr. 997:2–98:8.) They spoke briefly, and Walker went into the store. (Trial Tr. 997:2–98:8.) She left about five minutes later, and drove out of the parking lot to the corner. (Trial Tr. 997:2–98:21.) She saw James Abbott fighting with a black man on the right side of the street, near a telephone booth. (Defs.' 56.1 ¶ 126; Pl.'s 56.1 Counterstatement ¶ 126, Trial Tr. 998:25–1000:24.) She turned right onto Beach Channel Drive, and saw a man come from the other side of the street, run behind her car, and join the fight. (Defs.' 56.1 ¶¶ 127–28; Pl.'s 56.1 Counterstatement ¶¶ 127–28.)

Walker described this man as 5'6", slim, with his hair in braids. (Trial Tr. 1003:4–16.) She claimed that she did not recognize him, had never seen him before, and did not know his name.[31] (Trial Tr. 1002:22–1003:3.)

Walker recalled speaking with Detectives Gillen and Solomeno the Friday before her testimony, during which she mentioned the name "Kareem." (Trial Tr. 1003:22–4:4.) When asked if she told Detective Solomeno that the person who joined the fight looked like Kareem,

---

[29] It is undisputed that the plaintiff knew Veronica Walker. (Defs.' 56.1 ¶ 119; Pl.'s 56.1 Counterstatement ¶ 119.) Prior to 1994, she lived next door to the mother of the plaintiff's child and babysat his daughter. (Defs.' 56.1 ¶ 123; Pl.'s 56.1 Counterstatement ¶ 123.)

[30] As Walker entered the courtroom to testify, the plaintiff asked her, "Why are you doing this to me?" (Defs.' 56.1 ¶ 124; Pl.'s 56.1 Counterstatement ¶ 124.)

[31] In a hearing outside the presence of the jury, Walker testified that Detective Gillen started to take a photograph out of his pocket, but put it back, saying that he could not show it to her. (Trial Tr. 981:20–82:8, 989:13–16, 990:7–23.)

she responded, "I said it could have been him. It could have." (Trial Tr. 1005:13–5:16.) Walker did not identify the plaintiff at trial. (Pl.'s Add. 56.1 ¶ 284; Trial Tr. 1003:17–21.)

### vi. ADA Stephen Antignani

Assistant District Attorney Stephen Antignani testified that he was at the May 14, 1994 lineup at the 101st Precinct; one of his responsibilities was to "assist[] in . . . making sure that the lineup[s] [were] fair." (Defs.' 56.1 ¶ 141; Pl.'s 56.1 Counterstatement ¶ 141; Trial Tr. 948:9–20.) He made sure that the fillers resembled the plaintiff, and that the plaintiff had the chance to choose his position in the lineup. (Trial Tr. 948:9–20.) Linda Sanchez viewed the lineup around 7:30 p.m., and Andrew Carter viewed it at around 8:00 p.m. (Defs.' 56.1 ¶ 142; Pl.'s 56.1 Counterstatement ¶ 142.) Carter made statements during the lineup, and ADA Antignani spoke with Carter after the lineup.[32] (Defs.' 56.1 ¶ 143; Pl.'s 56.1 Counterstatement ¶ 143.)

### vii. Defense Case

The plaintiff's stepfather, Eugene Howard, testified that on the morning of the murder, the plaintiff went into the bathroom at around 9:00 a.m., and started watching television around 10:00 a.m. (Trial Tr. 1027:4–29:18.) The plaintiff left the apartment at around 10:15 or 10:20 a.m. (Trial Tr. 1029:9–13.) Howard saw the plaintiff again at around 11:00 a.m., just before Howard learned from his daughter and son-in-law that Abbott had been killed. (Trial Tr. 1027:4–29:18.)

### viii. Summations

Defense counsel began his summation by reminding the jury that the People had the burden to prove the plaintiff's guilt beyond a reasonable doubt, including disproving his alibi. (Trial Tr. 1075:5–17, 1104:10–23.) He then went through the testimony of the main witnesses,

---

[32] The court did not permit ADA Antignani to testify about the substance of that conversation. (Trial Tr. 950:3–59:4.)

beginning with Linda Sanchez, whose testimony he attacked as "simply not true," "not credible," "illogical, fl[ying] in the face of common sense," and "rather strange." (Trial Tr. 1076:18–1084:5.) He assigned two motives to her: a desire to have "her 15 minutes of fame," and to get paid by the District Attorney's Office. (Trial Tr. 1086:8–87:2.)

He also addressed Andrew Carter's testimony; he conceded that Carter had no motive to lie, but attacked his identifications as unreliable. (Trial Tr. 1087:9–1090:12.) He dismissed the lineup identification as mistaken, and reminded the jurors that Carter had wavered between the plaintiff and the filler in the number two position. (Trial Tr. 1087:9–1090:12.) He also pointed out Carter's testimony that he had selected the filler in the second seat. (Trial Tr. 1087:9–1090:12.) As for Carter's in-court identification of the plaintiff, counsel posited that Carter identified him because, "Who else is sitting at that counsel table? A white lawyer, a district attorney, white court officers and Mr. Bellamy, a black man," and that Carter did not have to be a "rocket scientist to know" whom he was supposed to identify. (Trial Tr. 1099:3–18.) Counsel also dismissed Veronica Walker's testimony as insufficient to establish the plaintiff's guilt. (Trial Tr. 1091:3–93:9.)

Counsel underscored what he argued were deficiencies in the police investigation, which he characterized as a "rush to judgment." (Trial Tr. 1099:21–25.) He argued that the detectives should have done a more robust investigation of Rodney Harris and Ishmel Melvin, whom the "Anna Simmons" caller had identified. (Trial Tr. 1100:2–2:11.) He dismissed Detective Gillen's notes about the plaintiff's statements, and pointed out that the detective had added additional notes long after the original report. (Trial Tr. 1097:2–98:2.) Counsel also argued that the lineup was unduly suggestive. (Trial Tr. 1098:18–99:2.)

Counsel urged the jury to accept the alibi proffered by the plaintiff's stepfather, and went through all the reasons why the jurors should credit it.  (Trial Tr. 1103:14–04:23.)  And, defense counsel pointed out that the evidence did not establish that the plaintiff had any motive to kill James Abbott.  (Trial Tr. 1103:4–13.)

Assistant District Attorney Guy began his summation by telling the jury that the nature and location of James Abbott's wounds demonstrated that his killer intended to kill him, and thus "clearly this was a case of intentional murder."  (Trial Tr. 1110:20–11:22.)  Accordingly, the prosecutor argued, the "one question" for the jurors was whether they were satisfied beyond a reasonable doubt that the plaintiff was the killer.  (Trial Tr. 1111:20–12:2.)  Next, the prosecutor explained that the judge would instruct the jury that "we all have to be concerned to make sure that the right man is on trial, and the judge, of course, is absolutely right.  That's as it should be.  That's why we are all here."  (1112:3–9.)

In the course of reviewing Andrew Carter's testimony, the prosecutor responded to defense counsel's argument that Carter identified the plaintiff in court only because he was the sole black man at the defense table, by arguing that the case was not about race, since the deceased was also black, but about "identification" and "recognition."  (1117:14–20.)

At another point in his summation, the prosecutor discussed Carter's testimony that at the lineup he selected the person in position number two:

> Mr. Carter told you when he testified in this courtroom that when he saw the lineup he picked either one or two.  He wasn't sure, and that in the next room he spoke with the detectives, and when I asked him on the stand about that conversation he told you he picked out number two, and I showed him the lineup photos and he is still stuck with number two but you know he didn't pick out number two.  Number two isn't sitting over there.  Number one is sitting over there.

(1135:8–20.)  The prosecutor also pointed out that the plaintiff, unlike the filler in the second seat, had braids.  (1135:21–36:4.)  The prosecutor argued that Carter made a mistake when he testified that he selected number two.

> We all make mistakes, but that doesn't mean that when he said I picked out number two that in fact when he viewed the lineup he picked out number two and you don't have to take my word.  Common sense will tell you that.  It's the defendant, number one, who is on trial, not some filler in a lineup.

(1137:13–19.)  ADA Guy also referenced ADA Antignani's testimony that when Carter first viewed the lineup, he "said that it was either one or two, he couldn't be sure," and that after the lineup, Carter said, "I am ninety-nine percent sure it was definitely number one;" the prosecutor then cited Carter's statement that it was the "difference in the hairstyle" that confused him.  (1137:20–38:6.)  From there, ADA Guy argued that the evidence showed the lineup was fair.  (1138:8–22.)

ADA Guy also reviewed Linda Sanchez's testimony, and argued that she had no motive to lie, that her identification of the plaintiff was reliable, and that her testimony was corroborated by other evidence.  (Trial Tr. 1118:4–21:11, 1138:23–44:20.)

In addition to the testimony of Carter and Sanchez, the prosecutor discussed the plaintiff's statements to Detective Gillen and the plaintiff's various outbursts during the proceedings.  (Trial Tr. 1129:5–17.)  In another portion of the summation, ADA Guy addressed the plaintiff's alibi defense: "People hear the word alibi and put a negative connotation on it.  That wouldn't be fair to the defendant.  Alibi means evidence that at the time of the crime you were somewhere else. . . .  Alibi is not a dirty word."  (Trial Tr. 1125:12–26:10.)

The prosecutor pointed out that the plaintiff's alibi witness was his stepfather, who was "forthright enough to tell you that he loves his son, his stepson very much; that he would do almost anything for his stepson.  He would go into a burning building to save his stepson.  All of

these are commendable things." (Trial Tr. 1125:19–26:9.) The prosecutor urged the jury to "test [the witness's] testimony in the context of all his testimony" and to consider the witness' criminal conviction. (Trial Tr. 1126:10–27:23.) In addition, ADA Guy reminded the jury that the plaintiff had spoken to his stepfather about seeing Abbott's body, and argued that there were inconsistencies between what the plaintiff told his stepfather and what the first officer on the scene said about how long the victim's body was at the scene. (Trial Tr. 1128:9–29:4.) The prosecutor asked, "Why do you suppose he makes such a point of trying to say he left at ten o'clock?" (Trial Tr. 1129:5–17.)

At this point, defense counsel registered a general objection, which the trial judge "noted;" she then instructed the jurors that they were "the judges of the facts," and should "determine whether a witness told the truth or not the truth." She admonished the prosecutor, "Please, Mr. Guy, fair comment," to which the prosecutor replied, "I believe this is, Judge."[33] (Trial Tr. 1129:18–30:1.)

ADA Guy went on to discuss the importance of the time of the murder, and also argued that the alibi witness corroborated Linda Sanchez's testimony that the plaintiff was a customer at C-Town. (Trial Tr. 1130:2–31:1.)

The prosecutor rebutted defense counsel's "rush to judgment" arguments (Trial Tr. 1131:2–32:18), and also commented on the question of motive:

> Defense attorney candidly told you that the judge will tell you that the [P]eople are under no obligation to prove motive . . . that proof of motive or proof of the lack of motive are factors you are entitled to consider, but there is not proof of either one in this case. So why is he asking you to consider that? Where is there proof of motive? There is none. Where is there proof defendant had no motive to kill somebody? I submit there is no proof that he had no motive. Maybe a bit of double negative but that doesn't mean he had no motive. We may not know what his motive was. We don't have to know what

---

[33] While counsel made two other general objections, he did not object to any of the comments the plaintiff now challenges. (Trial Tr. 1127:24–25, 1143:23–44:4.)

his motive was.  What's sufficient is to know who did it, how he did it, and to know the results, and that we know absolutely beyond any doubt at all.

(1132:19–33:12.)  In the final portion of his closing remarks, ADA Guy made the following comments:

I know who committed the murder.[34]  You know it was an intentional murder and you and you know there's no rational explanation for why so many people are pointing their fingers at the guy just like the needle of the compass unless he is in fact the right man.

(Trial Tr. 1149:12–17.)  The prosecutor urged the jurors to consider all of defense counsel's arguments, because he was "entitled to that," and that the People were also entitled to a review of their arguments.  (Trial Tr. 1149:17–20.)  He expressed his confidence that the jury would come to "rational findings of fact not based on emotion, not based on rhetoric, but based on common sense, logic, and evidence," and argued that the evidence pointed to "a verdict of guilty, guilty as proven and guilty as charged."  (Trial Tr. 1149:21–50:2.)  ADA Guy concluded: "When the defendant asked why would someone be accusing me of murder, by your verdict you can answer his question.  Because you are the murderer.  It's because the evidence shows that you are a murderer, and that you are not going to get away with it, not this time."  (Trial Tr. 1150:4–9.)  He asked the jury, "in the interest of justice" to find the plaintiff guilty.  (Trial Tr. 1150:10–13.)

### ix.  The Court's Charge and the Verdict

The trial judge charged the jury, and included the standard charges on the burden of proof and the presumption of innocence.  (Trial Tr. 1159:25–64:10.)  The judge said that the lawyers' arguments were "not evidence," and that the jurors were the "exclusive . . . judges of the facts."  (Trial Tr. 1073:23–25, 1156:16–57:3.)  The judge described the difference between intent and motive, and charged that while the prosecutor had to prove intent, he did not have to prove that

---

[34] The defendants argue, and the ADA testified at his deposition, that this sentence was a transcription error, and that the context of the argument makes it obvious that the prosecutor must have said, "You know who committed the murder."  (Guy Dep. Tr. 232:9–23.)

the plaintiff had a motive to commit the crime. (Trial Tr. 1175:12–76:13.) Nevertheless, the court explained, the jury could consider the evidence of motive or the lack of a motive in deciding whether the plaintiff was guilty. (Trial Tr. 1175:12–76:13.) She also gave an expanded charge on identification, including an admonition that "judges, the prosecutors, the defense, and you the jury must be deeply concerned that no mistaken identification should result in conviction and punishment of the wrong man or a defendant who is innocent of the crime." (Trial Tr. 1179:11–19.) The judge submitted, in the alternative, two counts of second degree murder—intentional and depraved indifference—as well as the lesser included offense of intentional murder—first degree manslaughter—and fourth degree criminal possession of a weapon, a misdemeanor.[35] (Trial Tr. 1182:24–85:7.)

The jury deliberated over the course of three days, during which they requested and received read-back of witnesses' testimony, including Carter's and Sanchez's, as well as items of physical evidence. (Trial Tr. 1208:13–25:16.) At one point, they sent a note that they were unable to reach a verdict. The judge gave an *Allen* charge, and the jury resumed deliberations, requesting additional testimony and evidence. (Trial Tr. 1215:18–18:14, 1221:24–26:12.)

The jury reached a verdict on December 13, 1995; they convicted the plaintiff of depraved indifference murder and criminal possession of a weapon, and acquitted him of intentional murder. (Defs.' 56.1 ¶ 159; Pl.'s 56.1 Counterstatement ¶ 159; Trial Tr. 1226:1–29:15.)

---

[35] Defense counsel also asked that the court submit Manslaughter in the Second Degree, a lesser included offense of depraved indifference murder. (Trial Tr. 1203:14–17.) The judge declined, as there was no reasonable view of the evidence to support that charge. (Trial Tr. 1203:14–5:13.)

### F. Post-Conviction

The plaintiff appealed his conviction to the Appellate Division, Second Department, claiming that his guilt was not proved beyond a reasonable doubt, that Detective Gillen gave misleading testimony about the circumstances of the plaintiff's post-arrest statements, that defense counsel was ineffective, and that the plaintiff's statements and the identifications should have been suppressed. (Defs.' 56.1 ¶¶ 160–61; Pl.'s 56.1 Counterstatement ¶¶ 160–61; Defs.' Ex. JJ (ECF No. 157-36).) The Appellate Division affirmed the plaintiff's conviction, *People v. Bellamy*, 247 A.D.2d 399 (N.Y. A.D. 2d Dep't 1998), and the Court of Appeals denied the plaintiff's application for leave to appeal. *People v. Bellamy*, 91 N.Y.2d 970 (1998).

The plaintiff's petition for a writ of habeas corpus in this District focused on the circumstances surrounding his alibi and the statement he made to Detective Gillen at the precinct; the plaintiff claimed that his attorney was ineffective for failing to cross examine Detective Gillen about a perceived discrepancy in his testimony about the plaintiff's statement, and that the prosecutor should have corrected the detective's testimony. (Defs.' 56.1 ¶¶ 164–65; Pl.'s 56.1 Counterstatement ¶¶ 164–65; Defs. Ex. KK (ECF No. 157-37).) The Honorable Charles P. Sifton denied the petition.[36] (Defs.' 56.1 ¶ 166; Pl.'s 56.1 Counterstatement ¶ 166.) The certificate of appealability was denied and the appeal dismissed. (Defs.' 56.1 ¶ 167; Pl.'s 56.1 Counterstatement ¶ 167.)

### G. First 440 Hearing

The plaintiff moved to vacate the judgment against him pursuant to New York Criminal Procedure Law Section 440.10. (Defs.' 56.1 ¶ 169; Pl.'s 56.1 Counterstatement ¶ 169.) The plaintiff's lawyer, Thomas Hoffman,[37] argued that "[w]itnesses were found who were threatened

---

[36] That habeas petition was captioned as *Bellamy v. Portuondo, et al.*, No. 1:99-cv-01832-CPS (EDNY 1999).

[37] The law firm of Cravath, Swaine, & Moore was "co-equal co-counsel." (Pl.'s 56.1 Counterstatement ¶ 171.)

to testify in a certain way and in one case threatened and frightened into not testifying at all," that police officers circumvented proper police procedures, and that an "innocent man is shackled before [the court] today." (Defs.' 56.1 ¶ 171; Pl.'s 56.1 Counterstatement ¶ 171; 440 Tr. 6:25–9:25.[38]) Between March 5, 2007 and March 12, 2008, Judge Joel Blumenfeld heard evidence in connection with the plaintiff's initial 440 application. While thirteen witnesses testified in the first set of 440 hearings, I summarize below only those relevant to this action.

### i. Andrew Carter

Andrew Carter testified that his identification of the plaintiff as the man who stabbed James Abbott was false, and that he identified the plaintiff only because he feared some sort of reprisal from Detective Gillen. (440 Tr. 193:10–20.) While the detective never threatened him, Carter nonetheless feared him because he was "crooked." (440 Tr. 160:7–12, 178:16–21, 194:1–17, 198:12–99:11.) Throughout the hearing, Carter repeatedly claimed not to remember what he had said during different interviews or at trial, even when shown transcripts of his testimony. (*See, e.g.*, 440 Tr. 158:9–62:18.)

Nevertheless, Carter did confirm some of his trial testimony. He testified that on the morning of April 9, 1994, he was waiting at the bus stop on Beach Channel Drive. (440 Tr. 135:10–12.) Three men, including James Abbott, walked by and greeted him. (440 Tr. 135:15–20.) At their closest point, they were approximately eight feet away from him. (440 Tr. 150:6–10.) He also saw them coming back from C-Town. (440 Tr. 149:10–25.) James Abbott went to the payphone. (440 Tr. 135:15–20.) At some point, however, the other two men started kicking and beating him. (440 Tr. 136:4–10; 151:1–8.) The smaller of the two men pulled what Carter said was a "knuckle knife" and stabbed the victim multiple times. (440 Tr. 136:4–10; 151:9–19;

---

[38] The transcript of the proceedings begins numbering anew at "1" on July 9, 2007. Unless otherwise indicated, the page numbers listed after "440. Tr." refer to testimony taken prior to July 9, 2007.

155:21–56:5.)  The men looked at Carter, and he looked back at them.[39]  (440 Tr. 136:4–10; 153:24–154:6.)  They then ran down Beach 48th Street.  (440 Tr. 136:4–10, 157:9–24.)  Although Carter said he did not remember being interviewed by Detective Lane on the day of the murder, he did remember looking through photographs, and that he did not identify anyone.  (440 Tr. 159:9–63:4.)

Carter claimed that at some point, Detective Gillen and another detective came to his residence.  (440 Tr. 139:19–140:6.)  Carter had been smoking crack cocaine with a woman, and spoke to the detectives outside the door.  (440 Tr. 139:19–140:6.)  Detective Gillen offered to take Carter and the woman to a motel, and said that he would "go rip off some drug dealers and go get [Carter and the woman] some drugs."  (440 Tr. 139:19–140:6.)  Carter declined, saying, "No, thank you."  (440 Tr. 140:7–140:12.)

About a month later, Detective Gillen returned with another detective to take Carter to view a lineup.[40]  (440 Tr. 140:15–41:15.)  Carter asked the detective how he apprehended the killer.  (440 Tr. 140:15–41:15.)  Carter claimed that Detective Gillen replied that the killer was "bragging about the murder, drinking 40s out in front of the building."  (440 Tr. 140:15–41:15.)  Detective Gillen added that the suspect had "changed his appearance," and cut his hair.  (440 Tr. 144:10–45:4.)  Once at the precinct, Detective Gillen took Carter into a room; a female uniformed police officer was in the room, as was another person.[41]  (440 Tr. 142:11–19, 182:24–84:9.)  As Carter looked at the lineup, Detective Gillen pointed directly at the plaintiff, making no effort to conceal what he was doing from the other two people in the room.  (440 Tr. 142:20–

---

[39] Carter did not remember telling the jury that he "got a good look" at the men's faces.  (440 Tr. 154:5–55:16.)

[40] At the trial, Carter testified that he did not remember the names of the detectives who took him to the lineup.  (440 Tr. 180:18–81:6.)

[41] The record, including depositions and testimony from the trial and hearings, demonstrates that ADA Antignani was in the lineup room.

143:11; 184:24–185:18.)  He asked if Carter recognized anyone, and Carter first said either number one or number two.  (440 Tr. 188:12–14.)  Carter then said, "Number 1," (440 Tr. 186:13–19.)  Detective Gillen also asked from where Carter recognized number one, and he answered, "[F]rom the corner . . . where the stabbing took place."  (440 Tr. 187:5–10.)  Then, even though Detective Gillen pointed at number one, Carter signed a form to the effect that "it was either Number 1 or Number 2," and that he was not sure.  (440 Tr. 189:25–90:9.)  Carter did not remember speaking with ADA Antignani.  (440 Tr. 190:24–91:17.)

Later, when Detective Gillen drove Carter to the court to testify, Carter told Detective Gillen that he was not sure if he could identify the killer.  (440 Tr. 145:23–46:18.)  Detective Gillen said that "he wanted to get this case off the docket."  (440 Tr. 145:23–46:18.)

Although Carter conceded that he told Detective Gillen the killer was either one or two, he also claimed that he identified the person in the first position because he was "quite afraid" of what Detective Gillen would do to him and his family.  (440 Tr. 193:10–20.)  He also remembered testifying before the grand jury that he saw the plaintiff stab the victim, but claimed that he was lying because Detective Gillen put "fright in my heart for being so crooked," and "was so crooked when he offered me crack.  To take me and my girl to the motel.  He's pointing the man out.  He's telling before what he look like.  He telling how -- he told me where they caught him and what they were doing and everything."  (440 Tr. 198:22–199:11.)

Carter admitted that he met privately with ADA Guy, and never told him what Detective Gillen had supposedly done.  (440 Tr. 201:1–23.)  Carter also remembered testifying at the trial that he had no doubt that the plaintiff was the stabber, but claimed that the testimony was untrue.  (440 Tr. 204:6–18.)

Carter claimed that he had wanted to "get this off [his] chest for a long time," and that he was "relieved" that "the truth can come out." (440 Tr. 206:13–25.) The plaintiff's investigators met with him in 2005, which Carter agreed would have been the "perfect opportunity" for him to "unburden" himself about the "great injustice" he had committed. (440 Tr. 207:5–09:6.) Carter did not remember telling the plaintiff's investigator at that first meeting that he was "positive" that the plaintiff killed James Abbott. (440 Tr. 207:5–10:8.)

Sometime between November and December of 2005, Carter asked defense investigators whether he would be reimbursed for his "time."[42] (440 Tr. 212:3–14.) According to him, the plaintiff's team of lawyers and investigators proposed paying him $90 an hour.[43] (440 Tr. 213:23–214:2.) Over the course of almost a month, the plaintiff's team paid Carter $1350 in cash on three separate occasions.[44] (440 Tr. 213:20–22; 216:18–17:5; 227:10–11.)

Mr. Hoffman later explained to Judge Blumenfeld that he had actually negotiated a fee with Carter: "We did extensive analysis . . . before we actually paid the money to Mr. Carter, and we determined that we had to kind of negotiate with him, get him down to the lowest price possible for what he was demanding." (March 3, 2008 440 Tr. 426:1–12.)

### i. Defense Investigator Donald Barclay

Donald Barclay, a private investigator hired by Cravath, Swaine & Moore, testified that he first interviewed Andrew Carter on May 24, 2005 in the courtyard of the nursing home where Carter lived. (Defs.' 56.1 ¶ 189; Pl.'s 56.1 Counterstatement ¶ 189.) Barclay told Carter that he

---

[42] Carter met with the plaintiff's investigators and lawyers on different occasions in 2005 and signed two affidavits. (440 Tr. 168:4–13.)

[43] Carter had used a wheelchair since being shot by police in 1983 while committing an armed robbery. (440 Tr. 177:8–178:2.) Carter was unemployed and receiving about fifty dollars a month. (440 Tr. 212:24–213:7.)

[44] Each time, the firm had a car take Carter to and from meetings with the plaintiff's team. On November 5, 2011, he got $500, on November 17th, he got $580, and on December 2nd, he received $270 after signing the second affidavit. (440 Tr. 222:17–227:11.)

worked for the plaintiff's attorneys, but did not raise the issue of money.  (Defs.' 56.1 ¶ 190; Pl.'s 56.1 Counterstatement ¶ 190.)

Carter told Barclay that he remembered the murder well, that it was "not something that you forget."  (Defs.' 56.1 ¶ 191; 440 Tr. 1228:8–11.)  He was "positive" that the plaintiff was the killer, and there was "no doubt in his mind."  (Defs.' 56.1 ¶ 191; 440 Tr. 1228:12–21, 1234:17–24.)  He also offered to take a lie detector test.[45]  (Defs.' 56.1 ¶ 191; 440 Tr. 1228:22–25, 1234:17–24.)  According to the investigator, Carter told him that the police had "bugged the hell out of him," and the lineup "did not seem right."   (Pl.'s 56.1 ¶ 191; 440 Tr. 1234:9–13.)  Nevertheless, Carter asserted that he recognized the plaintiff as the killer when he testified at trial.  (Defs.' 56.1 ¶ 191; 440 Tr. 1228:17–21.)

In November of 2005, the plaintiff's counsel directed their investigator to contact Carter again.  (Defs.' 56.1 ¶ 192; 440 Tr. 1229:4–15.)  Barclay said that when he contacted Carter, Carter raised the issue of money:

> He brought up the fact that he had expenses, that was the term that he used.  He had expenses.  And he also brought up the fact that another witness had been -- that he had heard that another witness was compensated for her expenses.  So I asked him what he wanted.  He said that he wanted money.

(Pl.'s 56.1 ¶ 192; 440 Tr. 1231:2–24.)  After this discussion, there were three subsequent meetings for which the plaintiff's counsel compensated Carter for his time.[46]  (Defs.' 56.1 ¶ 193; Pl.'s 56.1 Counterstatement ¶ 193.)

---

[45] At the hearing, Judge Blumenfeld asked Carter if he would take a lie detector test.  Carter replied, "No, I'm not. It's no reason to." [sic] (440 Tr. 219:7–14.)

[46] The plaintiff maintains that Cravath paid Carter only after consulting a legal ethicist, and with full disclosure to the District Attorney's Office.  (Pl.'s 56.1 Counterstatement ¶ 193.)

### ii. Linda Sanchez

Thomas Hoffman met with Linda Sanchez before her testimony at the hearing.[47]  (440 Tr. 482:14–17.)  Mr. Hoffman told her a number of things: that she had made a mistake in identifying the plaintiff at the criminal trial, that Mr. Hoffman knew who the real killer was, and that the police also knew the identity of the real killer.  (440 Tr. 482:14–84:3.)  He told her that she should say something different than what she had said previously.  (440 Tr. 482:14–84:3.)  He also told her that Andrew Carter had asked the plaintiff's forgiveness.  (440 Tr. 483:20–25.)  In addition, Mr. Hoffman told her that she was confused about the date on which the murder occurred.  (440 Tr. 490:5–91:7.)  He told her that he was looking for "justice" and the "truth."  (440 Tr. 492:4–9.)  Sanchez asked, "What is in it for me?  What am I getting?"  Mr. Hoffman asked what she wanted, and she replied, "The only thing I want is just peace."[48]  (440 Tr. 485:16–86:3.)

Linda Sanchez's testimony was largely consistent with her trial testimony.  She confirmed that she knew the plaintiff from the area, that he was a frequent customer at C-Town, and that he and another man were in the store with James Abbott on the day of the murder.[49]  (440 Tr. 473:7–74:1, 477:3–6.)  She also testified that she initially told detectives that she did not see anything, because she had not seen the murder.  (440 Tr. 474:8–75:1.)  In fact, at the point when detectives were asking questions, she did not yet know that Abbott had been murdered; her supervisor, "JJ," told her about the murder after the police left.[50]  (440 Tr. 492:19–93:9, 494:5–

---

[47] Before Sanchez testified, the judge advised the parties that a lawyer for Sanchez reported that she had "a lot of fear" about testifying.  (440 Tr. 295:7–12.)

[48] At some point, one of the plaintiff's lawyers also let her know that the plaintiff's sister had seen her with her children.  (440 Tr. 486:6–87:10.)

[49] The plaintiff argues that Sanchez actually saw the plaintiff on Sunday, not Saturday, and that detectives concealed this from the plaintiff's trial lawyer.  While Sanchez did say at one point that the events occurred on a Sunday, she made it clear that she made her observations on the day of the murder.  (440 Tr. 473:7–74:1, 477:3–6.)

[50] At her deposition, Sanchez said that "JJ" told her "to keep [her] mouth shut" about what she had seen.  (Sanchez Dep. Tr. 136:15–37:1.)

95:1.) As she did at the trial, she testified that the plaintiff came into the store shortly after the murder and threatened her. (440 Tr. 481:4–8.)

Sanchez's testimony about being relocated prior to trial was also consistent.[51] She clarified that she did not want to move, but that investigators told her she had to be relocated for her safety. (July 27, 2007 440 Tr. 319:7–21:7.) She also testified that after the trial she researched Section 8 housing on her own, and obtained it for herself. (July 27, 2007 440 Tr. 305:3–15, 313:17–25.)

Detectives took her to view the lineup, at which she identified the plaintiff. (440 Tr. 461:25–62:4.) They also picked her up before her grand jury testimony. (440 Tr. 462:14–16.) The only conversation she had with them was about "the guy in the wheelchair," presumably Andrew Carter. (440 Tr. 463:9–25.) One detective said he "need[ed]" her "help" because "they were having problems with the guy with the wheelchair." (440 Tr. 463:9–64:18.) No detectives ever threatened her or told her whom to identify.

### iii. ADA Stephen Antignani

Assistant District Attorney Stephen Antignani testified that he went to the 101st Precinct on May 14, 1994, and was present for the lineup involving the plaintiff. (Defs.' 56.1 ¶ 184; Pl.'s 56.1 Counterstatement ¶ 184.) He was in the viewing room with Detective Gillen and a sergeant from another precinct when Linda Sanchez looked at the lineup, and did not see any officer suggest to Sanchez that she should identify a specific person in the lineup. (Defs.' 56.1 ¶ 186; Pl.'s 56.1 Counterstatement ¶ 186.)

---

[51] At her deposition, Sanchez gave additional detail about the circumstances surrounding the relocation. At the time of the trial, Rakeem Reilly, the father of her children, and a drug dealer who knew the plaintiff, called her a "rat," and threatened to "rat [her] out" to the plaintiff and his friends; Reilly also wanted her to tell him "what's going on" and that he needed "some explanation to do in the streets," because "everybody from the neighborhood knew what happened." (Sanchez Dep. Tr. 119:6–120:4, 132:1–33:7.) She did not want to move, but was "very scared," because she had infant twins. (Sanchez Dep. Tr. 70:16–23, 115:4–16:2.)

He was also in the viewing room with Detective Gillen and the sergeant when Andrew Carter looked at the lineup, and did not hear or see any police officer suggest whom Carter should identify. (Defs.' 56.1 ¶ 187; Pl.'s 56.1 Counterstatement ¶ 187.) According to ADA Antignani, Carter looked at the lineup and said that it was either the person in position one or in position two who stabbed Abbott. (Defs.' 56.1 ¶ 185; Pl.'s 56.1 Counterstatement ¶ 185.)

After the lineup, Detective Gillen escorted Carter from the lineup room. (440 Tr. 1135:8–21.) About five minutes later, ADA Antignani met with Carter, who said that he was certain that the attacker was the person in position number one, but that his hair was different. (Defs.' 56.1 ¶ 185; Pl.'s 56.1 Counterstatement ¶ 185; 440 Tr. 1135:8–1136:5.)

### iv. Michael Green

Michael Green, an unemployed convicted felon, testified that he knew Levon Melvin, was the godfather to Melvin's children, and worked for him as a house cleaner. (Feb. 13, 2008 440 Tr. 7:19–9:10, 32:13–33:15, 35:24–36:4.) Green claimed that sometime between August and November of 2007, he and Melvin were driving to a work site, when Melvin told him that he was angry at Rodney Harris for talking to detectives about a murder that happened "14 years ago." (Feb. 13, 2008 440 Tr. 10:12–11:18.) Melvin went on to say that he killed a man who was "messing with his girl," Yolanda Doves.[52] (Feb. 13, 2008 440 Tr. 15:5–16:10, 55:8–56:15.) According to Green, Melvin said that one afternoon fourteen years ago, he and Harris were driving a truck and saw Abbott on the street in Far Rockaway. (Feb. 13, 2008 440 Tr. 15:5–16:10, 47:14–48:4.) They stopped, argued with him, and Melvin stabbed him. (Feb. 13, 2008 440 Tr. 15:5–16:10, 48:5–12.) He and Harris also kicked and beat Abbott, and then drove away. (Feb. 13, 2008 440 Tr. 15:5–16:10, 48:5–21.)

---

[52] On cross examination, Green admitted that Melvin did not name James Abbott. (Feb. 13, 2008 440 Tr. 42:3–44:2, 49:3–50:12.) One of the plaintiff's investigators gave Abbott's name to Green. (Feb. 13, 2008 440 Tr. 49:3–50:12.)

Green had been close with Melvin for years, but Melvin had never before mentioned that he had murdered someone.  (Feb. 13, 2008 440 Tr. 57:6–61:18.)  Although Green was a police informant in the 101st Precinct at the time, he did not tell any of his contacts about this conversation.  (Feb. 13, 2008 440 Tr. 51:9–53:3, 54:16–55:7.)  Some months later, Green saw one of the plaintiff's investigators, retired detective Ed Henson, in Far Rockaway.  (Feb. 13, 2008 440 Tr. 17:23–18:20, 36:20–37:8.)  Henson told him that he was investigating the murder of James Abbott; Green said that he had information on the murder, and shortly thereafter, told Henson and another investigator what Melvin supposedly told him.  (Feb. 13, 2008 440 Tr. 17:23–18:20.)  After that, he gave a deposition to the plaintiff's team.  (Feb. 13, 2008 440 Tr. 38:17–39:4.)

Green also gave a statement to ADA Brad Leventhal.  (Feb. 13, 2008 440 Tr. 21:16–22:10.)  During that interview, Green agreed to be "wired up," and to attempt to get Melvin's statement on tape.  (Feb. 13, 2008 440 Tr. 23:2–18.)  Green eventually agreed with plaintiff's counsel that he would attempt to tape record a conversation with Melvin.[53]  (Feb. 13, 2008 440 Tr. 23:22–24:6.)  Green and Mr. Hoffman went to a "spy store," and bought a small tape recorder.  (Feb. 13, 2008 440 Tr. 23:22–24:12.)  At some point, Green claimed that Melvin left him a message on his cell phone, accusing Green of talking to the police and threatening him.  (Feb. 13, 2008 440 Tr. 30:6–31:21.)  Green somehow managed to tape record that message, but could no longer retrieve the original message from his cell phone, because his it was "stuck."  (Feb. 13, 2008 440 Tr. 32:2–5.)

---

[53] Melvin's lawyer contacted the ADA and the plaintiff's investigator, and told them not to speak with Melvin.  (Feb. 13, 2008 440 Tr. 127:12–29:23.)  As the ADA advised the plaintiff's investigator, the District Attorney's Office could not use Green to get a statement from Melvin, assuming that Green really had been talking to Melvin, because Melvin was represented by a lawyer.  (Feb. 13, 2008 440 Tr. 127:12–29:23.); *United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1988).  It is not clear why plaintiff's counsel, if he thought Green was going to speak with Melvin, would have thought that it was appropriate to use Green to get a statement from someone who was represented by counsel.  NYRPC Rule 4.2(a).

Sometime thereafter, while supposedly aware that Green had told someone about Melvin's admission to the murder, Melvin called Green and asked him to meet him at a restaurant. (Feb. 13, 2008 440 Tr. 24:13–25:7.) Melvin talked again about the killing, saying that he was going to try to "come up with" a self-defense case, but Green did not tape that conversation.[54] (Feb. 13, 2008 440 Tr. 24:13–26:4.) As luck would have it, though, Melvin had another conversation with Green about the murder, and Green recorded that conversation. (Feb. 13, 2008 440 Tr. 26:5–27:7.) Green then called Mr. Hoffman, and gave him the tape recorder. (Feb. 13, 2008 440 Tr. 29:18–30:5.) Mr. Hoffman paid Green $1500, supposedly so that his wife could go to South Carolina, as well as "fifty dollars here, fifty dollars there" three or four times. (Feb. 13, 2008 440 Tr. 33:16–34:22, 70:18–71:19.) In addition, Mr. Hoffman gave Green $500, so that Green could pay his telephone bill, and also promised him a "reward" of $2,500. (Feb. 13, 2008 440 Tr. 72:12–74:21, 76:12–81:13.)

### v. Yolanda Doves

Yolanda Doves, Levon Melvin's ex-girlfriend and mother of his children, was employed as a corrections officer at the time of the hearing. (Feb. 13, 2008 440 Tr. 346:2–9.) She and Melvin were dating in 1994 when James Abbott was murdered. (Feb. 13, 2008 440 Tr. 347:2–48:8.) She knew who Abbott was, but had never had any kind of romantic relationship with him, and Melvin had never accused her of having any such relationship. (Feb. 13, 2008 440 Tr.

---

[54] There were no safeguards employed to ensure that Green actually was meeting with Melvin; no one took photographs or monitored Green in any way. At one point, the plaintiff's counsel asked Detective Kevin Cashen from the 101st precinct to sit outside a restaurant where Green and Melvin were supposed to meet. (Feb. 13, 2008 440 Tr. 260:24–62:9.) Detective Cashen waited at the restaurant for three hours, and did not see either Green or Melvin. (Feb. 13, 2008 440 Tr. 260:24–62:9.)

348:8–49:20, 350:5–16.)  She did have an affair with another man, which made Melvin angry, but he did not attack or hurt that person in any way.[55]  (Feb. 13, 2008 440 Tr. 351:13–52:14.)

### vi.  Detective Kevin Cashen

Detective Kevin Cashen of the 101st Precinct was assigned to look into the case after the plaintiff's team raised questions about it.  (440 Tr. 505:2–14.)  As part of that investigation, he interviewed the plaintiff.  (440 Tr. 595:3–10.)  The plaintiff told him that he might have been in the C-Town supermarket on the day of the murder at about 10:30 in the morning.  (440 Tr. 602:14–03:6.)  Detective Cashen asked him, "[W]ell, you know, how is it that the cashier in C-town, who seems to know you, said, you know, she saw you in there at 9:30?"  (440 Tr. 602:14–03:6.)  The plaintiff replied that "maybe" he was in the store at 9:30.  (440 Tr. 602:14–03:6.)  Detective Cashen also did a search for "Anna Simmons;" he checked housing records, ran computer checks and followed up on information that the plaintiff's legal team gave him.  (440 Tr. 594:10–95:2.)  He never found any evidence that Anna Simmons existed.  (440 Tr. 594:10–95:2.)

### vii.  Judge Blumenfeld's Decision

On June 27, 2008, Judge Blumenfeld granted the plaintiff's motion to vacate his conviction, and ordered a new trial.  *People v. Bellamy*, 20 Misc. 3d 1131(A), *16–17.  Judge Blumenfeld determined that Green's testimony and the conversation he allegedly recorded of Levon Melvin constituted newly discovered evidence that could have changed the outcome of the trial.  *Id.*, at *17.

---

[55] Levon Melvin was aware that the case was being investigated and was staying with his and Doves' children while she testified; he did nothing to dissuade her from testifying.  (Feb. 13, 2008 440 Tr. 355:11–16, 370:11–19, 377:14–78:4.)

However, Judge Blumenfeld rejected the plaintiff's additional claims, finding that there were no *Brady* or *Rosario* violations, and that trial counsel had represented the plaintiff effectively. *People v. Bellamy*, 20 Misc. 3d 1131(A), at *8, 11. In particular, Judge Blumenfeld rejected the plaintiff's contention that the prosecutors committed a *Brady* violation in connection with Linda Sanchez and her receipt of Section 8 Housing. *Bellamy*, 20 Misc. 3d 1131(A), at *11. Judge Blumenfeld observed that the jury knew that Sanchez had been relocated, and that no one knew at the time of trial that she would eventually secure Section 8 housing. *Id.*

Judge Blumenfeld also rejected the plaintiff's claims about Andrew Carter, and determined that Carter's 440 hearing testimony was not credible. *Bellamy*, 20 Misc. 3d 1131(A), at *17–18. The judge pointed out that Carter initially stood by his trial testimony, and that it was only after he negotiated an hourly fee of $90 that he came up with the story about Detective Gillen. *Id.*, at *17.

Thus, Judge Blumenfeld did not credit Carter's accusations that Detective Gillen pointed out the criminal defendant during the lineup, that Detective Gillen told him the defendant confessed on videotape and changed his appearance, or that Detective Gillen offered to get Carter and his girlfriend crack and put them up in a motel. *Id.*, at *17–18. Judge Blumenfeld concluded that Carter used "street smarts" to get $1350 for telling defense counsel what he assumed they wanted to hear. *Id.*, at *18.

## H. Reopened 440 Hearing

After the court's decision, the prosecutor learned that Michael Green's entire testimony was false—that the tape was a fraud and that Levon Melvin had never confessed to Michael Green. The lawyers from Cravath Swain & Moore gave the prosecutors an additional tape recording—one between one of their investigators and the real Levon Melvin. (2d 440 Tr.

404:3–08:14.)  Although they had this tape in their possession at the same time they had Green's fraudulent tape, and at the same time they were urging the prosecutor to reinvestigate the case against the plaintiff, they had not previously revealed the existence of the tape recording.  (2d 440 Tr. 404:3–08:14.)  Nor had they disclosed that their retained expert had concluded that the voices on the two recordings—the faked Green tape and the recording of Melvin's voice—were in all probability not the same.  (2d 440 Tr. 421:1–23:3.)

Judge Blumenfeld relieved Mr. Hoffman and Cravath Swain & Moore as counsel, and appointed a lawyer from the Legal Aid Society to represent the plaintiff.  (Oct. 31, 2008 Tr. 5:3–16.)  He re-opened the hearing, at which eleven witnesses testified.  I summarize the relevant testimony below.

### i.  Levon "Ishmel" Melvin

Levon Melvin had known Michael Green for about fifteen years.  (2d 440 Tr. 60:3–12.)  Although Green referred to himself as the godfather of Melvin's children, he actually had "nothing to do with" them.  (2d 440 Tr. 60:3–12.)  Green often helped Melvin in his cleaning business, an arrangement that ended when $20,000 in pipes disappeared from a building that Green was supposed to watch.  (2d 440 Tr. 60:13–61:5.)

Melvin knew James Abbott; he did not kill Abbott, nor did he ever have a conversation with Green about the murder.  (2d 440 Tr. 61:12–25.)  Melvin also knew Ed Henson, a retired detective from the 101st Precinct.  (2d 440 Tr. 65:6–14.)  According to Melvin, Henson was a "dirty cop" who had often threatened to arrest Melvin.  (2d 440 Tr. 65:6–14.)  In January of 2008, Melvin learned that Henson was "riding around" in Far Rockaway, buying beer for people that Melvin knew, and telling them that Melvin killed Abbott.  (2d 440 Tr. 66:10–19.)  Melvin called Henson on January 13, 2008, and asked him why he was accusing Melvin of something

that he did not do.[56]  (2d 440 Tr. 66:10–25, 72:19–73:22.)  Henson replied, "I got you this time.
You in trouble this time.  You are going to jail."  (2d 440 Tr. 72:19–73:22.)  Henson told Melvin
that he was coming to "get" Melvin that Thursday.  (2d 440 Tr. 72:19–73:22.)

Following this conversation, Melvin went to see a lawyer, Eugene Levy, and told him
about Henson's conduct.  (2d 440 Tr. 74:4–76:3.)  Levy called Henson and told him he was
representing Melvin, and directed Henson not to talk to him again.  (2d 440 Tr. 75:14–76:11.)
He also instructed Melvin not to speak with anyone else.  (2d 440 Tr. 80:10–12.)

Months later, in August or September of 2008, Melvin learned from a newspaper article
that Green claimed to have a recording of Melvin confessing to a murder.  (2d 440 Tr. 80:18–
82:19, 127:8–23.)  Melvin told Levy that he had never made any such admission.  (2d 440 Tr.
80:18–82:19.)  At one point, Melvin confronted Green about it; Green denied that he had named
Melvin as the killer.  (2d 440 Tr. 82:13–19.)  In September of 2008, Melvin and Levy went to the
Queens District Attorney's Office and listened to the tape.  (2d 440 Tr. 83:5–84:12.)

### ii.  Michael Green

Michael Green admitted that Levon Melvin never told him that he was in any way
involved in the murder of James Abbott.  (2d 440 Tr. 269:11–270:1.)  Green gave Melvin's name
to investigators because he was angry with Melvin for firing him.  (2d 440 Tr. 276:23–277:2.)

Green did not know how Abbott was killed "at first."  (2d 440 Tr. 278:3–5.)  He learned
about the details from Mr. Hoffman, who showed him "what was going on;" he showed him
pictures of Abbott's body, videotapes of the plaintiff's trial, and letters the plaintiff had written.
(2d 440 Tr. 278:3–279:6.)  Green "started feeling sorry for the man. Man, you know after I seen
the Court TV thing and it convinced me that the guy was innocent too."  (2d 440 Tr. 541:14–23.)

---

[56] Melvin's cell phone records reflect calls to Henson's number on this date.  (2d 440 Tr. 67:5–68:21.)

Then, Mr. Hoffman gave Green a recording device, and asked him to "try to get Ish on the tape." (Defs.' 56.1 ¶ 204; Pl.'s 56.1 Counterstatement ¶ 204; 2d 440 Tr. 273:11–22.)

Because Levon Melvin had never said anything about killing anyone, Green recruited an acquaintance, Jonathan Tatum, to play the role of Melvin on tape. (Defs.' 56.1 ¶ 202; Pl.'s 56.1 Counterstatement ¶ 202.) As Green explained:

> [Me] and Tom [Hoffman] and us, they started telling me about Kareem Bellamy. Then after a while, you know, they just gave me an opportunity to, you know, to try to help this guy. And when Tom [Hoffman] said to me to try to get Ish on the tape, I knew I couldn't get Ish on the tape because Ish never said anything to me about that. I know he didn't know anything about that. So, I came to the conclusion to get Johnny to make the tape to help this guy.

(2d 440 Tr. 273:11–22.)

In addition to urging Green to get Melvin on tape, Mr. Hoffman also "kept telling" Green to find Anna Simmons. (2d 440 Tr. 288:19–89:1.) According to Green, Mr. Hoffman and the plaintiff's team "showed [Green] alleyways like they was looking for something. And here I am to give it to them." (2d 440 Tr. 288:19–89:1.) Accordingly, Green "made up a story" that he had met Simmons, and Mr. Hoffman "went for it." (2d 440 Tr. 288:19–89:1.) Hoping to make additional money, Green made another fraudulent tape, this time using a female relative to play the role of Simmons. (2d 440 Tr. 288:19–93:10.) He gave the tape to Mr. Hoffman, and told him that he was going to meet Simmons in Atlantic City. (2d 440 Tr. 296:7–13.) Mr. Hoffman got a hotel room for Green and gave him $1000. (2d 440 Tr. 296:7–18.)

Green went to Mr. Hoffman's office after he got back from Atlantic City, and Mr. Hoffman told him that the Cravath lawyers did not believe that it was Anna Simmons on the tape. (2d 440 Tr. 296:22–97:12.) Mr. Hoffman commented that he had "been taking care of [Green] from the beginning," and asked Green to "be straight" with him, and to tell him whether it was really Simmons on the tape. (2d 440 Tr. 296:22–97:12.) Green admitted that it was not

Simmons.  (2d 440 Tr. 296:22–97:12.)  Mr. Hoffman did not question the authenticity of the Levon Melvin tape that Green had made earlier.  (2d 440 Tr. 297:13–98:10.)

At some point in August of 2008, Green met with Levon Melvin's attorney, Eugene Levy, and learned that Mr. Levy knew that the recording purporting to be a conversation between Green and Melvin was a fake.  (2d 440 Tr. 285:5–86:1.)  After that meeting, Green met with Mr. Hoffman and told him that the tape was fake, that it was not Melvin's voice on the tape. (2d 440 Tr. 286:9–11.)  According to Green, Mr. Hoffman told him to leave: "Get out of town. Go down south."  (2d 440 Tr. 286:9–20.)  Green testified that Mr. Hoffman promised to pay him $500 each week for the next six months.  (2d 440 Tr. 286:9–20.)  Green also admitted that the plaintiff's lawyer gave him more money than he previously testified.  (2d 440 Tr. 281:13–16.)  In all, Mr. Hoffman paid him $6000 in cash.[57]  (2d 440 Tr. 281:13–25.)

### iii.  Jonathan Tatum

Jonathan Tatum testified that in February of 2008, Michael Green gave him fifteen dollars to make a tape.[58]  (2d 440 Tr. 13:14–22, 22:13–17.)  Green wanted him to "act like" some other person, and to talk about a stabbing.  (2d 440 Tr. 22:24–23:5.)  Green told him what to say. (2d 440 Tr. 22:24–23:5, 40:24–41:16.)

### iv.  Eugene Levy

Eugene Levy, a criminal defense attorney, testified that Levon Melvin contacted him in early January of 2008, and told him that two investigators were "going around in the Far Rockaway" asking questions about Melvin in connection with a 1994 homicide.  (2d 440 Tr. 320:9–322:2.)  Mr. Levy called both investigators and told them that Melvin had advised Mr.

---

[57] Green accompanied the plaintiff's counsel to ATM machines and banks, so that counsel could take out cash.  (2d 440 Tr. 282:1–7.)  Counsel disputes this accusation.  (Pl.'s 56.1 Counterstatement ¶ 203D.)

[58] Tatum identified the recording—purportedly of Melvin talking to Green—as the tape he made with Green.  (2d 440 Tr. 16:25–19:1.)

Levy that he had nothing to do with the murder, and that they should not contact him again. (2d 440 Tr. 322:9–24:12.) He also told them that Melvin was "very upset" that the investigators had intimated to Melvin's children that he had murdered someone. (2d 440 Tr. 322:9–24:12.) At one point, a Cravath lawyer sent Mr. Levy a subpoena for Melvin; Mr. Levy told the lawyer that Melvin would come to court, but would invoke his Fifth Amendment right not to testify. (2d 440 Tr. 324:16–24, 349:8–51:19.)

Later that summer, Melvin contacted Mr. Levy again; he was "very upset" about a newspaper article reporting that he had confessed to the 1994 murder. (2d 440 Tr. 325:14–27:2.) Mr. Levy spoke with the prosecutor, Brad Leventhal, and eventually brought Melvin to ADA Leventhal's office, where he listened to the fraudulent tape. (2d 440 Tr. 327:6–8, 330:14–31:22.) In September of 2008, Mr. Hoffman contacted Mr. Levy and said that Mr. Levy "might want to meet with" Mr. Hoffman, because he had "information" that Melvin was involved in the murder of James Abbott. (2d 440 Tr. 348:3–25.)

### v. Judge Blumenfeld's Decision

Judge Blumenfeld issued a written decision, in which he adhered to his earlier decision granting the plaintiff a new trial. (Defs.' 56.1 ¶ 209; Pl.'s 56.1 Counterstatement ¶ 209.) The judge rejected Green's admission that he concocted the entire story about Melvin's admission to a murder; while the judge acknowledged that the tape was a fraud, he concluded that Green's testimony at the first hearing—that Melvin admitted the murder while they were on their way to a job site—was actually true, notwithstanding Green's testimony at the second hearing that the whole story was a lie. *Bellamy*, 26 Misc. 3d 1210(A), at *6. The Appellate Division, Second Department affirmed the judge's decision. (Pl.'s Add. 56.1 ¶ 2; Defs.' Resp. 56.1 ¶ 2.) *People v. Bellamy*, 84 A.D.3d 1260 (N.Y. A.D. 2 Dep't 2011).

## I.  Dismissal

On September 16, 2011, the Queens County District Attorney's Office dismissed the indictment against the plaintiff.  (Defs.' 56.1 ¶ 212; Pl.'s 56.1 Counterstatement ¶ 212.)  ADA Brad Leventhal, who handled the hearing, advised the court that the District Attorney's Office did not view the case as an exoneration or as a case of "actual innocence."  (Defs.' Ex. OO (ECF No. 157-41), Dismissal Tr., ECF Page No. 4.)  It was the Office's position that the plaintiff and his attorneys had perpetrated "an outright fraud" on the court.[59]  (Dismissal Tr., ECF Page No. 4.)  Nevertheless, because of a change in the law defining depraved indifference homicide—the only crime for which the plaintiff was convicted—the District Attorney's Office was compelled to dismiss the indictment.[60]  (Defs.' 56.1 ¶¶ 212–13.)

The indictment was sealed pursuant to Criminal Procedure Law Section 160.60, which provides for a "termination of the criminal action in favor of the accused," and that upon sealing "the arrest and prosecution shall be deemed a nullity and the accused shall be restored, in contemplation of law, to the status he occupied before the arrest and prosecution."  (Pl.'s Add. 56.1 ¶ 4; Defs.' Resp. 56.1 ¶ 4.)  The certificate of disposition stated that "the conviction was terminated in favor of Mr. Bellamy."  (Pl.'s Add. 56.1 ¶ 5; Defs.' Resp. 56.1 ¶ 5.)

---

[59] ADA Leventhal stated:
> [A]pproximately 15 years ago, Kareem Bellamy was convicted by a jury of his peers for the murder of James Abbott in the Far Rockaway section of our county.  That conviction has been upheld on direct appeal and review and federal habeas corpus proceeding as well.  Mr. Bellamy has been freed from the conviction based on an outright fraud perpetrated against this Court.  He has not, and I repeat he has not, been exonerated.  This is not a case of actual innocence.  The sole basis for the vacatur of this defendant's conviction was the patently false testimony of Michael Green, a career criminal who received a substantial amount of money from the defense, which induced his original hearing testimony.

(Dismissal Tr., ECF Page No. 4.)

[60] The prosecutor also characterized the "Anna Simmons" tip as "an effort to misdirect the initial police investigation," and pointed out that the plaintiff, despite having spent "a small fortune" on "numerous private investigators," never established that Simmons was a real person.  (Dismissal Tr., ECF Page No. 6.)

## II.     Procedural History

On March 1, 2012, the plaintiff filed this lawsuit against the City of New York, Detective John Gillen, Detective Michael Solomeno, and unnamed individuals (the "John Doe defendants").  The plaintiff asserts claims for malicious prosecution, denial of a right to a fair trial, Fourteenth Amendment due process claims, failure to intercede and supervisory liability against the John Does, municipal liability, and infliction of emotional distress.

On February 10, 2014, the Honorable William F. Kuntz, II denied the defendants' motion to dismiss the initial complaint.[61]  Thereafter, the plaintiff filed an amended complaint on October 31, 2014 (ECF No. 82), which the defendants moved to dismiss on December 19, 2014. (ECF No. 86.)  On May 8, 2014, Magistrate Judge Viktor Pohorelsky granted the defendants' motion to bifurcate discovery, and postponed discovery on the plaintiff's *Monell* claim pending a decision on the issue of whether the District Attorney's Office did anything to violate the plaintiff's federal constitutional rights.  (ECF No. 52.)  By stipulation dated August 14, 2015, the plaintiff withdrew his first amended complaint,[62] and the defendants withdrew their motion to dismiss and consented to proceed with discovery on the *Monell* claims.  (ECF No. 110.)  After a pre-motion conference on April 15, 2015, I reinstated the stay of discovery on the plaintiff's *Monell* claims and set a briefing schedule for summary judgment.[63]

After years of contentious civil litigation, the parties' cross-moved for summary judgment.  The defendants move on the following grounds: that the plaintiff cannot establish a malicious prosecution claim, that the individual detectives are entitled to qualified immunity, that the plaintiff "cannot show that any alleged fabrication of evidence . . . caused [the plaintiff] to

---

[61] This case was reassigned to me in November of 2015.
[62] The original March 1, 2012 pleading is the operative complaint.  (ECF No. 110.)
[63] None of the depositions noticed for purposes of *Monell* discovery have taken place.  (Pl.'s Add. 56.1 ¶ 17; Defs.' Resp. 56.1 ¶ 17.)

suffer injury," that his due process claims are duplicative, that the claims against the John Does are time barred,[64] that his *Monell* claims fail as a matter of law, as do his claims of infliction of emotional distress.[65]  The plaintiff cross-moves on only one issue: that the dismissal of the indictment against the plaintiff was favorable termination for purposes of the malicious prosecution claim.

I heard oral argument on the cross-motions for summary judgment on October 11, 2016, and received additional briefing in March of 2017 regarding Andrew Carter's availability to testify at trial, and the admissibility of his prior statements.  (ECF Nos. 185–87.)  It is undisputed that Carter died in August of 2008.  (ECF No. 185-1.)

For the reasons discussed below, the defendants' motion for summary judgment is granted.  Thus, the action is dismissed in its entirety.

## ANALYSIS

A district court may grant a motion for summary judgment if the record evidence—in the form of affidavits, deposition transcripts, or other documentation—shows that there is "no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a) & (c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  In deciding whether there is a genuine dispute as to a material fact, the court does not make credibility determinations, and must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party.  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545–46 (2d Cir. 2010); *see also Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010).

---

[64] The plaintiff withdrew his claims against the John Doe defendants by stipulation on August 15, 2015.  (ECF No. 110.)

[65] In his opposition to the defendants' motion to dismiss, the plaintiff withdrew his negligent infliction of emotional distress claim.  (Pl.'s Opp. to Motion to Dismiss at 2 (ECF No. 24).)

However, the party opposing summary judgment may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration in original) (emphasis in original) (citation omitted). A mere "scintilla of evidence in support of the [non-movant's] position" is inadequate. *Hayut v. State Univ. of New York*, 352 F.3d 733, 743 (2d Cir. 2003) (citation omitted). Put another way, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then the court must deny the request for judgment as a matter of law. *Liberty Lobby*, 477 U.S. at 248.

Among other claims, the plaintiff asserts Section 1983 claims of malicious prosecution, denial of a fair trial, and violation of due process. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks and citation omitted). While federal courts look to state law to determine the elements of a particular claim arising under Section 1983, it is the violation of a constitutional right that is actionable under Section 1983. *Morse v. Spitzer*, No. 07-cv-4793-CBA-RML, 2012 WL 3202963, at *2 (E.D.N.Y. Aug. 3, 2012) (citations omitted). Thus, the court must identify the specific constitutional right allegedly infringed before evaluating a claim under Section 1983. *Id.* (quoting *Albright*, 510 U.S. at 271).

## I.    Malicious Prosecution Claims

A plaintiff who claims that law enforcement deprived him of his rights by maliciously prosecuting him "invokes the protection of the Fourth Amendment." *Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015). The elements of a Section 1983 malicious prosecution claim are "substantially the same" as the elements under New York law, and "the analysis of the state and the federal claims is identical." *Boyd v. City of N.Y.*, 336 F.3d 72, 75 (2d Cir. 2003); *see also Manganiello v. City of N.Y.*, 612 F.3d 149, 160–61 (2d Cir. 2010) ("In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law"). Under New York law, the plaintiff in a malicious prosecution case must prove: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello*, 612 F.3d at 161 (citations omitted). "Because 'accusers must be allowed room for benign misjudgments,' the New York Court of Appeals has held that the law 'places a heavy burden on malicious prosecution plaintiffs. . . .'." *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (quoting *Smith–Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)).

### A.    Favorable Termination

In order to prevail on his malicious prosecution claims, the plaintiff must prove that the proceeding terminated in his favor. *Manganiello*, 612 F.3d at 161. While this determination must be made in light of "the circumstances of each case," *Cantalino v. Danner*, 96 N.Y.2d 391, 396 (N.Y. 2001), the issue is one of law for the court. *Genovese v. Cty. of Suffolk*, 128 F. Supp. 3d 661, 672 (E.D.N.Y. 2015).

This is an unusual case.  The Queens County District Attorney's Office was compelled to dismiss the plaintiff's case, but not because they believed that he was exonerated.  On the contrary, ADA Leventhal made it clear that the District Attorney's Office believed that the plaintiff's attorneys had perpetrated a fraud on the court—in the form of Michael Green's faked tape recording and perjured testimony—that convinced the state court judge to set aside the plaintiff's conviction.  However, after that ruling, the only available count for which the plaintiff could be tried—depraved indifference murder—was not an option, in view of an intervening change of the law; in the years following the plaintiff's conviction, the New York Court of Appeals sharply limited the circumstances under which a defendant can be tried for depraved indifference murder.  *See People v. Payne*, 3 N.Y.3d 266, 271 (2004); *People v Feingold*, 7 N.Y.3d 288 (2006).  Nor could the prosecutor try the plaintiff on the intentional murder count, since the jury acquitted him of that crime.  In short, the prosecutor had no alternative but to dismiss the indictment.[66]

The parties cross-move for a decision as a matter of law regarding whether the dismissal of the indictment pursuant to Criminal Procedure Law Section 160.60 constitutes a "favorable termination" for purposes of the malicious prosecution claim.

"An acquittal is the most obvious example of a favorable termination."  *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995).  If the plaintiff has not been acquitted, he must establish that the termination of his criminal proceeding is not "inconsistent with innocence."  *Rothstein*, 373 F.3d at 286 (citing *Smith–Hunter*, 95 N.Y.2d at 198–99).  New York law does not demand that a plaintiff alleging malicious prosecution prove his innocence, nor even that the disposition in the

---

[66] There were no additional crimes for which the plaintiff could constitutionally be charged.  In light of the fact that the plaintiff was acquitted of the intentional murder charge, he could not be charged with manslaughter in the first degree, a lesser included offense, *see People v. Biggs*, 1 N.Y.3d 225, 230 (2003) (citations omitted), and the statute of limitations had run.  *People v. Turner*, 5 N.Y.3d 476, 481 (N.Y. 2005); CPL 30.10(2)(b); (4)(a).

criminal proceeding was "indicative of innocence." *Genovese v. Cty. of Suffolk*, 128 F. Supp. 3d 661, 671 (E.D.N.Y. 2015).

"As a general rule, a final termination of a criminal proceeding in favor of the accused is a favorable termination for the purposes of a subsequent malicious prosecution claim." *Rothstein*, 373 F.3d at 286. Nonetheless, the Second Circuit has identified exceptions to this general principle, and reasoned that certain kinds of terminations are not "favorable" because they are inconsistent with innocence. *Rothstein*, 373 F.3d at 286; *see also Arum v. Miller*, 273 F. Supp. 2d 229, 234 (E.D.N.Y. 2003) (same). Generally, dismissals that have been found to be inconsistent with innocence fall into three categories: "(1) misconduct on the part of the accused in preventing the trial from going forward, (2) charges dismissed or withdrawn pursuant to a compromise with the accused, and (3) charges dismissed or withdrawn out of mercy requested or accepted by the accused." *Anilao v. Spota*, 774 F. Supp. 2d 457, 508 (E.D.N.Y. 2011) (citation omitted). The defendants do not assert any of these exceptions apply to this case.[67]

Instead, the defendants argue that I should find an additional exception to the general rule. The defendants rely on the Restatement [Second] of Torts, Section 661, which provides that "[t]he formal abandonment of proceedings by a public prosecutor is not a sufficient termination in favor of the accused if the abandonment is due to the impossibility or impracticability of bringing the accused to trial." The defendants assert that the sole reason for dismissal in this case was that the prosecution was no longer feasible due to an intervening change in the law.

---

[67] Notably, the defendants do not allege that the dismissal was caused by "misconduct on the part of the accused in preventing the trial from going forward." *Anilao*, 774 F. Supp. 2d at 508. Although there was considerable evidence that the plaintiff's lawyers employed unseemly tactics—paying some witnesses, pressuring and misleading others—the state court was aware of all of it, and still set the verdict aside.

The defendants' argument is not without appeal, given the confluence of circumstances in this case. Nevertheless, for the purposes of this decision, I assume that the plaintiff has established that criminal proceeding terminated in the plaintiff's favor.

## B. Probable Cause

Because lack of probable cause is an element of a malicious prosecution claim, "the existence of probable cause is a complete defense to a claim of malicious prosecution." *Stansbury v. Wertman*, 721 F.3d 84, 94–95 (2d Cir. 2013) (citation omitted). The court considers the issue of probable cause "in light of facts known or reasonably believed at the time the prosecution was initiated." *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 34 (E.D.N.Y. 2015) (collecting cases). The Second Circuit has described probable cause, for the purposes of a malicious prosecution claim, "as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Stansbury*, 721 F.3d at 95 (citations omitted).

A grand jury indicted the plaintiff, which creates a presumption of probable cause that the plaintiff bears the burden of rebutting. *Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003). This presumption "may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Id.* (quoting *Colon v. City of N.Y.*, 60 N.Y.2d 78, 83 (1983)). "Courts have repeatedly determined that a plaintiff's own testimony is insufficient to rebut the presumption of probable cause arising from a grand jury indictment." *Bonds v. City of N.Y.*, No. 12-cv-1772-ARR-MDG, 2014 WL 2440542, at *7 (E.D.N.Y. May 30, 2014) (internal quotation marks and citation omitted); *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 555 (2d Cir. 2005) (the plaintiff's "testimony—which was largely unsubstantiated by other direct evidence—was so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to

credit the allegations made in his complaint.").  Thus, in order to raise a triable issue of fact on the element of probable cause, the plaintiff cannot merely rely on his testimony denying that he committed the murder.

### i.  Andrew Carter

In this case, the plaintiff cites Andrew Carter's claim at the 440 hearing, which took place more than a decade after the criminal trial, that Detective Gillen somehow forced him to identify the plaintiff.  The principal flaw in the plaintiff's claim is that there is no admissible evidence to support it.  Andrew Carter is dead.  His testimony before Judge Blumenfeld is hearsay, and falls within no recognized exception to the hearsay rule.[68]  *O'Brien v. City of Yonkers*, No. 07-cv-3974, 2013 WL 1234966, at *7 (S.D.N.Y. Mar. 22, 2013) (adopting Report and Recommendation) ("Testimony of a nonparty witness that was given at a prior hearing is, when offered for its truth, hearsay.") (quoting *Patterson v. Cty. of Oneida*, 375 F.3d 206, 219–20 (2d Cir. 2004)).

Carter's testimony is not, as the plaintiff argues, admissible as prior testimony under Federal Rule of Evidence 804(b)(1).  "In order to admit prior testimony under Rule 804(b)(1), the proponent has the burden to show by the preponderance of the evidence that (1) the witness is unavailable; (2) the party against whom the testimony is offered is the same as in the prior proceeding; and (3) that that party had the same motive and opportunity to examine the witness." *Annunziata v. City of N.Y.*, No. 06-cv-7637-SAS, 2008 WL 2229903, at *7 (S.D.N.Y. May 28, 2008) (quoting *United States v. Amato*, No. 03-cr-1382-NGG, 2006 WL 1891119, at *2 (E.D.N.Y. June 27, 2006)).

---

[68] Carter's 2005 affidavits, signed in advance of the 440 Hearing, are likewise inadmissible hearsay.

Detectives Gillen and Solomeno were not parties in the state post-trial proceedings. *See United States v. Amato*, No. 03-cr-1382, 2006 WL 1788190, at *1-3 (E.D.N.Y. June 26, 2006) (state government was not a "predecessor in interest" to the federal government in the prosecution); *O'Brien*, 2013 WL 1234966, at *7 (defendant officers in a Section 1983 action "were not parties to the prior criminal proceeding"); *Annunziata*, 2008 WL 2229903, at *8 ("[T]he prosecutor in plaintiff's criminal trial (the Kings County District Attorney's Office) and the defendants in the instant action (the City of New York and Detective Henn) are not the same parties, nor are they in privity with each other."). The detectives did not have their own lawyers at the trial. And, the assistant district attorneys, charged with prosecuting cases on behalf of the People of the State of New York, did not represent either detective, and did not cross-examine Carter with the detectives' interests in mind.

The plaintiff's characterization of the prosecutor as a "predecessor in interest" is not persuasive. The plaintiff maintains that the prosecutor had a "similar motive" and "adequate opportunity" to discredit Carter at the hearing. But the fact that the prosecutor sought to discredit aspects of Carter's testimony does not change the analysis. The prosecutor's aim was to bolster Carter's trial testimony, and undermine the testimony he gave at the 440 hearing. It was not his job to represent the detectives. *See Annunziata*, 2008 WL 2229903, at *8 (the prosecutor did not have the same motive to question a witness as the defendants in the civil action because the issue was "of little, if any concern to the State" and the prosecutor had other evidence to support a conviction); *accord Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 3876915, at *3 (N.D. Ill. Sept. 1, 2011) ("the motive of a prosecutor to cross-examine a witness is different than the motive of a defendant in a later-filed civil rights lawsuit in relation to the potential penalties or financial stakes involved.").

There is also nothing about Carter's testimony that would warrant departing from the requirements of Rule 804(b)(1). Certainly, his testimony had none of the "guarantees of trustworthiness" that are the hallmark of exceptions to the hearsay rule. *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 233 (2d Cir. 1999), *as amended on reh'g* (Sept. 29, 1999) ("The traditional exceptions to the hearsay rule, in turn, provide the benchmark against which the trustworthiness of evidence must be compared in a residual hearsay analysis.") On the contrary, Carter's 440 testimony was perhaps the "exceptional circumstance[] where a witness['s] testimony is so fanciful and lacking in any corroboration that it could be insufficient to create an issue of fact because no rational jury could believe it." *Blake v. Race*, 487 F. Supp. 2d 187, 203 (E.D.N.Y. 2007); *see also Jeffreys*, 426 F.3d at 555 (summary judgment properly granted because "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [the] complaint").

When first interviewed by one of the plaintiff's investigators, Carter was adamant that the plaintiff was the man he saw stab James Abbott; he even volunteered to take a lie detector test to that effect. It was only after the plaintiff's team agreed to pay him $90 an hour for his "time" that Carter, an unemployed felon, did an about-face and claimed that Detective Gillen pressured him to identify the plaintiff. Moreover, his testimony about what Detective Gillen did was illogical and inconsistent; Carter claimed that Detective Gillen directed him to identify the plaintiff, but then documented Carter's uncertainty in a police report, and testified about it at multiple court proceedings.[69]

---

[69] Notably, Carter's post-trial account of what happened at the lineup does not support the plaintiff's current theory—that Detective Gillen told Carter whom to identify after the lineup.

Judge Blumenfeld also concluded Carter's testimony was not credible, and that he used his "street smarts" to wrangle $1350 out of the plaintiff's team for telling them what they wanted to hear. In short, there is no scenario under which Carter's prior testimony is admissible.

*ii. Plaintiff's Statements*

The plaintiff claims Detective Gillen fabricated testimony about what the plaintiff said in the squad car: "This must be a case of mistaken identity—someone probably accused me of murdering someone." As the plaintiff acknowledges, Detective Gillen did not testify about this statement in the grand jury, and thus it could not have formed the basis of the grand jury's decision to indict. Consequently, even if Detective Gillen had fabricated the statement, it could not have had any effect on the grand jury's decision to indict the plaintiff, and is not evidence that the indictment was procured by "fraud, perjury, the suppression of evidence," or other police misconduct. *See Rothstein*, 373 F.3d at 283 (plaintiff "was required to rebut that presumption [of probable cause] by proving fraud, perjury, suppression of evidence or other misconduct *in the grand jury*." (emphasis added)). Because this evidence does not rebut the presumption, created by the indictment, that there was probable cause, it cannot form the basis of a cognizable malicious prosecution claim.

*iii. Linda Sanchez*

Linda Sanchez testified before the grand jury, as she did later at trial, that she saw the plaintiff and another man behind James Abbott shortly before Abbott was murdered. According to the plaintiff, however, Sanchez actually saw the plaintiff on a different day, and the defendants kept this "fact" from the grand jury; the plaintiff cites Sanchez's testimony more than ten years later, in the 440 hearing, that she might have seen the plaintiff on a Sunday rather than a Saturday, the day of the murder. Of course, even if Sanchez actually believed these events

occurred on a Sunday, nothing in the record establishes that her grand jury testimony was the product of police misconduct.  Moreover, the Saturday/Sunday conflict was not critical; Sanchez made it clear that she saw the plaintiff and another man in the store with Abbott, and that on that same day—regardless of whether it was a Saturday or a Sunday—she learned from her co-workers, after the arrival of the police, that Abbott had been murdered shortly after he left the store.  As Judge Blumenfeld observed:

> The fact that she confuses the day is not a mistaken identity issue.  She doesn't ever claim to have seen the crime.  She only knows that she saw the person in the supermarket.  She was interviewed.  She knows the day the cops came.  And if she forgets whether it was a Saturday or a Sunday doesn't change the fact that the cops came to her on the day that Abbott was murdered which turns out to be a Saturday.  So that's not a mistaken identity kind of argument.

(440 Tr. 581:4–14.)

### iv.  Conclusion

Even assuming that the disposition of the underlying criminal proceeding was a "favorable termination" for purposes of a malicious prosecution claim, there is no genuine issue of material fact as to the existence of probable cause to prosecute the plaintiff.  In light of this conclusion, the plaintiff's malicious prosecution claims are dismissed.

## II.    Fair Trial Claims

"A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights," *Fappiano v. City of N.Y.*, 640 F. App'x 115, 118 (2d Cir.), *cert. denied sub nom. Fappiano v. City of N.Y., N.Y.*, 137 S. Ct. 341 (2016), and is separate and distinct from a malicious prosecution claim.  *Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 446 (E.D.N.Y. 2015); *see also Morse v. Spitzer*, No. 07-cv-4793-CBA-RML, 2012 WL 3202963, at *5 (E.D.N.Y. Aug. 3, 2012) ("even where . . . there was probable cause to act (thereby rendering a malicious prosecution claim unavailable), an independent constitutional claim for the denial of

the right to a fair trial can proceed under § 1983 based on allegations that a police officer fabricated evidence, if that fabrication caused a deprivation of the plaintiff's liberty.").

A detective denies a defendant a fair trial when he generates "false information likely to influence a jury's decision and forwards that information to prosecutors." *Fappiano*, 640 F. App'x at 118 (quoting *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997)). Additionally, a fair trial claim may arise if law enforcement withholds *Brady* material from a defendant. *Id.*; *Bermudez v. City of N.Y.*, 790 F.3d 368, 376 n.4 (2d Cir. 2015) ("Police officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors."). Probable cause is not a defense to a fair trial claim. *Jovanovic v. City of N.Y.*, 486 F. App'x 149, 152 (2d Cir. 2012).

### i. Allegations of False Information

The plaintiff's fair trial claims are based on the following assertions: that Detective Gillen pressured Andrew Carter to identify the plaintiff, that Detective Gillen fabricated his testimony about the plaintiff's post-arrest statements, and that both detectives lied about investigating the anonymous report that two other men committed the murder. Additionally, the plaintiff maintains that other exculpatory evidence was not turned over, in violation of *Brady*.

### 1. Andrew Carter's Testimony

For the reasons discussed above, I conclude that the claims based on Andrew Carter's 440 testimony do not survive the defendants' motion for summary judgment. *See Morse*, 2012 WL 3202963, at *6 (in cases involving claims that police officer fabricated evidence and forward it to prosecutors in order to provide probable cause for a prosecution, the plaintiff's malicious prosecution and fair trial claims rise or fall together).

## 2. Plaintiff's Alleged Statements in the Police Car

The plaintiff claims that Detective Gillen lied about what the plaintiff said on the way to the precinct—"This must be a mistake. Somebody must have accused me of murdering somebody. Why would somebody accuse me of something I didn't do?"—and denied him his right to a fair trial. While this claim does not form the basis of a malicious prosecution claim, because the statement was not put before the grand jury, a Section 1983 claim for denial of a fair trial is separate from a malicious prosecution claim, *Bailey*, 79 F. Supp. 3d at 446; *see also Morse*, 2012 WL 3202963, at *5, and probable cause is not a defense. *Jovanovic*, 486 F. App'x at 152.

Thus, the question before me is whether the plaintiff demonstrates sufficient evidence to create a genuine issue of material fact such that the plaintiff's fair trial claim, based on the alleged fabrication of the statement, survives the defendants' motion for summary judgment. I find that it does not.

In order to establish that he was denied a fair trial, the plaintiff must demonstrate that: the "(1) investigating official (2) fabricate[d] evidence (3) that [was] likely to influence a jury's decision, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of liberty as a result." *Jovanovic*, 486 F. App'x at 152.

The only evidence the plaintiff cites to support his claim that Detective Gillen lied about what the plaintiff said is his own denial that he made the statements.[70] The plaintiff's claims are "unsubstantiated by any other direct evidence." *Jeffreys*, 426 F.3d at 555. Moreover, the subject

---

[70] While it is not pertinent to my decision, it is somewhat difficult to understand why a detective who was willing to lie about a suspect's statements would fabricate this kind of statement rather than something more obviously inculpatory.

was thoroughly explored at the plaintiff's criminal trial.[71]  Under the circumstances, I conclude that there is no genuine issue regarding whether Detective Gillen fabricated the plaintiff's admission.

### 3.   Veronica Walker

The plaintiff's next claim is that both detectives denied him a fair trial when they "tried, and failed to persuade [Veronica] Walker to identify Bellamy."  The flaw in this reasoning is apparent, since as the plaintiff acknowledges, Walker did not identify him at the trial.  The plaintiff cannot make out a cognizable fair trial claim based on an allegedly suggestive identification because Walker's identification "did not reach the jury."  *Fappiano v. City of N.Y.*, No. 01-cv-2476-SLT-SMG, 2015 WL 94190, at *18 (E.D.N.Y. Jan. 7, 2015) (citing *Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000)) *aff'd*, 640 F. App'x 115 (2d Cir. 2016), *cert. denied sub nom. Fappiano v. City of N.Y., N.Y.*, 137 S. Ct. 341 (2016).  Because a constitutional violation only occurs if the fabricated evidence results in a deprivation of liberty, this claim is dismissed.

### 4.   Levon Melvin and Rodney Harris

During the investigation, before the plaintiff was arrested or even a suspect, a woman called the 101st Precinct and claimed that she overheard two men—later identified as Levon Melvin and Rodney Harris—admit to killing James Abbott.  Detectives put together separate photographic arrays with both men's photographs, and showed them to Andrew Carter and Linda Sanchez, neither of whom identified Melvin or Harris.  The plaintiff faults the defendants'

---

[71] A component of the plaintiff's claim is that Detective Gillen improperly added the notation "Statement made by def while being asked his pedigree – spontaneous & unsolicited" to his memo book, but this evidence was not suppressed; both versions of the notebook were turned over to defense counsel, who used them in cross-examination.

investigation of the call and of Harris and Melvin, and says they denied him a fair trial by lying about their attempts to find the caller and by failing to question Melvin or Harris.

In order to prevail on a claim that law enforcement denied the plaintiff a fair trial, the plaintiff must establish that the detectives generated "false information likely to influence a jury's decision." *Fappiano*, 640 F. App'x at 118. The plaintiff's allegations do not satisfy that requirement. Here, Detective Gillen recorded that a caller had identified other men as the killers; he tracked down the photographs of these men, prepared photographic arrays, and showed them to witnesses. He turned the information over to the prosecutors, who in turn gave it to the plaintiff's criminal lawyer. The tactical decision not to question Harris and Melvin—about whom the detective had no solid information—did not deprive the plaintiff of a fair trial.[72]

### ii. Alleged Brady Violations

The plaintiff also claims that he was deprived of a fair trial because the detectives suppressed *Brady* material. A *Brady* violation includes three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Fappiano*, 640 F. App'x at 118 (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)). The Second Circuit has expressly declined to find that "anything less than an *intentional Brady* violation establishes a § 1983 due process claim for damages." *Fappiano*, 640 F. App'x at 118 (emphasis added). Moreover, to prove prejudice, the plaintiff must establish that the evidence was material, meaning that the "evidentiary suppression undermines confidence in the outcome of the trial." *Fappiano*, 640 F. App'x at 118 (quoting *Leka v. Portuondo,* 257 F.3d 89, 104 (2d Cir. 2001)).

---

[72] The plaintiff's team expended considerable resources to find the elusive "Anna Simmons," without success. It was the prosecutor's position that no such person existed.

The plaintiff maintains that the detectives withheld the following pieces of supposedly exculpatory evidence: that Linda Sanchez saw the plaintiff on a Sunday rather than Saturday, that on the day of the murder, she told Detective Gillen that she "didn't see anything," and that she identified Terrell Lee as the person she saw with the plaintiff.

As discussed earlier, the plaintiff seizes on testimony Sanchez gave long after the criminal trial—testimony that appears to have been prompted by the plaintiff's counsel. Moreover, as explained above, the Saturday/Sunday controversy is not significant, since Sanchez made it clear that she made her observations on the day of the murder. In any event, there is no evidence that the detectives, in 1994 and 1995, had proof that Sanchez saw the plaintiff on a Sunday, and intentionally withheld evidence that evidence. The plaintiff's claim that the detectives withheld this information does not survive summary judgment.[73]

The plaintiff has not demonstrated that the remaining allegedly suppressed evidence— that Sanchez told canvassing detectives that she "didn't see anything," and that she identified Terrell Lee as the person with the plaintiff—was material. As Sanchez explained at the hearing, she initially said that she did not see anything because at that point, she did not know that Abbott had been murdered; she learned about the murder after the detectives left the supermarket.[74] As for Terrell Lee, even if Sanchez had identified him as the plaintiff's companion, it is difficult to see how that would have been helpful to the plaintiff.

---

[73] One piece of "evidence" upon which the plaintiff relies—the opinion of Roger Ruben, proffered as an expert in documents and handwriting—hardly warrants mentioning. At the first 440 hearing, plaintiff's counsel asserted that his "expert," who did not testify, reviewed a copy of Detective Gillen's lineup report, and noticed some dots near the word "Saturday," which in his view could have been the result of someone whiting out a word and inserting "Saturday." (440 Tr. 966:10–68:10.) The expert acknowledged that the dot could have been "a trash mark as a result of generations of photocopying." (Report of Roger Rubin, Pl.'s Ex. S (ECF No. 169 at ECF Page No. 18).) Apparently, the expert could not state anything with a reasonable degree of scientific certainty. (440 Tr. 971:6–17.)

[74] Sanchez also testified at the trial that she learned about the murder after the detectives left the store.

Accordingly, the defendants' motion to dismiss the plaintiff's fair trial claims related to the *Brady* alleged *Brady* violation are dismissed as a matter of law.

### III.     Fourteenth Amendment Due Process Claims

A Fourteenth Amendment substantive due process claim is not cognizable where a more specific constitutional provision is directly applicable.  *Jackson ex rel. Jackson v. Suffolk Cty.*, 87 F. Supp. 3d 386, 399 (E.D.N.Y. 2015) (citations omitted).  Because the Fourth Amendment provides the basis for a Section 1983 claim premised on an allegedly malicious prosecution, the plaintiff cannot state a substantive due process claim against the defendants for that conduct.  *See id.*; *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997) (plaintiff's malicious prosecution claim arises under the Fourth Amendment, rather than the due process clause); *see also Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017) ("the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process").  In light of the fact that the Fourteenth Amendment Due Process claim is duplicative of the plaintiff's malicious prosecution claim, his Due Process claim is dismissed.

### IV.     Intentional Infliction of Emotional Distress Claim

The plaintiff's state law claim for intentional infliction of emotional distress does not survive summary judgment.  In the first place, there is no genuine issue of material fact that the detectives' conduct was "extreme and outrageous."  *Bender v. City of N.Y.*, 78 F.3d 787, 790 (2d Cir. 1996).  Additionally, New York law precludes a claim for intentional infliction of emotional distress if the conduct underlying the claim falls within the purview of traditional tort liability. *Sankar v. City of N.Y.*, 867 F. Supp. 2d 297, 314 (E.D.N.Y. 2012).  Because the plaintiff's intentional infliction of emotional distress claim is "subsumed" by his state law malicious

prosecution claim, summary judgment is granted on the plaintiff's claim for intentional infliction of emotional distress.  *See id.*

## V.    Qualified Immunity

The doctrine of qualified immunity shields law enforcement officials from civil liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Second Circuit has ruled that qualified immunity is justified in part by the risk that "fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."  *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006).

Arresting officers are entitled to qualified immunity on malicious prosecution claims if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," or because it "was 'objectively reasonable' for [them] to believe that [their] actions were lawful at the time of the challenged act."  *Betts v. Shearman*, 751 F.3d 78, 82–83 (2d Cir. 2014).  "The issue of 'reasonableness' for purposes of probable cause is distinct from the issue of 'reasonableness' for purposes of qualified immunity."  *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 38 (E.D.N.Y. 2015).  The Second Circuit has set out this standard, which is referred to as "arguable probable cause," as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law.  [I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.

*Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (emphasis in original) (internal quotation marks and citations omitted).  At summary judgment, a police officer is entitled to

qualified immunity if the undisputed facts and all permissible inferences favorable to the plaintiff establish that officers of "reasonable competence could disagree" on whether probable cause existed. *McClellan v. Smith*, 439 F.3d 137, 148 (2d Cir. 2006).

At a minimum, even if Detectives Solomeno and Gillen had some doubts as to the accuracy of Carter's lineup identification, or as to Sanchez's assertion that the plaintiff threatened her, they would be protected by qualified immunity, because Carter and Sanchez's identifications provided at least arguable probable cause to believe that the prosecution against the plaintiff would result in conviction. *O'Brien*, 2013 WL 1234966, at *11.

## VI. *Monell* Claims Against the City

The plaintiff sets out two claims against the City of New York. First, the plaintiff asserts that the Queens County District Attorney's Office had a policy or practice of failing to provide witness protection information to defense counsel. Second, the plaintiff contends that the Queens County District Attorney's Office had a practice of not disciplining assistant district attorneys for improper summation remarks. The defendants move for judgment on the pleadings on the grounds that the plaintiff cannot state a claim for municipal liability for conduct by the District Attorney's Office.[75]

Municipalities may be sued directly under Section 1983 for constitutional deprivations caused by a "governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Id.* Unless the plaintiff demonstrates that his constitutional rights were violated by "persons for whose conduct

---

[75] Discovery on *Monell* liability has been stayed, and there has been no discovery on the question of the existence of a policy or practice that caused the plaintiff to be deprived of a constitutional right. Thus, the defendant cannot move for summary judgment on this issue. *See* Fed. R. Civ. P. 56(d).

the municipality can be responsible, there is no basis for holding the municipality liable." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).

### A. City of New York as a Defendant

Under New York law, the City cannot be liable for the Queens County District Attorney's Office's decisions regarding prosecution. *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1153 n.14 (2d Cir. 1995) (finding no municipal liability for acts of an assistant district attorney if not related to the management of the office or arising from a long history of negligent disciplinary practices). This is because "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State" and not the municipality. *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988); *see also Miller v. Cty. of Nassau*, 467 F. Supp. 2d 308, 316 (E.D.N.Y. 2006) (Plea bargaining is intertwined with prosecutorial decisions regarding prosecution and trial. As a result, the County cannot be held liable for a plea bargaining policy of the District Attorney."); *Jones v. City of N.Y.*, 988 F. Supp. 2d 305, 314 (E.D.N.Y. 2013) ("While, the City is a properly named interested party, it is not itself liable for the conduct of the district attorney in failing to properly train his assistants with respect to specific aspects of prosecuting criminals.").

By contrast, a district attorney acts as municipal policymaker when he or she "acts as the manager of the district attorney's office." *Pinaud*, 52 F.3d at 1153 n.14; *Walker v. City of N.Y.*, 974 F.2d 293, 301 (2d Cir. 1992); *see also Jones*, 988 F. Supp. 2d at 316 ("With respect to building management, maintenance decisions, or discrimination against employees, for example, the district attorney can be considered a municipal actor.").

To the extent that the plaintiff asserts that the alleged practices of the District Attorney are administrative in nature, and not related to his prosecutorial function, his argument fails; the

Supreme Court in *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), held that matters of supervision and training related to the prosecutor's basic trial advocacy responsibilities are prosecutorial, not administrative.[76] *Van de Kamp*, 555 U.S. at 345–48. Specifically, in *Van de Kamp*, the plaintiff asserted that the district attorney's office management failed to train and supervise their line prosecutors on the disclosure of impeachment material to defendants, and failed to implement a system to access that information. *Id.* at 344. The Court held that these responsibilities are distinct from "administrative duties concerning . . . workplace hiring, payroll administration, the maintenance of physical facilities, and the like." *Id.* Further, the Court reasoned that the supervisory liability claims hinged upon underlying misconduct by the line prosecutors, who were entitled to absolute immunity. *Id.*

In light of the Supreme Court's decision in *Van de Kamp*, acts taken in connection with a prosecutor's "basic trial advocacy and prosecutorial duties—including *Brady* decisions—should . . . be treated as 'prosecutorial conduct.'" *Jones v. City of N.Y.*, 988 F. Supp. 2d 305, 317 (E.D.N.Y. 2013); *see also Norton v. Town of Brookhaven*, 33 F. Supp. 3d 215, 244 (E.D.N.Y.), *on reconsideration*,[77] 47 F. Supp. 3d 152 (E.D.N.Y. 2014); *Scalpi v. Town of E. Fishkill*, No. 14-cv-2126-KMK, 2016 WL 858955, at *6 n.7 (S.D.N.Y. Feb. 29, 2016) ("courts in the Second Circuit have routinely held that a municipality cannot be held liable for a district attorney's

---

[76] The Supreme Court's decision in *Van de Kamp* did not, as the defendants suggest, remove municipal liability for the managerial policies of a county district attorney's office. *See Norton v. Town of Islip*, No. 04-cv-3079-NGG-WDW, 2009 WL 804702, at *28 (E.D.N.Y. Mar. 27, 2009) (Section 1983 liability extends to a municipality where a county District Attorney's Office failed to supervise or train), *rev'd in part on other grounds*, 378 F. App'x 85 (2d Cir. 2010); *see also Connick v. Thompson*, 563 U.S. 51, 71 (2011) (policymaker for the district attorney's office was not liable for failing to train prosecutors to avoid *Brady* violations because plaintiff did not prove a pattern of similar violations). Instead, *Van de Kamp* held that in cases alleging failure to train and properly supervise, supervisory prosecutors were entitled to absolute immunity. *Van de Kamp*, 555 U.S. at 345–48.

[77] On reconsideration, the Honorable Arthur Spatt reinstated the declaratory judgment claim for municipal liability against the County because the Honorable Nicholas Garaufis, in a related case, held that the alleged policy or custom addressed the interlocking relationship between two tiers of government, and thus was administrative, rather than prosecutorial. *Norton v. Town of Brookhaven*, 47 F. Supp. 3d 152, 162 (E.D.N.Y. 2014). For that reason, Judge Spatt concluded that the *Monell* claim could proceed against the municipality. *Id.*

prosecutorial decisions"), *appeal dismissed* (June 3, 2016); *Dettelis v. Cty. of Cattaraugus*, No. 14-cv-1096A-SR, 2016 WL 1729554, at *6 (W.D.N.Y. Mar. 31, 2016), *report and recommendation adopted*, No. 14-cv-1096-A, 2016 WL 1728771 (W.D.N.Y. Apr. 29, 2016); *cf. Norton v. Town of Islip*, No. 04-cv-3079-NGG-WDW, 2009 WL 804702, at *25–27 (E.D.N.Y. Mar. 27, 2009), *rev'd in part on other grounds*, 378 F. App'x 85 (2d Cir. 2010).

Here, the plaintiff raises two challenges: the disclosure of the benefits offered to witnesses as part of protecting the witnesses, and appropriate training on summation comments. Both are inextricably linked to prosecuting a criminal matter. Because the conduct about which the plaintiff complains was prosecutorial, the City of New York is not the proper defendant. Accordingly, the *Monell* claims against the City are dismissed as a matter of law.

### B. Failure of Proof of Underlying Constitutional Violation

Even if the City were the proper defendant for purposes of the plaintiff's *Monell* claims, the claims could not survive summary judgment, because the plaintiff has not established that the prosecutor withheld details about Sanchez's relocation, or that the prosecutor's comments in summation deprived the plaintiff of a constitutional right.

Liability under Section 1983 arises when a municipality created a custom or policy that violated a plaintiff's constitutionally protected rights, and pursuant to that practice, a municipal actor tortiously injured the plaintiff. *Askins*, 727 F.3d at 253. *Monell* did not craft an independent cause of action under which a plaintiff may bring suit over a governmental practice, "regardless of whether he suffered the infliction of a tort resulting from the policy." *Id.* Consequently, in order for the plaintiff to prevail on his claims against the municipality, he must demonstrate that there is a triable question of whether his constitutional rights were violated.

*i.  Disclosure of Witness Protection Information*

As discussed above, a true *Brady* claim has three components: "The evidence at issue must be favorable to the accused, . . . that evidence must have been suppressed by the State, . . . and prejudice must have ensued."  *Poventud v. City of N.Y.*, 750 F.3d 121, 133 (2d Cir. 2014) (citation omitted).  In order to prove prejudice, the plaintiff must establish that the evidence was material; in other words, the plaintiff must demonstrate that the "evidentiary suppression undermines confidence in the outcome of the trial."  *Fappiano*, 640 F. App'x at 118.  However, "materiality does not depend on factual innocence, but rather what would have been proven absent the violation."  *Poventud*, 750 F.3d at 134.

The plaintiff contends that prosecutors promised Sanchez "thousands of dollars in direct payments, free housing for an indefinite period, and assistance relocating to subsidized housing," and then withheld this information from the plaintiff's criminal defense attorney.  This characterization distorts the record evidence.

Before Linda Sanchez testified at the trial, the prosecutor advised the court and counsel that the District Attorney's Office was "relocating" Sanchez because of the plaintiff's threats.  Sanchez testified that she received $50 from the Queens County District Attorney's Office before appearing in court, that she was told she would get $50 more, and that she received $25 per day.  She agreed that she was staying overnight in a "different location,"[78] but did not explain that the Queen's District Attorney's Office had also paid for her hotel.  In summation, the

---

[78] There was no testimony that Sanchez was in a witness protection program or that she was moved because of the plaintiff's threats.  Any criminal defense lawyer would have objected that such evidence was unfairly prejudicial.  *Penick*, 144 F. Supp. 2d at 157 (defense counsel might reasonably have concluded that the value of the argument that the witness invented her story "was far outweighed by the prejudice of opening the door to testimony regarding the reason for protective custody.")

plaintiff's defense counsel argued that she was not credible because she only testified that the plaintiff had threatened her in order to receive assistance from the District Attorney's Office.

There is no evidence that the prosecutor withheld any information about what his office was doing for Sanchez. He told counsel that the District Attorney's Office was relocating her, which obviously implied that the Office was paying for her lodging, and that she was being given a daily expense allowance. Sanchez testified about these payments, and was cross-examined about them. To the extent that the District Attorney's Office continued to assist Sanchez with relocation expenses—the first month's rent, security, or brokerage fee—these benefits did not arise until *after* the plaintiff's trial, and did not affect the trial itself. *Penick v. Filion*, 144 F. Supp. 2d 145, 157 (E.D.N.Y. 2001) (evidence cited as part of the *Brady* claim that did not arise until after the trial "would have had no effect on the trial itself."). Under the circumstances, there was no *Brady* violation, and the plaintiff was not denied a fair trial.

### ii. Summation Remarks

The plaintiff maintains not only that ADA Guy's comments in summation deprived him of a fair trial, but that the Queen's County District Attorney's Office had a policy of ignoring prosecutorial misconduct in summation, and that they failed to train and discipline prosecutors that crossed the line in summation. However, the plaintiff cannot establish that the prosecutor's summation deprived him of a constitutional right, and thus, the summation cannot form the basis of a *Monell* claim.

A person is deprived of a fair trial only if, among other things, there was a constitutional violation, which was "likely to influence a jury's decision." *Jovanovic*, 486 F. App'x at 152.

The plaintiff isolates passages from ADA Guy's summation, which he claims were prejudicial or inflammatory. These include: 1) responses to defense counsel's attacks on Linda

Sanchez's credibility; 2) comments on Andrew Carter's testimony; 3) arguments undercutting the plaintiff's alibi; 4) comments on Veronica Walker's testimony; and 5) certain rhetorical flourishes.

A "court must consider remarks in a summation in their entirety, not in isolation." *Guzman v. Jay*, 303 F.R.D. 186, 194 (S.D.N.Y. 2014). This is because isolated statements made by prosecutors in their summations, "even if seemingly improper, do not necessarily exceed 'the broad range of rhetorical comments allowed in closing arguments.'" *Jones v. Poole*, No. 06-cv-15, 2008 WL 2828836, at *8 (W.D.N.Y. July 21, 2008) (quoting *Harper v. Kelly,* 704 F. Supp. 375, 379 (S.D.N.Y. 1989), *rev'd on other grounds*, 916 F.2d 54 (1990)). In this case, the prosecutor's comments were garden variety summation comments, almost none of which prompted any objection. Thus, the prosecutor stressed that the critical issue in the case was identification; he also responded to defense counsel's arguments about Carter's identification, the alibi, and the timing of the murder.

Even if the prosecutor's remarks were improper—and I do not find that they were—the plaintiff must establish that the alleged violation was "likely to influence a jury's decision." *Jovanovic*, 486 F. App'x at 152. The plaintiff's argument that the summation included "more than a dozen" misleading and inflammatory comments—that were not responsive to the defense summation, and deprived Bellamy of a fair trial—is "seriously undercut" by counsel's "failures to lodge a contemporaneous objection" and to raise the issue on appeal or in the plaintiff's habeas petition. *Guzman*, 303 F.R.D. at 195. Significantly, the plaintiff's defense lawyer registered only one objection—to the prosecutor's argument that the plaintiff crafted an alibi to cover the time of the murder. There was nothing improper about this argument. In any event, the judge, whose instructions the jury is presumed to have followed, gave comprehensive

instructions—on the burden of proof, including the prosecutor's burden to disprove the plaintiff's alibi, and that the parties' comments in summation were not evidence. Under the circumstances, the plaintiff has not established a violation of his constitutional rights.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted in its entirety, and the claims against the individual defendants are dismissed. The *Monell* claims against the City of New York are dismissed as a matter of law. Thus, the action is dismissed in its entirety.

**SO ORDERED.**


/s/ Ann M. Donnelly
_____

Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
      May 17, 2017